Bradley Austin
Nevada Bar No. 13064
Snell & Wilmer
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
702-784-5247
baustin@swlaw.com

Nowell D. Bamberger
(pro hac vice forthcoming)
Matthew C. Solomon
(pro hac vice forthcoming)
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037
202-974-1500
nbamberger@cgsh.com
msolomon@cgsh.com

*Attorneys for North American Derivatives
Exchange, Inc. d/b/a Crypto.com | Derivatives
North America*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| North American Derivatives Exchange, Inc. d/b/a Crypto.com \| Derivatives North America,<br><br>          Plaintiff,<br><br>    v.<br><br>Kirk D. Hendrick, in his official capacity as Chairman of the Nevada Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada Gaming Control Board; Chandeni K. Sendall, in her official capacity as a Member of the Nevada Gaming Control Board; the State of Nevada on relation of the Nevada Gaming Control Board; Aaron D. Ford, in his official capacity as Attorney General of Nevada,<br><br>          Defendants. | Case No.:<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |

1

**INTRODUCTION**

1.       North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America ("CDNA") seeks declaratory and injunctive relief to restrain efforts by the Nevada Gaming Control Board ("NGCB") to improperly block CDNA from offering the trading of derivative contracts that reference sporting events on its federally regulated market.

2.       Nevada has purported to assert jurisdiction over CDNA, a federally regulated designated contract market ("DCM"), on the mistaken premise that contracts traded on the DCM constitute "wagering on sporting events" subject to Nevada gaming laws.

3.       But the NGCB has no authority to regulate, let alone prohibit, derivatives trading offered by a federally regulated DCM operating pursuant to federal law.

4.       Congress expressly conferred "exclusive jurisdiction" over DCMs and the products they make available for trading to the U.S. Commodity Futures Trading Commission ("CFTC") to ensure a uniform national derivatives market.  7 U.S.C. § 2(a)(1)(A).  Amendments to the Commodity Exchange Act ("CEA") have reinforced this decision, with Congress affirmatively excluding state authorities like the NGCB from playing any role in overseeing contracts traded on federally regulated derivatives exchanges.  *See infra* ¶¶ 29-32.

5.       Chief Judge Andrew P. Gordon of this Court has already recognized the preemptive effect of the CEA on state gaming law as it relates to a similarly situated DCM.  On April 9, 2025, Chief Judge Gordon enjoined the NGCB from regulating a federally registered DCM—KalshiEX, LLC ("Kalshi")—that offers derivatives nearly identical to those at issue here.  Chief Judge Gordon recognized the preemptive effect of federal law over Nevada gaming law based on the CEA's "plain and unambiguous language" granting the CFTC exclusive jurisdiction over these contracts.  *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *5 (D. Nev. Apr. 9, 2025) (hereinafter "*Kalshi v. Hendrick*").

6.       On April 28, 2025, Judge Edward S. Kiel of the U.S. District Court for the District of New Jersey similarly enjoined state gaming authorities in New Jersey from taking enforcement action against Kalshi and agreed with Chief Judge Gordon's assessment of jurisdiction relative to

Kalshi's federally regulated DCM, finding that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and field preemption therefore applies. *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) (hereinafter "*Kalshi v. Flaherty*"). No court has reached a contrary conclusion.

7.      Federal courts have consistently recognized that the CFTC's regulation of the national derivatives market is exclusive and preempts state involvement.[1]

8.      CDNA has operated as a federally regulated DCM since 2004. All of its products are certified pursuant to the CEA and established CFTC rules and are offered in compliance with CFTC regulations, including standards for contract specifications, market integrity, and trader protections. As a CFTC-registered self-regulatory organization, CDNA also administers a comprehensive market regulation program, functioning in a regulatory capacity to oversee trading in its markets. This program is subject to CFTC oversight and has been reviewed and approved by the CFTC.

9.      Among CDNA's offerings are "event contracts" defined by the CEA and the CFTC as derivatives or swaps whose returns depend on the outcome of a specified event.[2] At issue here

---

[1]      *See, e.g., Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1055−57 (9th Cir. 2003) (finding the CEA preempted California's Bucket Shop Law as applied to swaps exempted from coverage by the CEA); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 560, 563−64 (6th Cir. 1998) (noting that "[f]utures trading is conducted on exchanges designated as contract markets by the [CFTC], an independent agency created by Congress in 1974 to exercise *exclusive jurisdiction* over accounts, agreements, and transactions involving commodities futures contracts traded or executed on a contract market" (emphasis added) and holding that the CEA conflict preempted a Nevada statute that required payment to investors of any interest earned on collateral because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA"); *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1155−56 (7th Cir. 1992) (holding the CEA preempted state law whose application "would directly affect trading on or the operation of a futures market"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (holding CEA "preempts the application of state law" to futures trading); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (affirming dismissal of a claim that trading in futures contracts violated Georgia gambling statute "on the ground that the Commodity Exchange Act preempts all state laws inconsistent with its provisions").

[2]      *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, Commodity Futures Trading Commission, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane.

are "Sports Event Contracts," with return profiles dependent on the outcome of a live sporting event.

10.     In granting the CFTC exclusive jurisdiction over DCMs and the contracts traded on them, Congress authorized the agency to review certain event contracts and prohibit them if it determines that their trading would be contrary to "the public interest."  7 U.S.C. § 7a-2(c)(5)(C). The CFTC has adopted a 90-day review process for assessing whether an event contract should be suspended as contrary to public interest.  17 C.F.R. § 40.11.  None of the contracts listed on CDNA's market are currently under such review by the CFTC, and none of the Sports Event Contracts offered for trading on CDNA have been prohibited.

11.     Despite CDNA having complied with federal requirements for listing its Sports Event Contracts, and despite Chief Judge Gordon having enjoined the NGCB from enforcing state law against a similar DCM trading substantially similar contracts in April, the NGCB asserts that CDNA offering certain contracts in Nevada constitutes a "violation of Nevada law."  *See* May 20, 2025 NGCB Cease-and-Desist Letter, attached hereto as Ex. A, at 2.  The NGCB has ordered CDNA to cease offering them under threat of "criminal and civil penalties."  *Id.*  The NGCB has declined CDNA's attempts to discuss the matter.  NGCB Correspondence, attached hereto as Ex. B, at 1.

12.     Congress has fully occupied the field of regulating federally registered derivatives markets, thereby preempting any conflicting state laws.  Because CDNA's Sports Event Contracts are lawfully traded on a CFTC-registered DCM, federal law overrides state licensing or registration conditions that might otherwise apply, including those cited by the NGCB.  To the extent Nevada law conflicts with the CEA's framework, it is preempted under the Supremacy Clause of the U.S. Constitution.

13.     The NGCB's threatened enforcement action poses a direct and imminent threat to CDNA's business and its users.  Halting CDNA's Sports Event Contracts would cause immediate and irreparable harm to CDNA and disrupt the comprehensive federal framework that places CDNA exclusively under the CFTC's supervision.

14.     A declaratory judgment and injunction are necessary to prevent further unlawful intrusion by the NGCB into a market it has no legal authority to regulate.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution and the laws of the United States—specifically, whether Nevada gaming laws are preempted by the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, as applied to CDNA's Sports Event Contracts.  The Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to declare the rights and legal relations of the parties.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 1391(b)(2).  The individual defendants perform their duties and thus reside in this District.  The Nevada Gaming Control Board is an entity subject to this Court's personal jurisdiction and thus resides in this district.  A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

17.     Plaintiff North American Derivatives Exchange, Inc., doing business as Crypto.com | Derivatives North America, is a financial services company with its principal place of business in Chicago, Illinois.  CDNA operates a DCM and Derivatives Clearing Organization ("DCO") regulated by the CFTC under the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, where users can trade financial products, including Sports Event Contracts.

18.     Defendant Kirk D. Hendrick is sued in his official capacity as the Chairman of the Nevada Gaming Control Board.

19.     Defendant George Assad is sued in his official capacity as a Member of the Nevada Gaming Control Board.

20.     Defendant Chandeni K. Sendall is sued in her official capacity as a Member of the Nevada Gaming Control Board.

21.     Defendant, In the Name of the State of Nevada, on relation of the Nevada Gaming Control Board is sued as the independent state agency that (1) promulgates rules and regulations

for the licensing and operating of gaming in the state of Nevada, (2) establishes the rules and regulations for all tax reports that gaming licensees submit to the state, and (3) enforces state laws and regulations governing gaming through its six divisions, namely Administration, Audit, Enforcement, Investigations, Tax and License, and Technology.[3] In certain circumstances, for violations of the Nevada gaming laws, the Nevada Gaming Control Board "may recommend to the Attorney General that the Attorney General file a complaint or information or present the matter to a grand jury . . . and thereafter proceed as appropriate to complete the prosecution." *See* Nev. Rev. Stat. ("NRS") § 463.3465.

22. Defendant Aaron D. Ford is sued in his official capacity as Attorney General of Nevada.

## FACTUAL ALLEGATIONS

23. Defendants' attempt to regulate the trading of Sports Event Contracts listed on CDNA's federally regulated DCM is preempted by federal law and is unlawful. CDNA is entitled to a judicial declaration that its activities are not subject to Defendants' oversight, regulation, or jurisdiction, as well as an injunction barring the Defendants from any future enforcement efforts.

### A. The Commodity Futures Trading Commission Has Exclusive Jurisdiction to Regulate Derivatives Contracts on Federally Registered Markets.

24. Derivatives are financial instruments used to allocate risk between counterparties. The archetypal example is a grain futures contract, which allows buyers to lock in prices and manage volatility in agricultural markets by agreeing to buy or sell a specified amount of the crop at a fixed price on a future date.

25. As financial markets have matured, the category of derivatives has expanded significantly beyond futures based on agricultural commodities, enabling participants to hedge against volatility across a wide array of tangible and intangible areas, including commodities like gold, financial benchmarks such as interest rates, and even weather or credit risk. In principle,

---

[3] *About Us,* Nevada Gaming Commission and the Nevada Gaming Board, https://gaming.nv.gov/about/home/.

nearly any form of risk—economic, environmental, or event-driven—can be hedged if a CFTC-regulated market exists and a contract is available.

26.     For more than a century, the federal government has exercised its authority to regulate national derivatives markets in order to promote uniformity and integrity in national trading.

27.     Before the adoption of the CEA and its predecessor, the 1922 Grain Futures Act, futures contracts were often viewed with suspicion by state legislatures.  Because these markets necessarily involve the exchange of money tied to uncertain outcomes, some states equated them to gambling and sought to restrict or prohibit their use.  This led to a disjointed and often conflicting state-by-state approach.

28.     The CEA, enacted in 1936, was intended to replace the fragmented system of state oversight with a uniform federal framework for regulating futures markets.  It extended federal authority beyond grain to a broader class of commodities and created the Commodities Exchange Authority, a division within the Department of Agriculture charged with monitoring trading practices and prosecuting price manipulation.  But the CEA did not initially establish an independent federal agency to comprehensively regulate the nation's derivatives markets.  As markets grew more complex, lawmakers and industry participants became concerned that the lack of centralized enforcement would invite states to regulate futures trading on their own, leading to inconsistent standards across jurisdictions.

29.     In response, Congress enacted sweeping amendments to the CEA in 1974 (the "1974 Act"), which established the CFTC as an independent federal agency charged with regulating the national derivatives markets.  To eliminate the threat of conflicting state regulation, Congress expressly granted the CFTC "exclusive jurisdiction" over derivatives trading on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).

30.     Proponents of the 1974 Act warned that, absent a single national regulator, "states . . . might step in to regulate the futures markets themselves," subjecting national exchanges to "conflicting regulatory demands."  *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1145,

1155–56 (7th Cir. 1992). As one Senator put it, "different State laws would just lead to total chaos." *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93rd Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). The House Agriculture Committee stressed the need to bring "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). To that end, the Senate deliberately removed a provision of the CEA that would have preserved state regulatory authority "in order to assure that [f]ederal preemption is complete." *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

31. Congress's intent to vest the CFTC with exclusive authority over derivatives markets is further demonstrated by subsequent amendments to the CEA, including the 1992 Futures Trading Practices Act ("FTPA"). That law authorized the CFTC, in order to promote innovation, to exempt certain financial instruments from the requirement that they be traded on a registered exchange. 7 U.S.C. § 6(c). Because the preemption provision in § 2 applies only to derivatives traded on CFTC-registered markets, Congress included a separate provision in the FTPA explicitly preempting "any State or local law that prohibits or regulates gaming" with respect to any agreement, contract, or transaction exempted from the exchange-trading requirement. 7 U.S.C. § 16(e)(2). This provision extended the scope of federal preemption to off-exchange transactions under the CFTC's oversight, reinforcing Congress's intent to create a comprehensive and uniform federal framework for derivatives regulation.

32. The creation of the CFTC and the centralization of derivatives market regulation within a single independent federal agency reflect a clear exercise of Congress's authority to regulate interstate commerce and establish consistent national rules. As mandated by the CEA, which was significantly amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), the CFTC has adopted regulations setting out "Core Principles" that DCMs must follow. For example, one Core Principle requires DCMs to offer impartial access to their markets and services to users across the country. *See* 17 C.F.R. §

38.151(b). Compliance with a patchwork of differing state regulations would undermine this obligation and make it impossible for DCMs like CDNA to comply with the CFTC's impartial access rule.

33. Congress's decision to create a national market for derivatives products reflected a federal policy choice to permit their trading even if individual states might have preferred to prohibit them. Since their inception, derivatives contracts have been the subject of ongoing debate over whether they should be treated as a form of gambling, with some arguing that they should only be permitted where a party to a contract has actual exposure to an underlying commercial risk they are attempting to hedge.

34. But Congress and the CFTC have entirely rejected this approach. Instead, the federal policy has been to recognize the legitimacy of speculative trading and its role in supporting market liquidity. As one scholar observed, this reflects a federal commitment to "acknowledge the legitimacy of futures contracts" and "the need for speculative capital to provide liquidity to the markets." William L. Stein, *The Exchange-Trading Requirement of the Commodity Exchange Act*, 41 Vand. L. Rev. 473, 477 (1988).

35. Congress's longstanding policy of permitting broad market participation is integral to the healthy functioning of these markets. Restricting financial derivatives to participants with a direct risk in the outcome would diminish liquidity, impair price discovery, and undermine the market's essential role in allocating and managing risk. *Id.* at 482–485 (describing the policy rationale behind restricting futures trading to designated exchanges).

36. As the Seventh Circuit has recognized, "a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties." *Am. Agric. Movement*, 977 F.2d at 1156.

**B. Event Contracts Are Exchange-Traded Financial Instruments Used for Allocating Risk.**

37.    Event contracts are exchange-traded financial instruments, known as a derivative or swap, that facilitate risk allocation to specified outcomes of underlying future events. *See* 7 U.S.C. § 1(a)(47) (defining "swap").

38.    Event contracts typically involve two potential outcomes, represented by "yes" or "no" positions. A trader who takes an event contract with the "yes" position profits if the specified outcome occurs by the expiration date, while the "no" position purchaser profits if it does not. An active position may also be closed at a profit or loss prior to the occurrence or non-occurrence of the specified event.

39.    An event contract might be tied to specified movements of a financial index or a real-world event. For example, an event contract could be tied to changes in the yield on the 10-year U.S. treasury note, the magnitude of the upcoming hurricane season, or to the outcome of political, scientific or live sporting events. But, outside of providing the CFTC authority to prohibit specifically enumerated event contracts that it subsequently determines are contrary to the public interest, the CFTC does not purport to define what events are or are not properly the subject of event contracts. Rather, the regulatory approach that Congress has directed and that the CFTC has pursued is to allow the market to define the nature of the events on which parties wish to contract.

40.    The price of an event contract is determined by market forces, namely the supply and demand for entering into the "yes" and "no" positions of the contract. An event contract has a set expiration date, and the price of an event contract will fluctuate along with the market's perception of the likelihood of an event's occurrence until settling at a final price on the expiration date.

41.    The operator of a DCM on which event contracts are traded facilitates their trading by matching counterparties to each other. Unlike casinos, a DCM that lists an event contract does not act as a "bookmaker." It does not take opposing positions or set odds. Instead, it facilitates a

neutral, transparent marketplace where prices are established openly among participants based on supply and demand.

42.     Event contracts allow market participants, including those with a financial stake in the outcome of a particular event, to hedge against related risks.  These contracts have become a valuable risk management tool because they are linked to real-world events with commercial consequences and offer public utility by reflecting the market's aggregated expectations about whether those events will occur.  Event contracts where the underlying event is a sporting event may be used to hedge this type of risk across a variety of commercial scenarios, including:

a. Media and broadcasting companies that face financial exposure tied to viewership, which can fluctuate significantly depending on how competitive or compelling a game is;

b. Retailers that sell team merchandise or apparel who see major swings in sales depending on whether a popular team advances or whether a player affiliated with their brand wins a championship;

c. Travel and hospitality businesses that experience spikes in bookings if a local team advances or hosts a high-profile event, creating exposure to outcomes they cannot control;

d. Consumer goods companies, especially in the food and beverage industry, that run promotions tied to game results.  These campaigns, while effective for marketing, can carry substantial liabilities if the promotional conditions are met.  Advertisers and retailers offering giveaways or rebates based on a team's success face similar exposure and may seek to hedge that risk as well; and

e. Fantasy sports platforms and sports data providers that rely on fan engagement and player performance, where a dull game or early elimination of a key player can significantly reduce user participation and revenue.

43.     These are just a few examples, but they underscore a broader point:  Many businesses across diverse industries have meaningful financial exposure to the outcomes of sporting events and may seek to manage that risk through event contracts.

### C.  The CEA and CFTC Regulations Establish a Comprehensive Federal Regulatory Framework for Trading in Event Contracts and Other Derivatives.

44.     The federal regulatory framework governing DCMs and the trading of derivatives contracts on them is longstanding, comprehensive, and well-established.

45.     To offer derivatives for public trading, an entity must obtain designation from the CFTC as a contract market.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).

46.     To receive this designation, an applicant must submit detailed materials demonstrating compliance with the CEA's Core Principles.  17 C.F.R. § 38.3(a)(2).  This requires it to show it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation.  17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.  Prospective contract markets must also provide information demonstrating their capacity to maintain and evidence continued adherence to the CEA.  17 C.F.R. § 38.3(a)(2).

47.     If approved by the CFTC and granted designation as a contract market, a DCM becomes subject to an extensive federal regulatory framework administered by the CFTC.  DCMs are required to meet a wide range of ongoing regulatory obligations to remain in good standing, including: prescriptive capital and liquidity requirements, participant eligibility requirements, reporting obligations, recordkeeping requirements, and numerous operational and governance standards directed toward compliance with the CEA and its Core Principles.  17 C.F.R. §§ 38.604, 38.1051(i), 38.950, 1.31; 38.450, 38.451, pt. 16; 7 U.S.C. § 7(d); *see generally* 17 C.F.R. pt. 38.

48.     Moreover, because of the breadth and depth of the regulatory framework applicable to a DCM, a market that has earned the CFTC's designation is granted the status of a self-regulatory organization under federal law.  As such, DCMs are entrusted with front-line responsibilities for establishing rules and enforcing their compliance, detecting and preventing market abuses, and ensuring the integrity of their listed products and intermediaries.  *See* 17 C.F.R. §§ 1.3; pt. 38.

49.     As a registered DCM and self-regulatory organization, CDNA is permitted to list derivatives for trading without obtaining the CFTC's prior approval for each individual contract. However, it must adhere to product-related regulatory standards and certify that each new contract complies with applicable law by filing a written certification with the CFTC prior to the time of listing.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).

50.     Written certifications are subject to CFTC regulation, and the CFTC may initiate a formal review of any submitted contract under its authority.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §§ 40.2, 40.11(c).  After a stipulated period of time, if the CFTC does not take action, the contract is deemed "effective" and may be listed on the DCM for trading.  *See* 7 U.S.C. § 7a-2(c); *see also* 17 C.F.R. § 40.2 (outlining the process for listing products for trading by certification).

51.     The Sports Event Contracts at issue in this case have all been certified and deemed "effective."  *See infra* ¶¶ 66-68.

**D.  The CFTC's Enforcement Authority over DCMs and Its Power to Prohibit Contracts Contrary to the Public Interest.**

52.     In addition to regulatory oversight authority, the CFTC possesses exclusive and comprehensive enforcement powers with respect to DCMs, their intermediaries, and market participants.

53.     The CFTC's Division of Enforcement may initiate investigations and, with the approval of a majority of the Commission, bring enforcement actions in federal court or through administrative proceedings.  *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3.  If the Division concludes that a violation of the CEA has occurred, it may recommend the

Commission pursue a broad range of remedies, including civil monetary penalties, restitution, and disgorgement, as well as the suspension, denial, revocation, or restriction of registration and trading privileges. *Id.* The Commission may also pursue injunctive relief, including cease-and-desist orders, and can refer criminal violations to the Department of Justice for prosecution. *Id.*

54.    The scope of the CFTC's authority extends not only to market participants, but also to the types of derivatives products traded on DCMs. The Commission regulates a broad range of derivatives, including those based on physical commodities like wheat, cotton, rice, corn, and oats, as well as "excluded commodities" that are not tangible such as interest rates, financial instruments, economic indices, risk metrics, and events. 7 U.S.C. § 1a(9), (19)(i)–(iv).

55.    The CFTC regulates event contracts, including the Sports Event Contracts at issue here, as a subcategory of derivatives that reference an "excluded commodity." *See id.* § 1a(47)(A)(ii), (iv), (vi). "Event contracts" are defined broadly under the CEA as relating to any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. 7 U.S.C. § 7a-2(c)(5)(C)(i); § 1a(19)(iv).[4]

56.    In 2010, the Dodd-Frank Act amendments to the CEA also specifically addressed event contracts. The amended statute created a "Special Rule" for event contracts that granted the CFTC discretionary authority to determine whether specific event contracts are "contrary to the public interest" and prohibit them from trading on DCMs.

57.    This discretionary authority applies where, in the CFTC's determination, a contract references an underlying activity that falls into one of several specifically enumerated categories listed in the CEA that may warrant further review as to whether allowing them to trade would be in the public interest. These categories include contracts that reference terrorism, assassination, war, gaming, activity that is unlawful under federal or state law, or other similar activity, and is contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

---

[4]    Events themselves are an excluded commodity under the CEA. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

58.    This Special Rule does not require the CFTC to disallow event contracts referencing these underlying activities, but grants the agency the discretion to conduct a public interest review based on its own criteria.

59.    The CFTC's authority is focused not on the terms of the event contract itself, but on the nature of the underlying event.  While federal law generally authorizes the trading of event contracts, the CFTC may prohibit contracts from being listed or traded on DCMs where the referenced activity (*i.e.*, the "excluded commodity") "involves, or relates to" specifically enumerated conduct that the CFTC determines to be contrary to the public interest.  17 C.F.R. § 40.11.

60.    This framework reflects a deliberate policy choice:  Congress did not authorize or delegate to states the power to override or nullify federal authorization of event contracts by deeming them unlawful under state law.  Rather, Congress granted the CFTC exclusive authority to establish the criteria and process for assessing whether a referenced activity should be disallowed from underlying an event contract trading on national derivatives markets as contrary to the public interest.

61.    Pursuant to this authority, the CFTC has promulgated regulations that establish procedures by which the CFTC may determine whether trading in a specific contract should be suspended.  17 C.F.R. § 40.11.  This includes placing the contract in a 90-day review period, at the conclusion of which the CFTC may determine a contract as contrary to the public interest and order the DCM to suspend its trading.  17 C.F.R. § 40.11 (c).

62.    The Sports Event Contracts at issue and currently being offered in this case have not been subjected to a 90-day review, have not been determined to be contrary to the public interest, and have not been ordered to be suspended from trading by the CFTC.

**E.  CDNA Is a Federally Regulated DCM That Lists Sports Event Contracts.**

63.    CDNA is a federally regulated DCM that provides a market for trading a variety of derivatives products, including Sports Event Contracts that are based on the outcome of live sporting events.

64.    The CFTC first approved CDNA as a DCM in 2004, confirming that its market complied with the CEA.  In 2010, the CFTC amended its registration, again confirming CDNA's compliance with the CEA.  For two decades, the entity now known as CDNA has operated continuously as a CFTC-regulated market offering event contracts.

65.    As an early entrant in the regulated event contract space, CDNA specializes in event contract trading and has steadily expanded its offerings over time.  Its market provides a secure, federally approved exchange where individual, retail, and institutional participants can hedge risk tied to event-based outcomes.

66.    On January 30, 2025, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. §§ 40.2(a), CDNA certified and announced its intention to list a new category of event contracts: "Industry Event - Live Presentations Contracts."  *See* Jan. 30, 2025 CDNA Certification Ltr. For Industry Event – Live Presentations Contracts, attached hereto as Ex. C, at 1.  These contracts allow users to trade on the outcome of lawful live events in the performing arts, spectator sports, and related industries, provided the users themselves are not participants in the events.  *Id.* at 4-5.

67.    CDNA designed these event contracts "to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises."  *Id.* at 8. Examples include contracts tied to the winner of an award like "Best Picture," the location of a flagship event or ceremony, or the winner of a live sporting event like the Super Bowl.

68.    CDNA's currently listed "Industry Event - Live Presentations Contracts," became effective under the process described in ¶¶ 49-51 on January 30, 2025.  This includes the Sports Event Contracts at issue in this case, which are the subset of CDNA's "Industry Event - Live Presentations Contracts" that reference the outcome of live sporting events.

**F.  The Nevada Gaming Control Board Threatened CDNA with Legal Action for Offering Sports Event Contracts to Nevada Residents.**

69.    Despite having been enjoined by Chief Judge Gordon from enforcing state law against a similar exchange trading substantially similar contracts in April 9, 2025, the NGCB sent

a cease-and-desist order to CDNA on May 20, 2025, signed by Defendant Kirk D. Hendrick in his capacity as Chairman of the NGCB. Ex. A, at 1. The NGCB's letter asserted that CDNA was offering "event-based wagering contracts in Nevada on sporting events through its exchange." *Id.* at 1. The NGCB claimed that offering "event-based wagering contracts is unlawful in Nevada, unless and until approved as licensed gaming by the Nevada Gaming Commission." *Id.* The letter described the NGCB's "strict regulation" requiring "that a person must be licensed to operate a sports pool in Nevada," defining "sports pool" as a person in "the business of accepting wagers on sporting events or other events by any system or method of wagering" under NRS § 463.0193. *Id.*

70.     The NGCB's letter asserted that "by offering event-based wagering contracts in Nevada, [CDNA] is operating as an unlicensed sports pool in violation of NRS 463.160(1)(a) and NRS 463.245(2)" noting that a violation of the former is "a category B felony" under NRS § 463.360(3). *Id.* at 2. The letter further asserted that CDNA's "event-based wagering contracts concerning sporting events" also violate NRS § 463.350 (prohibiting gaming or employment in gaming for persons under 21), NRS § 465.086 (prohibiting unlicensed receipt of compensation for accepting bets or wagers on sporting and other events), and NRS § 465.092 (prohibiting unlicensed acceptance or allowance of acceptance of wagers by any means of communication from a person within Nevada). *Id.* The letter directed CDNA to contact John S. Michela, Senior Deputy Attorney General, with any questions about the letter. *Id.*

71.     The NGCB purported to "order[]" CDNA "to immediately cease and desist from offering in Nevada any event-based wagering contracts concerning sporting events." *Id.* The NGCB ordered CDNA to provide "[w]ritten confirmation" of its compliance with that order by "5:00 p.m. on Wednesday, June 4, 2025," and warned that failure to provide such confirmation would be considered "willful intention to violate Nevada law." *Id.* In the letter, "NGCB, as well as all state and local law enforcement and regulatory agencies in Nevada, expressly reserve[d] all rights to pursue criminal and civil actions based on [CDNA's] past and future conduct within the state." *Id.*

72.    The NGCB's cease-and-desist letter failed to acknowledge CDNA's status as a federally regulated and CFTC-registered DCM and the fact that the activities it seeks to regulate fall squarely within the scope of federal oversight.  It also failed to acknowledge that it had been enjoined by this Court from applying the same state laws against Kalshi.

73.    The NGCB's cease-and-desist letter copied Defendants George Assad and Chandeni Sendall, as well as Kristi Torgerson, Chief of the NGCB Enforcement Division.  The letter also copied Mr. Michela and several other members of Defendant Attorney General Aaron D. Ford's office:  Craig A. Newby, First Assistant Attorney General; Darlene B. Caruso, Chief Deputy Attorney General, Gaming; Jessica E. Whelan, Chief Deputy Attorney General, Complex Litigation; and Alissa C. Engler, Chief Deputy Attorney General.

74.    In response to the letter, counsel for CDNA contacted Mr. Michela by email, per the letter's instructions, requesting a time to discuss the cease-and-desist letter and asking "how the Board intend[ed] to proceed in light of the federal injunction issued in the case involving Kalshi."  Ex. B, at 2.  In response, Mr. Michela indicated that he discussed the matter with his "client, the Nevada Gaming Control Board" and that any response from CDNA to the cease-and-desist letter "should be submitted to the Board Chairman Kirk Hendrick in writing," foreclosing any other method of discussion.  *Id.*, at 1.  With respect to the preliminary injunction issued in *Kalshi v. Hendrick*, Mr. Michela noted only that Chief Judge Gordon "clarified that the preliminary injunction only applies to action against Kalshi."  *Id.*, at 1.

75.    In light of Mr. Michela and the NGCB's refusal to engage in any substantive discussion prior to the date by which Defendants have ordered that CDNA provide "[w]ritten confirmation of [CDNA's] cessation" of activities it considers prohibited, Ex. A, at 2, CDNA had no choice but to promptly seek judicial intervention.

**G.    The NGCB and New Jersey's Gaming Authority Are Enjoined from Enforcing State Gaming Laws Against DCMs Listing Event Contracts.**

76.    Chief Judge Andrew P. Gordon of this Court and Judge Edward S. Kiel of the U.S. District Court for the District of New Jersey have already rejected states' arguments on this issue.

In April, both of those courts considered challenges to threatened state enforcement action against a different federally regulated DCM—Kalshi—that offers event contracts substantially similar to those offered by CDNA. Both courts concluded that state law is preempted due to the CFTC's exclusive jurisdiction over federally regulated DCMs and the event contracts offered thereon.

77.    In *Kalshi v. Hendrick*, the NGCB asserted that Kalshi was engaged in gambling under Nevada law through the offering of event contracts "including, for example, who will win a sporting event or which party will have control over the House of Representatives." 2025 WL 1073495, at *1.

78.    On April 9, 2025, Chief Judge Gordon entered a preliminary injunction enjoining state authorities "from enforcing preempted state laws against KalshiEX LLC" and "from pursuing civil or criminal prosecutions against KalshiEX LLC for offering event-based contracts on a CFTC-designated market." *Id.* at *8.

79.    Chief Judge Gordon's reasoning is equally applicable to this case. Specifically the CEA's "plain and unambiguous language grants the CFTC exclusive jurisdiction" over event contracts trading on DCMs, and "reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *Id.* at *5-*6. Chief Judge Gordon summarized the implications of those holdings as follows:

> In sum, if Kalshi were offering its contracts without CFTC designation, then the defendants could regulate it. But because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted. Nevada regulatory agencies thus have no jurisdiction to decide that Kalshi's conduct violates state law where, at least at present, those activities are legal under federal law.

*Id.* at *6.

80.    As Chief Judge Gordon correctly observed in *Kalshi v. Hendrick,* the question is not whether the event contracts listed by a DCM are "gaming." Rather, the question is whether the entity offering the contracts is a federally regulated DCM that has properly listed the contracts on its market. If so, whether the contracts should be permitted to be made available is a question of federal, not state, law: "[E]ven if Kalshi's sports contracts involve 'gaming,' that would not

subject Kalshi to state gaming laws.  Rather, it would subject Kalshi to the Special Rule that allows the CFTC to conduct a public interest review." *Id.* at *6.

81.    And Chief Judge Gordon recognized that subjecting federally regulated DCMs to a patchwork of inconsistent state regulation would undermine the very objective that exclusive federal regulation of derivatives trading was intended to achieve:

> [D]efendants noted that other States have taken an interest in Kalshi's contracts and have sent or intend to send Kalshi cease-and-desist letters.[5]  But that merely highlights the problem of allowing the States to regulate a national exchange.  It raises the possibility that another State would have different rules than not only [] the CFTC, but other States.  Preventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges.

*Id.* at *7.

82.    The defendants in *Kalshi v. Hendrick* did not appeal Chief Judge Gordon's ruling issuing a preliminary injunction against them.

83.    On April 28, 2025, Judge Edward S. Kiel of the U.S. District Court for the District of New Jersey, in ruling on a "substantially similar motion for preliminary injunction," enjoined the New Jersey Division of Gaming Enforcement from regulating Kalshi's DCM and event contracts.  *Kalshi v. Flaherty*, 2025 WL 1218313, at *4.  The District of New Jersey expressly agreed with the reasoning of Chief Judge Gordon in *Kalshi v. Hendrick* in reaching its conclusion that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and field preemption applies.  *Id.* at *6.  It further noted that:

> The special rule for event contracts states that no agreement, contract, or transaction determined by the CFTC to be contrary to the public interest may be made available on a registered market. *See* 7 U.S.C. § 7a–2(c)(5)(C)(ii).  Therefore, at this stage, Kalshi's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them.

*Id.*

---

[5]    On March 4, 2025, the NGCB sent Kalshi a nearly identical cease-and-desist letter to stop offering its sports-referenced event contracts to Nevada residents.

84.     After finding that Kalshi was likely to succeed on the merits based on the CFTC's exclusive jurisdiction over DCMs, the District of New Jersey also found in favor of Kalshi with regard to irreparable harm and the balance of hardships.  The court held that Kalshi faced likely "harms to its reputation and goodwill" and that such harms "may constitute irreparable injury." *Id.* at *7.  Further, the court determined that, given its conclusion that Kalshi was likely to succeed on the merits in demonstrating that state law preempted regulation of its sports-related event contracts, "the interests favor injunction."  *Id.*  It dismissed the likelihood of any notable harm to the state and concluded that to find the interests disfavored Kalshi "would mean leaving it subject to state enforcement or obligating it to shift its business practices, consequences that are not cleanly undone." *Id.*

85.     The reasoning of the courts in *Kalshi v. Hendrick* and *Kalshi v. Flaherty* is directly applicable to this case.  The Defendants' purported exercise of state law authority to regulate a federally registered market is unlawful, and CDNA is entitled to a declaration of law and to an injunction precluding Defendants from enforcing Nevada law to undermine "activities [that] are legal under federal law."  *Kalshi v. Hendrick*, 2025 WL 1073495, at *6.

## H. Defendants' Threatened Action Will Imminently and Irreparably Harm CDNA and Interfere with Its Ability to Conduct Federally Regulated Activities.

86.     CDNA's rulebook sets forth over 50 different event contracts, all of which are subject to federal regulation pursuant to the process described above.

87.     CDNA also permits these cash-settled event contracts to be purchased and sold by residents of Nevada and other states and territories.

88.     As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject CDNA and its customers to irreparable harm.

89.     Compliance with the NGCB's order that CDNA immediately cease and desist from permitting Nevada residents to purchase or sell event contracts on its DCM would, among other things, require CDNA to develop and implement the technology necessary to limit customers

based on their geography within the United States. This is technology that CDNA has no need to, and does not, maintain or deploy.

90.    Compliance with the NGCB's order would also, without justification, deprive CDNA of the revenue that it would otherwise derive from trading of event contracts by Nevada residents.

91.    If CDNA were to comply with the NGCB's cease-and-desist order, it would also suffer competitive injury by losing the ability to compete as a market for event contracts against other federally registered DCMs.

92.    In addition, if the NGCB was permitted to regulate participation in contracts on CDNA's DCM by Nevada residents, there is no reason to believe that the authorities of other states would not likewise exercise their own regulatory authority. Accepting such jurisdiction would subject CDNA to the very patchwork of state regulation (including prohibitions, regulations, reporting obligations, registration costs, and other rules) across the states that Congress expressly preempted under the CEA. Different states have taken different approaches to regulation of online gambling. Many states permit online gambling, subject to state-level regulation. Others, such as Utah, prohibit it entirely. It would be impossible for CDNA to both offer "impartial access" to its DCM as required by 17 C.F.R. § 38.151(b) and simultaneously comply with state gaming laws in 50 states.

93.    CDNA is also irreparably harmed by the regulatory overhang of the NGCB's assertion of jurisdiction. The NGCB has asserted that by listing event contracts on a federally regulated DCM, CDNA has committed civil and criminal offenses in Nevada which carry penalties including fines and incarceration.[6] This assertion coupled with the threat of a state enforcement

---

[6] See NRS § 463.360(3) (willful violation of NRS § 463.160 is a category B felony to be punished by 1-10 years imprisonment and/or a fine of up to $50,000); NRS § 463.360(6) (violation of chapter 463 provisions with unspecified penalties is a gross misdemeanor); NRS § 193.140 (penalty for gross misdemeanor is imprisonment of up to 364 days and/or fine of up to $2,000); NRS § 465.088(1)(a) (first violation of NRS § 465.086 is a category C felony to be punished by 1-5 years imprisonment, with additional fine of up to $10,000 (or more if required or authorized by statute) permitted, see NRS § 193.130; subsequent violation is a category B felony to be punished by 1-6 years imprisonment, with additional fine of up to $10,000 permitted); NRS § 465.092(3) (violation of NRS § 465.092 is a misdemeanor to be punished by imprisonment of up to 6 months and/or fine of up to $1,000, see NRS § 193.150).

action prejudices CDNA's reputation, its ability to certify compliance with the laws of the jurisdictions in which it operates, and potentially its ability to engage in ordinary-course business activities such as raising capital.

94.     As Chief Judge Gordon noted in *Kalshi v. Hendrick*, "[a] credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm." 2025 WL 1073495, at *7 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)). The threat of enforcement alone presents CDNA with the choice between subjecting itself to civil or criminal penalties brought by the NGCB, with all of the expenditures and reputational damage that entails, or incurring the substantial monetary expenditures discussed above to assure compliance with the NGCB's assertion of authority. This latter choice may also violate the CFTC's Core Principles by disrupting contracts or geographically limiting who can enter contracts on CDNA's national exchange. *See Kalshi v. Hendrick,* 2025 WL 1073495, at *7 (noting Kalshi would face "the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles" on that basis); *supra* ¶ 32.

95.     Submission to the regulatory oversight of the NGCB would subject CDNA to a regulatory regime inherently in conflict with CFTC regulations, including its Core Principles, and the very concept of a registered DCM. Nevada law prohibits receiving or allowing another person to receive a wager from anyone located in Nevada through any medium of communication. *See* NRS § 465.092. In order to comply with this regulation, CDNA would need to geofence its services by monitoring the geolocation of all its clients and denying service to anyone located in Nevada. CDNA operates as a national exchange, registered with the CFTC. It could not possibly comply with Nevada gaming regulations and the CFTC's Core Principle of impartial—not location-based—access. 17 C.F.R. § 38.151(b).

96.     An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein will result in irreparable injury to Plaintiff, including but not limited to criminal liability, civil liability, economic hardship, and impairment of existing contractual relationships.

97.    Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein.  Moreover, because money damages are generally not available in suits against state government agencies, CDNA likely would be left without a remedy in the absence of prospective relief.

98.    Plaintiff therefore seeks declaratory and injunctive relief restraining Defendants from enforcing Nevada law that interferes with the operation and function of Plaintiff's market described herein.

## COUNT I

### (Declaratory Judgment – Express Preemption – Against All Defendants)

99.    Plaintiff incorporates all prior paragraphs by reference.

100.    Under 28 U.S.C. § 2201, the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

101.    An actual controversy exists between CDNA, on the one hand, and the Defendants, on the other, regarding whether the NGCB and the Nevada Attorney General's office have legal authority to prohibit the trading of Sports Event Contracts not licensed by the Nevada Gaming Commission ("NGC").

102.    As reflected in the NGCB's May 20, 2025 letter to CDNA, the NGCB asserts that by offering Sports Event Contracts, and potentially other contracts, CDNA is "operating as an unlicensed sports pool" in violation of Nevada law.  Ex. A, at 2.  The NGCB has asserted that CDNA is therefore obligated under Nevada law, without regard to federal law, to cease and desist from permitting Nevada residents to trade event contracts on its market.

103.    For the reasons described above, without regard to whether the NGCB has correctly interpreted Nevada law, CDNA is authorized to list and offer event contracts to Nevada residents (and residents of each of the other states and territories of the United States) pursuant to the CEA.

Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

104.    To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Nevada law, Nevada law is preempted pursuant to Article VI, Section 2 of the United States Constitution (the "Supremacy Clause"), which provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

105.    The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly reserved exclusive authority to the federal government.

106.    The CEA's express preemption of state laws purporting to regulate trading on federally regulated derivatives markets or otherwise under the oversight of the CFTC could not be more clear.  Congress gave the CFTC "exclusive jurisdiction" to regulate derivatives trading on approved exchanges for off-exchange trading.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to derivatives regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings, 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  Congress punctuated the importance of preemption of state law by ensuring federal law supersedes and preempts state gaming law as applied to financial instruments the CFTC exempted from the registered exchange requirement.  7 U.S.C. § 16(e)(2).  Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in derivatives trading on CFTC-regulated exchanges.  *See, e.g., Thrifty Oil Co.*, 322 F.3d at 1055–57 (9th Cir. 2003); *Am. Agric. Movement*, 977 F.2d at 1156; *Rasmussen v*, 608 F.2d at 178 (5th Cir. 1979); *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981); *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).  Congress went even further in clarifying the scope of the preemptive impact of the CEA when it passed the FTPA, explicitly

superseding state gaming laws as applied to futures contracts the CFTC had exempted from the CEA's exchange requirement.  7 U.S.C. § 16(e)(2).

107.    Defendants may therefore not enforce Nevada's gaming laws against CDNA because CDNA is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## COUNT II

### (Declaratory Judgment – Field Preemption – Against All Defendants)

108.    Plaintiff incorporates all prior paragraphs by reference.

109.    Under 28 U.S.C. § 2201, the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

110.    An actual controversy exists between CDNA, on the one hand, and the Defendants, on the other, regarding whether the NGCB and the Nevada Attorney General's office have legal authority to prohibit the trading of Sports Event Contracts not licensed by the NGC.

111.    As reflected in the NGCB's May 20, 2025 letter to CDNA, the NGCB asserts that by offering Sports Event Contracts, and potentially other contracts, CDNA is "operating as an unlicensed sports pool" in violation of Nevada law.  Ex. A, at 2.  The NGCB has asserted that CDNA is therefore obligated under Nevada law, without regard to federal law, to cease and desist from permitting Nevada residents to trade event contracts on its market.

112.    For the reasons described above, without regard to whether the NGCB has correctly interpreted Nevada law, CDNA is authorized to list and offer event contracts to Nevada residents (and residents of each of the other states and territories of the United States) pursuant to the CEA.  Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

113.    To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Nevada law, Nevada law is preempted pursuant to the Supremacy Clause.

114.     The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has adopted a comprehensive regulatory scheme over an activity, thus occupying the field for regulating that activity.

115.     Through the CEA and its amendments, Congress has adopted a comprehensive regulatory scheme regulating derivatives trading on regulated markets, including the trading of event contracts. 7 U.S.C. §§ 1 *et seq.* That scheme includes the creation of the CFTC and vesting it with exclusive authority to regulate derivatives trading.

116.     In threatening to enforce NRS §§ 463.0193, 463.160, 463.245, 463.350, 463.360, 465.086, 465.092, and any other state or local laws against CDNA, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate derivatives trading on CFTC-regulated exchanges or derivatives otherwise traded under the CFTC's oversight. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same subject matter. Because federal law occupies the entire field of regulating derivatives trading on regulated markets, the threatened actions are field-preempted under the Supremacy Clause.

117.     Defendants therefore may not enforce Nevada's gaming laws against CDNA because CDNA is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*

### COUNT III

### (Declaratory Judgment – Conflict Preemption – Against All Defendants)

118.     Plaintiff incorporates all prior paragraphs by reference.

119.     Under 28 U.S.C. § 2201, the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

120.    An actual controversy exists between CDNA, on the one hand, and the Defendants, on the other, regarding whether the NGCB and the Nevada Attorney General's office have legal authority to prohibit the trading of Sports Event Contracts not licensed by the NGC.

121.    As reflected in the NGCB's May 20, 2025 letter to CDNA, the NGCB asserts that by offering Sports Event Contracts, and potentially other contracts, CDNA is "operating as an unlicensed sports pool" in violation of Nevada law.  Ex. A, at 2.  The NGCB has asserted that CDNA is therefore obligated under Nevada law, without regard to federal law, to cease and desist from permitting Nevada residents to trade event contracts on its market.

122.    For the reasons described above, without regard to whether the NGCB has correctly interpreted Nevada law, CDNA is authorized to list and offer event contracts to Nevada residents (and residents of each of the other states and territories of the United States) pursuant to the CEA.  Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

123.    To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Nevada law, Nevada law is preempted pursuant to the Supremacy Clause.

124.    The Supremacy Clause mandates that federal law preempts state law where compliance with the state law would conflict with federal law.

125.    Nevada authorities likewise threatened to deploy Nevada law in a manner that conflicts with federal law and policy.  Defendants seek to ban event contracts that federal law and the CFTC have authorized or subject them to state regulatory requirements that conflict with federal law, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges.  For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

126.    Defendants therefore may not enforce Nevada's gaming laws against CDNA because CDNA is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CDNA requests that judgment be entered in its favor and against Defendants as follows:

1. Declare that states, including the State of Nevada, lack legal authority to regulate the offering or listing of event contracts by CDNA conducted in accordance with federal law in its capacity as a DCM and pursuant to the CEA;

2. Declare that, to the extent that they would purport to prohibit or otherwise regulate the trading of derivatives by CDNA in its capacity as a federally regulated DCM, Nevada Revised Statutes §§ 463.0193, 463.160, 463.245, 463.350, 463.360, 465.086, 465.092, and any other similar Nevada laws are preempted by the CEA;

3. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Nevada Revised Statutes §§ 463.0193, 463.160, 463.245, 463.350, 463.360, 465.086, 465.092, and any other Nevada law that attempts to effectively regulate Plaintiff's market, against Plaintiff;

4. Award such other relief within this Court's discretion that it deems just and proper.

Dated this 3rd day of June, 2025.

*/s/ Bradley Austin*
Bradley Austin (Nevada Bar No. 13064)
SNELL & WILMER
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
702-784-5247
baustin@swlaw.com


*/s/ Nowell D. Bamberger*
Nowell D. Bamberger (*pro hac vice forthcoming*)
Matthew C. Solomon (*pro hac vice forthcoming*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037
202-974-1500
nbamberger@cgsh.com
msolomon@cgsh.com


*Attorneys for North American Derivatives Exchange, Inc.,*
*d/b/a Crypto.com | Derivatives North America*

1

## INDEX OF EXHIBITS TO PLAINTIFF'S COMPLAINT FOR PERMANENT

2

## INJUNCTION AND DECLARATORY RELIEF

3

4

| EXHIBIT | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit A | May 20, 2025 NGCB Cease-and-Desist Letter | 001 – 003 |
| Exhibit B | Email Thread with NGCB | 004 – 006 |
| Exhibit C | January 30, 2025 CDNA Certification Letter for Industry Event – Live Presentations Contracts | 007 – 023 |

5

6

7

8

4928-5887-2338

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28