# EXHIBIT C

*January 30, 2025 CDNA Certification Letter for Industry Event – Live Presentations Contracts*

# EXHIBIT C

*January 30, 2025 CDNA Certification Letter for Industry Event – Live Presentations Contracts*

**crypto.com** | DERIVATIVES NORTH AMERICA

January 30, 2025

Via CFTC Portal Submissions

Mr. Christopher Kirkpatrick
Secretary of the Commission
Office of the Secretariat
Commodity Futures Trading Commission
3 Lafayette Centre
1155 21st Street, N.W.
Washington D.C. 20581

RE:    Certification of Contingent Derivatives Contract (Industry Event - Live Presentations - NAICS 711) - Submission Pursuant to Commission Regulation 40.2(a)

Dear Mr. Kirkpatrick:

Pursuant to Section 5c(c)(1) of the Commodity Exchange Act, as amended (the "Act" or "CEA"), and §40.2(a) of the regulations promulgated by the Commodity Futures Trading Commission (the "Commission") under the Act, the North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America (the "Exchange" or "CDNA") hereby certifies a contingent derivatives contract that is a tradeable financial instrument (*i.e.* a swap) based on an event in the live presentations industry (the "Event Contract" or "Contract"). The Exchange intends to list the Event Contract for trading no later than February 3, 2025.

In connection with this certification, CDNA is submitting the following:

(i)     A concise explanation and analysis of the Event Contract;
(ii)    A certification that the Event Contract complies with the Act and Commission Regulations thereunder;
(iii)   A certification that CDNA has posted a copy of the product submission on its website;
(iv)    The intended listing date of the Event Contract;
(v)     The terms and conditions of the Event Contract, set forth in Exhibit A hereto; and
(vi)    A discussion of the Event Contract's compliance with applicable provisions of the Act and Commission Regulations thereunder, set forth in Exhibit B hereto.

The Event Contract is a contingent derivatives contract that is a tradeable financial instrument designed to express a market view related to the broad and varying economic and commercial impacts of the outcome of an event in the live presentations industry.  Separate, discrete and identifiable live presentation industry events (each an "Industry Event") not only have an outcome that determines a leader, an achievement, an accomplishment, a champion, a title holder or a winner of a particular live presentation industry event, but more importantly the outcome of a live presentation industry event has a substantial economic and commercial impact on businesses and individuals throughout America depending on many factors.[1]  CDNA designed the Event Contract to meet the varied and diverse hedging and market needs of commercial firms and individuals impacted by or with an economic interest in the Industry Event outcome.  The Event Contract is traded in the centralized market of the Exchange where bids and offers are matched first by price and then time priority.  There is no intervention in the trading process by the Exchange.  Rather, the Event Contract trades in a competitive, open, and efficient market and mechanism for executing transactions.  The trading provides a market for the price and information discovery process related to market sentiment on the outcome of the Industry Event.

The Event Contract operates in a manner equivalent to economic event contracts that CDNA and other designated contract markets have certified for trading.[2]  Price bands will apply so that the Contract may only be listed at increments of at least \$0.25 and at most \$99.75.  The Contract has a notional value of \$100 and a minimum price fluctuation of \$0.25 to align with other CDNA contracts.

As outlined in Exchange Rule 5.18, trading will be available at all times outside of any maintenance windows and as set forth in the Trading System, which CDNA will announce in advance.  At least one dedicated market maker that is committed to providing immediate liquidity will participate upon the Event Contract's launch.  CDNA has further imposed position limits as described in more detail below.  Members will be charged fees in accordance with Exchange Rule 3.9 in such amounts as may be revised from time to time and reflected on CDNA's website.

During the Event Contract trading hours, Members are able to adjust their positions and trade freely.  After trading of the Event Contract has closed, CDNA will determine the Expiration Value and whether the Payment Criteria encompasses the Expiration Value (i.e., whether the market outcome is "Yes" or "No").  The market is then settled by CDNA, and either the long position

---

[1] The U.S. The Bureau of Labor Statistics maintains data for over 100 industries and uses the North American Industry Classification System (NAICS) for supersectors, sectors, and industries to categorize the data.  The Event Contract encompasses Industry Events in the industry categorized under NAICS 711 (Performing Arts, Spectator Sports, and Related Industries).  *See* https://www.bls.gov/iag/tgs/iag711.htm.

[2] *See e.g.*, Rule Certification:  Nadex Lists New Event Binary Contracts – Submission Pursuant to Commission Regulation §40.2(a), Nov. 26. 2021, available at: https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/47219.

holders or the short position holders are paid the Settlement Value.  In this case, "long position holders" refers to Members who purchased the "Yes" side of the Event Contract and "short position holders" refers to Members who purchased the "No" side of the Event Contract.  If the Expiration Value is "Yes" (please see Exhibit A for the conditions upon which the Expiration Value is "Yes"), then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment.  If the Expiration Value is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment.  Specification of the circumstances that would trigger an Expiration Value of "Yes" are included below in the section titled "Payment Criterion" in Exhibit A. The Expiration Date of the Contract is designed to account for multiple possible contingencies regarding the timing of the determination of the event.

In accordance with §40.2(a)(2) of the Commission's Regulations and as set forth above, the Exchange intends to list the Event Contract for trading no later than February 3, 2025.

The contract specifications as they will appear in the CDNA Rulebook are set forth in Exhibit A. A complete index of the Core Principles for designated contract markets, which addresses each applicable Core Principle, is set forth in Exhibit B.

The Exchange hereby certifies that the product complies with the Act, as amended, and the Commission Regulations adopted thereunder.  No substantive opposing views were expressed to the Exchange with respect to any of these actions.  The Exchange hereby certifies that a copy of this submission was concurrently posted on the CDNA website.

Should you have any questions regarding the above, please do not hesitate to contact me by telephone at (312) 884-0161 or by email at Kevin.Dan@nadex.com.

Sincerely,

/s/

Kevin Dan
Chief Compliance Officer and Chief Regulatory Officer
The North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America

**EXHIBIT A**

*The Contract Specifications set forth below will appear in the Rulebook as Rule 13.29. Capitalized terms not defined herein shall have the meaning set forth in the Rulebook.*

13.29 CONTINGENT DERIVATIVES CONTRACT - INDUSTRY EVENT - LIVE PRESENTATIONS - NAICS 711

(a)   SCOPE − These Rules shall apply to the Class of Contracts referred to as the Contingent Derivatives Contract - Industry Event- Live Presentations - NAICS 711, a type of "Event Contract" listed by the Exchange.

(b)   UNDERLYING − The Underlying for this Contract is a separate, discrete and identifiable industry event (the "Industry Event") that determines a leader, champion, title holder or winner for that specific Industry Event that occurs on a specific Date.

   (i)   Industry Event: refers to any separate, discrete and identifiable live presentation industry event in Performing Arts, Spectator Sports, and Related Industries[3] where the outcome identifies a leader, an achievement, an accomplishment, a champion, a title holder or a winner (the "Industry Event Holder") from the eligible participants in the Industry Event (the "Industry Participants").
   (ii)   Date: refers to the month, day and year in which the Industry Event takes place.

(c)   SOURCE AGENCY − The Source Agency is the final result of the Industry Event reported by AP News or as a back-up Source Agency, any U.S. national news provider as published on the Trading System.

(d)   TYPE − The Type of Contract is a contingent derivatives contract (i.e. an Event Contract), which is a Swap.

(e)   PAYMENT CRITERION − The Payment Criterion for the Event Contract encompasses the Expiration Value where the Industry Event Holder is determined by the outcome of the Industry Event, as published by the Source Agency on the Expiration Date.  Industry Event Holder will have the value set forth on the Trading System.

(f) MINIMUM TICK − The Minimum Tick size for the Event Contract shall be $0.25.

---

[3] The U.S. The Bureau of Labor Statistics maintains data for over 100 industries and uses the North American Industry Classification System (NAICS) for supersectors, sectors, and industries to categorize the data.  The Event Contract encompasses Industry Events in the industry categorized under NAICS 711 (Performing Arts, Spectator Sports, and Related Industries).  See https://www.bls.gov/iag/tgs/iag711.htm.

(g) POSITION LIMIT – The Position Limit for the Event Contract shall be 2,500 Contracts, or as updated on the Exchange's website or Trading System.

(h) MARKET MAKER ALTERNATIVE POSITION LIMIT – The Position Limit for Market Makers shall be 250,000 Contracts, or as updated on the Exchange's website or Trading System.

(i) LAST TRADING DATE – The Last Trading Date is the same as the Expiration Date.  The Last Trading Time is the same as the Expiration Time. No trading in the Event Contract shall occur after its Last Trading Date and Last Trading Time.

(j) SETTLEMENT DATE AND TIME – The Settlement Date and Time will be the same as the Last Trading Date and Last Trading Time.

(k) EXPIRATION DATE – The Expiration Date of the Event Contract will be the date on which the Industry Event is held. The Expiration Date will be adjusted if a potential Industry Event Holder is eliminated from being eligible to participate in the Industry Event.

(l) EXPIRATION TIME – The Expiration Time of the Event Contract will be the start time of the Industry Event. The Expiration Time will be adjusted if a potential Industry Event Holder is eliminated from being eligible to participate in the Industry Event.

(m) SETTLEMENT VALUE – The Settlement Value is the amount paid to the holder of the in-the-money Event Contract on the Settlement Date. The Settlement Value of an in-the-money Event Contract is $100.

(n) EXPIRATION VALUE – The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration Time.

(o) CONTINGENCIES – If the Source Agency does not actually announce the outcome on or before the Expiration Date due to a delay, postponement or otherwise in such release announcement by the Source Agency, the Settlement Date and Time, Expiration Date, and Expiration Time  will be delayed until the Underlying outcome is released.

(p) TRADING PROHIBITIONS – Certain individuals are prohibited from trading the Event Contract.  Those persons include:

- Current and former Industry Participant players, coaches, agents and staff.
- Paid employees and management of the Industry Participants.
- Owners of the Industry Participants.
- Household members and immediate family members (siblings, children, and parents) of any of the above.

(q) TEMPORARY MARKET SUSPENSIONS – The Event Contract market will be temporarily suspended beginning approximately 60 seconds prior to the official start time of any event that is used to determine the Industry Event Holder or as set forth in the Trading System.

CONFIDENTIAL TREATMENT REQUESTED BY CDNA PURSUANT TO 17 CFR 145

## EXHIBIT B

## COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT AND COMMISSION REGULATIONS THEREUNDER

**BACKGROUND**

In connection with CDNA's certification of the Economic and Commercial Event Contract (the "Event Contract"), below we set forth a concise explanation and an analysis of the swap's compliance with applicable provisions of the Act, including Core Principles, and the Commission's Regulations thereunder.

The Event Contract is a contingent derivatives contract that is a tradeable financial instrument designed to express a market view related to the broad and varying economic and commercial impacts of the outcome of an event in the live presentations industry events. Separate, discrete and identifiable live presentation industry events (each an "Industry Event") not only have an outcome that determines a leader, an achievement, an accomplishment, a champion, a title holder or a winner of a particular live presentation industry event, but more importantly the outcome of an live presentation industry event has a substantial economic and commercial impact on businesses and individuals throughout America depending on many factors.[4] CDNA designed the Event Contract to meet the varied and diverse hedging and market needs of commercial firms and individuals impacted by or with an economic interest in the Industry Event outcome. The Event Contract is traded in the centralized market of the Exchange where bids and offers are matched first by price and then time priority. There is no intervention in the trading process by the Exchange or any other market participant. Rather, the Event Contract trades in a competitive, open, and efficient market and mechanism for executing transactions. The trading provides a market for the price and information discovery process related to market sentiment on the outcome of the Industry Event.

A wide range of factors and developments, including but not limited to the following, shape the significant commercial impact of Industry Events:

1. which Industry Participant make it to an Industry Event;
2. which Industry Participant leader, title holder or winner of an Industry Event;
3. where the Industry Event is located;
4. the hometowns of Industry Participants that makes it to the Industry Event;

---

[4] The U.S. The Bureau of Labor Statistics maintains data for over 100 industries and uses the North American Industry Classification System (NAICS) for supersectors, sectors, and industries to categorize the data. The Event Contract encompasses Industry Events in the industry categorized under NAICS 711 (Performing Arts, Spectator Sports, and Related Industries). *See* https://www.bls.gov/iag/tgs/iag711.htm.

5. the decisions by businesses as to how much money to spend on Industry Event advertisements within and beyond the surrounding areas of where the Industry Event is held;

6. how many people are drawn to the Industry Event (in person, streamed over the Internet, or watching from a local restaurant or bar);

7. the hiring of part-time and full-time employees to support the Industry Event and ancillary and adjacent activities, including any applicable post-Industry Event parades and celebrations;

8. impacts on the production and sales of products and services advertised during the Industry Event;

9. impacts on the production and sales of ancillary and adjacent products and services that support the Industry Event (e.g. hotels, airlines, rental properties, car rentals, entertainment events, taxis and rideshares, tourism generally, food items including chicken wings, pizza, and beverages);

10. decisions by viewers and the public at-large on taking a market view related to the Industry Event;

11. the impact of all Industry Event participant sponsorships including visibility, future branding campaigns, and advertisement thereon; and

12. City, county, and state level tax receivables.

The Event Contract's commercial utility directly derives from the broad-based and diverse number of businesses and individuals that are economically impacted by Industry Event and the availability of a fully regulated approach to hedging against the commercial risks associated with uncertain outcomes.

The Event Contract is designed to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises. As set forth below, these market participants take on material economic risk based on the outcome of an Industry Event. As is the case with any financial derivatives contract, the Event Contract may also be bought and sold speculatively, which creates a robust and healthy market. The Event Contract may also meet other hedging and speculative needs and suit other purposes of market participants that CDNA has not considered.

Industry Events serve as a significant economic driver whose economic effects can be felt in infrastructure investments, transportation networks, and the global supply chain. With this in mind, the following is a sampling of just some of the market participants that would benefit from hedging their economic exposure on a federally-regulated derivatives exchange. These market participants encounter direct and quantifiable economic consequences when engaging in activities related to the outcome of the Industry Event, making the Industry Event, itself, a commercial event.

1.  <u>Vendors and Merchandisers</u>

Vendors and merchandisers would benefit from the ability to hedge their risks associated with the uncertainty of supply chain and product demand. Vendors and merchandisers take on risk when deciding how to utilize services and distribute products for an event that a large percentage of Americans consume, as with other commercial products and services. Moreover, vendors and merchandisers may use an Industry Event to introduce promotional events where, if their forecasted result does not occur, the vendor or merchandiser may face a significant commercial impact.

2.  <u>Advertisers</u>

Advertisers would benefit from hedging their investment in Industry Event ad campaigns. Advertisements can reach millions of dollars for a 30-second commercial spot and thus carry the risk to advertisers' return on investment if the commercial or branding does not perform as expected.

3.  <u>Local Municipality (Host Location)</u>

Local municipalities would benefit from hedging the risk exposure they take on as Industry Event hosts. Industry Events have the potential to generate millions of dollars in local gross domestic product, and billions of dollars in overall economic impact.  This economic benefit, however, is by no means guaranteed to be net positive. Moreover, local municipalities face exposure to risk from fan unrest and local property destruction following the outcome of an Industry Event, which necessitates increased financial resources for safety and emergency response.  Local municipalities that host Industry Events would benefit from having the ability to hedge the risk associated with the outcome of an Industry Event that comes with a substantial up-front investment with indeterminate revenue outcomes and safety concerns.

4.  <u>Local Municipalities (Association Participant Hometowns)</u>

Local municipalities where Industry Participants partaking in an Industry Event are located would benefit from hedging their risk regarding the outcome. In addition to safety and security concerns noted above, the local municipality may wish to host a celebration, such as a parade, to fete the victorious Industry Participant. In such a circumstance, the local governments would be at risk of a major outlay to host a celebration. Hedging this exposure would mitigate the economic impact to local municipalities' budgets.

5.  <u>Airlines</u>

Airlines and other travel-related industries would benefit from being able to hedge their exposure for an anticipated major commercial event such as an Industry Event. Airlines take on risk as

they prepare for surge in travel demand because they must increase flights and capacity to accommodate the influx of fans to and from particular locations.

 6. Stadium and Arena Owners and Operators

The owners and operators of the stadium or arena in which an Industry Event is held would benefit from being able to hedge the risk of hosting such a massive event. The stadium or arena owners and operators take on risk as they make a substantial investment in hosting an Industry Event and must account for insurance, weather-related incidents, vendors, workers' compensation, sponsors, security, and other third-party service providers. As the production inputs of an Industry Event increase, the stadium owners and operators would benefit from being able to hedge these operational risks based on the outcome of the event.

 7. Broadcast and Streaming Companies

Broadcast and streaming companies would benefit from hedging the risk associated with bidding on the broadcast rights to an Industry Event. Bids to air the Industry Event require billions of dollars, and come with the risk that the association participants playing will not be able to develop an audience that would allow the broadcast or streaming companies to recoup their costs. Additionally, the broadcast and streaming companies face operational risks, such as lag or dead air, that would threaten their reputation and their financial wellbeing. The competitiveness and outcome of the Industry Event influences overall viewership that influences a broadcaster's willingness to bid on the broadcast rights.

 8. Insurance Companies

Insurance companies would benefit from being able to hedge the risks presented to them by insuring occurrences and developments related to an Industry Event. Insurance companies take on a variety of risks relating to an Industry Event in terms of individual homeowner policies as well as large policies insuring the venue itself, whether in the city where an Industry Event is located or in the hometowns of the association participants in an Industry Event that year. Homeowner's insurance claims place insurers at risk during the Industry Event due to large group gatherings with increased grilling, fires, and alcohol, which all have the potential to lead to an increased volume of claims. Policies ensuring the venue itself pose exposure to the insurance companies that write the respective policies if an emergency occurs. Therefore, insurance companies would benefit from having the ability to hedge these risks associated with the outcome of the Industry Event.

 *       *       *       *       *

Trading in the Event Contract would also offer market participants the opportunity to engage in price discovery related to the economic outcome, one of the key benefits of transacting in a

regulated exchange environment.  With millions in viewership and billions of dollars in revenue, each Industry Event presents unique risks and opportunities for market participants to optimize through business decision-making, from merchandising choices to insurance policy writing. By offering the Event Contract on a CFTC-registered exchange such as CDNA, market participants can take advantage of the transparency, liquidity, efficiency and real-time pricing adjustments of a regulated, exchange-trading environment.   Industry Events provide a massive pool of consumer data—offering market participants access to that data would enhance informed decision-making about how to mitigate risks and adjust their risk profiles, thereby establishing a fair market value and supply for their goods and services.  The establishment of the true price gives participants an opportunity to engage in calculated risk-mitigation and risk-taking to best achieve their goals and benefit the public and communities they serve.

Based on the above, the Event Contract would allow market participants access to a product that would meet their legitimate hedging needs and allow for efficient and accurate price discovery in these markets.

**CONFIDENTIAL TREATMENT REQUESTED BY CDNA PURSUANT TO 17 CFR 145**

**CONFIDENTIAL TREATMENT REQUESTED BY CDNA PURSUANT TO 17 CFR 145**

**DESIGNATED CONTRACT MARKET ("DCM") CORE PRINCIPLES**

The Exchange has identified the following DCM Core Principles as potentially being impacted by the launch of the Event Contract: Core Principle 2 (Compliance with Rules), Core Principle 3 (Contracts Not Readily Subject to Manipulation), Core Principle 4 (Prevention of Market Disruption), Core Principle 7 (Availability of General Information), Core Principle 8 (Daily Publication of Trading Information), and Core Principle 18 (Recordkeeping).

A. Core Principle 2 Compliance with Rules

Core Principle 2 requires the DCM to have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market. The Exchange has a dedicated Compliance/Regulatory staff that monitors the markets, investigates potential rule violations, and imposes sanctions against individuals who have been determined to have violated the Rules. The Exchange has an automated trade surveillance system, SCILA, which is capable of detecting potential trade practice violations, and also conducts real-time market monitoring of all trading activity in all Contracts, at all hours the Exchange is open. The Exchange is able to set the parameters by which the system detects potential issues. Chapter 9 of the Exchange Rulebook sets forth the Exchange's authority to investigate and sanction Members for activity that violates the Exchange Rules. Exchange Rule 2.10 grants the Exchange jurisdiction over any Person initiating or executing a transaction on or subject to the Rules of the Exchange, either directly or through an intermediary, and any Person for whose benefit such transaction has been initiated or executed. The Exchange's jurisdiction continues notwithstanding the termination of the Person's Exchange Membership. Exchange Rule 3.3 requires all Trading Members and Authorized Traders to comply with the Exchange Rules and to cooperate with the Exchange promptly and fully in any investigation, call for information, inquiry, audit, examination or proceeding. Such cooperation may involve a request for the Member's or Authorized Trader's activity in the relevant Underlying. Accordingly, the listing of the Event Contract will not negatively impact the Exchange's ability to comply with this Core Principle.

The Exchange certifies that its surveillance program together with its participation in a key industry group for information sharing and regulatory coordination addresses the requirements of Core Principle 2.

B. Core Principle 3 Contracts Not Readily Subject to Manipulation and Core Principle 4 Prevention of Market Disruption

Core Principles 3 and 4 (Contracts Not Readily Subject to Manipulation and Prevention of Market Disruption), implemented by Commission Regulations 38.200 and 38.250, require a DCM

to list only contracts that are not readily susceptible to manipulation and to prevent market disruption.  The Exchange has at least one existing Market Maker that has committed to providing liquidity in these contracts, which should limit opportunities for markets in the Event Contract to be manipulated.  As previously stated, the Exchange also uses the SCILA surveillance system to assist with market monitoring and has a staff dedicated to market surveillance to detect potential market manipulation.

The Exchange has dedicated staff to conduct surveillance of the market and uses the SCILA surveillance system to assist with market monitoring at all times the Event Contract will be listed.

The Exchange trading system has a cap-check feature that ensures a trader has sufficient funds in the account to fully collateralize the Order if executed before the Order is accepted by the Exchange.  The Exchange also has the ability to block new Orders and/or cancel working Orders if necessary to prevent market disruption.

Additionally, Commission Regulation 38.256 requires a DCM to have the ability to comprehensively and accurately reconstruct all trading on its trading facility.  The Exchange is currently able to reconstruct trading in its markets based on the data stored in the database, the SCILA surveillance system, as well as the Exchange log files.  Trade data will continue to be stored in this same manner following the addition of the Event Contract.  Therefore, the addition of these contracts will not negatively impact the Exchange's ability to comply with these Core Principles.

    C.  <u>Core Principle 5 Position Limits</u>

Core Principle 5 requires the DCM set position limits or position accountability to reduce the potential threat of market manipulation or congestion.  The Exchange has set the initial position limit for Trading Members at 2,500 Contracts, thereby reducing the motivation for an individual to manipulate the Underlying in order to affect the Exchange settlement, explained in detail above.  Market Makers will not be subject to the 2,500 Contract position limit in order to provide sufficient liquidity to the market.  Market Makers will instead be subject to an Alternative Position Limit of 250,000 Contracts.  A Market Maker taking advantage of the Alternative Position Limits must, within one business day following a request by the Exchange's Compliance Department, provide the Exchange Compliance Department with a trade register detailing all trading activity in any account owned or controlled by the Market Maker in the relevant Underlying during the 15 minutes immediately before and after any Expiration time identified by the Exchange's Compliance Department in the request.

D. Core Principle 7 Availability of General Information and Core Principle 8 Daily Publication of Information

Core Principles 7 and 8, implemented by Commission Regulations 38.400, 38.401, 38.450, and 38.451, require a DCM to make available to the public accurate information regarding the contract terms and conditions, as well as daily information on contracts such as settlement price, volume, open interest, and opening and closing ranges. The Exchange makes the Exchange Rulebook available on its website, as well as the Daily Bulletin which contains the preceding required information. The Results page on the website also publishes the Expiration Value and Settlement Value for all the Exchange contracts settled during that week. Contract specifications for the new Event Contracts will likewise be set forth in the Rulebook and on the Exchange website. Settlement prices, volume, open interest, and opening and closing ranges for the Event Contract will be included on the Daily Bulletin and posted on the Exchange website. Therefore, the addition of the Event Contract will not negatively impact the Exchange's ability to comply with these Core Principles.

E. Core Principle 9 Execution of Transactions

Core Principle 9 requires the DCM to provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process. The Exchange has [one] dedicated Market Maker[s] that have committed to pricing a two-sided market. Market participants are able to view the orderbook up to five layers deep (depending on the market activity at any particular time) on the platform. The Exchange displays the Time and Sales of all Contracts traded on the Exchange website which is updated every 15 minutes. Therefore, the addition of the Event Contract will not negatively impact the Exchange's ability to comply with this Core Principle.

F. Core Principle 10 Trade Information

Core Principle 10 requires the DCM to maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manger that enables the contract market to use the information to assist in the prevention of customer and market abuses and to evidence any violations of the Exchange Rules. The Exchange maintains an electronic audit trail as required by the Commission Regulations which enables the Exchange to review all activity on the Exchange.

G. Core Principle 11 Financial Integrity of Transactions

Core Principle 11 requires the DCM to establish and enforce rules and procedures for ensuring the financial integrity of transactions entered on the contract market. As with all Contracts offered on the Exchange, the Event Contract will be fully collateralized and Members entering a

transaction will have knowledge of their maximum risk prior to executing a transaction. All transactions will be cleared by CDNA's registered derivatives clearing organization.

H.   Core Principle 12 Protection of Markets and Market Participants

Core Principle 12 requires a DCM to protect markets and market participants from abusive practices committed by any party and to promote fair and equitable trading on the contract market. Chapter 5 of the Exchange Rulebook establishes Rules to protect the market and market participants from abusive, disruptive, fraudulent, noncompetitive, and unfair conduct and trade practices. The Rules apply to all market participants and transactions on the Exchange, and participants will need to comply with the Rules when trading the Event Contract.

I.   Core Principle 18 Recordkeeping

Finally, Core Principle 18, implemented by Commission Regulation 38.951, requires a DCM to maintain records of all activities relating to the business of the DCM, (i) in a form and manner that is acceptable to the Commission, and (ii) for a period of at least 5 years. A DCM must maintain such records in accordance with the applicable requirements of Commission Regulations.

**CONFIDENTIAL TREATMENT REQUESTED BY CDNA PURSUANT TO 17 CFR 145**

CONFIDENTIAL TREATMENT REQUESTED BY CDNA PURSUANT TO 17 CFR 145

**DCM CORE PRINCIPLES**

| Core Principle Number | Core Principle Name | Addressed in or Not Applicable to Certification |
|---|---|---|
| 1 | Designation as Contract Market | Not applicable (designation granted) |
| 2 | Compliance with Rules | Addressed |
| 3 | Contracts Not Readily Subject to Manipulation | Addressed |
| 4 | Prevention of Market Disruption | Addressed |
| 5 | Position Limitations or Accountability | Addressed |
| 6 | Emergency Authority | Not applicable (the Exchange Rulebook, 2.4 Emergency Rules) |
| 7 | Availability of General Information | Addressed |
| 8 | Daily Publication of Trading Information | Addressed |
| 9 | Execution of Transactions | Addressed |
| 10 | Trade Information | Addressed |
| 11 | Financial Integrity of Transactions | Addressed |
| 12 | Protection of Markets and Market Participants | Addressed |
| 13 | Disciplinary Procedures | Not applicable (the Exchange Rulebook, Chapter 9 Rule Enforcement) |

| 14 | Dispute Resolution | Not applicable (the Exchange Rulebook, 10.2 – 10.4 Arbitration) |
|---|---|---|
| 15 | Governance Fitness Standards | Not applicable (the Exchange Rulebook, 2.2 Service Restrictions, 11.2 Service and Disciplinary History) |
| 16 | Conflicts of Interest | Not applicable (the Exchange Rulebook, 2.6 Voting, 2.9 Trading Limitations, 11.1 Non-Public Information, 11.3 Voting) |
| 17 | Composition of Governing Boards of Contract Markets | Not applicable (internal review and appointment of directors) |
| 18 | Recordkeeping | Addressed |
| 19 | Antitrust Considerations | Not applicable |
| 20 | System Safeguards | Not applicable (internal controls and policies in place) |
| 21 | Financial Resources | Not applicable (capital requirements and quarterly reporting compliant) |
| 22 | Diversity of Boards of Directors | Not applicable (not public company, internal review and appointment of directors) |
| 23 | Securities and Exchange Commission | Not applicable |

**CONFIDENTIAL TREATMENT REQUESTED BY CDNA PURSUANT TO 17 CFR 145**