Bradley Austin
Nevada Bar No. 13064
Snell & Wilmer
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
702-784-5247
baustin@swlaw.com

Nowell D. Bamberger
(*pro hac vice pending*)
Matthew C. Solomon
(*pro hac vice forthcoming*)
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037
202-974-1500
nbamberger@cgsh.com
msolomon@cgsh.com

*Attorneys for North American Derivatives*
*Exchange, Inc., d/b/a Crypto.com |*
*Derivatives North America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| North American Derivatives Exchange, Inc. d/b/a Crypto.com \| Derivatives North America, <br><br> Plaintiff, <br><br> v. <br><br> Kirk D. Hendrick, in his official capacity as Chairman of the Nevada Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada Gaming Control Board; Chandeni K. Sendall, in her official capacity as a Member of the Nevada Gaming Control Board; the State of Nevada on relation of the Nevada Gaming Control Board; Aaron D. Ford, in his official capacity as Attorney General of Nevada, <br><br> Defendants. | Case No.: 2:25-cv-00978-JCM-DJA <br><br> **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> **(ORAL ARGUMENT REQUESTED)** |

Plaintiff North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America ("CDNA") respectfully moves for a preliminary injunction against Defendants' threatened enforcement of Nevada gaming laws to prohibit trading of federally regulated event contracts listed on CDNA's Designated Contract Market ("DCM").  This Motion is based on the referenced pleadings and papers on file herein, the following Memorandum of Points and Authorities, the Declaration of Kevin Dan,[1] and any oral argument the Court may entertain in connection with this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The Nevada Gaming Control Board ("NGCB") has unlawfully asserted jurisdiction to regulate—and prohibit—the trading of federally regulated derivatives listed by CDNA.  CDNA is a federally regulated DCM under the federal Commodities Exchange Act ("CEA").  The event contracts that CDNA lists are lawful under the CEA, are traded in a national market, and are subject to exclusive regulation by the Commodity Futures Trading Commission ("CFTC") under federal law.  It is not within the remit of the NGCB—or any other state authority in any state—to assume jurisdiction of this federal market and require CDNA (which is not even based in Nevada) to prohibit Nevada residents from accessing its trading market.

Federal law vests the CFTC with "exclusive jurisdiction" to regulate derivatives on DCMs, including the event contracts at issue here.  7 U.S.C. § 2(a)(1)(A).  The two courts that have addressed this issue so far have both granted preliminary injunctions enjoining states from imposing state regulation on a DCM based on federal preemption by the CEA.  *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *5–7 (D. Nev. Apr. 9, 2025) (Gordon, C.J.) (hereinafter "*Kalshi v. Hendrick*"); *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *4–6 (D.N.J. Apr. 28, 2025) (hereinafter "*Kalshi v. Flaherty*").  No court has ruled otherwise.  This Court should reach the same conclusion.

---

[1]     Attached hereto as Exhibit A.

The derivatives in question here trade in a national market that is heavily regulated at the federal level.  CDNA is registered with and designated by the CFTC pursuant to the CEA as a self-regulatory organization within a regulated marketplace.  The CFTC prescribes rules that govern what types of derivatives may be listed and provides for examination, enforcement, and penalties in the event its rules are violated.  CDNA offers derivatives to be traded in full compliance with those rules.

The NGCB does not appear to contend that *all* event contracts are unlawful.  Rather, it appears to take the view that because the underliers of certain derivatives listed by CDNA and sold nationwide—the outcome of live events, including sporting events—are events on which people may *also* wager, the event contracts in question themselves become "gaming" under state law.  But what the NGCB has failed to explain is how other people's gambling on the outcome of a given event could transform the otherwise lawful derivative contracts listed by CDNA into gambling subject to state regulation.

Efforts by state gaming authorities to assume jurisdiction over the derivatives markets are nothing new.  For decades leading up to the enactment of the CEA, state regulators sought to regulate all manner of derivatives products, including under state gaming law.  In 1936, Congress made a deliberate policy choice to remove derivatives contracts from state regulation, providing for uniform nationwide rules.  That decision has been repeatedly re-affirmed.  And both Congress and the CFTC have developed specific rules pursuant to which the CFTC may—but is not required to—disallow the trading of event contracts that reference gaming.

The issue presented in this case is straightforward.  The Court is not required to assess whether the event contracts listed by CDNA are gambling.  Rather, the only questions before the Court are whether CDNA is in fact a federally regulated DCM (it demonstrably is), whether the contracts at issue are traded on CDNA's DCM (they demonstrably are), and whether the Court will enforce the CFTC's "exclusive jurisdiction" to regulate such contracts (it should).

CDNA is entitled to a preliminary injunction in this case because the NGCB threatens immediate and irreparable injury by assuming regulatory jurisdiction over federally regulated

event contracts and purporting to prohibit CDNA from making its trading market available in Nevada.  If the NGCB is permitted to do so, CDNA would suffer immediate injury in the form of unrecoupable compliance costs, lost business opportunities, reputational damage, and potential collateral effects to its business from being found to be engaged in unlawful vice activities. CDNA's users would also be harmed by the forced pausing or liquidation of Nevada users' contracts and the ensuing market disruptions.  Moreover, because money damages are generally not available against a state, CDNA's injury would be unredressable even if it were to ultimately prevail in this litigation.  Accordingly, CDNA respectfully requests that the Court issue a preliminary injunction.

## BACKGROUND

**A.    Congress Established a Comprehensive Regulatory Scheme for Exclusive Federal Oversight of Futures Markets.**

The CFTC regulates financial derivative contracts and their markets.  Derivative contracts are financial tools that allocate risk between counterparties.  *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, 2024 WL 4164694, at *1–2 (D.D.C. Sept. 12, 2024), *appeal dismissed*, 2025 WL 1349979 (D.C. Cir. May 7, 2025) (hereinafter "*Kalshi v. CFTC*").  Historically, the archetypal example is a grain futures contract, which allows buyers to lock in prices and manage agricultural market volatility by agreeing to buy or sell a specified amount of a crop at a fixed price on a future date.  For over a century, the federal government has regulated national derivatives markets to promote uniformity and integrity in national trading.

"Under the CEA, the CFTC has exclusive jurisdiction to regulate commodities and futures on designated exchanges."  *Kalshi v. Hendrick*, 2025 WL 1073495, at *3.  Congress enacted the CEA in 1936 to replace the fragmented system of state oversight with a uniform federal framework for regulating commodities and futures markets.  In 1974, Congress enacted sweeping amendments to the CEA to modernize and centralize federal oversight, expressly granting the CFTC "exclusive jurisdiction" over futures markets.  7 U.S.C. § 2(a)(1)(A).  Congress feared inconsistent state regulations could destabilize futures markets, noting concerns that "states . . . might step in to

4

regulate the futures markets themselves." *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995). As one Senator warned, applying varied state laws to futures trading "would just lead to total chaos." *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry* (hereinafter "Senate Hearings"), 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Prior to passing the 1974 amendments, the Senate removed a provision from the CEA that would have preserved state authority over futures trading, thereby confirming the CFTC's exclusive regulatory power. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

The CFTC's regulatory framework is comprehensive and exclusive. To offer derivatives for public trading, an exchange must seek and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The application for such a designation must provide detailed information demonstrating the exchange's capacity to abide by the CEA, including the CFTC's "Core Principles" for DCMs, which include, among other requirements, providing "impartial access" to the DCM. 17 C.F.R. §§ 38.3(a)(2), 38.151(b). Under the scheme Congress established, once the CFTC has designated an exchange as a contract market, the CFTC has "exclusive jurisdiction" and enforcement powers to regulate derivatives—including any swaps and futures—traded on that DCM. *See* 7 U.S.C. § 2(a)(1)(A).

As long as the DCM abides by the requirements set forth in the CEA and CFTC regulations, it may list contracts on its exchange without pre-approval from the CFTC. A CFTC-designated contract market may certify that a contract complies with applicable law by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); *see also* 17 C.F.R. § 40.2(a). Within ten days, the CFTC reviews the reports and may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). If the CFTC does not take action within the ten-day period, the contract becomes "effective." *See* 7 U.S.C. § 7a-2(c)(2). Alternatively, exchanges may submit contracts to the CFTC for approval prior to listing. 7 U.S.C.

§ 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c).  The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA.  7 U.S.C. § 7a-2(c)(5)(B).

Among the products the CFTC regulates under this regime are event contracts listed on DCMs.  Event contracts are a type of derivative contract with a payment schedule based on the outcome of a specified event as of an expiration date.  The purchaser of an event contract takes a position on an event's outcome—usually a "yes" or "no" position, with "yes" meaning the event will occur by the expiration date and "no" meaning the event will not occur.  The "yes" position purchaser profits if the specified outcome occurs by the expiration date, while the "no" position purchaser profits if it does not.  The event contract's purchase price fluctuates based on supply and demand, reflecting the market's perception of the likelihood of the specified event's occurrence or non-occurrence.  The event contract holder may sell their position at a profit or loss prior to expiration.  An event contract could be tied to a variety of events, including specified movements of a financial index, a particular yield on the 10-year U.S. treasury note, the magnitude of the upcoming hurricane season, or the outcome of political, scientific, or live sporting events.

The CFTC regulates event contracts as a derivative referencing an "excluded commodity," a category which includes specified commodities that are not subject to the same set of CEA regulations as physical commodities.  *See id.* §§ 1a(19), (47)(A)(ii), (iv), (vi); *see Kalshi v. CFTC*, 2024 WL 4164694, at *2–3.  "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities."  7 U.S.C. § 7a-2(c)(5)(C)(i).  Events themselves constitute "excluded commodities" under the CEA, defined as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences.  *Id.* § 1a(19)(iv).

The CEA contains a "Special Rule" authorizing—but not requiring—the CFTC to prohibit specific types of event contracts it determines to be "contrary to the public interest."  The CFTC has discretionary authority to deem contracts contrary to the public interest if they "involve" (i) "activity that is unlawful under any Federal or State law"; (ii) "terrorism"; (iii) "assassination"; (iv) "war"; (v) "gaming"; or (vi) "other similar activity determined by the Commission, by rule or

regulation, to be contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The CFTC "may," but need not, prohibit an event contract under the Special Rule only if it falls into one of these six categories.  *Id.*

**B.    CDNA Is Registered as a CFTC-Designated Contract Market Under Federal Law.**

The CFTC first certified CDNA's predecessor as a DCM in 2004, confirming its market complied with the CEA.  ECF No. 1 ("Compl.") ¶ 64.  In 2010, the CFTC recertified its registration.  *Id.*  For two decades, the entity now known as CDNA has operated continuously as a CFTC-regulated DCM and has been fully regulated as a derivatives exchange under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.  *Id.* Because CDNA operates as a CFTC-designated contract market, its event contracts fall under the "exclusive jurisdiction" of the CFTC.  7 U.S.C. § 2(a)(1)(A).  Under this designation, CDNA is subject to a comprehensive set of federal obligations designed to safeguard market integrity.

On January 30, 2025, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. § 40.2(a), CDNA certified and announced its intention to list a new category of event contracts:  "Industry Event - Live Presentations" contracts.  *See* Jan. 30, 2025 CDNA Certification Letter, attached hereto as Ex. B, at 1.  These contracts allow users to trade on the outcome of live events in the performing arts, spectator sports, and related industries, provided the users themselves are not participants in the events.  *See id.* at 4–5.  CDNA designed these event contracts "to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises."  *Id.* at 8.  These Industry Event – Live Presentations contracts provide for payment "dependent on the occurrence or nonoccurrence . . . of an event or contingency associated with a potential financial, economic, or commercial consequence" and are therefore "swaps" as defined by the CEA.  7 U.S.C. § 1a(47)(A)(ii).

Under the process described above, as a CFTC-designated contract market, CDNA ensured that these contracts adhered to product-related regulatory standards and certified that they

1   complied with applicable law prior to the time of listing.  *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §

2   40.2(a).  CDNA's contracts with return profiles that are dependent on the outcome of live sporting

3   events (hereinafter "Sports Event Contracts") at issue in this case have all been certified and

4   deemed "effective" under this process.  *See* 7 U.S.C. § 7a-2(c); 17 C.F.R. § 40.2(a).

5   **C.**     **The Nevada Regulatory Scheme for Gaming.**

6   Gaming in Nevada is subject to a two-tiered system of regulatory oversight.  The NGCB

7   establishes and enforces rules and regulations governing gaming in the State of Nevada.  Compl.

8   ¶ 21.  The Nevada Gaming Commission ("NGC") is the final authority on licensing matters in

9   Nevada, and it acts on recommendations of the NGCB with regard to licensing.[2]  Together, the

10  NGCB and NGC administer and enforce gaming laws and regulations throughout Nevada.  The

11  NGCB seeks to assert its authority over Sports Event Contracts offered for trading on CDNA based

12  on its view that these contracts violate various provisions of Nevada gaming law.  *Id.* ¶ 70.

13  The NGCB issued a cease-and-desist order to CDNA on May 20, 2025.  May 20, 2025

14  NGCB Cease-and-Desist Order, attached hereto as Ex. C.  The NGCB's order states that CDNA

15  "has been offering, and continues to offer, event-based wagering contracts in Nevada on sporting

16  events through its exchange" and that this offering "is unlawful in Nevada, unless and until

17  approved as licensed gaming by the Nevada Gaming Commission."  *Id.* at 1.  The NGCB

18  concluded that "by offering event-based wagering contracts in Nevada, [CDNA] is operating as

19  an unlicensed sports pool in violation of [Nevada law]."[3]  *Id.* at 2.

20  The NGCB ordered CDNA to "immediately cease and desist from offering in Nevada any

21  event-based wagering contracts concerning sporting events."  *Id.*  In response to the order, counsel

22  for CDNA contacted Nevada Deputy Attorney General John Michela by email requesting a time

23  to discuss the cease-and-desist order and asking "how the Board intend[ed] to proceed in light of

24  the federal injunction issued in the case involving Kalshi."  May 22, 2025 through June 4, 2025

25

26  _____

27  [2] *Gaming Commission*, Nevada Gaming Commission and the Nevada Gaming Control Board,
    https://gaming.nv.gov/gaming/commission/.
    [3] Unauthorized sports wagering can lead to both criminal and civil liability under Nevada law.  *See infra* p. 20.

28

Email Chain, attached hereto as Ex. D, at 6.  In response, Mr. Michela declined a discussion on behalf of his client by asserting that any response from CDNA to the cease-and-desist order "should be submitted to Board Chairman Kirk Hendrick in writing." *Id.* at 5.  With respect to the preliminary injunction issued in *Kalshi v. Hendrick*, Mr. Michela noted only that Chief Judge Gordon had "clarified that the preliminary injunction only applies to action against Kalshi." *Id.*

Given the lack of assurances by Mr. Michela and the NGCB, CDNA had no choice but to promptly seek judicial intervention and filed the instant action on June 3, 2025.  On the same date, counsel for CDNA sent a letter to Defendant Hendrick, attaching the Complaint and noting that both this Court's Chief Judge Gordon and the United States District Court for the District of New Jersey have issued preliminary injunctions prohibiting state enforcement action against another DCM—Kalshi—for offering similar event contracts.  *See* June 3, 2025 CDNA Response to NGCB, attached hereto as Ex. E, at 1–2.  The letter stated that, had the NGCB responded to engagement efforts, CDNA would have proposed a stay of further proceedings pending the outcome of *Kalshi v. Hendrick* and, failing that, would have proposed a briefing schedule.  *Id.* at 2.  Counsel for CDNA also offered once again to meet and confer and requested the NGCB's assurance that "neither the NGCB nor any other Nevada state authority [would] commence enforcement action against CDNA" without first meeting and conferring with CDNA.  *Id.* at 3.

On June 4, 2025, CDNA met and conferred with Defendants' counsel.  Based on that discussion, the parties agreed that CDNA would promptly file a motion for a preliminary injunction, the parties would stipulate to a reasonable briefing schedule on that motion, and the Defendants would refrain from any enforcement action against CDNA prior to this Court ruling on the motion (obviating the need for emergency motions practice).  *See* Ex D, at 1–2.  Accordingly, CDNA filed the present Motion.

## **ARGUMENT**

The NGCB's order threatening imminent enforcement of Nevada civil and criminal law subjects CDNA and its users to immediate and irreparable harm absent a preliminary injunction.  To be granted a preliminary injunction, a movant must establish that "(1) they are likely to succeed

on the merits; (2) they are likely to suffer irreparable harm; (3) the balance of equities tips in their favor, and (4) a preliminary injunction is in the public interest." *Matsumoto v. Labrador*, 122 F.4th 787, 804 (9th Cir. 2024).  CDNA meets each element.

**A.    CDNA Is Likely to Succeed on the Merits Because the CEA Preempts Application of Nevada Gaming Law to CFTC-Regulated Event Contracts.**

"The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'"  *Arizona v. United States,* 567 U.S. 387, 399 (2012) (quoting U.S. Const. art. VI, cl. 2).  "Under this principle, Congress has the power to preempt state law."  *Id.*  There are three types of federal preemption: express, field, and conflict. *Id.*  A court's inquiry is the same under each—whether Congress intended a particular federal law to preempt state law.  All three types of preemption apply to event contracts listed on CDNA.

*1.    The CEA Expressly Preempts Nevada Gaming Law as Applied to CDNA.*

Congress may preempt state law "by enacting a statute containing an express preemption provision."  *Arizona,* 567 U.S. at 399.  Congress expressed its intent in the text of the CEA that state law is preempted as to CFTC-regulated derivatives:

> The [CFTC] shall have *exclusive jurisdiction* . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of [the CEA] or a swap execution facility pursuant to section 7b–3 of [the CEA] or any other board of trade, exchange, or market, and transactions subject to regulation by the [CFTC] pursuant to section 23 of [the CEA].

7 U.S.C. § 2(a)(1)(A) (emphasis added).  In *Kalshi v. Hendrick,* Chief Judge Gordon found this "plain and unambiguous language grants the CFTC exclusive jurisdiction over accounts, agreements, and transactions involving swaps or contracts of sale of a commodity for future delivery" traded on a CFTC-designated exchange.  2025 WL 1073495, at *5.

The Sports Event Contracts traded on CDNA are exactly that—derivative contracts traded on a DCM.  Like other event contracts, a Sports Event Contract is a "swap" as defined by the CEA,

because it is an "agreement, contract, or transaction" that provides for a payment "dependent on the occurrence [or] non-occurrence" of a specified event "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Sports events have a wide array of *actual* financial, economic, and commercial consequences for a variety of market participants—from the vendors who sell event- or team-branded merchandise to broadcasters who promote and air the events themselves. The Sports Event Contracts CDNA offers provide a means to hedge against the commercial risks of the underlying sports events, just like any other derivative contract does. Sports Event Contracts are thus "swaps" traded on a "contract market designated pursuant to section 7" of the CEA, putting them squarely under the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A). Section 2 of the CEA expressly preempts states from asserting their authority to regulate these contracts.

> 2.    *Nevada's Sports Wagering Laws Are Field Preempted as Applied to CDNA.*

Even if express preemption did not apply, field preemption does. Field preemption is implied "[w]hen the federal government completely occupies a given field or an identifiable portion of it." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 212–13 (1983). "[T]he ultimate touchstone of pre-emption analysis" is the "purpose of Congress." *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). Congress's intent to occupy a field can be expressed in a statute's text and legislative history, *see e.g.*, *Pac. Gas & Elec. Co.*, 461 U.S. at 203–13, or in a scheme of "federal statutory directives" that "provide a full set of standards" that are "designed as a 'harmonious whole,'" *Arizona,* 567 U.S. at 401 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)). "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.* The CEA's text and legislative history, as well as the comprehensive nature of its regulatory framework, illustrate Congress's clear intent to occupy the field of derivatives trading on federally designated contract markets.

**Statutory Text.** The same provisions discussed with respect to express preemption demonstrate Congress's intent to preempt the field of derivatives traded under CFTC oversight. It

could not be clearer—Section 2 affords "exclusive jurisdiction" to the CFTC over derivatives traded on a DCM. 7 U.S.C. § 2(a)(1)(A). Put simply, if the CFTC is hands on, Congress wants the states to be hands off. *See Kalshi v. Hendrick*, 2025 WL 1073495, at *6 ("In sum, if Kalshi were offering its contracts without CFTC designation, then the defendants could regulate it. But because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted.").

Chief Judge Gordon of this Court and Judge Kiel of the United States District Court for the District of New Jersey have already recognized the preemptive effect of the CEA on state gaming law as applied to Sports Event Contracts traded on DCMs. *See Kalshi v. Hendrick*, 2025 WL 1073495, at *5–6; *Kalshi v. Flaherty*, 2025 WL 1218313, at *5–6. On June 3, 2025, Chief Judge Gordon denied defendants' motion to dismiss in *Kalshi v. Hendrick*, affirming his prior ruling that "Kalshi was likely to prevail on its arguments that the CEA preempts Nevada gaming laws" and rejecting other arguments for dismissal. Order Denying Defs.' Mot. to Dismiss at 13, *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575 (D. Nev. June 3, 2025). These decisions are consistent with those of numerous courts that have recognized the CEA preempts state and local laws as applied to derivatives trading on DCMs. *See Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (finding CEA "preempts the application of state law" to futures trading); *see also Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981) (holding that "the Alabama gambling statutes, if construed to require actual delivery [of a commodity], would directly conflict with the federal purpose of fostering the markets in that they would destroy the markets in this state, and that Congress has preempted the field"); *Sinclair & Co. v. Gurule*, 757 P.2d 225, 228 (Idaho Ct. App. 1988) (declining to find commodity futures contracts unenforceable as gambling under state law because, "with passage of the CEA, the federal government has moved to occupy the entire field of commodities futures traded on federally regulated exchanges" and "a state should not treat commodity transactions as 'gambling' because such treatment could destroy the market").

**Statutory Purpose.** The text of the CEA, as amended in 1974, comports with Congress's purpose of regulating the expanding commodity futures market with a uniform set of federal

regulations.    The 1974 amendments were intended to "avoid unnecessary, overlapping and duplicative regulation."  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  Congress wanted to avoid overlap with the Securities and Exchange Commission and was concerned that the states might "step in to regulate the futures markets themselves" and introduce "conflicting regulatory demands."  *Am. Agric. Movement*, 977 F.2d at 1156.  Congress addressed these concerns by putting "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974).  Indeed, one sponsor of the 1974 amendments lamented that the application of "different state laws would just lead to total chaos."  Senate Hearings, 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

Courts throughout the country have agreed that the whole point of the exclusive jurisdiction provision of the CEA was to preempt parallel state regulation.  *Hofmayer v. Dean Witter & Co*., 459 F. Supp. 733, 737 (N.D. Cal. 1978) ("In the light of Congress' plainly stated intent to have the Commodity Exchange Act, as amended, preempt the field of regulation of commodity futures trading, any claim under federal or state securities statutes is barred."); *Jones v. B.C. Christopher & Co*., 466 F. Supp. 213, 220 (D. Kan. 1979) ("It is now established, however, that the SEC and other federal agencies are 'stripped' of authority to regulate commodities transactions . . . and that state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC.") (citations omitted); *Int'l Trading Ltd. v. Bell*, 262 Ark. 244, 250–51 (1977) (finding CEA's language "express[es] a clear intention to vest exclusive jurisdiction of the regulation of commodity options in the [CFTC] and to supersede the jurisdiction of all state and federal agencies"); *Taylor v. Bear Stearns & Co*., 572 F. Supp. 667, 673 (N.D. Ga. 1983) (noting that "the primary concern of Congress was preemption of federal and state regulatory schemes").  Attempting to preclude trading of Sports Event Contracts on CDNA, a CFTC-regulated DCM, directly contradicts this clear purpose.

**Legislative History.**  If the text and purpose were not clear enough, the legislative history of the CEA crystalizes congressional intent to occupy the field of CFTC-regulated derivatives.  The exclusive jurisdiction provision was introduced by the 1974 amendments to the CEA.  The

Conference Report that preceded the enactment of those amendments elucidates the purpose of the exclusive jurisdiction provision: "Under the exclusive grant of jurisdiction to the Commission, the authority of the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*." S. Rep. No. 93-1194, at 35 (1974) (Conf. Rep.) (emphasis added). *See also Kalshi v. Hendrick*, 2025 WL 1073495, at *6 ("[L]egislative history supports the conclusion that Congress intended to occupy the field and preempt state law from applying to CFTC-designated exchanges.").

The drafting history of the 1974 amendments eliminates any doubt of Congress's preemptive purpose. At that time, Congress deleted a provision that would have preserved the states' authority over derivatives trading on federally designated contract markets. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687–88 (1982); *see also* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge). The Senate made this deletion and clarified that "the [CFTC's] jurisdiction, where applicable supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 5848 (1974). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987). The Senate's deliberate deletion of the provision for concurrent state jurisdiction is an unmistakable indication of Congress's intent to preempt parallel state regulation.

**Comprehensive Regulatory Scheme.** The CEA's comprehensive regulatory framework, including its enforcement provisions, confirms Congress's intent to occupy the field exclusively. The CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)). Congress establishes such comprehensive structures when it means to leave "no room for the states to supplement federal law." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368–69 (1986); *see also Arizona*, 567 U.S. at 401 (explaining that a federal scheme's "comprehensive" nature supports field preemption). An

exchange may offer derivatives only after obtaining CFTC designation as a regulated exchange.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).  To receive this designation, the exchange must submit a detailed application demonstrating its ability to comply with the CFTC's extensive regulatory requirements.  17 C.F.R. § 38.3(a).  The CFTC then conducts a thorough review of the application to determine whether the exchange satisfies its standards.  *See id.*

Once designated as a federally regulated contract market, a DCM is governed by the CFTC's far-reaching regulatory scheme, which includes, among other requirements, recordkeeping obligations, 17 C.F.R. §§ 38.950, reporting requirements, *id.* § 38.450, and liquidity standards, *id.* § 38.1101(a)(2).  Congress also authorized CFTC-designated exchanges to list contracts—including event contracts—through a certification process, whereby the exchange affirms that the contract complies with the CEA.  Congress granted the CFTC authority to conduct a post-certification review if it believes the contract may violate any applicable statute or regulation.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).  To keep its designation, a DCM must comply with all Core Principles and CFTC regulations.  7 U.S.C. § 7(d).  If an exchange disregards a CFTC regulation, the Commission may pursue civil and criminal penalties.  *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3.

Importantly, the CEA expressly permits the CFTC to reject event contracts that it finds "contrary to the public interest" if they "involve" conduct such as "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or other comparable conduct identified by the CFTC through rule or regulation.  7 U.S.C. § 7a-2(c)(5)(C)(i).  This authority is discretionary.  The statute provides that the CFTC "may"—not must—find a contract contrary to the public interest if it falls into one of the listed categories.  *Id.*  That judgment is assigned to the CFTC alone—not to the NGCB and its counterparts in 50 individual states.  Cumulatively, this elaborate regulatory structure demonstrates Congress's intent to occupy the field of futures contracts on federally designated exchanges.

Individually, and in aggregate, the text, history, purpose, and comprehensive structure of the CEA demonstrate that Congress intended to occupy the field of derivatives traded on federally

1  designated contract markets.  As a result, Nevada's gaming laws are field preempted as applied to

2  CDNA's Sports Event Contracts.

3          3.    *Nevada's Gaming Laws Are Conflict Preempted as Applied to CDNA.*

4          The NGCB's cease-and-desist order directed CDNA to take one of two options:  Either

5  permanently stop offering trading of Sports Event Contracts in Nevada or stop offering them until

6  CDNA obtains a sports wagering license under Nevada law.  Either option would directly conflict

7  with the congressional objectives underlying the CEA and would put CDNA at odds with specific

8  regulatory requirements for operating a DCM.  *See Crosby v. Nat'l Foreign Trade Council*, 530

9  U.S. 363, 373 (2000) ("If the purpose of the act cannot otherwise be accomplished—if its operation

10  within its chosen field else must be frustrated and its provisions be refused their natural effect—

11  the state law must yield to the regulation of Congress . . . . ") (quoting *Savage v. Jones*, 225 U.S.

12  501, 533 (1912)).  Application of Nevada's gaming laws to the Sports Event Contracts at issue

13  here would frustrate congressional purposes of uniformity of regulation and uniformity of

14  enforcement as applied to derivatives traded under CFTC oversight, as well as furtherance of the

15  CFTC's Core Principles, and would jeopardize CDNA's designation as a DCM.

16          *First*, application of Nevada's sports wagering laws to CDNA would frustrate the CEA's

17  purpose of bringing futures markets "under a uniform set of regulations."  *Am. Agric. Movement*,

18  977 F.2d at 1156.  As the Seventh Circuit noted, "a contract market could not operate efficiently,

19  and perhaps not at all, if varying and potentially contradictory legal standards governed its duties

20  to investors."  *Id*.  The assertion of state authority and the demands in the NGCB's cease-and-

21  desist order cannot be squared with Congress's intent to shield regulated exchanges from being

22  governed by a patchwork of potentially conflicting legal regimes.  The NGCB's order seeks to

23  subject a CFTC-regulated DCM to the state's licensure scheme—precisely the type of regulation

24  Congress intended to preclude.  The inconsistency becomes even more apparent when considering

25  that, if the NGCB is allowed to proceed, each of the other 49 states and the District of Columbia

26  could likewise attempt to impose their own laws on CDNA.  Subjecting DCMs to state regulation

27

28

1  would create "an obstacle to the accomplishment and execution of the full purposes and objectives

2  of Congress." *Hines*, 312 U.S. at 67.  These state laws are therefore preempted.

3    *Second*, subjecting CDNA to Nevada's sports wagering laws would frustrate Congress's

4  intended uniformity of enforcement for DCMs.  Preemption also arises where there is "a conflict

5  in the method of enforcement." *Arizona*, 567 U.S. at 406.  A state law creates an "obstacle" to a

6  federal regulatory framework when Congress adopts a particular method of enforcement to achieve

7  its objectives, and state law imposes a different approach that disrupts "the careful balance struck

8  by Congress." *Knox v. Brnovich*, 907 F.3d 1167, 1175 (9th Cir. 2018) (citation and internal

9  quotations omitted).  This is especially true when Congress reserves "prosecutorial power" and

10  "discretion" to federal authorities—a state law allowing prosecutions for the same conduct

11  "conflicts with the federal scheme." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1027 (9th Cir.

12  2013).  Otherwise, as the Supreme Court cautioned, a state could initiate charges "even in

13  circumstances where federal officials in charge of the comprehensive scheme determine that

14  prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402.

15    That is precisely the danger presented by the NGCB's actions.  Once CDNA received

16  CFTC designation as a contract market, it was permitted under federal law to list event contracts

17  by certifying that those contracts comply with federal requirements.  The CFTC—and no other

18  body—has the authority to review that certification on the basis that the contracts are "contrary to

19  the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i).  If the CFTC determines that CDNA has violated

20  federal law, it may act.  *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3.

21  Congress provided the CFTC with a range of enforcement tools and vested the agency with

22  discretion to determine how best to deploy them.

23    Allowing Nevada to impose its own laws on federally regulated exchanges would

24  "disrupt[] 'the congressional calibration of force.'" *Valle del Sol*, 732 F.3d at 1027 (quoting

25  *Crosby*, 530 U.S. at 380).  The NGCB's cease-and-desist order asserts that CDNA's activities are

26  "in violation of Nevada law" and expressly reserves the rights of itself and other Nevada authorities

27  "to pursue criminal and civil actions based on [CDNA's] past and future conduct within the state."

28

Ex. C, at 2.  One example of a statute NGCB alleges CDNA to be violating is Nevada Revised Statutes ("NRS") § 463.160—a willful violation of which is a category B felony for which an offender "*shall* be punished" by one to ten years imprisonment and/or a fine of up to $50,000. NRS § 463.360(3) (emphasis added).  If there were no preemption here, the federal enforcement regime enacted by Congress would be frustrated by state-imposed civil and criminal sanctions. *See Crosby*, 530 U.S. at 373–74 (finding conflict preemption where state law "undermin[ed]" Congress's "delegation of effective discretion" to the executive).  Courts have recognized conflict preemption where state discipline and enforcement regimes diverge from the federal scheme.  For example, the Sixth Circuit held that the CEA preempted an Ohio statute that required payment to investors of any interest earned on collateral because it conflicted with a regulation promulgated by the CFTC.  *Bibbo v. Dean Witter Reynolds, Inc.,* 151 F.3d 559, 563–64  (6th Cir. 1998). Similarly, the Seventh Circuit held that the CEA preempted a state law defamation claim against a registered futures association because the CEA regulates in a "comprehensive way" the "disciplinary proceedings" by self-regulated organizations and a state common-law challenge to those proceedings would "impair[ ] significantly" such an organization's "capacity to discipline its members." *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 893–94 (7th Cir. 2019).

*Third*, the NGCB's order is at odds with the CFTC Core Principles that underpin CDNA's status as a DCM.  *See Kalshi v. Hendrick*, 2025 WL 1073495 at *7 (noting the "potential existential threat" that if Kalshi disrupted contracts or geographically limited access to its national exchange, the CFTC could find Kalshi to have violated the CFTC's Core Principles).  The CFTC's Core Principle 2 requires CDNA to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services."  17 C.F.R. §§ 38.150, 38.151(b) (emphasis added).  Evicting users from the contract market and terminating their contracts based on their location within the State of Nevada would not be providing "impartial access."  Under Core Principle 4, CDNA is required to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and market disruptions." 17 C.F.R §§ 38.250, 38.255.  Abruptly cutting off Nevada residents—including those residents

holding ongoing investments—from CDNA's Sports Event Contracts would constitute exactly the sort of disruption the CFTC requires CDNA to prevent.  In contemplating such a disruption, the Seventh Circuit emphasized that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted."  *Am. Agric. Movement*, 977 F.2d at 1156–57 (citation omitted).  In this scenario, it may be "impossible for [CDNA] to comply with both state and federal law"—the quintessential case for conflict preemption.  *Valle del Sol*, 732 F.3d at 1023 (quoting *Crosby*, 530 U.S. at 372).

Many courts have extended these principles to find state laws preempted by the CEA on conflict preemption grounds.  *See Am. Agric. Movement*, 977 F.2d at 1155–56 (holding the CEA preempted state law whose application "would directly affect trading on or the operation of a futures market"); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (affirming dismissal of a claim that trading in futures contracts violated a Georgia gambling statute "on the ground that the [CEA] preempts all state laws inconsistent with its provisions"); *Paine, Webber*, 515 F. Supp. at 207 (finding application of that state's gambling laws "would destroy the markets in this state" and holding them preempted); *Sinclair & Co.*, 757 P.2d at 228 (holding the application of state's gambling laws to federally regulated exchanges "could destroy the market."); *see also Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1055–57 (9th Cir. 2003) (finding CEA preempted California's Bucket Shop Law as applied to swaps exempted from coverage by the CEA).

Because imposing Nevada sports wagering law obligations on CDNA would frustrate the purpose and effect of the CEA's uniformity of regulation, uniformity of enforcement, and furtherance of the CFTC's Core Principles, those laws are conflict preempted.

**B.    CDNA Will Suffer Irreparable Harm if the Requested Relief Is Not Granted.**

Absent an injunction, CDNA will be forced to decide between: (1) risking imposition of unlawful civil and criminal penalties by refusing to comply with the cease-and-desist order; or (2)

complying with the cease-and-desist order, which would result in significant unrecoverable losses for CDNA and its users.  Either way, CDNA will be irreparably harmed.

A court may find irreparable harm and exercise its discretion to grant an injunction when monetary damages are an inadequate remedy.  *See OnPointe Cmty. Care LV LLC v. Charter Health Holdings, Inc.*, 2023 WL 2430192, at *3 (D. Nev. Jan. 10, 2023) (citing *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320–21 (9th Cir. 1994)) ("To show irreparable harm, a plaintiff must demonstrate that other legal remedies like money damages cannot cure that harm.").  The cost of compliance with a preempted state law is considered irreparable where, as here, such costs would be unrecoverable through a final judgment due to the opposing party's sovereign immunity.  *See California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012) (finding irreparable harm where plaintiffs "can obtain no remedy in damages against the state because of the Eleventh Amendment.").

### 1.    CDNA Will Suffer Irreparable Harm if It Does Not Comply with the Cease-and-Desist Order.

CDNA faces the imminent threat of criminal and civil prosecution if it does not comply with the NGCB's cease-and-desist order.  The NGCB asserts that CDNA is "operating as an unlicensed sports pool" and is violating various Nevada statutes.  Ex. C, at 1–2.  The purported violations of Nevada law carry penalties including fines and incarceration.[4]

CDNA therefore faces an imminent threat of being subjected to these civil and criminal penalties.  Indeed, the NGCB warned CDNA that it must "immediately cease and desist from offering in Nevada any event-based wagering contracts concerning sporting events."  Ex. C, at 2.

---

[4] *See* NRS § 463.360(3) (willful violation of NRS § 463.160 is a category B felony to be punished by one to ten years imprisonment and/or a fine of up to $50,000); NRS § 463.360(6) (violation of chapter 463 provisions with unspecified penalties is a gross misdemeanor); NRS § 193.140 (penalty for gross misdemeanor is imprisonment of up to 364 days and/or fine of up to $2,000); NRS § 465.088(1)(a) (first violation of NRS § 465.086 is a category C felony to be punished by one to five years imprisonment, with additional fine of up to $10,000 (or more if required or authorized by statute) permitted, *see* NRS § 193.130; subsequent violation is a category B felony to be punished by one to six years imprisonment, with additional fine of up to $10,000 permitted); NRS § 465.092(3) (violation of NRS § 465.092 is a misdemeanor to be punished by imprisonment of up to six months and/or fine of up to $1,000, *see* NRS § 193.150)

20

This threat of imminent civil and criminal prosecution establishes irreparable harm. *See Kalshi v. Hendrick*, 2025 WL 1073495, at *8 (finding "fac[ing] civil and criminal liability" contributed to a showing of "a likelihood of irreparable harm"). As the Supreme Court has recognized, a plaintiff establishes irreparable harm when it demonstrates a credible threat of "imminent" enforcement of a preempted state law. *See Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 382 (1992) ("[T]he [imminent] prospect of state suit . . . supplies the necessary irreparable injury."). This irreparable injury is particularly significant, where, as here, "repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses." *Id.* at 381. In these circumstances, litigants are faced with a "Hobson's choice: continually violate the [state] law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Id.* The NGCB's threat of imminent enforcement of preempted state statutes that carry severe civil and criminal penalties would force CDNA to make this "Hobson's choice."

        2.    *CDNA Will Suffer Irreparable Harm if It Complies with the Cease-and-Desist Order.*

CDNA will also suffer irreparable harm if it complies with the NGCB's order—if compliance is even possible. To cease offering Sports Event Contracts in Nevada as the NGCB has ordered, CDNA would need to identify users in Nevada and exclude them from its market. Doing so would cause CDNA (and its users) to suffer irreparable harm.

CDNA does not restrict users' access to the market or particular contracts based on location. Rather, because CDNA is a national exchange, it has no need to identify the geographical location of any individual user at a particular time. To comply with the NGCB's order to cease permitting Nevada residents to access Sports Event Contracts, CDNA would have to immediately develop the technological capability to geolocate all of its users and exclude users from certain contracts based on their location. As explained in detail in the attached Declaration of Kevin Dan, developing this technology would subject CDNA to significant challenges and costs. Decl. of

1    Kevin Dan (hereinafter "Dan Decl.") ¶¶ 12–19.   Developing this technology would also take

2    significant time, making immediate compliance with the NGCB's order all but impossible.  *Id.* ¶¶

3    18–19.   The necessity of taking on substantial expenses in order to comply with a state law that

4    CDNA is challenging as preempted supports a showing of irreparable harm.   *See Kalshi v.*

5    *Hendrick*, 2025 WL 1073495, at *8 (requiring Kalshi to "spend millions to geofence, which might

6    result in losing its CFTC designation" contributed to "a likelihood of irreparable harm").

7         Even if the Nevada sports wagering statutes are later found to be preempted by the CEA,

8    these costs to comply with the cease-and-desist order would likely be unrecoverable, as the

9    Defendants likely would be immune from suit.  *See Stanley v. Trs. of California State Univ.*, 433

10   F.3d 1129, 1133 (9th Cir. 2006) ("In an action for incurred monetary damages, state sovereign

11   immunity can be overcome only by explicit abrogation by Congress pursuant to its powers under

12   the Fourteenth Amendment or by state consent to suit.")   The Ninth Circuit has concluded that

13   costs that are unrecoverable due to sovereign immunity qualify as irreparable harm.  *See California*

14   *Pharmacists Ass'n*, 563 F.3d at 852.

15        The NGCB's order also poses an existential threat to CDNA because complying with it

16   would jeopardize CDNA's status as a DCM.  *See Kalshi v. Hendrick*, 2025 WL 1073495, at *7

17   (recognizing the "potential existential threat of the CFTC taking action against [Kalshi]" for

18   disrupting contracts or geographically limiting "who can enter contracts on what is supposed to be

19   a national exchange").   Terminating existing contracts in Nevada would violate CFTC Core

20   Principles requiring exchange markets to provide "impartial access" to markets, 17 C.F.R.

21   § 38.151(b), and prevent "market disruptions."   17 C.F.R. § 38.255; Dan Decl. ¶¶ 29–33.   As

22   described above, compliance with the cease-and-desist order would require CDNA to *cause* the

23   very market disruption it is required to prevent.   Excluding users based on their location would be

24   contrary to CDNA's responsibility to provide impartial access to its markets.   These violations of

25   CFTC Core Principles could cause CDNA to lose its CFTC designation as a DCM, putting its

26   entire business in jeopardy.  *See* 17 C.F.R. § 38.100(a) (requiring compliance with Core Principles

27   to "maintain" designation as a contract exchange).   In addition, CDNA could be subject to

28

significant civil penalties, further adding to the harm CDNA would incur absent an injunction. *See*

7 U.S.C. §§ 13a, 13a-1(d). This potential for devastating harm to CDNA's business further

supports a finding of irreparable harm. *See Kalshi v. Hendrick*, 2025 WL 1073495, at *8 (finding

irreparable harm to Kalshi posed by reputational harm, unredressable expenditures, and potential

loss of CFTC designation from compliance with state cease-and-desist order).

### C. The Balance of Equities and the Public Interest Support Enjoining Enforcement of Nevada's Sports Wagering Laws.

The other preliminary injunction elements likewise support CDNA's requested relief

because the public interest and the harm to CDNA from denying the injunction outweigh any

potential harm to the Defendants from granting the injunction. *See Valle del Sol*, 732 F.3d at 1029

("[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate

the requirements of federal law, especially when there are no adequate remedies available.")

(citation and internal quotation marks omitted); *United States v. California*, 921 F.3d 865, 893 (9th

Cir. 2019) ("[P]reventing a violation of the Supremacy Clause serves the public interest.").

Compliance with the NGCB's order would cause significant harms to the public,

particularly CDNA's users. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)

(noting the particular relevance of public interest analysis where "the impact of an injunction

reaches beyond the parties, carrying with it a potential for public consequences"); *see also Kalshi

v. Hendrick*, 2025 WL 1073495, at *8 (determining the public interest weighed in favor of an

injunction in part because "third parties' contracts and investment expectations would be disrupted

if Kalshi were forced to terminate its existing [sports and election event] contracts for Nevada-

based users"). To comply with the NGCB's order, CDNA would be forced to pause or liquidate

numerous users' positions in Sports Event Contracts. *See* Dan Decl. ¶¶ 20–21. A substantial

number of investors exiting the Sports Event Contract market simultaneously could distort contract

prices and send a false signal to other investors, setting off further market disruption. *See id.* ¶¶

22–28. The CFTC requires CDNA to prevent this sort of market disruption, as it is contrary to the

CFTC's interest in "safeguarding the public interest in commodity futures markets." *CFTC v. Brit.*

*Am. Commodity Options*, 560 F.2d 135, 142 (2d Cir. 1977). Further, Nevada users would be barred from responding to market fluctuations and denied the flexibility they relied on in investing in an event contract position traded on CDNA's DCM. *See* Dan Decl. ¶¶ 22–24, 27. These negative effects on CDNA's users would also cause substantial harm to CDNA's reputation. *Id.* ¶¶ 34–36.

The financial, reputational, and potential legal harms CDNA would face in the absence of a preliminary injunction are exactly the kinds of harms that tip the balance of equities in favor of issuing an injunction:

> The balance of hardships tips in Kalshi's favor given that it is facing substantial monetary expenditures, reputational damage, or civil and criminal prosecution based on the defendants' demands [that Kalshi cease offering its sport and election event contracts on its CFTC-designated exchange] that the defendants likely cannot make because they are preempted. In contrast, the defendants are not facing much harm in the short term because I believe they are preempted.

*See Kalshi v. Hendrick*, 2025 WL 1073495, at *7. Here too, the harms faced by CDNA are significant and even existential, while any purported harms faced by the Defendants would be negligible or nonexistent.

**D.      No Security or at Most *De Minimis* Security Is Appropriate.**

Rule 65(c) of the Federal Rules of Civil Procedure requires a party seeking a preliminary injunction to post "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A district court has broad discretion in setting the amount of security and "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citing *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)). The Defendants will suffer no compensable costs or damages by halting enforcement of Nevada's gaming laws against CDNA during the pendency of this litigation. As a result, no security is needed. If this Court elects to require a security, it should set it at a nominal amount.

## CONCLUSION

CDNA respectfully requests that the Court grant a preliminary injunction.

Dated this 5th day of June, 2025.

SNELL & WILMER L.L.P.


By: */s/ Bradley Austin*
    Bradley Austin (Nevada Bar No. 13064)
    1700 South Pavilion Center Drive, Suite 700
    Las Vegas, NV 89135
    702-784-5247
    baustin@swlaw.com

    Nowell D. Bamberger (*pro hac vice pending*)
    Matthew C. Solomon (*pro hac vice forthcoming*)
    CLEARY GOTTLIEB STEEN & HAMILTON LLP
    2112 Pennsylvania Ave. NW
    Washington, DC 20037
    202-974-1500
    nbamberger@cgsh.com
    msolomon@cgsh.com

    *Attorneys for North American Derivatives*
    *Exchange, Inc., d/b/a Crypto.com | Derivatives*
    *North America*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2025, I electronically filed the foregoing **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court for the U.S. District Court, District of Nevada by using the Court's CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

DATED this 5th day of June, 2025.

*/s/ Debbie Shuta*
An Employee of Snell & Wilmer L.L.P.