AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada, Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3416 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Kirk D. Hendrick, George Assad, Chandeni K. Sendall, The State of Nevada on Relation of the Nevada Gaming Control Board, and Aaron D. Ford*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| NORTH AMERICAN DERIVATIVES EXCHANGE, INC. d/b/a CRYPTO.COM \| DERIVATIVES NORTH AMERICA,<br><br>                     Plaintiff,<br><br>vs.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; THE STATE OF NEVADA ON RELATION OF THE NEVADA GAMING CONTROL BOARD; AARON D. FORD, in his official capacity as Attorney General of Nevada,<br><br>                     Defendants. | Case No. 2:25-cv-00978-APG-DJA<br><br>**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

/ / /

/ / /

/ / /

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Defendants Kirk D. Hendrick[1], in his Official Capacity as Chairman of the Nevada Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada Gaming Control Board; Chandeli K. Sendal, in her official capacity as a Member of the Nevada Gaming Control Board; the State of Nevada on relation of the Nevada Gaming Control Board; and Aaron D. Ford, in his official capacity as Attorney General of Nevada, by and through counsel, hereby oppose Plaintiff North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America's ("Crypto.com") Motion for Preliminary Injunction ("Motion"). This Opposition is based on the following memorandum of points and authorities, the pleadings and papers on file herein, and any oral argument before the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The State of Nevada has been a bastion of gambling regulation in this country for over 160 years, consistently at the forefront of safe, legalized gambling and often an example for others. Now, over, Crypto.com and companies like it are attempting to exploit a perceived loophole in commodities law to offer de facto sports betting nationwide via so-called "events contracts." As we know, however, "A rose by any other name would smell as sweet."[2] And sweet it has been for Crypto.com. The company has facilitated presumably millions of dollars of sports events contracts—wagers—since beginning such operations in Nevada on January 30, 2025, taking a fee or commission—a rake—for each contract. Yet Crypto.com unilaterally exempted itself from Nevada gaming regulation by self-certifying sports events contracts under the CEA, giving it a competitive advantage over all licensed and regulated sports books in Nevada and allowing it to avoid paying otherwise applicable state taxes.

/ / /

---

[1] As of June 22, 2025, Mr. Hendrick resigned his position as Chairman of the Nevada Gaming Control Board. He is succeeded in office by Chairman Mike Dreitzer.
[2] William Shakespeare, Romeo and Juliet, Act II, Scene II.

This outcome should not be countenanced by the Court, and Crypto.com's Motion should be denied. Crypto.com has shown neither a likelihood of success on the merits nor irreparable harm. Its selective reading of the Commodity Exchange Act is insufficient, and it has not shown how being held to the same standards as every other sports book would impose on it anything other than the ordinary costs of doing business in a highly regulated area. Finally, and critically, the balance of the equities weighs strongly in favor of denying the Motion so that the Defendants can return to their statutory mandate to protect and preserve the stability of the gaming industry in Nevada.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. History of Gaming in Nevada

Gaming in Nevada has a long and storied history, dating back to before the state's inception. Prospectors traveling to the Sierra Nevada to search for gold in the mid-nineteenth century brought games of chance with them to the area. "History of Gaming in Nevada," Nevada Resort Association, https://perma.cc/9VX4-F8NG (last accessed July 5, 2025). In 1861, however, under the leadership of Nevada Territory Governor James Nye, the territorial legislature instituted stiff penalties for running and participating in any game of chance. *Id.* However, the measure was not very successful, and when Nevada attained statehood in 1864, penalties were drastically reduced; operators were punished only mildly and players were not punished at all. *Id.*

In 1869, the Legislature succeeded in decriminalizing certain forms of gambling. *Id.* After a brief ban on gambling during the Progressive Movement of the early twentieth century, Nevada eventually legalized "wide-open" gambling in 1931, a move that soon gave rise to Nevada's booming casino industry. *Id.*; Robert D. Faiss & Gregory R. Gemignani, Nevada Gaming Statutes: The Evolution and History, University of Nevada: The Center for Gaming Research, at 1 (2011), http://digitalscholarship.unlv.edu/occ_papers/11 (last accessed July 5, 2025). About a decade later, the Legislature shifted licensing from local to state government through passage of the landmark Gaming Control Act of 1949. *See* Faiss, Nevada Gaming Statutes: The Evolution and History, at 3. The State's current two-tiered

regulatory structure, involving the Nevada Gaming Control Board (NGCB) and Nevada Gaming Commission (NGC), evolved from there. *Id.* at 4–6.

With the passage of the Gaming Control Act of 1949, Nevada became the first state in the nation to legalize sports betting. *See* Jennifer Carleton et al., "Nevada" in The Gambling Law Review 147 (Carl Rohsler ed. 2016), https://perma.cc/3BSY-UYMZ (last accessed July 5, 2025).

## II. Commodity Exchange Act[3]

Compared to Nevada's 164-year regulation of gambling, federal regulation of commodities is a relatively recent development. Congress enacted the Commodity Exchange Act (CEA) in 1936, overseen by the Commodity Exchange Commission, a division within the U.S. Department of Agriculture.[4]

Over the next four decades, the CEA was amended to: (1) add additional products (e.g., wool tops, fats, oils, peanuts etc.) to the list of regulated commodities; (2) enable the Secretary of Agriculture to submit to Congress and make public the names, addresses, and market positions of traders; and (3) allow the Commodity Exchange Commission to set the level of registration and renewal fees for futures commission merchants and other registrants. *Id.*

During this period, two major scandals concerning the manipulation of costs on futures contracts and the use of phony receipts for non-existent commodities highlighted the need for increased regulation of the commodity futures market. *Id.* As a result of incidents like these, new financial requirements for futures commission merchants; enhanced reporting requirements; and increased criminal penalties for manipulation were enacted. *Id.*

---

[3] Pursuant to FRE 201, State Defendants request that the Court take judicial notice concerning the enactment and evolution of the Commodity Exchange Act.

[4] The CEA replaced the Grain Futures Act which applied to agriculture and natural resources. All references to "grain" were replaced with the term "commodities" and the Grain Futures Commission became the Commodity Exchange Commission. CFTC, History of the CFTC: US Futures Trading and Regulation Before the Creation of the CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html#:~:text=June%2015%2C%201936%20%E2%80%93%20The%20Commodity,potatoes%2C%20as%20well%20as%20grains (last visited July 10, 2025).

**III.     1974 Amendments to the Commodity Exchange Act[5]**

The 1974 Amendments overhauled the CEA and resulted in the establishment of the Commodity Futures Trading Commission (CFTC). The CFTC was tasked with taking enforcement actions against individuals and firms registered with the Commission, those who were engaged in commodity futures and option trading on designated domestic exchanges, and those who improperly issued market futures and options contracts.[6]

In its current form, the CEA grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . ., and transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). "Swaps" are defined to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Two savings clauses limit the CFTC's exclusive jurisdiction. The regulatory savings clause provides: "Except as [provided in the exclusive-jurisdiction provision], nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred . . . under the laws of . . . any State, or (II) restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). And the jurisdictional savings clause provides: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

The CEA allows an entity registered with the CFTC to "elect to list for trading . . . any new contract . . ., by providing to the [CFTC] . . . a written certification that the new contract . . . complies with this chapter[.]" 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a); ECF

---

[5] Pursuant to FRE 201, State Defendants request that the Court take judicial notice concerning the amendment of the Commodity Exchange Act.

[6] CFTC, Law Regulation: Enforcement Actions, https://www.cftc.gov/LawRegulation/EnforcementActions/index.htm#:~:text=The%20CFTC%20takes%20enforcement%20actions,market%20futures%20and%20options%20contracts.&text=March%2012%20Order:%20Debiex%2C%20et,Order:%20Debiex%2C%20et%20al (last visited July 10, 2025).

No. 1, ¶ 49. A registered entity's written certification is subject to CFTC regulation, and the CFTC may initiate a formal review of any submitted contract. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.R.F. §§ 40.2, 40.11(c); ECF No. 1, ¶ 50. If the CFTC does not take action, the new contract is deemed "effective" and may be listed by the registered entity for trading. *See* 7 U.S.C. § 7a-2(c); 17 C.F.R. 40.2; ECF No. 1, ¶ 50.

## IV. Crypto.com's Operations

According to its Complaint, the CFTC first approved Crypto.com as a designated contract market (DCM) in 2004. ECF No. 1, ¶ 64. Crypto.com characterizes itself as "an early entrant into the regulated event contract space," alleging that it "specializes in event contract trading and has steadily expanded its offerings over time." *Id.*, ¶ 65.

On January 30, 2025, Crypto.com self-certified to the CFTC a new category of event contracts titled "Industry Event – Live Presentation Contracts," which "allow users to trade on the outcome of lawful live events in the performing arts, spectator sports, and related industries, provided the users themselves are not participants in the events." *Id.*, ¶ 66 (citing Ex. 1-4, pp. 4–5). Crypto.com represents that it "designed these event contracts 'to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises.'" ECF No. 1, ¶ 67 (quoting Ex. 1-4, p. 8). Given Crypto.com's self-certification, its "Industry Event – Live Presentation Contracts," including the sports event contracts at issue in this case, became effective on January 30, 2025, the same day it self-certified with the CFTC. ECF No. 1, ¶ 68.

## V. Pre-Litigation and Litigation History

On May 20, 2025, then-Chairman of the NGCB, Kirk D. Hendrick, sent a letter to Crypto.com advising it that the NGCB was "aware that Crypto.com has been offering, and continues to offer, event-based wagering contracts in Nevada on sporting events through its exchange." ECF No. 1-2, p. 2. The May 20, 2025 letter informed Crypto.com that, by offering of event-based wagering contracts in Nevada, it was "operating as an unlicensed sports pool in violation of NRS 463.160(1)(a) and NRS 463.245(2)." *Id.* The NGCB requested

written confirmation of Crypto.com's cessation of such prohibited activities within Nevada by 5:00 p.m. on Wednesday June 4, 2025, and reserved all rights to pursue criminal and civil actions against Crypto.com. *Id.*, p. 3.

In response, on June 3, 2025, Crypto.com filed the instant action, seeking a declaratory judgment that the CEA preempts state gaming law with respect to Crypto.com's sports event contracts under theories of (1) express preemption, (2) field preemption, and (3) conflict preemption. ECF No. 1, ¶¶ 99–126. Crypto.com seeks both a preliminary and permanent injunction prohibiting Defendants from enforcing Nevada gaming and other law in an effort to regulate Crypto.com's market.

On June 5, 2025, Crypto.com filed the instant Motion.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm; (3) the balance of the equities tips in its favor; and (4) the injunction is in the public interest. *Id.* at 21. Where the party opposing injunctive relief is a government entity, the potential hardship and the public interest considerations are merged. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts should pay particular attention to the public consequences when considering a request for injunctive relief. *Winter,* 555 U.S. at 24. They must also consider the effect on each party and balance the competing claims of harm. *Id.*

## ARGUMENT

**I.      Crypto.com Is Unlikely to Succeed on the Merits**

Crypto.com alleges that, with respect to sports event contracts, state gaming law is preempted by the CEA under any one of three theories: (1) express preemption, (2) field preemption, and (3) conflict preemption. ECF No. 1, ¶¶ 99–126. Crypto.com recognizes that this Court's inquiry is the same under each theory—whether Congress intended the CEA

to preempt state gaming law. *See* ECF No. 15, p. 10. Crypto.com has not shown it is likely to succeed on the merits here because the answer to that question is a resounding **no**.

### A. The Plain Text of the CEA Cuts Against Preemption

Crypto.com relies on the text of 7 U.S.C. § 2(a)(1)(A) to support its claim of express preemption. ECF No. 15, pp. 10–11. This provision states that the CFTC "shall have exclusive jurisdiction" over "accounts, agreements . . ., and transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC "or any other board of trade, exchange, or market." 7 U.S.C. § 2(a)(1)(A).

Crypto.com claims, with minimal analysis, that its sports events contracts are "swaps," as defined by the CEA. A "swap" is defined as (1) "any agreement, contract, or transaction" that (2) "provides for any purchase, sale, payment, or delivery" that (3) "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated **with a potential financial, economic, or commercial consequence**." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added).

Although the Complaint strains to show the "financial, economic, or commercial consequence[s]" associated with sporting events, *see* ECF No. 1, ¶ 42, it paints with too broad a brush to sweep in the full array of "events" for which one can contract. Specifically, the Complaint points to media and broadcasting companies' financial exposure tied to viewership of sporting events (inapplicable, of course, to untelevised sporting events). The Complaint further points to retailers that sell team merchandise or apparel who see major swings in sales depending on how a team does (inapplicable to wagers for, say, whether the Superbowl coin flip will be heads or tails). The remaining alleged financial, economic, or commercial consequences, likewise fall flat in many wagering scenarios.

Moreover, the Complaint implies that the "swaps" offered by Crypto.com are targeted to "market participants, including those with a financial stake in the outcome of a particular event" so that they may "hedge against related risks." *Id.* Discovery will bear out what percentage of Crypto.com's event contracts are entered by "market participants"

looking to "hedge," versus ordinary citizens looking to gamble on sporting events. One can assume, however, that the latter category will make up the lion's share of contracting parties, i.e. bettors. Because the only "financial, economic, or commercial consequence" for a sports bettor is the fact of winning or losing the bet, that consequence falls outside the purview of the CFTC's jurisdiction.

### B. Legislative History and Other Interpretive Sources Show that Congress Did Not Intend Sports Event Contracts to Be Swaps

The statutory definition of "swaps" is ambiguous, particularly as to what qualifies as a "financial, economic, or commercial consequence" meant to be covered by the CEA. *See* 7 U.S.C. § 1a(47)(A)(ii). Interpreting the terms "financial," "economic," and "commercial" in their ordinary sense would sweep in virtually all "agreement[s], contract[s] or transaction[s]" that "provide[] for any purchase, sale, payment, or delivery" that is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency," rendering the inclusion of the terms "financial," "economic," and "commercial" superfluous.[7] Indeed, virtually any "event" or "contingency" can be construed to have a financial, economic, or commercial consequence.

Interpretive sources inform that the definition of "swap" was intended to cover run-of-the-mill transactions at the core of the CFTC's authority—i.e., transactions pertaining to a specific farmer's crop yield or changes in corporate asset purchases. *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,671 (May 7, 2008). Legislative history of the 2010 amendments to the CEA, which added "swaps" to the CFTC's jurisdiction, confirms that Congress did not intend "swaps" to cover sporting events: "It would be quite easy to construct an 'event contract' around sporting events," and "[t]hese types of contracts would not serve any real commercial purpose," but

---

[7] One of the most basic interpretive canons is that a statute should be construed to give effect to all its provisions and to render no part of the statute inoperative, superfluous, void, or insignificant. See United States v. Corrales-Vazquez, 931 F.3d 944, 950 (9th Cir. 2019) (citing Rubin v. Islamic Republic of Iran, 583 U.S. ___,138 S.Ct. 816, 824 (2018)).

instead "would be used solely for gambling." 156 Cong. Rec. S5902-01, S5907 (July 15, 2010) (statement of Senator Lincoln).

### C. Interpreting "Swaps" to Include Sports Event Contracts Would Lead to Absurd Results

Accepting Crypto.com's argument that its these contracts are "swaps" could lead to the dangerous conclusion that a sports bet taken by a licensed Nevada sports book is likewise a "swap," because it is (1) an "agreement" between bettor and sports book that (2) provides for "payment" that (3) is dependent on an event "with a potential financial, economic, or commercial consequence." *See* 7 U.S.C. § 1a(47)(A)(ii). If this were the case, any licensed sports book would be in violation of the CEA for offering swaps outside a CFTC-designated exchange on "any other board of trade, exchange, or market." *See* 7 U.S.C. §§ 2(e), 6(a)(1).

### D. Even if Sports Event Contracts Qualify as "Swaps," Crypto.com Is Not Likely to Succeed on the Merits of Its Preemption Arguments

If the Court finds that Crypto.com's sports event contracts qualify as "swaps" under the CEA, Crypto.com must still show that it is likely to succeed on its express, field, or conflict preemption claims. Crypto.com is unlikely to do so.

#### 1. The CEA Does Not Expressly Preempt State Gaming Law

Crypto.com relies upon the CEA's exclusive jurisdiction clause, 7 U.S.C. § 2(a)(1)(A), to support its claim of express preemption. ECF No. 15, pp. 10–11. However, it cites no case law holding that this provision, which provides only "exclusive jurisdiction" with respect to, among other things, "swaps" traded on a regulated exchange, has been interpreted to expressly preempt state law. To the contrary, at least one sister court has rejected a broad reading of the "exclusive jurisdiction" provision that would "preempt the activities of all other federal agencies in their regulatory realms." *Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001). Indeed, as the *Ken Roberts* Court found, "Preemption of the regulation of the market does not also mean preemption of all law that might involve

participants in the market." *Id.* (quoting *Poplar Grove Planting and Refining Co. v. Bache Halsey Stuart Inc.*, 465 F. Supp. 585, 592 (D. La. 1979)).

The CEA does contain at least one provision that can be viewed as express preemption of state law. *See* 7 U.S.C. § 16(e)(2). This provision states that the CEA "shall supersede and preempt the application of any state or local law that prohibits or regulates gaming" in the case of an electronic trading facility and other excluded agreements, contracts, or transactions not relevant here. Had Congress wanted to expressly preempt all state gaming law, it could have and would have done so. Congress did not, however, **expressly** preempt state gaming law through **implication** of an "exclusive jurisdiction" clause.

### 2. The Structure and Purpose of the CEA Show that Congress Did Not Intend to Preempt the Entire Field of Derivatives Trading Regulation

Contrary to Crypto.com's contention that Congress "has fully occupied the field of regulating federally registered derivatives markets, thereby preempting any conflicting state laws," the Supreme Court has explained that the "exclusive jurisdiction" provision in the CEA was "intended only to consolidate federal regulation of commodity futures tradition in the Commission," and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982). Stated differently, Congress' purpose in granting the CFTC exclusive jurisdiction over commodity futures trading was merely "to remedy the confusion about whether certain types of commodities transactions came within the definition of a security and thus subject to regulation under the securities laws." *R.J. Hereley & Son Co. v. Stotler & Co.*, 466 F. Supp. 345, 347 (N.D. Ill. 1979). The purpose of the exclusive jurisdiction provision was not to completely oust the states from this field.

Other provisions in the CEA confirm that state law continues to play an important part in regulation of derivatives trading. First, in the savings clause of the jurisdiction provision, Congress made clear that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts" or "any State." 7 U.S.C. § 2(a)(1)(A). Courts interpreting

1  this clause have held that Congress "did not manifest an intent to occupy completely the
2  entire field of commodity futures regulation." *See, e.g., Effex Capital, LLC v. Nat'l Futures*
3  *Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019); *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977
4  F.2d 1147, 1155 (7th Cir. 1992); *accord Kerr v. First Commodity Corp.*, 735 F.2d 281, 288
5  (8th Cir. 1984).

6  Second, the CEA's "special rule" provides that the CFTC "may determine" that
7  "swaps in excluded commodities that are based upon the occurrence, extent of an
8  occurrence, or contingency" are "contrary to the public interest," and thus prohibited, if
9  they involve "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-
10 2(c)(5)(C)(i); *see also* 17 C.R.F. § 40.11(a). Rather than excluding state law from application
11 to swaps, the CEA expressly incorporates state law as relevant to whether a swap is lawful.
12 And, where "a federal statute expressly incorporates state law," a "preemption analysis is
13 inappropriate." *Cf. Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 864 (4th Cir. 1994). While
14 the CEA allows the CFTC to determine if a swap is against the public interest, nothing in
15 the special rule prohibits another regulatory authority—i.e., state gaming regulators—
16 from enforcing its laws concurrently with the CFTC's authority. This makes logical sense;
17 the CFTC is not an expert on state laws and regulations, particularly state gaming laws.
18 Congress' incorporation of state law into the special rule was clearly meant to parallel, not
19 usurp, the states' enforcement of their own laws.

20 Third, the CEA's two express preemption provisions do not include state gaming
21 laws. *See* 7 U.S.C. § 16. The first provision states that the CEA "supersede[s] and
22 preempt[s] the application of any" state law "that prohibits or regulates gaming" for certain
23 exempt or excluded transactions—but not for sports event contracts. 7 U.S.C. § 16(e)(2).
24 The second express preemption provision states that, to the extent insurance laws can be
25 construed as applying to swaps, those laws are expressly preempted. 7 U.S.C. § 16(h). The
26 decision to expressly preempt state gaming laws for certain transactions and state
27 insurance laws for swaps, without expressly preempting other state gaming law, is
28 evidence that Congress did not intend to preempt the entire field so as to exclude all state

law. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024). Had Congress wanted to preempt all state gaming law with the enactment and amendment of the CEA, it certainly could have done so. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liabl. Litig.*, 959 F.3d 1201, 1220 (9th Cir. 2020) ("Congress's certain awareness of the prevalence of state law, coupled with its silence on the issue, is powerful evidence that Congress did not intend to preempt [those state] laws." (cleaned up)). Congress, however, did not do so here.

In sum, Crypto.com's argument that Congress intended to preempt the entire field of derivatives trading reads the "exclusive jurisdiction" language of 7 U.S.C. § 2(a)(1)(A) too narrowly and in isolation from other relevant provisions in the CEA. When the statute is read in context as a whole, it is clear that Crypto.com is not likely to succeed on the merits of its field preemption argument.

### 3. Crypto.com Cannot Show that State Gaming Law Is Preempted under a Conflict Preemption Theory.

Crypto.com's argument with respect to conflict preemption amounts to an argument that, "[o]nce [Crypto.com] received CFTC designation as a contract market," it may violate state law with impunity because any state law would be an "obstacle" to the federal regulatory framework of the CEA. *See* ECF No. 15, p. 17. However, "[t]he mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *MD Mall Assocs., LLC v. CSX Trans.*, 715 F.3d 479, 495 (3d Cir. 2013) (quoting *Madeira v. Affordable Housing Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006)). Indeed, "the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded **only where the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand**

1 **together.**" *MD Mall Assocs.*, 715 F.3d at 495 (emphasis added) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 544, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (Rehnquist, J., concurring in part and dissenting in part).

Crypto.com cannot meet the high burden to show that the State of Nevada's exercise and enforcement of its gaming laws, which fall squarely within the traditional police power of the State, so directly conflicts with the CEA such that the two cannot harmoniously exist. To that end, Crypto.com points to various ways that application of Nevada gaming law would "frustrate" the CEA's purposes. *See, e.g.,* ECF No. 15, pp. 16–17. But frustration of a federal statute's purpose is not the kind of "direct and positive" conflict that must exist when exercise of a state's traditional police power is at stake.

## II. Crypto.com Cannot Show Irreparable Harm

In seeking a preliminary injunction, a party must make a "clear showing" that, absent injunctive relief, it suffers irreparable harm that is both likely and imminent. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."); *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) (en banc) ("The Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way."). And because Crypto.com "seeks to enjoin a government agency, '[its] case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs.'" *Midgett v. Tri-County Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850 (9th Cir. 2001) (quoting *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)). "This 'well-established rule' bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." *Id.* (quoting *Hodgers-Durgin*, 199 F.3d at 1042-43).

Here, Crypto.com chose to violate Nevada gaming laws. And after receiving the NGCB's May 20, 2025 letter, Crypto.com did not timely comply with the NGCB's letter. Instead, Crypto.com chose to continue its actions, and decided to ask this Court to issue a

preliminary injunction—an extraordinary equitable remedy—to facilitate Crypto.com's illegal conduct. This foul play, alone, torpedoes Crypto.com's ability to establish irreparable harm and enjoin the NGCB's "dispatch of its own internal affairs." *Midgett*, 254 F.3d at 850. Further still, preliminary injunctive relief is unwarranted here because Crypto.com largely seeks relief for non-irreparable monetary and reputational harms; harms which Crypto.com itself has created.

### A. The Board's Lawful Enforcement Of Nevada Gaming Laws, Designed To Prevent Illegal Acts Like Crypto.Com's Does Not Create Irreparable Harm

Through its Motion, Crypto.com effectively asks this Court to halt Nevada's lawful enforcement efforts and to bless Crypto.com's illegal activities as an unlicensed sports pool. *See Midgett*, 254 F.3d at 850. Crypto.com cannot use this Court's inherent equitable powers to rubberstamp its own violations—an illegal status quo that Nevada's gaming laws were designed to prevent. *See John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203-04 (D.D.C. 2017) (finding lack of irreparable harm in part because, even in "cases involving enforcement actions pursued in an unconstitutional manner or by an unconstitutional," "having to submit oneself to an enforcement proceeding typically does not constitute irreparable harm" (citing *Jarkesy v. SEC*, 803 F.3d 9, 26 (D.C. Cir. 2015)); *cf. Original Invs., LLC v State*, 542 F. Supp. 3d 1230, 1233-35 (W.D. Okla. 2021) (denying equitable relief because "[i]t is well-settled . . . that 'a court won't use its equitable power to facilitate illegal conduct.'"); *U.S. v. City of Los Angeles*, 595 F.2d 1386, 1391 (9th Cir. 1979) (suggesting preliminary injunctions are inappropriate to maintain an illegal status quo that a challenged "statute was designed to disrupt"). Conversely, any chance that Crypto.com, as a result of NGCB action, will have to submit to federal (CFTC) enforcement actions— regulatory powers Crypto.com does not challenge—does not constitute irreparable harm. *See John Doe Co.*, 235 F. Supp. 3d at 203–04; *Jarkesy*, 803 F.3d at 26, 28.

Even if Crypto.com were not seeking injunctive relief to bless its own illegal acts, the Nevada gaming laws at issue are not preempted, and the Board's valid enforcement actions are not "unconstitutional." *See supra*, § I.

### B. Neither Economic Nor Reputational Losses Establish Irreparable Harm

Crypto.com first alleges that it would be harmed by having to implement technological changes to determine users' geographical locations to comply with Nevada law. ECF No. 15-2, ¶¶ 12–19. This harm is largely monetary, and "such monetary injury is not normally considered irreparable." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). Crypto.com provides no **factual** showing of **irreparable** monetary harms beyond the unsubstantiated statements of Mr. Kevin Dan, Crypto.com's Chief Compliance Officer and Chief Regulatory Officer.

Second, Crypto.com alleges harm from halting access to sports event contracts in Nevada. ECF No. 15-2, ¶¶ 20–28. This harm primarily affects Crypto.com's users, not Crypto.com itself, and third-party harm cannot be the basis of the irreparable harm inquiry for purposes of obtaining a preliminary injunction. *See Doe #1 v. Trump*, 957 F.3d 1050, 1070 (9th Cir. 2020) (alleged harms to third parties do not constitute irreparable harm). To the extent Crypto.com would be harmed financially because it "does not have access to the immediate liquidity necessary to refund users' investments from its *own* funds," this appears to be a problem created by Crypto.com's own business model—not from the actions of the NGCB.

Third Crypto.com alleges harm from Crypto.com's "violation" of CFTC requirements to provide impartial access to markets and prevent price distortion. ECF No. 15-2 ¶¶ 29–33. Yet these allegations are as flimsy as they are abbreviated. Crypto.com provides nothing more than a statement of one of the CFTC's Core Principles along with a code cite relating to CFTC enforcement power to claim harm. Without any real indication that the CFTC has taken or would take enforcement action for "violation" of this Core Principle, Crypto.com's argument is unconvincing.

Finally, Crypto.com goes on to lament the potential "market uncertainty and disruption" to nearly 12,000 users of Crypto.com in Nevada, who Crypto.com speculates

"would likely turn to other markets[8] in the wake of the uncertainty created by" Crypto.com's compliance with Nevada law. ECF No. 15-2, ¶ 35. Again, this claimed "harm" is purely speculative and cannot serve as the basis for the grant of a preliminary injunction.

By far, this is not a "clear showing" of likely irreparable harm. *Winter,* 555 U.S. at 22; *Midgett*, 254 F.3d at 850. "As with [Crypto.com's] speculation on future harm, citation to a different case with a different record does not meet the standard of showing 'likely' irreparable harm." *Herb Reed*, 736 F.3d at 1250 (reversing preliminary injunction and remanding because plaintiff had failed to show likely irreparable harm); *but See Disney*, 869 F.3d at 854, 866 (finding irreparable harm given plaintiff's "substantial," "uncontroverted evidence" that plaintiff had improperly streamed defendant's copyrighted works).

## III. The Balance of the Equities Weighs in the State's Favor

It is vital that all gaming activity which takes place in Nevada or activity which is related to a licensed gaming establishment is strictly regulated and licensed. "It is established beyond question that gaming is a matter of privilege conferred by the State rather than a matter of right." *State v. Rosenthal*, 93 Nev. 36, 40, 559 P.2d 830, 833 (1977). "Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments…" NRS 463.0129(1)(c). "All establishments where gaming is conducted… must therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State…" NRS 463.0129(1)(d). An activity which reflects "discredit upon the State of Nevada or the gaming industry . . ." may be deemed an unsuitable method of operation by the NGCB and Nevada Gaming Commission. Because Crypto.com is not licensed and its business model facilitates illegal gaming activities, the Court should deny Crypto.com's Motion.

///

---

[8] One can assume that the "other markets" to which users would turn are licensed sports books, which provide a safe, stable, and regulated venue for users to place wagers. Users would benefit from Crypto.com being regulated in the same manner.

### IV. Significant Security Is Appropriate

Rule 65(c) of the Federal Rules of Civil Procedure allows a court to issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A district court has "wide discretion" in setting the amount of bond. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999).

Although this Court in *KalshiEX, LLC v. Hendrick*, 2:25-cv-00575-APG-BNW, 2025 WL 1073495 at *8 (D. Nev. Apr. 9, 2025), ordered only de minimis bond in the amount of $10,000, the New Jersey district court in *KalshiEX, LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 at *8 (D.N.J. Apr. 28, 2025), found that $100,000 bond was appropriate. This amount was "intended to mirror that of the maximum fine of a violation under" the New Jersey Sports Wagering Act. *Id.*

If this Court were to issue the preliminary injunction in Crypto.com's favor, it should take the approach that the *Flaherty* Court did and order bond in the amount of the maximum administrative fine that can be imposed under state law, which is $500,000. *See* NRS 463.310(4)(d)(1), as amended by S.B. 46 (2025). This will ensure that, if the State is found to have been wrongfully enjoined, there is security available to compensate the State to some degree.

### CONCLUSION

For the preceding reasons, Defendants request that Crypto.com's Motion be denied in its entirety and that, if it is granted, bond be set in the amount of $500,000.

DATED this 10th day of July, 2025.

<div style="margin-left:2em">

AARON D. FORD
Attorney General

By: /s/ Jessica E. Whelan
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
*Attorneys for Kirk D. Hendrick, George Assad, Chandeni K. Sendall, The State of Nevada on Relation of the Nevada Gaming Control Board, and Aaron D. Ford*

</div>