Bradley Austin
Nevada Bar No. 13064
Snell & Wilmer
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
702-784-5247
baustin@swlaw.com

Nowell D. Bamberger
(*pro hac vice*)
Matthew C. Solomon
(*pro hac vice*)
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037
202-974-1500
nbamberger@cgsh.com
msolomon@cgsh.com

*Attorneys for North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America,

        Plaintiff,

  v.

Mike Dreitzer, in his official capacity as Chairman of the Nevada Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada Gaming Control Board; Chandeni K. Sendall, in her official capacity as a Member of the Nevada Gaming Control Board; the State of Nevada on relation of the Nevada Gaming Control Board; Aaron D. Ford, in his official capacity as Attorney General of Nevada,

        Defendants.

Case No.: 2:25-cv-00978-APG-BNW

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

1

**INTRODUCTION**[1]

Defendants' Opposition does not even attempt to distinguish this Court's decision in *KalshiEX LLC v. Hendrick*. 2025 WL 1073495 (D. Nev. Apr. 9, 2025) (hereinafter *"Kalshi v. Hendrick"*). There, the Court found that Congress, through the exclusive jurisdiction provision of the CEA, intended at least to occupy the field of derivatives traded on DCMs regulated by the CFTC. *Id.* at *6. On that basis, the Court entered a preliminary injunction against the same defendants seeking to take the same action against another party that is indistinguishable in relevant aspects from CDNA. *See id.* at *8. For exactly the same reason that the Court has enjoined Defendants from taking enforcement action under state gaming laws against Kalshi, it should enjoin them from doing so against CDNA.

In response to Plaintiff's Motion, Defendants recycle the same arguments this Court and the United States District Court for the District of New Jersey have already rejected. *See id.*; *KalshiEX LLC v. Flaherty*, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) (hereinafter "*Kalshi v. Flaherty*"). These decisions follow fifty years of precedent and comport with the text, purpose, and history of the CEA by concluding the CEA preempts state law as applied to derivatives traded on DCMs. Defendants offer no reason to revisit this Court's prior conclusions. But even were this Court to do so, Defendants' arguments should be rejected again because they remain wrong.

Broadly, Defendants' arguments against preemption rest on a fundamental mischaracterization of CDNA's position. CDNA does not assert that all state law that might touch derivatives generally is preempted by the CEA. Indeed, one can conceive of plenty of examples where a derivatives transaction is part of a course of conduct that gives rise to a claim under state law—whether under contract, tort, or some other regime. But that is a separate question from whether a derivatives transaction can legally be entered into on a DCM *at all*. It is that latter question that Congress answered in the CEA, when it rejected a patchwork of state regulation of

---

[1] Defendant Mike Dreitzer, in his official capacity as Chairman of the Nevada Gaming Control Board, is substituted in place of Defendant Kirk D. Hendrick, by operation of Fed. R. Civ. P. 25(d). The latter resigned his position as of June 22, 2025, after the onset of this litigation, and is succeeded in office by the former. Defs' Opp'n to Mot. for Preliminary Inj., ECF No. 36 (hereinafter "Opp'n"), 2 n.1.

2

the derivatives markets, and vested "exclusive jurisdiction" for such regulation with the CFTC. *See* 7 U.S.C. § 2(a)(1)(A). Preemption does not apply to all transactions in derivatives however and by whomever they are conducted. Rather, it applies solely to the narrow class of derivatives contracts that the CFTC has permitted to be listed for trading on CFTC-regulated exchanges. In other words, CDNA advocates precisely the scope of preemption this Court recognized in *Kalshi v. Hendrick*.

Defendants' response to CDNA's irreparable harm arguments fails because Defendants assume the constitutionality of Nevada's enforcement action and the unlawfulness of CDNA's conduct. Both assumptions are incorrect. CDNA will suffer irreparable financial, reputational, and operational harm from the enforcement of preempted state gaming law. When weighed against Defendants' limited hardship, these factors strongly favor granting preliminary relief.

## ARGUMENT

### A.  CDNA Is Likely to Succeed on the Merits of Its Preemption Claim.

Defendants' Opposition relies entirely on arguments this Court rejected in *Kalshi v. Hendrick* or that New Jersey gaming regulators unsuccessfully advanced in *Kalshi v. Flaherty*. In both cases, preliminary injunctions issued based on the finding that the plaintiff had demonstrated a likelihood of success in showing that Congress occupies the field of derivatives traded on CFTC-registered exchanges, preempting state law that would disrupt such transactions. *Kalshi v. Hendrick*, 2025 WL 1073495, at *6–7; *Kalshi v. Flaherty*, 2025 WL 1218313, at *5–6. Defendants' arguments fail now for the same reasons they failed when advanced before.

*1. CDNA's Sports Event Contracts Fall Under the Exclusive Jurisdiction of the CFTC.*

Defendants' first argument appears to challenge the CFTC's decision to permit the Sports Event Contracts at issue from being listed by a DCM in the first place. Defendants argue that because, in their own judgment, the event contracts listed by CDNA are not "swaps," the CFTC does not have jurisdiction over them. ECF No. 36 ("Opp'n") 8–9. With due respect, Defendants are not in a position to make that determination. The contracts at issue are listed pursuant to a well-established regulatory regime in which Congress has conferred upon the CFTC exclusive

3

jurisdiction for regulation of swaps trading, and the CFTC in turn has charged well-regulated exchanges—DCMs—with authority to list contracts, subject to CFTC oversight. *See* 7 U.S.C. §§ 7a-2(c), 8(b); 17 C.F.R. §§ 38.150, 38.151, 40.11. Defendants' argument is akin to attempting to prohibit trading of NYSE-listed stocks by arguing that the instruments listed on the NYSE are not stocks in the first place. If CDNA were listing non-swaps for trading on its DCM, the CFTC has jurisdiction to take action against it for doing so. 7 U.S.C. §§ 7a-2(c), 8(b). In fact, while the CEA permits states to enforce its provisions in some circumstances, it expressly precludes them from doing so with respect to DCMs—confirming that Congress intended CFTC regulation of DCMs to be exclusive. 7 U.S.C. § 13a-2(1). As this Court has already held, the text, purpose, and legislative history of the CEA demonstrate "congressional intent to occupy the field of regulating CFTC-designated exchanges and transactions conducted on those exchanges." *Kalshi v. Hendrick*, 2025 WL 1073495, at *6.

Regulatory guidance and legislative history confirm Congress intended the CFTC, not state regulators, to evaluate the potential financial, commercial, or economic consequences of an event underlying a given event contract. Defendants cite a CFTC release as supporting the proposition that "the definition of 'swap' was intended to cover run-of-the-mill transactions" like "transactions pertaining to a specific farmer's crop yield or changes in corporate asset purchases." Opp'n 9. But the release says no such thing and in fact identifies a "multitude of subcategories" of event contracts, including "political or entertainment measures or events." Concept Release on the Appropriate Regul. Treatment of Event Contracts, 73 Fed. Reg. 25,671 (May 7, 2008). The same release notes that "the CEA supersedes and preempts other laws, including state and local gaming and bucket shop laws" as to transactions on registered exchanges. *Id.* at 25,673.

Defendants cite to a 2010 colloquy, arguing it shows intent to exclude event contracts without financial consequence from the CFTC's exclusive jurisdiction. Opp'n 9–10. But the full colloquy and the CEA itself show the opposite is true: Congress intended for the CFTC to determine whether an event contract should be prohibited where it lacked a hedging or economic use. In the colloquy, Senator Feinstein sought to confirm that the CFTC will "have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative

4

as opposed to a hedging or economic use." 156 Cong. Rec. S5906 (2010) (statement of Sen. Feinstein). Senator Lincoln confirmed: "That is our intent. The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed 'event contracts.'" *Id.* at S5906–07 (statement of Sen. Lincoln).[2] The tool Congress gave to the CFTC for this is the Special Rule.

The very existence of the Special Rule demonstrates Congress's intent for the CFTC to exercise its exclusive jurisdiction to prohibit event contracts related to gaming, not lose its jurisdiction over them. *See Kalshi v. Hendrick*, 2025 WL 1073495, at *6 ("[E]ven if Kalshi's sports contracts involve 'gaming,' that would not subject Kalshi to state gaming laws. Rather, it would subject Kalshi to the special rule that allows the CFTC to conduct a public interest review."). The Special Rule empowers the CFTC to review event contracts that may involve "gaming" and prohibit them from trading on a DCM. 7 U.S.C. § 7a-2(c). CDNA's Sports Event Contracts "evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them." *Kalshi v. Flaherty*, 2025 WL 1218313, at *6.

In any event, CDNA's Sports Event Contracts meet the statutory definition of "swap." Defendants argue Sports Event Contracts are not swaps because the underlying sports events are not "associated with a potential financial, economic, or commercial consequence." Opp'n 8–9 (citing 7 U.S.C. § 1a(47)(A)(ii)). That argument has no basis in reality. CDNA's Complaint referred to several such consequences of sports events. ECF No. 1 ("Compl.") ¶ 42. Though these consequences need only be *potential*, the ones listed in the Complaint are based on *real* consequences of sporting events. Television viewership—and advertising costs—fluctuate based

---

[2] Senator Lincoln recently confirmed this interpretation of the colloquy, writing, "The intent of the statute was to give the CFTC the authority to distinguish between gambling for entertainment and economic trading." Blanche L. Lincoln, Comment Letter on Proposed Rule Regarding Event Contracts, PR 8907-24 (Aug. 8, 2024), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=74357.

5

on sports outcomes.³ Food and beverage providers run promotions tied to game results.⁴ Defendants deflect to contracts CDNA does not offer—contracts on non-televised games and prop bets on events like coin tosses. Opp'n 8. On a similar record, the court in *Kalshi v. Flaherty* found Kalshi's sports event contracts have potential financial, economic, or commercial consequences. *Kalshi v. Flaherty*, 2025 WL 1218313, at *6.

Defendants also make the irrelevant point that if the CFTC has determined that CDNA's Sports Event Contracts are swaps, then the "dangerous conclusion" is that all state-licensed sportsbooks are violating the CEA as trades of swaps outside a CFTC-registered exchange. Opp'n 10. But this is a strawman, and one for which Defendants fail to proffer any evidence—for example, concerning the typical structure of licensed sports betting. In fact, the structure of event contracts listed on CDNA and the structure of sports betting are fundamentally different. CDNA lists contracts in specified amounts that allow market participants to buy and sell risk from each other. There is no "house" against which a bet is made, and CDNA does not take a position, make books, set odds, or do any of the other things that a sportsbook operator would do. Compl. ¶¶ 40–41. These are not superficial distinctions—they are the features that enable the use of Sports Event Contracts, unlike sportsbooks, as tools for hedging risk. To the extent Defendants' point is that one could make a "bet" that would have economic consequences similar to trading a Sports Event Contract, that is true of every derivative. That argument leads to a sort of reverse-preemption, in which state authority over derivatives contracts would turn on whether people happen to place bets on the same underlier used as the basis for the derivative, not the CEA or CFTC regulations. Under that interpretation, if casinos began accepting bets on Brent Crude prices or winter wheat yields, that private action would divest the CFTC of the exclusive jurisdiction conferred by Congress. That is not how preemption works, and that is not the regulatory regime that Congress created.

---

³ For example, when Rory McIlroy won the 2025 Masters via a sudden-death playoff, television viewership of the final round rose by 33% over 2024. Jay Coffin, *Rory McIlroy's Masters Victory Delivered The Most-Watched Final Round in 7 Years*, GolfDigest (Apr. 14, 2025), https://www.golfdigest.com/story/rory-mcilroy-masters-2025-win-delivered-most-watched-final-round-in-7-years.

⁴ For example, California Pizza Kitchen has offered free pizza tied to the Los Angeles Dodgers winning a home game. Alysia Gray Painter, *Score a Free CPK Pizza When the Dodgers Win a Home Game*, NBC Los Angeles (Mar. 29, 2023), https://www.nbclosangeles.com/the-scene/score-a-free-cpk-pizza-when-the-dodgers-win-a-home-game/3125064/.

*2. Congress Intended the CFTC's Jurisdiction to Preempt State Regulation of Transactions on DCMs.*

As CDNA's opening brief established, the text, purpose, and history of the CEA all demonstrate Congress's intent to preempt state law from interfering with the CFTC's regulation of transactions on registered exchanges. As this Court held, "Even if [CEA] section 2's plain and unambiguous language does not amount to express preemption, it reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *Kalshi v. Hendrick*, 2025 WL 1073495, at *6. Defendants raise no argument that refutes that conclusion.

Defendants fundamentally misapprehend CDNA's argument, and therefore attack arguments about preemption that CDNA does not make. Defendants contend that CDNA argues Congress intended to occupy "the entire field of derivatives trading," and proceed to respond to that argument. Opp'n 13. But that is not CDNA's argument. Rather, CDNA's point is the more modest contention that Congress intended CFTC jurisdiction "to be exclusive with regard to the trading of futures on organized contract markets." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590–91 (D.C. Cir. 2001) (cleaned up). Accordingly, state law is preempted "[w]hen application of state law would directly affect trading on or the operation of a futures market." *Am Agric. Movement v. Bd. of Trade*, 977 F.2d 1147, 1156–57 (7th Cir. 1992); *see also Kalshi v. Hendrick*, 2025 WL 1073495, at *6 ("The defendants have not cited any authority that the CFTC does not have exclusive jurisdiction over the exchanges it designates.").

Defendants also selectively quote *Merrill Lynch Pierce, Fenner & Smith, Inc. v. Curran* as suggesting the "only" purpose of the CEA's exclusive jurisdiction provision was to delineate jurisdiction between the CFTC and SEC. Opp'n 11 (quoting 456 U.S. 353, 386–87 (1982)). But this argument ignores the text of CEA Section 2, which explicitly refers to states in its savings clause, as well as case law and legislative history showing Congress's concern with bringing exchanges "under a uniform set of regulations." *Am. Agric. Movement*, 977 F.2d at 1156; *see also* Senate Hearings, 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark) (expressing concern that application of "different state laws would just lead to total chaos").

The savings clause cited by Defendants, Opp'n 11–12, does not support their position. That clause preserves "the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A). But this provision says nothing about whether federal or state substantive law applies—it speaks only to state *courts'* jurisdiction.[5] CDNA is not aware of any court that has held this clause allows states free reign in regulating transactions that fall into the scope of the CFTC's exclusive jurisdiction.

Defendants' argument that the Special Rule's reference to state law evidences intent to allow state interference with federally regulated exchanges, Opp'n 12, is nonsensical. The state law reference in the Special Rule applies to the legality of the underlying events, not event contracts themselves. *Kalshi v. Flaherty*, 2025 WL 1218313, at *5 ("[T]he only workable interpretation of the special rule is that 'unlawful under any Federal or State law' refers to the underlying event rather than the act of staking money on that event."). Defendants certainly could not contend that professional sporting events are unlawful in Nevada. The reference to state law serves only as a trigger for CFTC public interest review, not a broad incorporation of state law and not permission for states to prosecute DCMs. *See Kalshi v. Hendrick*, 2025 WL 1073495, at *6.

Defendants' citation to Section 16 of the CEA, Opp'n 12–13, similarly fails. The CEA authorizes the CFTC to exempt any derivative from the requirement that it be traded on an exchange. 7 U.S.C. § 6(c)(1). Because Section 2's exclusive jurisdiction provision is limited to transactions on exchanges, it would not apply to these off-exchange transactions that the CFTC has exempted. To ensure states do not interfere with the CFTC's authority over these off-exchange transactions, Section 16 of the CEA includes express preemption provisions that apply to these commodities that are "not conducted or subject to the rules of a [DCM]." 7 U.S.C. § 16(e)(1)(B)(i). Far from limiting Section 2's scope, Section 16's preemption provisions demonstrate Congress's intent to preclude state enforcement action against transactions under CFTC regulatory authority.

---

[5] The cases cited by Defendants, Opp'n. at 12, show state law was preempted to the extent it would interfere with transactions on a registered DCM. *See Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (finding CEA preempted attempt to bring state law tort action against self-regulatory organization for effects of disciplinary actions against its members); *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d at 1156.

### 3. Enforcement of Nevada Gaming Law Would Conflict with Federal Law.

Defendants contend that gaming regulation falls within the state's police powers and dismiss the conflicts CDNA identified as merely frustrating congressional intent. But the conflicts here are direct—CDNA cannot comply with federal law and Nevada gaming law, and application of Nevada gaming law would upend the comprehensive regulatory scheme Congress enacted.

*First*, complying with Nevada gaming law would cause CDNA to violate the CFTC's Core Principles. Excluding Nevada residents from access to Sports Event Contracts traded on CDNA would breach the Core Principles requiring DCMs to avoid market disruption and provide impartial access to exchanges. *See* 17 C.F.R. §§ 38.150, 38.151(b), 38.250, 38.255. Defendants offer no resolution to this "Hobson's choice." *Kalshi v. Hendrick*, 2025 WL 1073495, at *7.

*Second*, application of Nevada gaming law to prohibit CDNA's Sports Event Contracts from being offered to Nevada residents would conflict directly with the CFTC's implicit authorization of those same contracts to be traded on a national exchange.

*Third*, Defendants fail to recognize the broader conflict their interpretation of the law would invoke—complete undermining of Congress's intent to establish a uniform set of regulations for derivatives traded on federally registered exchanges. Nevada gaming law imposes specific requirements on sportsbooks and confers broad authority on the Chair of the Nevada Gaming Control Board ("NGCB") to impose even more requirements. For example, Nevada law requires sportsbooks' wagering systems be approved by the Chair of the NGCB and affords the Chair of the NGCB authority to impose recordkeeping and reporting requirements on sportsbooks as it sees fit. Nev. Gaming Comm'n Regul. 22.060, 22.200. These provisions, among others, if applied to CDNA would allow the NGCB to impose requirements on CDNA that are at odds with those of the CFTC and would give the NGCB a veto right over any federal requirements or changes to the national DCM. If Nevada can invoke its gaming law to prohibit event contracts traded on a DCM from being traded by its residents, then every other state and the District of Columbia could do the same, creating the very patchwork of conflicting state regulation Congress sought to avoid.

**B.     CDNA Faces Imminent Irreparable Harm from Defendants' Unconstitutional Attempt to Regulate Derivatives Traded on Its DCM.**

CDNA has demonstrated the likelihood of irreparable harm from the unconstitutional enforcement of Nevada gaming law against federally regulated Sports Event Contracts. Defendants' arguments to the contrary rest on false premises: (1) that enforcement of Nevada gaming law is constitutional, and (2) that CDNA's Sports Event Contracts are unlawful. Opp'n 15. They fail to address that the enforcement of preempted state law is itself irreparable harm, and they ignore the very real financial and reputational harm to CDNA in the absence of an injunction.

Defendants simply ignore a long line of cases establishing that irreparable harm exists where there is a credible threat of imminent prosecution under a state law that is preempted by federal law. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding a "credible threat of prosecution" under an allegedly preempted state statute supported finding of irreparable harm). "[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

This Court confirmed this principle in *Kalshi v. Hendrick*, holding that Kalshi's "Hobson's choice" between facing "civil and criminal liability" and "incur[ring] substantial economic and reputational harm" as well as "the potential existential threat" of losing DCM status demonstrated a likelihood of irreparable harm. *Kalshi v. Hendrick*, 2025 WL 1073495, at *7. CDNA is a DCM lawfully offering its Sports Event Contracts under federal law, and the Defendants sent a cease-and-desist order threatening imminent, unconstitutional enforcement of preempted state law, subjecting CDNA to irreparable harm if they are not enjoined from pursuing those threats. That should end the analysis. When threatened with unlawful state law enforcement action, a party should not also be required to prove that the action will cause any particular quantum of financial loss. The unlawful state action should be sufficient.

The cases Defendants cite do not undermine these conclusions. Defendants cite to no case that evaluates harms that might result from the enforcement of preempted state law. *See John Doe*

*Co. v. CFPB*, 235 F. Supp. 3d 194, 203–05 (D.D.C. 2017) (considering lack of harm from allegedly unconstitutional structure of federal agency, even in the absence of further agency action or the specter of civil or criminal penalties); *Jarkesy v. S.E.C.*, 803 F.3d 9, 25 (D.C. Cir. 2015) (considering harm from allegedly unconstitutional federal agency enforcement process); *Original Invs., LLC v. State*, 542 F. Supp. 3d 1230, 1233–35 (W.D. Okla. 2021) (considering harm from compliance with state law in violation of federal law). Even if the Defendants had correctly applied these cases, they must bend to contradictory Ninth Circuit precedent.

Defendants dismiss CDNA's evidence of monetary harm as "unsubstantiated statements." Opp'n 16. But a declaration, like that of CDNA's Chief Compliance Officer and Chief Regulatory Officer Kevin Dan, is sufficient evidence to support injunctive relief. *See Disney Enters., Inc. v. VidAngel, Inc*, 869 F.3d 848, 865–66 (9th Cir. 2017) (affirming decision finding irreparable harm was established largely based on evidence in the form of a declaration by a senior executive of plaintiffs); *see also SEC v. Liu*, 2016 WL 3679389, at *1 (C.D. Cal. July 11, 2016) (granting a TRO on the basis of "declarations and exhibits, and the other evidence").

The risk of material and irreparable financial harm to CDNA is substantial and not open to reasonable dispute. Defendants themselves presume CDNA has facilitated "millions of dollars" in Sports Event Contracts in the state of Nevada. Opp'n 2. Ceasing operations in Nevada would eliminate Nevada users' business and require costly geofencing implementation. These are harms to CDNA *itself*, not just CDNA's users, as the Defendants imply. These financial harms are irreparable because CDNA "can obtain no remedy in damages against the state because of the Eleventh Amendment." *See California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012). Defendants are certainly not offering to compensate CDNA for the costs and financial impact of any enforcement action if it turns out they are wrong on the law.

Defendants also wholly ignore the reputational harms CDNA would suffer as a result of an unconstitutional enforcement action by Nevada gaming regulators. The Defendants do not dispute the market disruption and financial jeopardy that CDNA's users would face as a result of CDNA complying with the cease-and-desist order and halting access to Sports Event Contracts in

Nevada. Instead, they recast these points as describing harms *only* to CDNA's users without addressing the reputational impact such harms have *on CDNA directly*. Such harms are relevant to a court's preliminary injunction analysis. *See Kalshi v. Hendrick*, 2025 WL 1073495, at *7–8.

### C. The Balance of Equities and Public Interest Favor an Injunction.

The balance of equities and public interest also weigh in favor of a ruling for CDNA. In their Opposition, the Defendants merely recite Nevada gaming regulations and broad caselaw about gaming being a privilege rather than a right. *See* Opp'n 17. But they ignore that CDNA is not a fly-by-night operator—it is a federally-regulated exchange, listing derivatives that the CFTC has permitted to be listed. Defendants do not grapple with this Court's finding in *Kalshi v. Hendrick* that Kalshi faced "substantial monetary expenditures, reputational damage, or civil and criminal prosecution" while the NGCB was "not facing much harm in the short term because [this Court] believe[d] they are preempted." 2025 WL 1073495, at *7. Nor do they dispute clear precedent from the Ninth Circuit holding that "preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019). This Court also found that harms such as disruption of Nevada users' "contracts and investment expectations" shifted the public interest in favor of an injunction. *Kalshi v. Hendrick*, 2025 WL 1073495, at *8. The Defendants present no analysis that counsels a contrary result here.

The same is true for the setting of a bond. The Defendants fail to point to a distinction that justifies this Court setting any more than a *de minimis* bond here when it did so in enjoining the same regulator in *Kalshi v. Hendrick*. 2025 WL 1073495, at *8. The Defendants cannot explain why this Court should re-evaluate its assessment of what bond is appropriate based on a different jurisdiction's approach to its regulator. Accordingly, a nominal bond is proper.

### CONCLUSION

For the foregoing reasons, the Court should grant the Plaintiff's Motion for Preliminary Injunction.

Dated this 29th day of July, 2025.

        /s/ Bradley Austin
        Bradley Austin (Nevada Bar No. 13064)
        SNELL & WILMER
        1700 South Pavilion Center Drive, Suite 700
        Las Vegas, NV 89135
        702-784-5247
        baustin@swlaw.com

        Nowell D. Bamberger (*pro hac vice*)
        Matthew C. Solomon (*pro hac vice*)
        CLEARY GOTTLIEB STEEN & HAMILTON LLP
        2112 Pennsylvania Ave. NW
        Washington, DC 20037
        202-974-1500
        nbamberger@cgsh.com
        msolomon@cgsh.com

        *Attorneys for North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2025, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, District of Nevada by using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

DATED July 29, 2025.

/s/ Lyndsey Mosbey
An Employee of Snell & Wilmer L.L.P.