Bradley Austin
Nevada Bar No. 13064
Snell & Wilmer
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
702-784-5247
baustin@swlaw.com

Nowell D. Bamberger
(*pro hac vice*)
Matthew C. Solomon
(*pro hac vice*)
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037
202-974-1500
nbamberger@cgsh.com
msolomon@cgsh.com

*Attorneys for North American Derivatives
Exchange, Inc., d/b/a Crypto.com |
Derivatives North America*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

|  |  |
|---|---|
| North American Derivatives Exchange, Inc. d/b/a Crypto.com \| Derivatives North America, <br><br>        Plaintiff, <br><br>        v. <br><br> Mike Dreitzer, in his official capacity as Chairman of the Nevada Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada Gaming Control Board; Chandeni K. Sendall, in her official capacity as a Member of the Nevada Gaming Control Board; the State of Nevada on relation of the Nevada Gaming Control Board; Aaron D. Ford, in his official capacity as Attorney General of Nevada, <br><br>        Defendants. | Case No.: 2:25-cv-00978-APG-BNW <br><br> **PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO STRIKE** <br><br> **(ORAL ARGUMENT REQUESTED)** |

1

Plaintiff North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America ("CDNA") respectfully moves pursuant to Federal Rule of Civil Procedure 12(c) for the Court to enter judgment on the pleadings, issue a declaration that Nevada laws pertaining to licensing and regulation of gaming are preempted by the Commodity Exchange Act ("CEA") insofar as they would apply to instruments listed on a designated contract market ("DCM"), and permanently enjoin Defendants from enforcing Nevada gaming law against CDNA with respect to such instruments. Pursuant to the same rule and Federal Rule of Civil Procedure 12(f), CDNA asks the Court to strike Defendants' unsupported denials and affirmative defenses. This Motion is based on the referenced pleadings and papers filed herein, the following Memorandum of Points and Authorities, and any oral argument the Court may entertain in connection with this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This case presents a straightforward pure legal question of federal preemption: whether Nevada's gaming regulator can enforce Nevada gaming laws against federally regulated derivatives trading on a Commodity Futures Trading Commission ("CFTC")-designated contract market. The answer is no, as a matter of law.

CDNA is a CFTC-regulated DCM that lists for trading in a national derivatives market derivatives products that fall under the exclusive jurisdiction of the CFTC pursuant to the CEA. CDNA has, in accordance with the procedures for listing such products and subject to CFTC oversight, listed for trading event contracts that reference the outcomes of live sports events ("Sports Event Contracts"). Event contracts are a type of derivative product expressly recognized under the CEA and in CFTC regulations. In the CEA, Congress established a national market in derivatives products, regulated at the federal level. It vested the CFTC with authority to authorize and regulate DCMs and with "exclusive jurisdiction" to regulate transactions on them. The CFTC has not disallowed listing of the Sports Event Contracts at issue, and these contracts are therefore lawfully offered for trading in a federally regulated market.

Notwithstanding this federal regulatory framework and its applicability to Sports Event Contracts, the Nevada Gaming Control Board ("NGCB") and its members have asserted state-level

jurisdiction to regulate what instruments can and cannot be listed on CDNA's DCM. The NGCB's position, if adopted, would allow individual states—not the CFTC—to effectively prohibit federally regulated derivatives based on state-specific evaluations of the underlying events, even where the CFTC has already authorized those derivatives to be traded on national exchanges. It would make the CFTC's exercise of its authority under the CEA effectively subject to veto by any of fifty different states and the District of Columbia. That outcome would directly contravene Congress's comprehensive regulatory scheme and its decision to subject listing and trading of derivatives on DCMs to uniform federal regulation.

This case can and should be resolved on the pleadings. There is no fact dispute to be adjudicated. Indeed, *only* three facts are or could be relevant: (1) Is CDNA a CFTC-regulated DCM? (2) Are the Sports Event Contracts at issue listed on CDNA's DCM? and (3) Have Defendants purported to require CDNA to cease offering Sports Event Contracts for trading in Nevada? None of these facts are in dispute: The Court can take judicial notice that CDNA is a DCM and the Sports Event Contracts at issue are listed on its DCM. And Defendants have attempted to enforce Nevada gaming law to preclude listing of Sports Event Contracts. All that remains is for the Court to apply the law to these undisputed facts. To the extent Defendants seek to muddy the issue by interjecting the policy question of how derivatives products *should* be regulated, or assert conclusory affirmative defenses, their allegations and arguments are beside the point and, as a matter of law, could not defeat CDNA's claims.

## BACKGROUND

### A.  Congress Established a Comprehensive Regulatory Scheme for Exclusive Federal Oversight of Futures Markets.

In 1974, Congress enacted sweeping amendments to the CEA to "[b]ring[] all futures trading under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry* (hereinafter "Senate Hearings"), 93rd Cong., 2d Sess. 848 (1974). The 1974 amendments created the CFTC and vested in it "exclusive jurisdiction" over derivatives traded on federal exchanges. 7 U.S.C. § 2(a)(1)(A). Congress took this step because it feared that inconsistent state regulations could destabilize futures markets,

noting concerns that "states . . . might step in to regulate the futures markets themselves." *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995). As one Senator warned, applying varied state laws to futures trading "would just lead to total chaos." Senate Hearings, 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

The 1974 amendments further provided that "[n]othing in this chapter shall supersede or preempt" the application of state statutes to a transaction "that is *not* conducted on or subject to the rules" of a federally licensed exchange or to "any person required to be registered" who fails to do so. 7 U.S.C. § 16(e)(1) (emphasis supplied). Congress also removed an existing provision from the CEA that preserved state authority over transactions governed by the CEA. 7 U.S.C. § 6c (1940); *see* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sen. Curtis, supported by Sen. Talmadge). Accordingly, the 1974 amendments left intact only the states' authority to police "transactions outside those preserved exclusively for the jurisdiction of the CFTC." H.R. Rep. No. 97-565, pt. 1, at 44 (1982). Indeed, after the House introduced a state-law savings clause to the CEA's exclusive jurisdiction provision, the Senate revised it to include in the final bill "except as hereinabove provided," making it clear state law could not encroach on CFTC jurisdiction over transactions in derivatives on registered exchanges. S. Rep. No. 93-1131, at 5870 (1974).

Two later amendments to the CEA broadened the scope of commodities subject to its regulatory scheme to include derivatives for which the underlier was a specified event and re-affirmed the CFTC's exclusive jurisdiction over transactions that occur on regulated exchanges. First, in 2000, Congress expanded the definition of "commodity" to include what it called "excluded commodities," which by definition include events. *See* Pub. L. No. 106-554, 114 Stat. 2763 (2000). Specifically, the definition of "excluded commodity" includes "an occurrence, extent of an occurrence, or contingency" that is both "beyond the control of the parties to the relevant contract, agreement, or transaction; and associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). Second, with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Congress added "swaps" to the CEA's exclusive jurisdiction provision. *See* Pub. L. No. 111-203, 124 Stat. 1376, 1672 (July 21, 2010).

"Swaps" include contracts "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

These provisions led to the listing of "event contracts" by DCMs on their registered exchanges, subject to the CFTC's exclusive jurisdiction. Event contracts are a type of derivative contract with a payment schedule based on the outcome of a specified event as of an expiration date. ECF No. 1 ("Compl.") ¶¶ 37–40; *see also Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm ("An event contract . . . is a derivative contract whose payoff is based on a specified event, occurrence, or value . . . ."). They are "swaps" under the CEA's definition. An event contract purchaser takes a position on an event's outcome—usually a "yes" or "no" position, with "yes" meaning the event will occur by the expiration date and "no" meaning it will not occur. Compl. ¶ 38. The "yes" position purchaser profits if the specified outcome occurs by the expiration date, while the "no" position purchaser profits if it does not. *Id.* The event contract's purchase price fluctuates based on supply and demand, reflecting the market's perception of the likelihood of the specified event's occurrence or non-occurrence. *Id.* ¶ 40. The event contract holder may sell their position at a profit or loss prior to expiration. *Id.* ¶ 38. An event contract can be tied to a variety of events, including specified movements of a financial index, a particular yield on the ten-year U.S. Treasury note, the magnitude of the upcoming hurricane season, or the outcome of political, scientific, or live sporting events. *Id.* ¶ 39.

The Dodd-Frank Act amendments in 2010 included a "Special Rule" that pertains specifically to event contracts. The Special Rule allows the CFTC to deem event contracts contrary to the public interest if they "involve" (i) "activity that is unlawful under any Federal or State law," (ii) "terrorism," (iii) "assassination," (iv) "war," (v) "gaming," or (vi) "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC "may," but need not, prohibit an event contract under the Special Rule if it falls into one of these six categories. *Id.*

Derivatives transactions on registered exchanges are subject to a comprehensive regulatory scheme, starting with their designation by the CFTC. To offer derivatives for public trading, an exchange must seek and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). Entities seeking to achieve this designation must provide detailed information demonstrating the exchange's capacity to abide by, among other requirements, the CFTC's "Core Principles" for DCMs. Those principles include providing the public "impartial access" to opportunities to transact on the DCM. 17 C.F.R. §§ 38.3(a)(2), 38.151(b). DCMs must also create and maintain a "system capable of detecting and investigating potential trade practice violations," *id.* § 38.156, monitor for "manipulation," *id.* § 38.251, and "have the ability to comprehensively and accurately reconstruct all trading" on their exchange, *id.* § 38.256.

The CEA and CFTC regulations also provide for an extensive framework for listing, review, and approval of contracts for trading on DCMs. DCMs may list contracts on their exchanges without pre-approval from the CFTC by filing a "written certification" affirming compliance with applicable CFTC requirements at the time of listing. 7 U.S.C. § 7a-2(c)(1); *see also* 17 C.F.R. § 40.2(a). Within ten days, the CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). If the CFTC does not take action within the ten-day period, the contract becomes "effective." *See* 7 U.S.C. § 7a-2(c)(2).

## B. CDNA is a Designated Contract Market Offering Self-Certified Sports Event Contracts for Trading.

The CFTC first certified CDNA's predecessor as a DCM in 2004. Compl. ¶ 64.[1] In 2010, the CFTC recertified its registration. *Id.*; CFTC Filings, *supra* note 1. For two decades, the entity now known as CDNA has operated continuously as a CFTC-regulated DCM and has been fully regulated as a derivatives exchange under federal law. Compl. ¶ 64; CFTC Filings, *supra* note 1.

On January 30, 2025, pursuant to the CEA and CFTC regulations, CDNA certified and announced its intention to list a new category of event contracts: "Industry Event - Live

---

[1] The CFTC's orders approving CDNA's designation as a DCM are publicly available on the CFTC's Industry Filings page. *See Industry Filings, North American Derivatives Exchange, Inc.*, CFTC, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations/34536 (hereinafter "CFTC Filings").

Presentations" contracts. Compl. ¶ 66; Compl. Ex. C, at 1[2]; *see* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). These contracts allow users to trade on the outcome of live events in the performing arts, spectator sports, and related industries, provided the users themselves are not participants in the events. Compl. ¶ 66; Compl. Ex. C, at 4–5; Certification Filing, *supra* note 2, at 4–5. Under the process described above, as a CFTC-designated contract market, CDNA ensured that these contracts adhered to product-related regulatory standards and certified that they complied with applicable law prior to the time of listing. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). CDNA's Sports Event Contracts have all been certified and deemed "effective" under this process. *See* 7 U.S.C. § 7a-2(c); 17 C.F.R. § 40.2(a).

## C.    Defendants Threaten to Enforce State Gaming Law Against CDNA.

The NGCB and Nevada Gaming Commission ("NGC") administer and enforce gaming laws and regulations throughout Nevada. The NGCB establishes and enforces the rules and regulations governing gaming in Nevada, while the NGC acts on recommendations of the NGCB with regard to licensing.[3] Compl. ¶ 21. The NGCB seeks to assert its authority over Sports Event Contracts offered for trading on CDNA based on its view that these contracts violate various provisions of Nevada gaming law. *Id.* ¶ 70.

On May 20, 2025, the NGCB issued a cease-and-desist order to CDNA. Compl. ¶¶ 69–70; Compl. Ex. A; ECF No. 38 ("Answer") ¶¶ 69–70. The order asserts that CDNA has been offering, and continues to offer, "event-based wagering contracts in Nevada on sporting events through its exchange" and that this "is unlawful in Nevada, unless and until approved as licensed gaming by the [NGC]." Compl. ¶ 69; Compl. Ex. A, at 1; Answer ¶ 69. The NGCB concluded that "by offering event-based wagering contracts in Nevada, [CDNA] is operating as an unlicensed sports pool in violation of [Nevada law]." Compl. ¶ 70; Compl. Ex. A, at 2; Answer ¶ 70. The

---

[2]    CDNA's January 30, 2025 self-certification pertaining to its Sports Event Contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Contingent Derivatives Contract (Industry Event – Live Presentations – NAICS 711) – Submission Pursuant to Commission Regulation 40.2(a)*, CFTC, https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01302514705.pdf (Jan. 30, 2025) (hereinafter "Certification Filing").

[3]    *Gaming Commission*, Nevada Gaming Commission and the Nevada Gaming Control Board, https://gaming.nv.gov/gaming/commission/.

1    NGCB ordered CDNA to "immediately cease and desist" offering its Sports Event Contracts in

2    Nevada.  Compl. ¶ 71; Compl. Ex. A, at 2; Answer ¶ 71.  The order threatened that the NGCB

3    would "pursue criminal and civil actions based on [CDNA's] past and future conduct within the

4    state."  Compl. ¶ 71; Compl. Ex. A, at 2; Answer ¶ 71.

5          In response, counsel for CDNA emailed Nevada Deputy Attorney General John Michela

6    requesting a time to discuss the cease-and-desist order and asking "how the Board intend[ed] to

7    proceed in light of the federal injunction issued in the case involving Kalshi."  Compl. ¶ 74; Compl.

8    Ex. B, at 2; Answer ¶ 74.  In response, Mr. Michela declined a discussion on behalf of his client

9    by asserting that any response from CDNA to the cease-and-desist order "should be submitted to

10   Board Chairman Kirk Hendrick in writing."  Compl. ¶ 74; Compl. Ex. B, at 1; Answer ¶ 74.

11         Faced with the imminent threat of enforcement and the express threat of civil and criminal

12   penalties, CDNA filed suit on June 3, 2025.  ECF No. 1.  The NGCB again refused to stay its hand

13   for any enforcement proceedings.  Accordingly, two days later, CDNA moved for a preliminary

14   injunction prohibiting Defendants from enforcing Nevada law against the Sports Event Contracts

15   traded on CDNA.  ECF No. 15.  On July 14, 2025, Defendants filed an Answer to the Complaint.

16   ECF No. 38.

17                                    **ARGUMENT**

18         CDNA is entitled to judgment on the pleadings because all facts material to a finding of

19   preemption and grant of the requested declaratory and injunctive relief are established on the

20   pleadings or by judicial notice.  Judgment on the pleadings is proper when "no issue of material

21   fact remains," and the moving party "is entitled to judgment as a matter of law."  *Doleman v. Meiji*

22   *Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984); *see* Fed. R. Civ. P. 12(c).  For purposes

23   of this motion, the allegations of the non-moving party are accepted as true, while the allegations

24   of the moving party that Defendants have expressly denied are treated as false.  *See MacDonald v.*

25   *Grace Church Seattle*, 457 F.3d 1079, 1081 (9th Cir. 2006).  In resolving a Rule 12(c) motion, the

26   Court may consider judicially noticeable facts as well as "'material which is properly submitted as

27   part of the complaint' or incorporated by reference into the complaint."  *Body Xchange Sports*

28

1  *Club, LLC v. Zurich Am. Ins. Co.*, 648 F. Supp. 3d 1205, 1210–11 (E.D. Cal. 2022) (quoting *Lee*

2  *v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001)).

3      Here, CDNA seeks a permanent injunction.  The preliminary and permanent injunction

4  standards are essentially the same, except the latter requires a showing of "actual success" on the

5  merits.  *See Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n.12 (1987).  Plaintiff must

6  demonstrate:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such

7  as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

8  balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

9  (4) that the public interest would not be disserved by a permanent injunction."  *Monsanto Co. v.*

10  *Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (cleaned up).

11      A.    **The CEA Preempts States from Applying Gaming Law to Derivatives Traded
12            on a Designated Contract Market.**

13      The Supremacy Clause provides that "federal law 'shall be the supreme Law of the Land;

14  and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any

15  state to the Contrary notwithstanding.'"  *Arizona v. United States,* 567 U.S. 387, 399 (2012)

16  (quoting U.S. Const. art. VI, cl. 2).  "Under this principle, Congress has the power to preempt state

17  law."  *Id.*  Preemption is "a purely legal question."  *See In re Bard IVC Filters Prod. Liab. Litig.*,

18  969 F.3d 1067, 1073 (9th Cir. 2020).  There are three types of federal preemption: express, field,

19  and conflict.  *Id.*  The fundamental question is the same under each—whether Congress intended

20  a particular federal law to preempt state law.  Under any preemption analysis the answer is clear—

21  Congress intended to preempt state law as applied to derivatives traded on DCMs.

22          1.    *Nevada Gaming Laws Are Expressly Preempted as Applied to CDNA.*

23      Congress may preempt state law "by enacting a statute containing an express preemption

24  provision."  *Arizona,* 567 U.S. at 399.  Congress expressed its intent in the CEA's text that state

25  law is preempted as to CFTC-regulated derivatives:

26      The [CFTC] shall have *exclusive jurisdiction* . . . with respect to accounts, agreements
       . . . and transactions involving swaps or contracts of sale of a commodity for future
27      delivery . . . traded or executed on a contract market designated pursuant to section 7
       of [the CEA] or a swap execution facility pursuant to section 7b–3 of [the CEA] or

28

any other board of trade, exchange, or market, and transactions subject to regulation by the [CFTC] pursuant to section 23 of [the CEA].

7 U.S.C. § 2(a)(1)(A) (emphasis added).  In *KalshiEX, LLC v. Hendrick*, this Court found this "plain and unambiguous language grants the CFTC exclusive jurisdiction over accounts, agreements, and transactions involving swaps or contracts of sale of a commodity for future delivery" traded on a CFTC-designated exchange.  2025 WL 1073495, at *5 (D. Nev. Apr. 9, 2025) (hereinafter "*Kalshi v. Hendrick I*").

The pleadings in this case, and judicially-noticeable facts, establish that the Sports Event Contracts traded on CDNA are exactly that—swaps traded on a DCM.  *See supra* pp. 4–7. Accordingly, Section 2 of the CEA expressly preempts states from asserting their authority to regulate these contracts.  7 U.S.C. § 2(a)(1)(A).  This case really is as simple as that.

   2. *Nevada Gaming Laws Are Field Preempted as Applied to CDNA.*

Even if express preemption somehow did not apply, field preemption does.  Field preemption is implied "[w]hen the federal government completely occupies a given field or an identifiable portion of it."  *Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 212–13 (1983).  "[T]he ultimate touchstone of pre-emption analysis" is the "purpose of Congress."  *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).  Congress's intent to occupy a field can be expressed in a statute's text and legislative history, *see e.g.*, *Pac. Gas & Elec. Co.*, 461 U.S. at 203–13, or in a scheme of "federal statutory directives" that "provide a full set of standards" that are "designed as a 'harmonious whole,'" *Arizona,* 567 U.S. at 401 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)).  "Where Congress occupies an entire field . . . even complementary state regulation is impermissible."  *Id.*  The CEA's text and legislative history, as well as the comprehensive nature of its regulatory framework, illustrate Congress's clear intent to occupy the field of derivatives trading on federally designated contract markets.

**Statutory Text.**  The same provisions discussed with respect to express preemption demonstrate Congress's intent to preempt the field of derivatives traded under CFTC oversight.  It could not be clearer—Section 2 affords "exclusive jurisdiction" to the CFTC over derivatives

traded on a DCM.  7 U.S.C. § 2(a)(1)(A).  Put simply, if the CFTC is hands on, Congress wants the states to be hands off.  *See Kalshi v. Hendrick I*, 2025 WL 1073495, at *6 ("In sum, if Kalshi were offering its contracts without CFTC designation, then the defendants could regulate it.  But because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted.").[4]

**Statutory Purpose.**  The text of the CEA, as amended in 1974, reflects Congress's intent to bring the expanding commodity futures market under a uniform set of federal regulations to "avoid unnecessary, overlapping and duplicative regulation."  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  In particular, Congress sought to avoid overlap with the Securities and Exchange Commission ("SEC") and was concerned that the states might "step in to regulate the futures markets themselves" and introduce "conflicting regulatory demands."  *Am. Agric. Movement*, 977 F.2d at 1156.  Congress addressed these concerns by putting "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974).

**Legislative History.**  If the text and purpose were not clear enough, the legislative history of the CEA crystallizes congressional intent to occupy the field of CFTC-regulated derivatives.  The Conference Report preceding the enactment of the 1974 amendments confirms the purpose of the exclusive jurisdiction provision:  "Under the exclusive grant of jurisdiction to the [CFTC], the

---

[4]    In April 2025, the United States District Court for the District of New Jersey agreed with this Court that "the exclusive jurisdiction language reflects an intent to occupy the field" as applied to Kalshi's event contracts.  *Kalshi v. Flaherty*, 2025 WL 1218313, at *5.  The United States District Court for the District of Maryland recently disagreed.  Mem. Op., *KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA (D. Md. Aug. 1, 2025).  That decision has already been appealed to the Fourth Circuit, *see id.* ECF No. 72, and it conflicts with contemporaneous authority from across the country from shortly after the 1974 amendments to the CEA finding that Congress intended to preempt state regulation.  *See Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) ("In the light of Congress' plainly stated intent to have the Commodity Exchange Act, as amended, preempt the field of regulation of commodity futures trading, any claim under federal or state securities statutes is barred."); *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 673 (N.D. Ga. 1983) (noting "the primary concern of Congress was preemption of federal and state regulatory schemes"); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("It is now established, however, that the SEC and other federal agencies are 'stripped' of authority to regulate commodities transactions . . . and that state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC.") (citations omitted); *see also Int'l Trading Ltd. v. Bell*, 262 Ark. 244, 250–51 (1977) (finding CEA's language "express[es] a clear intention to vest exclusive jurisdiction of the regulation of commodity options in the [CFTC] and to supersede the jurisdiction of all state and federal agencies").

authority of the [CEA] (and the regulations issued by the [CFTC]) *would preempt the field insofar as futures regulation is concerned.*"  S. Rep. No. 93-1194, at 35 (1974) (Conf. Rep.) (emphasis added).  *See also Kalshi v. Hendrick I*, 2025 WL 1073495, at *6 ("[L]egislative history supports the conclusion that Congress intended to occupy the field and preempt state law from applying to CFTC-designated exchanges.").

The drafting history of the 1974 amendments eliminates any doubt of Congress's purpose. At that time, Congress deleted a provision that preserved state authority over derivatives trading on DCMs.  *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687–88 (1982); *see also* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).  The Senate made this deletion, clarifying "the [CFTC's] jurisdiction, where applicable[,] supersedes State as well as Federal agencies."  S. Rep. No. 93-1131, at 5848 (1974). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."  *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987).  The Senate also added the "except as hereinabove provided" language to the state-law savings clause of the exclusive jurisdiction provision, clarifying that the savings clause does *not* apply to derivatives transactions on DCMs.  S. Rep. No. 93-1131, at 5870 (1974).  The Senate's deletion of the provision for concurrent state jurisdiction and limitation of the state-law savings clause are unmistakable indications of Congress's intent to preempt state regulation that would interfere with the CFTC's exclusive jurisdiction.

**Comprehensive Regulatory Scheme.**  The CEA's comprehensive regulatory framework, including its enforcement provisions, confirms Congress's intent to occupy the field exclusively. The CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)).  Congress establishes such comprehensive structures when it means to leave "no room for the states to supplement federal law."  *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368–69 (1986); *see also Arizona*, 567 U.S. at 401 (explaining that a federal scheme's "comprehensive" nature supports field preemption).  An

exchange may offer derivatives only after obtaining CFTC designation as a regulated exchange.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).  To achieve this designation, the exchange must submit a detailed application demonstrating its ability to comply with the CFTC's extensive regulatory requirements.  17 C.F.R. § 38.3(a).  The CFTC then conducts a thorough review of the application to determine whether the exchange satisfies its standards.  *See id.*

Once designated as a federally regulated contract market, a DCM is governed by the CFTC's comprehensive regulatory scheme, which includes, among other requirements, recordkeeping obligations, 17 C.F.R. § 38.950, reporting requirements, *id.* § 38.450, and liquidity standards, *id.* § 38.1101(a)(2).  Congress also authorized CFTC-designated exchanges to list contracts—including event contracts—through a certification process, whereby the exchange affirms that the contract complies with the CEA.  Congress granted the CFTC authority to conduct a post-certification review if it believes the contract may violate any applicable statute or regulation.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).  To keep its designation, a DCM must comply with all Core Principles and CFTC regulations.  7 U.S.C. § 7(d).  If an exchange disregards a CFTC regulation, the Commission may pursue civil and criminal penalties.  *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3.

Importantly, the CEA allows the CFTC to reject event contracts that it finds "contrary to the public interest" if they "involve" conduct such as "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or other comparable conduct identified by the CFTC through rule or regulation.  7 U.S.C. § 7a-2(c)(5)(C)(i).  The statute provides that the CFTC "may"—not must—find a contract contrary to the public interest if it falls into one of the listed categories.  *Id.*  As Congress specified, this judgment rests with the CFTC alone—not with the NGCB and its counterparts in fifty individual states.  The legislative history of the Dodd-Frank Act confirms that the Special Rule's drafters intended for the CFTC to have "the power to determine" whether contracts in certain categories were contrary to the public interest.  156 Cong. Rec. S5902, S5906 (daily ed. July 15, 2010) (statements of Sens. Feinstein

and Lincoln).[5]  Cumulatively, this elaborate regulatory structure unmistakably demonstrates Congress's intent to occupy the field of futures contracts on federally designated exchanges.

Individually, and in aggregate, the text, history, purpose, and comprehensive structure of the CEA demonstrate that Congress intended to occupy the field of derivatives traded on federally designated contract markets.  As a result, Nevada's gaming laws are field preempted as applied to CDNA's Sports Event Contracts.

>3.      *Nevada Gaming Laws Are Conflict Preempted as Applied to CDNA.*

The NGCB's cease-and-desist order directed CDNA to take one of two options:  Either permanently stop offering trading of Sports Event Contracts in Nevada or stop offering them until CDNA obtains a sports wagering license under Nevada law.  Either option would directly conflict with the congressional objectives underlying the CEA and would put CDNA at odds with specific regulatory requirements for operating a DCM.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect— the state law must yield to the regulation of Congress . . . . ") (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)).  Application of Nevada's gaming laws to Sports Event Contracts would frustrate congressional purposes of uniformity of regulation and uniformity of enforcement as applied to derivatives traded under CFTC oversight, as well as furtherance of the CFTC's Core Principles, and would jeopardize CDNA's designation as a DCM.

*First*, application of Nevada's sports wagering laws to CDNA would frustrate the CEA's purpose of bringing futures markets "under a uniform set of regulations."  *Am. Agric. Movement*, 977 F.2d at 1156.  As the Seventh Circuit noted, "a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors."  *Id*.  The assertion of state authority and the demands in the NGCB's cease-and-

---

[5]      Former members of Congress recently filed an amicus brief in the Third Circuit in connection with *Kalshi v. Flaherty*.  Br. of Amici Curiae Seven Former Members of Cong. in Supp. of Pl.-Appellee, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025), ECF No. 66.  In that brief, amici, including drafters of the Special Rule, affirmed the purpose of the Special Rule was to give the CFTC exclusive authority to govern which event contracts may be traded on registered exchanges.  *See id.* at 26–30.

1    desist order cannot be squared with Congress's intent to shield regulated exchanges from being

2    governed by a patchwork of potentially conflicting legal regimes.  The NGCB's order seeks to

3    subject a CFTC-regulated DCM to the state's licensure scheme—precisely the type of regulation

4    Congress intended to preclude.  The inconsistency becomes even more apparent when considering

5    that, if the NGCB is allowed to proceed, each of the other forty-nine states and the District of

6    Columbia could likewise attempt to impose their own laws on CDNA.  Subjecting DCMs to state

7    regulation would create "an obstacle to the accomplishment and execution of the full purposes and

8    objectives of Congress." *Hines*, 312 U.S. at 67.  These state laws are therefore preempted.

9        *Second*, subjecting CDNA to Nevada's sports wagering laws would frustrate Congress's

10   purpose of establishing uniformity of enforcement for DCMs.  Preemption also arises where there

11   is "a conflict in the method of enforcement."  *Arizona*, 567 U.S. at 406.  A state law creates an

12   "obstacle" to a federal regulatory framework when Congress adopts a particular method of

13   enforcement to achieve its objectives, and state law imposes a different approach that disrupts "the

14   careful balance struck by Congress."  *Knox v. Brnovich*, 907 F.3d 1167, 1175 (9th Cir. 2018)

15   (citation and internal quotations omitted).  This is especially true when Congress reserves

16   "prosecutorial power" and "discretion" to federal authorities—a state law allowing prosecutions

17   for the same conduct "conflicts with the federal scheme." *Valle del Sol Inc. v. Whiting*, 732 F.3d

18   1006, 1027 (9th Cir. 2013).  Otherwise, as the Supreme Court cautioned, a state could initiate

19   charges "even in circumstances where federal officials in charge of the comprehensive scheme

20   determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402.

21       That is precisely the danger presented by the NGCB's actions.  Once CDNA received

22   CFTC designation as a contract market, it was permitted under federal law to list event contracts

23   by certifying that those contracts comply with federal requirements.  The CFTC—and no other

24   body—has the authority to review that certification on the basis that the contracts are "contrary to

25   the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i).  If the CFTC determines that CDNA has violated

26   federal law, it may act. *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3.

27   Congress provided the CFTC with a range of enforcement tools and vested the agency with

28   discretion to determine how best to deploy them.

Allowing Nevada to impose its own laws on federally regulated exchanges would "disrupt[] 'the congressional calibration of force.'"  *Valle del Sol*, 732 F.3d at 1027 (quoting *Crosby*, 530 U.S. at 380).  The NGCB's cease-and-desist order asserts that CDNA's activities are "in violation of Nevada law" and expressly reserves the rights of itself and other Nevada authorities "to pursue criminal and civil actions based on [CDNA's] past and future conduct within the state." Compl. Ex. A, at 2.  One example of a statute NGCB alleges CDNA to be violating is Nevada Revised Statutes ("NRS") § 463.160—a willful violation of which is a category B felony for which an offender "*shall* be punished" by one to ten years imprisonment and/or a fine of up to $50,000. NRS § 463.360(3) (emphasis added).  Absent preemption, the federal enforcement regime enacted by Congress would be frustrated by state-imposed civil and criminal sanctions.  *See Crosby*, 530 U.S. at 373–74 (finding conflict preemption where state law "undermin[ed]" Congress's "delegation of effective discretion" to the executive).  Courts have recognized conflict preemption where state discipline and enforcement regimes diverge from the federal scheme, and this Court should do the same.  *See, e.g., Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563–64  (6th Cir. 1998) (holding CEA preempted state law requiring certain payments to investors because it conflicted with a CFTC regulation); *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 893–94 (7th Cir. 2019) (holding CEA preempted state law defamation claim against registered futures association because it would "impair[] significantly" the CEA's comprehensive regulation of self-regulatory organizations).

*Third*, the NGCB's order is incompatible with the CFTC Core Principles that underpin CDNA's status as a DCM.  *See Kalshi v. Hendrick I*, 2025 WL 1073495, at *7 (noting the "potential existential threat" that if Kalshi disrupted contracts or geographically limited access to its national exchange, the CFTC could find Kalshi to have violated the CFTC's Core Principles). The CFTC's Core Principle 2 requires CDNA to "provide its members . . . with *impartial access* to its markets and services."  17 C.F.R. §§ 38.150, 38.151(b) (emphasis added).  Evicting users from the contract market and terminating their contracts based on their location within the State of Nevada would not be providing "impartial access."  Core Principle 4 requires CDNA to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions

1   and market disruptions." 17 C.F.R §§ 38.250, 38.255.  Abruptly cutting off Nevada residents—

2   including those holding ongoing investments—from CDNA's Sports Event Contracts would

3   constitute exactly the sort of disruption the CFTC requires CDNA to prevent.  In contemplating

4   such a disruption, the Seventh Circuit emphasized that "[w]hen application of state law would

5   directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the

6   accomplishment and execution of the full purposes and objectives of Congress,' and hence is

7   preempted." *Am. Agric. Movement*, 977 F.2d at 1156–57 (citation omitted).  In this scenario, it

8   may be "impossible" for CDNA "to comply with both state and federal law"—the quintessential

9   case for conflict preemption. *Valle del Sol*, 732 F.3d at 1023 (quoting *Crosby*, 530 U.S. at 372).[6]

10     Because imposing Nevada sports wagering law obligations on CDNA would frustrate the

11  purpose and effect of the CEA's uniformity of regulation, uniformity of enforcement, and

12  furtherance of the CFTC's Core Principles, those laws are conflict preempted.

13         4.    *The Court Should Strike or Disregard Defendants' Non-Substantive Denials That*

14               *CDNA Is a DCM That Has Self-Certified Sports Event Contracts for Trading.*

15     Under any preemption analysis, CDNA must demonstrate only two material facts to show

16  its Sports Event Contracts fall under the CEA's exclusive jurisdiction provision:  (1) that CDNA

17  is a DCM; and (2) that Sports Event Contracts are listed for trading on CDNA.  Both of these facts

18  may be established by judicial notice, and Defendants cannot avoid judgment through

19  disingenuous assertions that they lack knowledge sufficient to answer CDNA's allegations.

20     The Court may and should take judicial notice of CDNA's status as a DCM and CDNA's

21  self-certification of the Sports Event Contracts traded on CDNA.  In a motion for judgment on the

---

22  [6]     Many courts have extended these principles to find state laws preempted by the CEA on conflict

23  preemption grounds.  *See Am. Agric. Movement*, 977 F.2d at 1155–56 (holding the CEA preempted state

    law whose application "would directly affect trading on or the operation of a futures market"); *Rasmussen*

24  *v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (affirming

    dismissal of a claim that trading in futures contracts violated a Georgia gambling statute "on the ground

25  that the [CEA] preempts all state laws inconsistent with its provisions"); *Paine, Webber, Jackson & Curtis,*

    *Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981) (finding application of that state's gambling laws

26  "would destroy the markets in this state" and holding them preempted); *Sinclair & Co., Inc. v. Gurule*, 757

    P.2d 225, 228 (Idaho Ct. App. 1988) (holding the application of state's gambling laws to federally regulated

27  exchanges "could destroy the market"); *see also Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*,

    322 F.3d 1039, 1055–57 (9th Cir. 2003) (finding CEA preempted California's Bucket Shop Law as applied

28  to swaps exempted from coverage by the CEA).

pleadings, "courts must consider the complaint in its entirety, as well as other sources [courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,] in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1201 (9th Cir. 2021) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)) (cleaned up). Federal Rule of Evidence 201(b)(2) permits a court to take judicial notice of any facts "not subject to reasonable dispute," including those which may be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "Even where judicial notice is not appropriate, on a motion for judgment on the pleadings, the Court may consider 'material which is properly submitted as part of the complaint' or incorporated by reference into the complaint." *Body Xchange Sports Club, LLC*, 648 F. Supp. 3d at 1210–11 (quoting *Lee*, 250 F.3d at 688).

CDNA alleged in its Complaint that it "is a federally regulated DCM" which "[t]he CFTC first approved . . . as a DCM in 2004." Compl. ¶¶ 63–64. CDNA also alleged that CDNA self-certified its Industry Event – Live Presentations contracts—a category that includes its Sports Event Contracts—on January 30, 2025, and CDNA attached to the Complaint the certification letter it filed with the CFTC as required by the CEA and CFTC regulations. Compl. ¶¶ 66, 68; Compl. Ex. C. In their answer, Defendants pled that they "lack knowledge sufficient to form a belief about the truth" of these allegations and they "therefore den[ied]" the allegations. Answer ¶¶ 63–64, 66, 68. As to the self-certification letter, Defendants admitted that "[t]he document and statutes identified in this paragraph speak for themselves." *Id.* ¶ 66.

CDNA's status as a DCM cannot reasonably be disputed. Its status as a DCM is a fact that can be determined by a simple search of the CFTC's public list of DCMs. *See* CFTC Filings, *supra* note 1. That alone entitles CDNA to judicial notice of its status as a DCM. *See Stoyas v. Toshiba Corp.*, 896 F.3d 933, 946 n.17 (9th Cir. 2018) (taking judicial notice of the list of registered alternative trading systems on the SEC's website to affirm fact of registration as an alternative trading system).

The Court should also take judicial notice of CDNA's self-certification of Sports Event Contracts based on the certification letter attached to and incorporated by reference into the

Complaint, Compl. Ex. C, the authenticity of which Defendants have not disputed. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (documents are incorporated by reference "where the complaint necessarily relies upon" them or the contents are alleged in the complaint and there is no dispute of the documents' authenticity or relevance); Compl. Ex. C.  Like CDNA's DCM status, its Sports Event Contracts certification is a matter of public record. Certification Filing, *supra* note 2.  In addition, the Sports Event Contracts "evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them." *Kalshi v. Flaherty*, 2025 WL 1218313, at *6.

This Court should strike under Rule 12(f), deem admitted, or otherwise disregard Defendants' denials claiming lack of knowledge sufficient to confirm that CDNA is a DCM on which Sports Events Contracts are listed.  Had they conducted one, the "reasonable" inquiry required by Federal Rule of Civil Procedure 11 would have supplied Defendants with a sufficient basis to admit to CDNA's registration as a DCM and self-certification of its Sports Event Contracts.  *See* CFTC Filings, *supra* note 1; Certification Filing, *supra* note 2; Compl. Ex. C. Under these circumstances, the Court should deem the allegations of the Complaint as to these facts admitted.  *See Wachovia Bank, N.A. v. Chaparral Contracting, Inc.*, 2010 WL 2803016, at *2–3 (D. Nev. July 12, 2010) (deeming admitted a total of seventeen implausible denials for lack of knowledge and information in defendant's answer).

**B.    CDNA Will Experience Irreparable Harm Absent Injunctive Relief.**

The Supreme Court and Ninth Circuit have made clear that a credible threat of imminent prosecution under a state law that is preempted by federal law demonstrates irreparable harm.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law. . . . [T]he [imminent] prospect of state suit . . . supplies the necessary irreparable injury."); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding a "credible threat of prosecution" under an allegedly preempted state statute supported finding of irreparable harm).  "[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Defendants have threatened to

1  seek to prohibit CDNA from offering Sports Events Contracts for trading in Nevada under pain of

2  civil and criminal law.  To the extent that the state law under which they purport to act is preempted

3  in this context—and it is—it follows that CDNA will suffer irreparable harm from the unlawful

4  enforcement of preempted state law.    This irreparable injury is particularly significant, where, as

5  here, "repetitive penalties attach to continuing or repeated violations and the moving party lacks

6  the realistic option of violating the law once and raising its federal defenses." *Morales*, 504 U.S.

7  at 381.  This Court confirmed these principles in *Kalshi v. Hendrick I*, holding that Kalshi's

8  "Hobson's choice" between facing "civil and criminal liability" and "incur[ring] substantial

9  economic and reputational harm as well as the potential existential threat" of losing DCM status

10  demonstrated a likelihood of irreparable harm.  2025 WL 1073495, at *7.  CDNA is faced with

11  just such a Hobson's choice here.  In the absence of an injunction, CDNA has no adequate remedy

12  at law for this harm.

13         If CDNA were to comply with Defendants' demands to cease and desist offering Sports

14  Event Contracts to Nevada residents, it could lose its DCM status.  Terminating existing contracts

15  in Nevada and excluding users based on their location would violate CFTC Core Principles

16  requiring exchange markets to provide "impartial access" to markets, 17 C.F.R. § 38.151(b), and

17  prevent "market disruptions."  17 C.F.R. § 38.255.  These violations could cause CDNA to lose

18  its CFTC designation as a DCM, putting its entire business in jeopardy. *See* 17 C.F.R. § 38.100(a)

19  (requiring compliance with Core Principles to "be designated, and maintain a designation, as a

20  contract market").  In addition, CDNA could be subject to significant civil penalties, further adding

21  to the harm CDNA would incur absent an injunction. *See* 7 U.S.C. §§ 13a, 13a-1(d).

22         No further proof is needed for the Court to find irreparable harm.  CDNA does not need to

23  quantify or prove the extent of the financial harm it would experience either from complying with

24  or resisting Defendants' cease-and-desist order because the imminent threat of enforcement of

25  preempted state law is alone sufficient irreparable harm under Supreme Court and Ninth Circuit

26  precedent. *See Morales*, 504 U.S. at 381–82; *Valle del Sol*, 732 F.3d at 1029.  But it is obvious

27  CDNA will experience financial and reputational harm without an injunction.  Even if this Court

28  issued the requested declaratory relief, CDNA would still incur costs defending against any

enforcement action to vindicate that relief in whatever forum Defendants choose.  Those costs, like any costs of compliance with Defendants' cease-and-desist order, would be unrecoverable due to Defendants' Eleventh Amendment immunity from damages.  *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012) (finding irreparable harm where plaintiffs "can obtain no remedy in damages against the state because of the Eleventh Amendment").

## C.    The Balance of Equities and Public Interest Favor an Injunction.

The balance of equities likewise supports permanent injunctive relief.  Defendants suffer no hardship from being enjoined from enforcing law they lack jurisdiction to enforce in the first place, and no public interest can be served by the enforcement of preempted state law.  *See Valle del Sol*, 732 F.3d at 1029 ("[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available.") (citation and internal quotation marks omitted).  To the contrary, "preventing a violation of the Supremacy Clause serves the public interest."  *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019).

## D.    Defendants' Affirmative Defenses Do Not Preclude Judgment on the Pleadings and Should Be Struck.

The Court should dispense with the fifteen so-called affirmative defenses enumerated in the Answer.  "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f); *see Fed. Sav. & Loan Ins. Corp. v. Gemini Mgmt.*, 921 F.2d 241, 242–43 (9th Cir. 1990).  The Court should strike or otherwise disregard each of Defendants' enumerated defenses for purposes of this Motion because they are either not affirmative defenses, are impertinent, have been insufficiently pled, or, even if they had been sufficiently pled, are insufficient as a matter of law.

Defendants' **first defense**, "[t]he Complaint fails to state a claim upon which relief can be granted," Answer at 16, is simply an assertion that CDNA cannot prove its case on the facts alleged—*not* an affirmative defense.  *Zivkovic v. S. Cal. Edison Co*., 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an

1    affirmative defense."); *see also Vogel v. Huntington Oaks Del. Partners, LLC*, 291 F.R.D. 438,

2    442 (C.D. Cal. 2013) ("An attack on a plaintiff's case-in-chief is not an affirmative defense," and

3    "failure to state a claim is not an affirmative defense."); *Hernandez v. Cnty. of Monterey*, 306

4    F.R.D. 279, 283 (N.D. Cal. 2015) ("An affirmative defense . . . does not negate the elements of the

5    plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim

6    are proven.").  As such, it must be struck.

7         Defendants' **second, third, and fourth defenses** raise sovereign immunity under the

8    Eleventh Amendment and immunities under Nevada state law.  Answer at 16.  This Court has

9    already held these immunity defenses as applied to the individuals named in the Complaint fail as

10   a matter of law under Supreme Court doctrine set forth in *Ex parte Young*, 209 U.S. 123 (1908).

11   *See KalshiEX, LLC v. Hendrick*, 2025 WL 1587682, at *4 (D. Nev. June 3, 2025) (hereinafter

12   "*Kalshi v. Hendrick II*").  Regardless of whether the Eleventh Amendment applies to the NGCB

13   itself, this case would proceed against the officials in their official capacities who cannot be

14   immunized under any legal doctrine named in the Answer.  *See id.* at *2 n.2 (noting that the case

15   would proceed against individuals named in their official capacities regardless of immunity

16   claims).  These defenses are therefore insufficient as a matter of law.  *See Ganley v. Cnty. of San*

17   *Mateo*, 2007 WL 902551, at *1 (N.D. Cal. Mar. 22, 2007) (holding a defense is insufficient as a

18   matter of law whenever "there are no questions of fact . . . any questions of law are clear and not

19   in dispute, and . . . under no set of circumstances could the defense succeed.") (citation omitted).

20        Defendants' **fifth defense**, asserting CDNA's "claim is barred by the Tenth Amendment,"

21   Answer at 16, is similarly insufficient as a matter of law.  This Court has already dismissed this

22   defense in *Kalshi v. Hendrick II*, agreeing with Kalshi both that the Tenth Amendment does not

23   apply because Congress enacted the CEA lawfully under the interstate commerce clause and that

24   the anti-commandeering principle does not apply because preemption of Nevada law "would not

25   compel the State to implement a federal regulatory program."  2025 WL 1587682, at *6–7.

26        Defendants' **sixth and seventh defenses** assert that CDNA's claims are "barred by the

27   doctrine of judicial estoppel" and "collateral estoppel."  Answer at 16.  These defenses are

28   insufficiently pled because they fail to provide the "plaintiff fair notice of the defense" asserted.

*Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979), *overruled on other grounds by Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016).  Fair notice requires the defendant to "describ[e] the defense in 'general terms.'"  *Kohler v. Flava Enters., Inc.*, 779 F.3d 1016, 1019 (9th Cir. 2015) (citation omitted).  It requires Plaintiffs to at least "allege [] facts identifying how the doctrine of [the defense] would apply in this case."  *SEC v. Markman Biologics Corp.*, 2024 WL 1075358, at *3–4 (D. Nev. Mar. 11, 2024) (Gordon, J.) (striking affirmative defenses for failure to plead any facts illustrating how the defenses would apply).  The Answer is silent as to what could possibly estop CDNA from pursuing its claims.  *See Ganley*, 2007 WL 902551, at *5 (striking res judicata and collateral estoppel defense because there were no allegations regarding "any prior judicial proceeding . . . which would carry preclusive effect").

Similarly, Defendants have pled no facts that give notice of the basis for their **eighth defense**, asserting CDNA's claims are "barred by the doctrine of unclean hands."  Answer at 16.  This defense should be struck on insufficient pleading grounds alone.  Even had Defendants alleged some facts illustrating how it might apply, the doctrine of unclean hands would be no bar to Plaintiff's preemption claim because "the clean hands doctrine should not be strictly enforced when to do so would frustrate a substantial public interest."  *E.E.O.C. v. Recruit U.S.A., Inc.*, 939 F.2d 746, 753 (9th Cir. 1991).  Enjoining Defendants serves the public interest.  *California*, 921 F.3d at 893 ("[P]reventing a violation of the Supremacy Clause serves the public interest.").

Defendants' **ninth defense** asserts that CDNA "cannot show that it will suffer irreparable harm."  Answer at 16.  Like Defendants' first defense, this is not an affirmative defense that would preclude judgment on the pleadings.  *See supra* pp. 21–22.  Rather, it is a claim that CDNA cannot meet its burden of proving its case-in-chief.  *See id.*  In any event, this defense fails as a matter of law for the reasons stated above—CDNA has demonstrated irreparable harm as a matter of law from the threatened enforcement of preempted state law.  *See supra* pp. 19–21.

Defendants' **tenth defense**, that CDNA "has failed to mitigate any alleged harm," Answer at 16, is likewise not an affirmative defense—it is a legal doctrine that may reduce damages which CDNA does not seek, and, therefore, it is impertinent.  *See Hope Med. Enters., Inc. v. Fagron Compounding Servs., LLC*, 2021 WL 2941546, at *6 (C.D. Cal. July 12, 2021) ("[F]ailure to

mitigate . . . [is] not an affirmative defense."); *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) (defining impertinent allegations as those "that do not pertain, and are not necessary, to the issues in question.") (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (1990)).

Defendants' **eleventh, twelfth, and thirteenth defenses**, are all merely legal arguments about the applicability of preemption. Answer at 16–17. None of these are affirmative defenses that might preclude judgment on the pleadings, and all are incorrect as a matter of law for the reasons discussed above. *See supra* pp. 9–17.

Defendants' **fourteenth defense** purports to "incorporate and assert any and all affirmative defenses advanced by Intervenors in this action." Answer at 17. But there is no intervenor in this action, much less one that has asserted any defenses, nor could any intervenor assert a defense on behalf of Defendants that they have not pled themselves.

Defendants' **fifteenth defense** is a catch-all—one that "incorporate[s] and assert[s] the affirmative defenses enumerated in Rule 8 of the Federal Rules of Civil Procedure." Answer at 17. Again, pleading requires more than general invocation of a rule—there must be some allegations sufficient to give notice of the basis for any affirmative defenses. *See Wyshak*, 607 F.2d at 827. A mere citation to the list of affirmative defenses in Rule 8 does not suffice. Moreover, several of the defenses listed in Rule 8, such as "injury by fellow servant," "failure of consideration," and "statute of frauds," should be dismissed as impertinent because they have nothing to do with the claims at issue here. *See Fantasy, Inc.*, 984 F.2d at 1527. This catch-all should be struck as both insufficiently pled and impertinent.

The defenses pled in the Answer either are not affirmative defenses, are insufficiently pled, fail as a matter of law, or are completely irrelevant to the instant suit. Accordingly, the Court should strike or disregard these defenses and rule on the pleadings without further fact development.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion for Judgment on the Pleadings and Motion to Strike.

Dated this 4th day of August, 2025.

/s/ Bradley Austin
Bradley Austin (Nevada Bar No. 13064)
SNELL & WILMER
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
702-784-5247
baustin@swlaw.com


Nowell D. Bamberger (*pro hac vice*)
Matthew C. Solomon (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037
202-974-1500
nbamberger@cgsh.com
msolomon@cgsh.com

*Attorneys for North American Derivatives Exchange, Inc.,*
*d/b/a Crypto.com | Derivatives North America*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 4, 2025, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, District of Nevada by using the Court's CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

DATED August 4, 2025.

*/s/ Lyndsey Mosbey*
An Employee of Snell & Wilmer L.L.P.