1  Adam Hosmer-Henner (NSBN 12779)
   A.G. Burnett (NSBN 5895)
2  Jane Susskind (NSBN 15099)
   Katrina Weil (NSBN 16152)
3  Cassin Brown (NSBN 15877)
   **McDONALD CARANO LLP**
4  2300 West Sahara Avenue, Suite 1200
   Las Vegas, NV 89102
5  Telephone: (702) 873-4100
   ahosmerhenner@mcdonaldcarano.com
6  agburnett@mcdonaldcarano.com
   jsusskind@mcdonaldcarano.com
7  kweil@mcdonaldcarano.com
   cbrown@mcdonaldcarano.com
8
   *Attorneys for Nevada Resort Association*

9

10  **UNITED STATES DISTRICT COURT**

11  **DISTRICT OF NEVADA**

12  North American Derivatives Exchange, Inc.      Case No.: 2:25-cv-00978-APG-DJA
    d/b/a Crypto.com | Derivatives North America,

13             Plaintiff,      **NEVADA RESORT ASSOCIATION'S**
                                                          **MOTION TO INTERVENE**
14  v.

15  Kirk D. Hendrick, in his official capacity as
    Chairman of the Nevada Gaming Control
16  Board; George Assad, in his official capacity as
    a Member of the Nevada Gaming Control
17  Board; Chandeni K. Sendall, in her official
    capacity as a Member of the Nevada Gaming
18  Control Board; the State of Nevada on relation
    of the Nevada Gaming Control Board; Aaron D.
19  Ford, in his official capacity as Attorney
    General of Nevada,

20             Defendants.

21       vs.

22  NEVADA RESORT ASSOCIATION,

    Proposed Intervenor-Defendant.

23

24          Proposed Intervenor-Defendant Nevada Resort Association ("NRA"), by and through its

25  attorneys of record, moves pursuant to Rule 24 of the Federal Rules of Civil Procedure to intervene

26  as a defendant in this matter. This Motion is supported by the following memorandum of points and

27  authorities, the declaration of Virginia Valentine attached as Exhibit 1**,** all of the pleadings and papers

28  on file in this action, and any oral argument presented by counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The intervention of the Nevada Resort Association ("NRA") in this lawsuit will assist the Court in fully vetting the legal issues on the merits, which would also inure to the benefit of the multiple other jurisdictions tracking this case and this Court's decisions. Intervention is favored in the Ninth Circuit because it "serves both efficient resolution of issues and broadened access to the courts." *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (citation omitted). Intervention by the NRA furthers both of these goals.

This Court has already granted the NRA's request to intervene in a case involving similar parties and issues. *See KalshiEX, LLC v. Kirk D. Hendrick et al* ("*Kalshi*"), 2:25-cv-00575-APG-BNW, at ECF No. 70 (granting the NRA's motion to intervene). There, KalshiEX, LLC ("Kalshi") brought essentially the same preemption claim against the same set of defendants as Plaintiff North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America ("CDNA") brings here in a follow-on lawsuit seeking the same type of relief. CDNA itself admits in its Complaint that Kalshi "offers derivatives nearly identical to those at issue here." ECF No. 1, ¶ 5. Intervention was granted there and should be granted here.

While the State Defendants support intervention by the NRA, CDNA has refused to consent to the NRA's intervention despite this Court's ruling in *Kalshi*, requiring the present motion practice.

### II.    FACTUAL AND PROCEDURAL BACKGROUND

#### A.    The NRA.

The NRA was established in 1965 and is the primary advocacy voice for Nevada's largest industry, the gaming and resort industry. Ex. 1, Declaration of Virginia Valentine ("Valentine Decl.") ¶ 3. This industry supports over 436,000 jobs (28% of Nevada's total employment) and generates $98 billion in total economic impact (37% of Nevada's GDP). *Id.* at ¶ 4. Indeed, the resort industry's tax contributions in 2024 accounted for 34% of Nevada's general fund. *Id.* The NRA represents the state's largest industry and provides information, perspective and industry insight for decision makers throughout the state. *Id.* at ¶ 5. This includes advocating and adopting policies related to state gaming issues, monitoring government and regulatory activities in Nevada that affect

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1

the gaming and resort sector, and providing economic data and industry insights to support the industry's interests and inform public policy. *Id.* One of the NRA's most important objectives is championing Nevada's gaming regulatory system, which is an integral part of Nevada's success and the standard upon which almost all other national and international gaming regulatory agencies have followed. *Id.* at ¶ 6.

The NRA's membership includes over 70 gaming and resort establishments located throughout the State, including companies that operate sportsbooks licensed under Nevada law. Ex. 1, Valentine Decl., ¶ 7. In 2024, over $7.8 billion dollars were wagered on sports through Nevada's regulated and licensed sports books, generating significant tax revenue to the State of Nevada. UNLV Center for Gaming Research, Nevada Sports Betting Totals: 1984-2024, *available at* https://gaming.library.unlv.edu/reports/NV_sportsbetting.pdf. Over the years, the NRA has successfully intervened in numerous cases in federal and state court affecting the interests of its members and the broader gaming and resort industry. Ex. 1, Valentine Decl., ¶ 8; *see also, e.g.*, *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1141 (9th Cir. 1998); *Marijuana Pol'y Project v. Miller*, 578 F. Supp. 2d 1290, 1295 (D. Nev. 2008); *Fair Maps Nevada v. Cegavske*, No. 3:20-cv-271-MMD-WGC, 2020 WL 8188427 (D. Nev. May 20, 2020); *Cegavske v. Hollowood*, 512 P.3d 284 (Nev. 2022); *People's Legislature v. Miller*, 131 Nev. 1332 (Nev. 2015) (unpublished). Indeed, this Court recently granted the NRA's request to intervene under almost identical facts. *See Kalshi*, 2 at ECF No. 70.

## B. Procedural History.

On June 3, 2025, CDNA filed its Complaint. ECF No. 1. CDNA alleges that the Commodity Exchange Act ("CEA") preempts Nevada's longstanding regulation of sports betting. ECF No. 1. Two days later, CDNA filed its Motion for Preliminary Injunction, seeking to enjoin the State Defendants from prohibiting event-based wagering contracts offered by CDNA on sporting events in Nevada. ECF No. 15. CDNA and the State Defendants stipulated to extend the briefing schedule on the Motion for Preliminary Injunction, with the State Defendants' opposition due on July 10, 2025, and CDNA's reply due July 29, 2025. ECF No. 34. Consistent with this stipulation, the State Defendants timely filed their opposition on July 10, 2025, and CDNA timely filed its reply on July

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

29, 2025. ECF Nos. 36, 41. This case, with just 45 docket entries, is at its infancy. Indeed, the vast majority of the docket entries in this case are filings from CDNA, and this Court has not issued any substantive orders relating to the merits of the case.

On June 5, 2025, CDNA filed a Notice of Related Case, contending that the instant case shares similar questions of fact and the same question of law with *Kalshi* and requesting that the case be reassigned to Chief Judge Gordon, who presides over *Kalshi*. ECF No. 14. In its notice, CDNA listed the vast similarities between the cases and argued that because "the premise of the cases is that Nevada state gaming law is unenforceable against these similar entities offering their similar products, assignment to the same district judge is likely to effect substantial savings of judicial effort." *Id.* On July 18, 2025, the Court granted CDNA's request for reassignment. ECF No. 40 ("Because the cases involve similar questions of fact and the same question of law, the Court further finds that reassignment to the same magistrate judge will promote judicial efficiency.") (citing LR 42-1(a)(3) and (5)).

Notably, in *Kalshi* – a case that CDNA admits involves the same questions of law – this Court granted the NRA's motion to intervene. *Kalshi*, ECF No. 70. In its order, this Court determined the NRA was entitled to intervention as a matter of right, as the NRA had timely filed its motion, had significantly protectable interests in their Nevada gaming licenses, and its interests would not adequately be represented by the State Defendants. *Id.* As the Court found,

> The NRA's members have significantly protectable interests in their Nevada gaming licenses that they have spent substantial sums to obtain, maintain, and protect. If Kalshi prevails in this case, the NRA members likely would be placed at a considerable competitive disadvantage because Kalshi and others like it would not have to comply with Nevada's comprehensive gaming laws, including prohibitions on bettors under 21 and types of bets allowed.

The Court further found that even if the NRA did not qualify for intervention as a matter of right, it would still grant permissive intervention. *Id.*

On August 4, 2025, CDNA moved the Court to enter judgment on the pleadings and to strike the State Defendants' affirmative defenses and denials contained in their answer. ECF No. 42 ("Motion for Judgment"); ECF No. 38 ("State Defendants' Answer"). Through this intervention, the NRA seeks to join the State Defendants' Answer. Further, no delay will result as the State

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

3

Defendants' response is due on August 18, 2025 or as subsequently extended and the NRA intends to provide a proposed response to the Motion for Judgment on the Pleadings on the same schedule as the State Defendants.

## III. <u>ARGUMENT</u>

### A. The NRA Is Entitled to Intervene as a Matter of Right.

Rule 24(a)(2) provides, in relevant part, that "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Consistent with this language, the Ninth Circuit identified four requirements for non-statutory intervention of right: "(1) [the applicant] has a significant protectable interest as to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately meet the applicant's interest." *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1086 (9th Cir. 2022). Associations and similar representative groups may intervene on behalf of their individual members' interests. *See, e.g.*, *United States v. Carpenter*, 526 F.3d 1237, 1240 (9th Cir. 2008); *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*, 41 F.4th 767, 771 (6th Cir. 2022); *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994).

Courts construe Rule 24(a)(2) "liberally in favor of potential intervenors," *California ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006), and are "guided primarily by practical considerations, not technical distinctions," *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) (quotation omitted). For "[a] liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) (quotation omitted); *see also id.* ("By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court.") (quotation omitted).

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

The NRA meets all of the four requirements for intervention as of right under Rule 24(a)(2). The NRA's members have significant protectable interests through their Nevada gaming licenses, the value of which will be impaired by a final judgment in favor of CDNA's theory of federal preemption, and by their economic interests in preventing an unlicensed and unregulated sports book operator to compete in Nevada. The NRA's motion to intervene is timely and will not prejudice the parties or occasion delay. The NRA's intervention is necessary to protect its interests and avoid being permanently subject to short-term political decisions, and the existing parties will not adequately represent the interests of the NRA's members. Under the liberal standards allowing for as-of-right intervention, the NRA should be permitted to intervene.

### i. The NRA's Members Have Significant Protectable Interests That Are Related to CDNA's Lawsuit.

The first Rule 24(a)(2) requirement is "a significant protectable interest as to the property or transaction that is the subject of the action." *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1086. This requirement serves as a "practical, threshold inquiry." *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996) (quotation omitted). Rule 24(a)(2) does not mandate "a specific legal or equitable interest." *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011). Rather, it merely requires that the asserted interest be "protectable under some law" and that there exist "a relationship between the legally protected interest and the claims at issue." *Id.* (quotation omitted). Either federal or state law may protect the asserted interest. *See Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1088-89.

As this Court already found in *Kalshi*, the NRA's members "have significantly protectable interests in their Nevada gaming licenses that they have spent substantial sums to obtain, maintain, and protect." *Kalshi*, ECF. No. 70 at 2. Since at least the 1959 Nevada Gaming Control Act, the regulatory framework for gaming in Nevada has been instrumental in the growth and expansion of the industry. The gold standard regulatory environment and the compliance by the NRA members fosters public confidence in the industry and promotes the reputation of the NRA members and the industry as a whole. Gaming plays a "vital role" in the economy of Nevada, the State "regulate[s] and control[s] the gaming industry consonant with the health, safety and welfare of the public." *State*

*v. Glusman*, 651 P.2d 639, 646 (Nev. 1982). The State thus requires all "sports pool" or sports betting operators to procure a license from the Nevada Gaming Commission. *See* NRS 463.193 (defining "sports pool"), 463.160(1)(a) (requiring gaming license), 463.220(2) (authority of Commission to grant license). As of August 14, 2025, the Commission had licensed only a limited number of sports betting operators in Nevada. *See Location Name and Address List: Nonrestricted Sports Pool*, Nevada Gaming Commission and the Nevada Gaming Control Board, https://tinyurl.com/sncjvh5d/ (last accessed August 14, 2025).

Many of these licensees are NRA members, *see id.* (listing, *inter alia*, Aria, Bellagio, Caesars, Hard Rock, Mandalay Bay, MGM, Venetian, and Wynn), which obtained their licenses in accordance with Nevada law, *see* NRS 463.200 (application requirements), 463.210 (application review and investigation), and paid (and continue to pay) annual fees, *see, e.g.*, NRS 463.380 (annual fees based on number of games operated). Nevada law also establishes uniform and comprehensive regulations for license holders, so the NRA's members not only have a property interest in the licenses themselves, but they have a property interest in using those licenses in a well-regulated market. The NRA's members accordingly possess interests (through licenses and a well-regulated market in which to operate those licenses) that are "protectable under some law"—Nevada law—and satisfy Rule 24(a)(2). *Wilderness Soc.*, 630 F.3d at 1179; *see also People's Legislature v. Miller*, No. 2:12-cv-272-MMD-VCF, 2012 WL 3536767, at *4 (D. Nev. Aug. 15, 2012) (recognizing Nevada state law sufficient to provide Rule 24(a)(2) interest).

Further, the protected interests of the NRA's members would be affected by the "claims at issue." *Wilderness Soc.*, 630 F.3d at 1179. CDNA's complaint brings three claims of preemption—express, field, and conflict—alleging that the CEA preempts Nevada state law regulating in-state sports betting like that offered by CDNA. ECF No. 1 at 24-28. These claims affect the gaming licenses currently held by NRA members in at least three ways.

*First*, CDNA's legal position, if accepted, would enable it to offer sports betting products to Nevada residents without complying with the State's comprehensive regulatory scheme or paying taxes to the State of Nevada. Nevada's regulations ensure that the gaming establishments continue to operate honestly and competitively and contribute to Nevadans quality of life, rather than unduly

impact it. *See* NRS 463.0129(1)(a) (recognizing the vital importance of gaming to Nevada and the general welfare of Nevadans), 463.0129(1)(b) (finding its continued growth dependent on "public confidence and trust" that gaming establishments operate "honestly and competitively"). For example, to protect young adults, Nevada restricts sports betting to adults aged 21 and older. NRS 463.350(1). To preserve the integrity of sports leagues, Nevada prohibits sportsbooks from knowingly accepting wagers by athletes, coaches, game managers, and owners on their own sporting contests. Nev. Gam. Reg. § 22.1205(2). To promote customer confidence, Nevada requires sportsbooks to hold sufficient reserves to cover outstanding wagers. *See id.* § 22.40. To facilitate law enforcement, sports betting operators must report all "suspicious transactions" over $5,000 that would violate federal, state, or local law, would allow athletes or coaches to make prohibited wagers, or have no business or apparent lawful purpose. *Id.* § 22.121(1)-(2). To protect problem gamblers, Nevada requires sportsbooks to provide to customers "written materials concerning the nature and symptoms of problem gambling," train employees to flag potential problem gambling, and limit problem gamblers' access to cash. *See id.* § 5.170(2)-(4). And to support the State's public services, Nevada sportsbooks are subject to a progressive tax on gross gaming revenue, with large operators paying 6.75% of their gross gaming revenue. *See* NRS 463.370(1).

To maintain their state gaming licenses, *see* Nev. Gam Reg. 5.011(h), the NRA's members spend substantial amounts of time and money complying with the above rules and many more (especially by paying gaming taxes[1]). By framing its products as outside of Nevada's purview, CDNA wants an exemption from those rules—*i.e.*, it intends to compete for the same sports betting customers with fewer regulatory requirements and without paying gaming taxes. That places NRA members at a potential competitive disadvantage, diminishing the attendant value of their gaming licenses.

---

[1]  The Nevada Gaming Control Board reported $482 million in sports betting revenue in 2024, most of which was from large operators, meaning that the State took in tens of millions in tax revenues from sports betting. *Monthly Revenue Report*, Nevada Gaming Control Board at 1-2 (December 2024), https://tinyurl.com/4w2artsf.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Courts have recognized that the competitive disadvantage in the market (and specifically the gaming industry) establishes "a legally protected interest in the action that may be impaired if intervention is denied." *Connecticut v. United States Dep't of the Interior*, 344 F. Supp. 3d 279, 298 (D.D.C. 2018). In *Connecticut*, the Court addressed whether MGM, a casino operator, had an interest in a case involving amendments to federally imposed procedures authorizing gambling within Connecticut. *See generally id.* There, the plaintiff, the state of Connecticut, sought "to overturn the Secretary's failure to approve a compact amendment that would give the Tribes an advantage in the state commercial casino market over private casino developers like MGM." *Id.* at 298. The Court concluded that MGM, as a competitor at risk of suffering a competitive disadvantage, had "competitor standing" to intervene and in turn demonstrated a legally protected interest in the action sufficient to satisfy Rule 24. *Id.* at 299; *see also id.* at 304 (concluding that for "the same reasons MGM has standing to intervene," including that the federal decision "would immediately diminish MGM's chances of securing state approval" for its casino over a tribal casino and "would create imminent competition" for MGM, MGM "demonstrated a legally protected interest in the action that may be impaired if intervention is denied."). Citing *Connecticut*, this Court held in *Kalshi* that if the plaintiff there prevails, "the NRA members likely would be placed at a considerable competitive disadvantage because Kalshi and others like it [*e.g.*, CDNA] would not have to comply with Nevada's comprehensive gaming laws, including prohibitions on bettors under 21 and types of bets allowed." *Kalshi*, ECF No. 70 at 2. There is no reason why this reasoning does not apply here too.

*Second,* this Court has already found that the NRA's members have a protectable interest in operating under their licenses in a "well-regulated market of betting in Nevada." *Kalshi*, ECF No. 70 at 2. CDNA's circumvention of the above regulatory scheme threatens to allow unregulated gaming establishments to operate in Nevada's gaming market, or at least those that the CFTC lets slip through via self-certification. This will erode public confidence and trust in the industry, which "can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments and the manufacture, sale or distribution of gaming devices and associated equipment." NRS 463.0129(1)(c). While the NGCB has similar interests in upholding the integrity of the gaming market, the NRA members will suffer

a distinct and specific harm if patrons lose confidence in the integrity of their products based on operations by CDNA.

The acceptance of CDNA's claims could create a potential competitive threat to many of the NRA's members and could devalue the regulatory infrastructure that the NRA members have invested in. Since resolution of CDNA's claims "actually will affect" the NRA's members' value and use of their state gaming licenses, *Arakaki v. Cayetano*, 324 F.3d 1078, 1084 (9th Cir. 2003) (quotation omitted), there is a sufficient relationship between the NRA's asserted interests and the claims in this case. *See also generally* ECF No. 70 (finding sufficient relationship between the NRA's interests and the similar claims of preemption).

> **ii.    Disposition Of This Case May Impair the Ability of the NRA's Members to Protect Their Interests.**

The second Rule 24(a)(2) requirement is whether "the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest." *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1086. Where an intervening party has already demonstrated a significant protectable interest, "courts have 'little difficulty concluding' that the disposition of the case may affect such interest." *TCutima, Inc. v. Bua Grp., LLC*, No. 2:24-cv-1130-JCM-NJK, 2025 WL 587041, at *6 (D. Nev. Feb. 24, 2025) (quoting *Lockyer*, 450 F.3d at 442); *see also Ctr. for Biological Diversity v. Haaland*, No. 2:24-cv-2043-CDS-NJK, 2025 WL 777528, at *2 (D. Nev. Jan. 14, 2025) (this requirement "often follows as a matter of course" where a protectable interest has been shown) (quotation omitted). Considerations of stare decisis can prove practical impairment. *See Greene v. United States*, 996 F.2d 973, 977 (9th Cir. 1993); 7C Wright & Miller, *Federal Practice and Procedure* § 1908.2 (3d ed., April 2025 update).

As explained, CDNA's lawsuit seeks to upend the longstanding authority of Nevada state agencies to regulate in-state sportsbooks. Any substantive ruling in this case will impair the NRA's members' ability to protect their gaming licenses in future litigation, as it could endorse CDNA's preemption theory. Thus, the NRA's members could "lose" the property interests "afforded to them by [Nevada] statute[]." *People's Legislature*, 2012 WL 3536767, at *4. That plainly constitutes practical impairment under Rule 24(a)(2).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

This Court recognized the very real risk of impairment in *Kalshi*, finding that because the "NRA members benefit from the well-regulated market of betting in Nevada" and parties like Kalshi and CDNA "could erode that market and the regulations that make it fair for the public and profitable for licensees, . . . the disposition of this case may impair the NRA members' ability to protect their interests." ECF No. 70, at 2. CDNA's Complaint further proves this point, as it directly relies on this Court's order granting Kalshi's motion for a preliminary injunction as a legal basis for its parallel claims. ECF No. 1, ¶ 5 ("Chief Judge Andrew P. Gordon of this Court has already recognized the preemptive effect of the CEA on state gaming law as it relates to a similarly situated DCM."). The NRA easily satisfies Rule 24(a)(2).

Finally, as the NRA has already been allowed to intervene in *Kalshi*, an inconsistent result in this action would harm the NRA even if successful in the *Kalshi* action. To avoid any possibility of inconsistent results or inconsistent procedure, the NRA should be permitted to intervene here as well.

### iii.    The NRA's Motion is Timely.

The third Rule 24(a)(2) requirement is timeliness. *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1086. "Timeliness is determined by the totality of the circumstances facing would-be intervenors, with a focus on three primary factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016) (quotation omitted). Prejudice is the most important factor, *id.* at 857, but all three are analyzed by reference to the "crucial date . . . when proposed intervenors should have been aware that their interests would not be adequately protected by the existing parties," *id.* at 854 (quotation omitted). T

CDNA filed its complaint on June 3, 2025, and moved for a preliminary injunction on June 5, 2025. ECF No. 1, 15. Briefing on CDNA's motion for a preliminary injunction was completed on July 29, 2025, just about two weeks ago. See ECF Nos. 36, 41. This Court has not yet held a hearing or issued a ruling. And while CDNA moved for judgment on the pleadings on August 4, 2025, ECF No. 42, this motion will not be fully briefed for at least another two weeks and the State Defendants

have further sought additional time to respond. This Court has not entered any substantive rulings and this case is still in the beginning stages for purposes of intervention.

In *Kalshi*, this Court found that the NRA's motion to intervene was timely because "no discovery has occurred and no substantive rulings have been made other than my decision on Kalshi's motion for an injunction, which I handled on an expedited basis." *Kalshi*, ECF No. 70 at 1.

Here, the Court has not even issued a ruling on CDNA's motion for an injunction, which makes this motion even more timely. There can be no dispute that the NRA's Motion is timely. The below analysis of the timeliness factors confirms this fact.

This case is still in the pleading stage with a pending (but not yet fully briefed) motion for preliminary injunction. Discovery has not opened, and thus there are no pending discovery deadlines or a trial date. Courts routinely find that motions to intervene at such an early stage (or even later) are timely. *See, e.g.*, *Nev. Ass'n of Ctys. v. U.S. Dep't of the Interior*, No. 3:13-cv-712-MMD-WGC, 2014 WL 1338736, at *2 (D. Nev. Apr. 2, 2014) (within two months of complaint and before answer); *Nevada v. United States*, No. 3:18-cv-569-MMD-CBC, 2019 WL 718825, at *2 (D. Nev. Jan. 14, 2019) (within two months of complaint and before answer); *see also PEST Comm. v. Miller*, 648 F. Supp. 2d 1202, 1212 (D. Nev. 2009), *aff'd*, 626 F.3d 1097 (9th Cir. 2010) (two months after answer); *Pershing Cnty. v. Jewell*, No. 3:14-cv-466-MMD-WGC, 2015 WL 3658074, at *3 (D. Nev. June 12, 2015) (one month after answer).

The second factor requires the Court to analyze prejudice. Prejudice is measured comparatively as the impact of the intervenor's failure to seek intervention earlier, or "after he knew, or reasonably should have known, that his interests were not being adequately represented." *Kalbers v. United States Dep't of Just.*, 22 F.4th 816, 825 (9th Cir. 2021) (quotation omitted). It "must be connected in some way to the timing of the intervention motion" and does not arise simply because a would-be intervenor's involvement in a case "might make resolution more difficult." *Id.* (cleaned up). So, the only relevant question is whether any delay in filing this motion causes prejudice to the parties. It will not. Neither party suffered any prejudice by any delay in filing this motion and it would be unreasonable to expect parties who are not named in the initial proceedings to seek to intervene much sooner. The NRA contacted the parties about intervention and purposefully filed this

Motion before this Court made any substantive rulings or the parties agreed to a discovery schedule. Further, the NRA does not seek to interfere with the briefing schedule for the preliminary injunction or the motion for judgment on the pleadings. The NRA seeks only to file a response to the motion for judgment on the pleadings on the same date the State Defendants file their response. The NRA also does not seek to add its own claims, which further cuts against any potential prejudice. *Republican Nat'l Comm. v. Aguilar*, No. 2:24-cv-518-CDS-MDC, 2024 WL 3721198, at *4 (D. Nev. May 24, 2024), *report and recommendation adopted*, 2024 WL 3409860 (D. Nev. July 12, 2024). This factor therefore also weighs in favor of intervention.

As to the third factor, any delay in the NRA's intervention was minimal. *See Kalbers*, 22 F.4th at 825 (delay of a few weeks "weighs in favor of timeliness, rather than against it"); *Smith*, 830 F.3d at 859-60 (intervention timely when sought "only weeks after definitively learning that their interests were not adequately represented by the existing parties"). Because all three factors weigh in favor of timeliness, the NRA's motion is timely.

### iv.    The Existing Parties Do Not Adequately Represent the Interests of the NRA's Members.

The fourth and final requirement is whether "the existing parties may not adequately meet the applicant's interest." *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1086. A prospective intervenor must show that the present parties' representation *may* be inadequate. *Sw. Ctr. for Biological Diversity*, 268 F.3d at 822; *see also Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538-39 n.10 (1972). The burden for the prospective intervenor is "minimal." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 823. It is sufficient for an applicant to show that, because of the difference in their interests, it is likely that the existing parties will not advance the same arguments as applicants. *Id*. at 823-24.

When determining the adequacy of representation, the Ninth Circuit considers three factors:

(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    *Id.* at 822. All three of these factors weigh in favor of inadequate representation here and satisfy the

2    NRA's "minimal" burden here.

3         In *Kalshi*, this Court found that "the State defendants' interests include enforcing the Nevada

4    gaming laws to preserve public trust and confidence and to protect the State's reputation," while

5    "the NRA's members are concerned about the competitive disadvantages they face if Kalshi is

6    unregulated by states, and they can discuss the impacts on gaming entities licensed in multiple

7    states." ECF No. 70 at 2 (internal quotations and citations omitted). The NRA need only make a

8    "minimal showing" that the State Defendants' representation will be inadequate. *United States v.*

9    *City of Los Angeles, Cal.*, 288 F.3d 391, 402 (9th Cir. 2002). The NRA has met this burden.

10        Among the most important arguments in this case that the NRA will present in its substantive

11   filings are that (1) the CEA does not field preempt state regulation of sports betting and the intent of

12   all of the laws and regulations cited by CDNA were to prohibit gaming contracts, not to permit them;

13   (2) Kalshi's "sports-related event contracts" are not "swaps" within the meaning of the CEA; and

14   (3) the CFTC has not authorized and cannot legally authorize Kalshi to offer the relevant contracts.

15   The NRA is uniquely situated to explain to the Court the details and significance of the various

16   wagers offered by CDNA and the NRA members, and how these wagers are not associated with

17   financial, economic, or commercial consequences.

18        Further, the NRA's intervention would add necessary elements to the proceeding. *See*

19   *Arakaki*, 324 F.3d at 1086. The NRA members operate throughout the nation and will discuss how

20   the multi-state regulatory approach works in practice. The NRA members have daily familiarity with

21   issues of federal and state law, and the NRA advocates for the interests of its many members who

22   operate Nevada sportsbooks. Accordingly, it is "uniquely well-positioned," *Kalbers*, 22 F.4th at 828,

23   and is indeed the only party in this case to discuss the full impact of CDNA's theory on Nevada

24   gaming operators or explain why sports event contracts cannot be categorized as federally-regulated

25   swaps. *See Sw. Ctr. for Biological Diversity*, 268 F.3d at 823-24 (inadequate representation where

26   intervenors would "express their own unique private perspectives"); *Defs. of Wildlife v. United*

27   *States Fish & Wildlife Serv.*, No. 21-16382, 2022 WL 3656444, at *1 (9th Cir. Aug. 24, 2022)

28   (emphasizing the importance of "specialized knowledge" and "expertise"). Put simply, it would be

13

unreasonable for this Court to decide the future of Nevada's sports betting industry without that industry's participation.

For this reason, the NRA overcomes any presumption of adequate representation by the State Defendants. *See Arakaki*, 324 F.3d at 1086. As the Ninth Circuit has explained, "[t]he government's representation of the public interest may not be identical to the individual parochial interest of a particular group just because both entities occupy the same posture in the litigation." *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011) (cleaned up). Just so here, the State Defendants' objectives lie in ensuring that Nevada laws remain enforceable and that its officials cannot be sued. *See* ECF No. 34, 50. The NRA's objectives, by contrast and as this Court already recognized, are to preserve its members' valuable property and protect the industry as a whole. *Kalshi,* ECF No. 70 at 2 (contrasting the NRA's interests from the State Defendants'); s*ee also Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (inadequate representation where economic interests of intervenor's members were "potentially more narrow and parochial than the interests of the public at large"); *Fund for Animals*, 322 F.3d 728, 736 (9th Cir. 2003) (concluding that often "governmental entities do not adequately represent the interests of aspiring intervenors"); *Sw. Ctr. for Biological Diversity*, 268 F.3d at 823 (noting that a federal agency cannot be expected to protect private interests). Indeed, as demonstrated by other litigation across the country, the government often has its own interests and political motives, which may not align with the NRA's. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025) (order granting CFTC's voluntarily dismissal of appeal in separate litigation concerning Kalshi). Accordingly, the NRA satisfies the minimal showing that representation of its interests may be inadequate, *see Sw. Ctr. for Biological Diversity*, 268 F.3d at 823, and must be permitted to intervene as of right.

## C.    Alternatively, the NRA Should Be Permitted to Intervene.

In the alternative, the NRA moves for permissive intervention under Rule 24(b)(1)(B), which provides that the court may, "[o]n timely motion," permit anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The Ninth Circuit recognizes three requirements for permissive intervention: (1) an

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

14

independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law or fact with the main action. *Cooper v. Newsom*, 13 F.4th 857, 868 (9th Cir. 2021). Permissive intervention should also not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

As already explained, *supra* Section III(B)(iii), the NRA's motion to intervene filed at the infancy of this litigation and before any substantive rulings is timely. The NRA also satisfies the remaining two requirements for permissive intervention, and intervention will not unduly delay or prejudice the Court's adjudication of the existing parties' rights.

### i. No Independent Ground for Jurisdiction Is Required.

Rule 24(b)(1)(B) generally requires the court to have "an independent basis for jurisdiction over the applicant's claims." *Glickman*, 159 F.3d at 412. But when a "proposed intervenor in a federal-question case brings no new claims," the requirement of an independent jurisdictional ground "drops away." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011); *cf. Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439-40 (2017) (intervenor needs additional jurisdictional ground when pursuing relief different from existing party). The NRA here brings no new claims; rather, it seeks to defend the State's authority to regulate sports betting in Nevada against CDNA's preemption argument. *See supra* Sections III(A), III(B)(i) and (iv). Since this is a federal-question case based on CDNA's preemption argument, *see* ECF No. 1 and 15, and the NRA "do[es] not raise new claims," an independent jurisdictional ground "is not required here." *Republican Nat'l Comm.*, 2024 WL 3409860, at *1. This Court recognized this principle in *Kalshi*, where the NRA similarly did not assert new claims, and appropriately granted the NRA's request for permissive intervention. *Kalshi,* ECF No. 70 at 3.

### ii. The NRA's Defense Shares a Common Question of Law with the Current Case.

Rule 24(b)(1)(B) also requires the applicant to show that its claim or defense "shares a common question of law or fact with the main action." *Glickman*, 159 F.3d at 412. In *Kalshi*, which involved the same preemption arguments, this Court has found that "the NRA clearly shares common questions of law and fact with this case." *Kalshi,* ECF No. 70 at 3. Further, the  reasons provided in support of intervention by right also support permissive intervention because they

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

demonstrate the commonality between the NRA's legal arguments and those existing in the current case. The NRA seeks to intervene to defend Nevada's state law authority to regulate in-state sports betting operators—including CDNA—against CDNA's preemption argument based on the CEA. "Because this is the precise claim at issue" in CDNA's complaint (and motion for preliminary injunction), *PEST Comm.*, 648 F. Supp. 2d at 1214; *see* ECF No. 1 at 15-16; ECF No. 18 at 12-21, and the NRA "raises arguments in response to" CDNA's lawsuit, *Paher v. Cegavske,* 3:20-cv-243-MMD-WGC, 2020 WL 2042365, at *3 (D. Nev. Apr. 28, 2020), there is a common question of law between the NRA's defense and the current case.

Further, the NRA has significant and unique interests that directly relate to the questions raised in this case and the NRA should therefore be permitted to represent those interests before this Court. As explained *supra* Sections III(A) and III(B)(i), the NRA's members, through their investments in licensure, have an interest in a well and uniformly regulated market in which to operate through their licenses. Anything less will erode public confidence and trust in Nevada's gaming industry, which is vital to Nevada's economy and the welfare of its residents. *See* NRS 463.0129(1)(a)-(c). Not only does the NRA seek to protect the Nevada gaming industry and the general welfare of the state, it also has an interest in protecting its own members. Those members, including some of the larging gaming establishments in the state, have worked for decades to earn the public's trust and build their reputation in an industry that, absent regulation, is susceptible to potential fraud and scandal. CDNA's circumvention of Nevada's regulatory scheme risks an increase in sports betting scandals, which will come at the costs of both Nevada residents and the NRA's members well-earned reputations.

### iii.    The NRA's Intervention Will Not Cause Undue Delay or Prejudice.

Finally, Rule 24(b)(3) requires the court to consider whether "intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Here, intervention will do neither. The NRA has sought to intervene at an early stage in the litigation while the case is still in the pleading stage, no substantive decisions, and no answer on file. Discovery has not opened and neither party will suffer prejudice from the NRA's intervention at this early stage. *See Hudson Ins. Co. v. Miller*, 2:15-cv-349-GMN-CWH, 2015 WL 5286884, at *3 (D. Nev. Sept. 9,

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

2015) ("Because this case is still in its infancy, Colonial's intervention would not unduly delay the litigation, and plaintiff has not presented any evidence showing it would be prejudiced by the intervention."); *SFR Invs. Pool 1,* 2023 WL 3341918, at *2 (characterizing the proceeding as in an early stage even after court had ruled on motions for preliminary injunction and to dismiss).

Further, the NRA does not seek to alter the case schedule or assert any new claims. *See Roberts v. Nye County*, 2:22-cv-398-RFB-EJY, 2023 WL 2844963, at *5 (D. Nev. Feb. 28, 2023) (finding "no practical prejudice" where permissive intervention was "neither going to materially change the breadth of discovery that will occur in the instant litigation nor prejudice the Officer Defendants through delay"); *supra* Sections III(A), III(B). As explained above, the NRA's motion comes shortly after it became aware of its need to intervene and just over a month after the initiation of this legal action. *Supra* Section III(B)(iii). Any delay is minimal and was necessary to ensure that this Court was provided with a full account of the relevant facts from the NRA's unique and invaluable perspective.

Moreover, intervention will not prejudice the adjudication of the existing parties' rights. With respect to CDNA, there can be no possible prejudice—the NRA does not seek to interfere with the current briefing or discovery schedule. And with respect to the State Defendants, the NRA's participation will, if anything, assist in responding to CDNA's misleading and incomplete arguments about the CEA (which will accrue to the State Defendants' benefit). For this reason and others, if the Court holds that the NRA cannot intervene as of right, it should nonetheless permit the NRA to intervene.

//

//

//

//

//

//

//

//

17

IV.    <u>**CONCLUSION**</u>

The Court should grant the NRA's motion to intervene and allow the NRA to file the proposed Joinder, Exhibit 2, and participate in this action.

Dated: August 15, 2025.

McDONALD CARANO LLP

By: */s/ Adam Hosmer-Henner*
    Adam Hosmer-Henner (NSBN 12779)
    AG Burnett (NSBN 5895)
    Jane Susskind (NSBN 15099)
    Katrina Weil (NSBN 16152)
    Cassin Brown (NSBN 15877)
    2300 West Sahara Avenue, Suite 1200
    Las Vegas, NV 89102

    *Attorneys for Nevada Resort Association*