Bradley Austin
Nevada Bar No. 13064
Snell & Wilmer
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
702-784-5247
baustin@swlaw.com

Nowell D. Bamberger
(*pro hac vice*)
Matthew C. Solomon
(*pro hac vice*)
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037
202-974-1500
nbamberger@cgsh.com
msolomon@cgsh.com

*Attorneys for North American Derivatives
Exchange, Inc., d/b/a Crypto.com |
Derivatives North America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| North American Derivatives Exchange, Inc. d/b/a Crypto.com \| Derivatives North America,<br><br>         Plaintiff,<br><br>    v.<br><br>Mike Dreitzer, in his official capacity as Chairman of the Nevada Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada Gaming Control Board; Chandeni K. Sendall, in her official capacity as a Member of the Nevada Gaming Control Board; the State of Nevada on relation of the Nevada Gaming Control Board; Aaron D. Ford, in his official capacity as Attorney General of Nevada,<br><br>         Defendants. | Case No.: 2:25-cv-00978-APG-BNW<br><br>**PLAINTIFF'S OPPOSITION TO THE NEVADA RESORT ASSOCIATION'S MOTION TO INTERVENE** |

North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America ("CDNA") respectfully submits this brief in opposition to the motion by the Nevada Resort Association ("NRA") to intervene in this litigation. *See* ECF No. 50 (hereinafter "NRA Mot."). For the reasons set out below, the NRA's motion should be denied or, at a minimum, held in abeyance until the resolution of CDNA's pending and potentially dispositive Motion for Judgment on the Pleadings and Motion to Strike. *See* ECF Nos. 42, 43 (hereinafter "Pl.'s 12(c)/12(f) Mot.").

**<u>INTRODUCTION</u>**

This case is about whether a state government agency can enforce civil and criminal state gaming laws with respect to federally regulated and approved derivatives transactions conducted on a federally regulated designated contract market ("DCM") that has been duly registered with the Commodity Futures Trading Commission ("CFTC") for over twenty years and has self-certified the event contracts at issue in accordance with federal law and CFTC regulations. The answer to that question is binary: Either the Nevada Gaming Control Board ("NGCB") has such authority, or federal law forecloses it. Nevertheless, the NRA seeks to inject itself into this purely legal dispute as a defendant in the litigation, putatively to "assist the Court in fully vetting the legal issues on the merits." NRA Mot. 1. But the NRA's motion is perfectly clear about its true motive: to "protect" the "competitive" interests of its members' state gaming licenses because it believes the State of Nevada—not the federal government—*should* regulate sports events contracts. *See, e.g.*, NRA Mot. 6–9, 16. That is not a permissible basis to intervene. This litigation has nothing to do with how gaming in Nevada *should* be regulated. Nor is it about how gaming in Nevada *should* be licensed. And it concerns no rights or interests obtained pursuant to any state gaming license. The Court should therefore deny the NRA's request to intervene.

CDNA submits that the Court need not reach this issue because it should dismiss this case pursuant to Federal Rule of Civil Procedure 12(c). *See* Pl.'s 12(c)/12(f) Mot. If the Court declines to do so, CDNA is mindful that the Court has permitted the NRA to intervene in *KalshiEX, LLC v. Hendrick. See* 2025 WL 1901399 (D. Nev. June 2, 2025) (hereinafter "*Kalshi v. Hendrick*"). The Court should nevertheless deny the NRA's motion at this time and in the context of this litigation. The merits arguments opposing intervention that CDNA presents herein are mostly new

1  to this Court, and they establish that the Court should deny intervention both as of right and as a

2  matter of permission.  Since the Court permitted intervention in *Kalshi v. Hendrick*, Defendants

3  have also retained prominent external counsel in this case, in addition to their experienced lawyers

4  in the Attorney General's office, confirming—as the law presumes—that they are more than well-

5  equipped to defend this action.  And any additional "vetting" of legal issues the NRA could

6  possibly provide has been or can be offered elsewhere, thereby weakening any conceivable basis

7  for intervention here.  *See infra* pp. 21–22.

8      The NRA is a stranger to this legal dispute, and it offers no valid basis for seeking to

9  intervene in this case regarding the threatened unlawful exercise of state power.  The lobbying arm

10  of a regulated industry should not be permitted to ride shotgun—with all the rights of a party

11  defendant—in a case challenging the regulator's jurisdiction to enforce state law against a private

12  party.[1]  The NRA could not even be a defendant here because the only relief sought—declaratory

13  and injunctive relief against enforcement of state gaming laws—is not relief that could be obtained

14  against a private trade association like the NRA (which, of course, does not enforce state law).

15  Nor does the NRA seek any relief from or against CDNA.  The NRA asserts its members have

16  proprietary interests in the gaming licenses they have obtained, but those licenses are not at issue

17  in this litigation in any respect.  Nothing about this case will impact in any way NRA members'

18  ability to exercise their rights pursuant to their gaming licenses.

19      Whenever state action is challenged, non-parties may believe they have interests at stake.

20  When the State grants or denies a license to one party, it may impact the commercial interests of

21  those already licensed.  When a citizen challenges the government's infringement of her civil

22  rights, other citizens have an interest in how the case may bear on their rights.  When one state

23  relaxes regulation of an industry, those in bordering states have an interest in what that means for

24  their competitive posture.  The list goes on and on.  But in none of these cases are the interests of

25  the bystander recognized as sufficiently compelling to permit direct intervention and participation

---

[1]      The NRA points to Defendants' lack of objection in support of its intervention.  NRA Mot. 1.  If anything, Defendants' position underscores the impropriety of the NRA's participation as a full party.  If Defendants are principally concerned with their ability to enforce state law, why do they need or desire assistance from the lobbying arm of the very industry they principally regulate to advocate on their behalf on a question of their jurisdiction?

1  with the rights of a party.  Rather, interested parties are frequently permitted to make their

2  perspectives known to the court through amicus curiae filings.[2]  That is what should happen here.

3      Beyond the NRA's lack of a concrete, justiciable interest in this case, the NRA's

4  participation here threatens to complicate and prolong the litigation by introducing irrelevant

5  issues and potential disputes (both before the Court and, inevitably, between the litigants).  The

6  NRA spends pages and pages of its motion on its apparent displeasure with the CFTC's

7  congressionally endorsed approach to the regulation of derivatives.  But it should not on the basis

8  of its policy views be afforded the right here to burden the parties and the Court with discovery

9  demands, disputes, and potential appeals that have nothing to do with the issue in this case.  And

10  to what end?  Under controlling law, Defendants—including Nevada's Attorney General—are

11  *presumed* to be capable of adequately defending their own jurisdiction in this case.  The NRA

12  cannot rebut that presumption.  Defending state jurisdiction is, after all, a core competency of the

13  Attorney General.

14      For these reasons, and as discussed below, the NRA's motion should be denied.

15  **BACKGROUND**

16      The relevant background is described in CDNA's Complaint, ECF No. 1 (hereinafter

17  "Compl."), and Motion for Preliminary Injunction, ECF No. 15 (hereinafter "PI Mot.").  CDNA

18  provides only an abridged summary below.

19  **A.  Federal Regulation of Designated Contract Markets.**

20      CDNA is a federally regulated DCM that lists for trading on a national exchange financial

21  derivatives products called "event contracts."  For certain of those event contracts, the underlier is

22  the outcome of live events, including sporting events (hereinafter "Sports Event Contracts").

23  Compl. ¶ 63.  The federal Commodity Exchange Act ("CEA") vests the CFTC with "exclusive

24  jurisdiction" to regulate derivatives traded on DCMs.  7 U.S.C. § 2(a)(1)(A).  Congress enacted

25  the CEA in 1936 and passed sweeping amendments to the statute in 1974 with the aim of

26

27

28  [2]    CDNA would not oppose the submission of an amicus curiae brief by the NRA.

facilitating a uniform, centralized system of federal oversight over commodities and futures markets, thereby rejecting fragmented, inconsistent regulation by the states.  PI Mot. 4–5.

Pursuant to the CEA, the CFTC has promulgated and enforces an extensive set of regulations that govern commodities and futures trading on DCMs, including CDNA.  To offer derivatives for public trading in the United States, a market must seek and receive approval from the CFTC to operate as a DCM.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).  Under the CEA, the CFTC has "exclusive jurisdiction" to regulate and take enforcement action with respect to derivatives—including any swaps and futures—traded on DCMs.  *See* 7 U.S.C. § 2(a)(1)(A).  The CFTC regulates event contracts like those at issue here as a derivative referencing an "excluded commodity," a category which includes specified commodities not subject to the same set of CEA regulations as physical commodities.  *See id.* §§ 1a(19), (47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. Commodity Futures Trading Comm'n*, 2024 WL 4164694, at *2–3 (D.D.C. Sept. 12, 2024), *appeal dismissed*, 2025 WL 1349979 (D.C. Cir. May 7, 2025).  "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities."  7 U.S.C. § 7a-2(c)(5)(C)(i).  Events themselves are thus "excluded commodities" under the CEA, defined as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences.  *Id.* § 1a(19)(iv).  An event contract meets the definition of a "swap" under the CEA because it is an "agreement, contract, or transaction" that provides for a payment "dependent on the occurrence [or] non-occurrence" of a specified event "associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).

The CEA contains a Special Rule that allows—but does not require—the CFTC to prohibit certain types of event contracts the CFTC deems to be "contrary to the public interest," including those involving (i) "activity that is unlawful under any Federal or State law," (ii) "terrorism," (iii) "assassination," (iv) "war," (v) "gaming," or (vi) "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."  7 U.S.C. § 7a-

2(c)(5)(C)(i).  The CFTC may decide to prohibit an event contract involving one of these categories or instead choose to allow the offering of such contracts.

## B.  CDNA's Status as a DCM.

CDNA has been registered with the CFTC as a DCM since 2004.  Compl. ¶ 64.  To achieve this status and be authorized to offer derivatives for public trading, a market like CDNA must establish and maintain compliance with twenty-three Core Principles enumerated in the CEA and the CFTC's regulations.[3]  *See generally* 7 U.S.C. § 7(d); 17 C.F.R. pt. 38.  Under these Core Principles, CDNA must abide by all CEA and CFTC directives, ensure the integrity of its market, and take a number of measures to protect users from financial harm, abusive practices, market manipulation and disruption, access discrimination, and other issues.  *Id.*; Compl. ¶¶ 44–48. CDNA must comply with this substantial body of rules and regulations in order to continue to offer its products for public trading.  Compl. ¶ 47.

## C.  Prior Court Rulings Recognize that State Gaming Regulation Is Preempted as Applied to Trading on DCMs.

This Court and the United States District Court for the District of New Jersey have already determined that another federally regulated DCM—Kalshi—is likely to succeed on the merits of the same federal preemption claim related to similar event contracts.  In granting a preliminary injunction to Kalshi, this Court held that the CEA's "plain and unambiguous language grants the CFTC exclusive jurisdiction" over event contracts trading on DCMs and "reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges."  *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *5–6 (D. Nev. Apr. 9, 2025).  On April 28, 2025, the New Jersey district court adopted the same reasoning in granting a preliminary injunction for Kalshi, finding that "Kalshi's sports-related event contracts fall within

---

[3]  *Designated Contract Markets (DCMs)*, Commodity Futures Trading Comm'n, https://www.cftc.gov/IndustryOversight/TradingOrganizations/DCMs/index.htm.

the CFTC's exclusive jurisdiction" and field preemption applies.  *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025).[4]

**D.    The NGCB's Attempt to Exercise Regulatory Jurisdiction over Trading on Federally Regulated DCMs.**

CDNA filed this case because the NGCB, relying on state law, attempted to exercise its law enforcement authority to "order" CDNA, under pain of criminal prosecution, to cease engaging in activities on its DCM that are expressly permitted under federal law.  On May 20, 2025, the NGCB sent CDNA a cease-and-desist order, incorrectly asserting that CDNA's "event-based wagering contracts" are "unlawful in Nevada, unless and until approved as licensed gaming by the Nevada Gaming Commission."  Compl. Ex. A, at 1.  The order demanded that CDNA "immediately cease and desist from offering in Nevada any event-based wagering contracts concerning sporting events."  *Id.* at 2.  CDNA did not comply with the order because the order is unlawful.  Instead, CDNA filed this lawsuit seeking a determination that the NGCB's regulatory authority does not extend to regulating the listing of event contracts on a federally regulated DCM. *See* Compl.  CDNA also filed a Motion for Preliminary Injunction against the NGCB's threatened enforcement of Nevada gaming law, *see* PI Mot., which is fully briefed.  Defendants agreed to refrain from enforcement action against CDNA prior to resolution of that motion.  PI. Mot. 9.

**E.    The NRA's Asserted Interests in This Litigation.**

On July 11, 2025, the NRA gave notice of its intent to intervene in this case.  After meeting and conferring, CDNA's counsel informed the NRA on July 24, 2025 that it would oppose the intervention motion.  The NRA waited over three weeks more, until August 15, 2025, to move to intervene in this litigation as a defendant.  *See* NRA Mot.  But CDNA asserts no claim against the NRA in relation to potential enforcement, nor could it do so.  The NRA does not seek to enforce state law against CDNA, nor does it have authority to do so.  The NRA is not a federally regulated DCM, nor does it or any of its members seek to become one.  It accordingly does not assert any

---

[4]    The United States District Court for the District of Maryland recently disagreed.  Mem. Op., *KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA (D. Md. Aug. 1, 2025).  That decision is wrongly decided and has already been appealed to the Fourth Circuit.  *See* Pl.'s Notice of Appeal, *KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA (D. Md. Aug. 1, 2025).

proprietary interest in whether or not DCMs are subject to state regulation.  The NRA also does not hold a state gaming license in Nevada, though it asserts that its members do without putting them forward as participants in this case.  NRA Mot. 6.

## ARGUMENT

Upon a proper showing, a non-party may intervene either as of right or with permission of the court.  Fed. R. Civ. P. 24.  Intervention as of right is appropriate where a party:

> (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).  Permissive intervention by a non-government actor may be allowed where, but only where, the motion is timely and the proposed intervenor is "given a conditional right to intervene by a federal statute" or "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1).  A court ruling on permissive intervention must also "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  In weighing this factor, the court considers its own interest and that of the existing parties—those with a "direct stake in the outcome" of a case—in avoiding unnecessary expenditure of the "additional time and resources" entailed in allowing a third-party "to conduct discovery on substantially similar issues."  *See Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 955–56 (9th Cir. 2009).  And, even when the proposed intervenor meets the technical requirements, courts have broad discretion to deny permissive intervention based on considerations such as delay or prejudice, adequacy of existing representation, and judicial economy.  *See PEST Comm. v. Miller*, 648 F. Supp. 2d 1202, 1214 (D. Nev. 2009), *aff'd*, 626 F.3d 1097 (9th Cir. 2010).  The NRA fails to show it is entitled to intervene as of right, and it should not be allowed to permissively intervene in this litigation.

### A.  The NRA Does Not Have a Right to Intervene.

A party may intervene as of right when it "(i) timely moves to intervene; (ii) has a significantly protectable interest related to the subject of the action; (iii) may have that interest

impaired by the disposition of the action; and (iv) will not be adequately represented by existing parties." *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020) (citations omitted). "Failure to satisfy any one of the requirements is fatal to the application." *Perry*, 587 F.3d at 950. The NRA fails at every step.

   1. *The NRA and Its Members Lack a Significantly Protectable Interest.*

Over time, and in accordance with binding Supreme Court precedent, the Ninth Circuit has narrowed its view on what constitutes a "significantly protectable interest." *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1087–88 (9th Cir. 2022) (citing *Donaldson v. United States*, 400 U.S. 517 (1971), *superseded by statute on other grounds*, 26 U.S.C. § 7609, *as recognized in Polsinelli v. Internal Revenue Serv.*, 598 U.S. 432 (2023)); *see Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1176, 1180 (9th Cir. 2011) (en banc). The Ninth Circuit has recently clarified that "at an irreducible minimum" a showing of a significantly protectable interest "requires that the asserted interest be 'protectable under some law' and that there exist 'a relationship between the legally protected interest and the claims at issue,' . . . . If these two core elements are not satisfied, a putative intervenor lacks any 'interest' under Rule 24(a)(2), full stop." *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1088 (citation omitted). Neither the NRA nor its members have a legally protected interest in this matter.

Here, the only legally protected interest the NRA asserts is not even its own. The only "property or transaction," Fed. R. Civ. P. 24(a)(2), the NRA identifies is its members' interests in the state gaming licenses they hold. But the NRA does not identify any aspect of this litigation that, resolved in favor of either party, would bear on its members' ability to exercise their rights under their state gaming licenses—much less interests that are legally protected. Indeed, courts in this Circuit have recognized that licensees' legally protectable interests in their state-issued licenses are limited to the entitlements conferred by statute. *See, e.g.*, *Stivers v. Pierce*, 71 F.3d 732, 740 n.4 (9th Cir. 1995) ("[T]he existence of a protected property interest hinges on whether state law confers a 'reasonable expectation of entitlement.'" (quoting *Kraft v. Jacka*, 872 F.2d 862, 866 (9th Cir. 1989), *overruled on other grounds by Dennis v. Higgins*, 498 U.S. 439 (1991))); *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980) (finding no property interest in state

gaming licenses where state law gave Gaming Commission "full and absolute power and authority" to grant or deny them) (quoting Nev. Rev. Stat. § 463.220); *Nev. Rest. Servs., Inc. v. Clark Cnty.*, 2012 WL 4355549, at *3–4 (D. Nev. Sept. 21, 2012) (finding no property interest implicated by county ordinance imposing new conditions on gaming licenses and stating that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. [They must have] a legitimate claim of entitlement to it." (quoting *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (cleaned up))).  But the NRA does not—and could not—assert that it or any of its members received licenses from the NGCB that entitled them to protection against perceived competitive threats from transactions conducted under the federal commodities laws (or even, for that matter, from other gambling activities).  Nothing about this lawsuit threatens to interfere in any way with the NRA or its members' rights to their state-issued gaming licenses, and the NRA therefore lacks the right to intervene.

The NRA's main response is to try to import the concept of "competitor standing" from administrative law.  *See* NRA Mot. 8 (citing *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279 (D.D.C. 2018)).  But this concept arises from a very different context: cases under the Administrative Procedure Act challenging government action or inaction and considering what classes of affected citizens are entitled to do so.  It is in that context that courts outside this Circuit[5] have permitted those who are subject to government action or inaction to challenge it, even when the injury they assert arises from relaxed regulation of a competitor.  *See Connecticut*, 344 F. Supp. 3d 279 (permitting competitor casino to intervene in lawsuit challenging inaction by the United States Department of the Interior).  This approach recognizes that a competitor may have a legally protected interest at issue "when the Government takes a step that benefits his rival and therefore injures him economically."  *See Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010).[6]

---

[5]    While the Court referenced *Connecticut*'s competitor standing analysis in its *Kalshi v. Hendrick* intervention decision, *see* 2025 WL 1901399, at *1, CDNA respectfully disagrees that the doctrine applies in the context of this case.

[6]    This comes up most frequently in circumstances where multiple parties are competing for a government benefit.  *See, e.g., Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d

But that is not what is going on in this case. The NRA does not have a legally protected interest in whether the CEA preempts state gaming law. Nor does a Nevada gaming license confer or purport to confer any protection against perceived "competition," let alone "competition" from an exclusively regulated federal market. The NRA does not assert, for example, that its members have been granted any sort of exclusive right to offer gaming in Nevada. This lawsuit does not seek to challenge or defend any decision made by any government agency. And, unlike in cases where courts have permitted intervention, the NRA would have no independent legal entitlement to bring this case or to litigate the narrow legal issue it raises. Nor does the NRA assert it would be bound in any way by the outcome of this litigation absent its participation. There is also no risk of later legal action by CDNA against either the NRA or its members based on the ultimate disposition of this case. *See Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1090–92 (finding that, under California law, an insurer had a right to intervene in a suit to prevent a default judgment against the insured, in part because such a judgment could lead to later claims against the insurer); *United States v. City of Los Angeles*, 288 F.3d 391, 399–400 (9th Cir. 2002) (finding protectable interest in the merits existed where Police League sought to intervene in case seeking injunctive relief against its members and alleging those members committed "unconstitutional acts in the line of duty" and finding Police League had protectable interest in whether a consent decree was issued given its "state-law rights to negotiate [] terms and conditions of its members' employment."). In short, all of the indicia courts look to in assessing competitor standing are absent here.[7]

Instead, the NRA is asserting a much more routine, and indirect, interest in this litigation: It has a policy preference on how a legal question in the case is answered because it believes that one answer would advance its policy interests and the economic interests of its members while the

---

1100, 1108–09 (9th Cir. 2020) (grant-funding competition participant had standing to challenge a change in competition requirements); *but see Air Excursions LLC v. Yellen*, 66 F.4th 272, 279–81 (D.C. Cir. 2023) (air carrier lacked standing to challenge the government's provision of relief funds to allegedly non-qualified competitor).

[7]     Even if competitor standing applied, the Ninth Circuit requires a different intervention analysis than the one used in the *Connecticut* case cited by the NRA. The D.C. Circuit imposes a "not onerous" standard for the proposed intervenor to show existing parties will not adequately represent its interests, *see Connecticut*, 344 F. Supp. 3d at 305 (quoting *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986)), whereas the Ninth Circuit requires a "very compelling showing" of inadequacy where a government is acting on behalf of those it represents, as is the case here, *see Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003), *as amended* (May 13, 2003) (citation omitted).

other would not.  But the Ninth Circuit has made very clear that mere economic interests in someone else's litigation are not a sufficient basis to permit intervention.  *See Greene v. United States*, 996 F.2d 973, 976 (9th Cir. 1993) ("An economic stake in the outcome of the litigation, even if significant, is not enough" to demonstrate a significantly protectable interest.); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 143 F. App'x 751, 753 (9th Cir. 2005) ("We have made clear, however, that pure economic expectancy is not a legally protected interest for purposes of intervention.").  That law is controlling here.

The NRA is likely not the only non-party watching this and similar cases with interest. CDNA has already been approached by one group who seeks to file an amicus brief, and it will not oppose that request.  Those who buy and sell event contracts on CDNA's DCM certainly have an interest in the outcome of this case.  So too, presumably, do those who trade other types of derivatives on DCMs besides CDNA and who do so in reliance on exclusive and uniform federal regulation of those markets.  But like those other non-parties, the NRA's interest, or even its anticipation of downstream economic impacts on its members' businesses, does not give rise to a legally protected interest that entitles the NRA to participate in this case as a party.  *See, e.g.*, *Pub. Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 205 (1st Cir. 1998) ("It is settled beyond peradventure [] that an undifferentiated, generalized interest in the outcome of an ongoing action is too porous a foundation on which to premise intervention as of right.").

   2.   *No Interest of the NRA or Its Members Will Be Impaired by the Disposition of the Action.*

It follows from the fact that the NRA lacks a legally protected interest that the disposition of this case also will not impair any such interest.  *See Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 838 (9th Cir. 1996), *as amended on denial of reh'g* (May 30, 1996) (impairment "presupposes that the prospective intervenor has a protectable interest.").  Even if the interests the NRA identifies were protectable interests, however, the NRA would still not be able to show that the disposition of this case would impair its interests, or those of its members.  While a finding that the NGCB lacks jurisdiction to regulate national derivatives markets would certainly impact the activities of *the NGCB* and its officials, it would in no way affect the rights or activities of *the*

*NRA* or its members.  The day after the declaratory relief and injunction sought in this case are entered, the NRA and its members would have every single right and could engage in precisely the same activities that they were permitted to engage in on the day before.  They do not, and cannot, argue otherwise.  *See, e.g.*, *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279–81 (D.C. Cir. 2023) (rejecting assertion of competitor standing because government conferring a benefit on a competitor did not impair proposed intervenor's rights).

Further, the outcome of this litigation is not inherently determinative of the status of CDNA's operations in Nevada.  This action is about the pure legal issue of whether regulation of CDNA is under the exclusive jurisdiction of the CFTC pursuant to federal law.  The outcome will determine *who* may regulate trading on CDNA's DCM, not *whether* CDNA will be regulated or whether it can do business in Nevada.  Because the outcome of this case will not alter the ability of the NRA itself, or its members, to exercise any property rights they are deemed to hold, there could be no impairment of protected interests here.

*3.  Defendants Adequately Represent the NRA's Interests.*

To the extent the NRA has a derivative interest in its members' gaming licenses or its members' interests in "using those licenses in a well-regulated market," *see* NRA Mot. 5–6, there is no reason to believe Defendants are not up to the task of representing them.  Defendants are the NGCB itself, its members, and the Attorney General of Nevada, and they are represented in this litigation by the Office of the Attorney General of Nevada.  It is difficult to conceive of anyone who would have more of an interest in the enforcement of state law, or in defending the jurisdiction of the NGCB.  The NRA's interests, even to the extent they are recognized, are entirely derivative of the interests that Defendants themselves represent.  The NRA has no free-standing interest in excluding potential competition.  Thus, to the extent it has any interest at issue here at all, it must flow exclusively from the assertion that the NGCB is lawfully exercising its authority with respect to CDNA—an assertion the NGCB is adequately representing in this litigation.

When a party seeks to intervene as of right in a case where "the government is acting on behalf of a constituency that it represents," the Ninth Circuit holds that there is "an assumption of adequacy" of representation.  *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003), *as*

*amended* (May 13, 2003) (citing *City of Los Angeles*, 288 F.3d at 401) (finding private group seeking to limit government benefits to only native Hawaiians had not shown state defendants were inadequate to represent the group's interests). The burden is on the prospective intervenor to make a "very compelling showing" that the government is an inadequate representative of interests it shares with its citizens. *Id.* The presumption of adequacy when a state defendant acts on behalf of its constituency is vital to judicial efficiency. Were it otherwise, every person and special interest group who wanted to see a state law enforced could potentially intervene as of right in every legal challenge to state law. In addition, it is well-settled that adequacy is also assumed whenever the would-be intervenor and an existing party share the same "ultimate objective." *See, e.g., Perry*, 587 F.3d at 951. Without more, "differences in litigation strategy do not normally justify intervention," *Arakaki*, 324 F.3d at 1086 (citing *City of Los Angeles,* 288 F.3d at 402–03), nor do differences "in style and degree," *Perry*, 587 F.3d at 949.

The presumption of adequacy is conclusive here, and unrebutted. Defendants are acting in their official capacities as the state actors charged with enforcing the laws at issue in this case on behalf of the people of Nevada, not in some personal or other limited capacity. *See City of Los Angeles*, 288 F.3d at 401–02 (finding the presumption of adequacy did not apply when the state was acting as an employer but *did* apply when a government was acting as a litigant on behalf of its constituents). Their objectives are also aligned with those of the NRA: Both the NRA and Defendants are asking the Court to find the NGCB has jurisdiction over CDNA that is not preempted by federal law. The Ninth Circuit has repeatedly found that when a state defendant and a would-be intervenor share the ultimate objective of defending state law or an initiative from a challenge, adequacy of representation is assumed. *See, e.g.*, *Perry*, 587 F.3d at 951 (denying intervention by group whose interest was not "'meaningfully distinct' from [defendant's] interest in defending the constitutionality of [a state law]"); *Prete v. Bradbury*, 438 F.3d 949, 957–59 (9th Cir. 2006) (holding that a public interest organization seeking intervention to defend a state constitutional ballot initiative failed to defeat the presumption of adequate representation when it shared the ultimate objective of upholding the measure's validity with the state defendant); *see also League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1305–06 (9th Cir. 1997)

14

(hereinafter "*LULAC*") (recognizing that a private foundation failed to rebut the presumption of adequacy because it shared the same ultimate objective as state defendants of ensuring state law was "upheld as constitutional on the merits").  The NRA admits to the shared objective, stating that "it seeks to defend the State's authority to regulate sports betting in Nevada against CDNA's preemption argument."  NRA Mot. 15.

To rebut the presumption of adequacy, the NRA is required to make a "very compelling" showing of inadequacy,[8] *see Arakaki*, 324 F.3d at 1086 (citation omitted), based on three factors:

> (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect.

*Id.*  (citing *California v. Tahoe Reg'l Planning Agency*, 792 F.2d 775, 778 (9th Cir. 1986)).

The NRA has made none of these required showings.

*First*, while the NRA might be able to present an industry opinion—what it styles as a "perspective," *see* NRA Mot. 17—or even an additional citation or two effectively as an amicus, it has no new *arguments* to offer as an intervenor.  Every legal issue the NRA proposes to cover is already well-trodden by Defendants' response to Plaintiff's preliminary injunction motion, *see* Defs.' Opp'n to Mot. for Prelim. Inj., ECF No. 36 (hereinafter "PI Opp'n"):

| The NRA's "Perspective" | Defendants' Existing Arguments |
| --- | --- |
| The CEA does not field preempt state gaming law, and the intent of cited laws and regulations was to prohibit gaming contracts.  NRA Mot. 13. | The CEA does not preempt the field to the exclusion of state gaming law, PI Opp'n at 7–13, and the intent of cited laws and regulations was to prohibit gaming contracts, PI Opp'n at 9–10. |
| Kalshi's [*sic*] event contracts are not "swaps."  NRA Mot. 13. | CDNA's event contracts are not "swaps."  PI Opp'n at 7–10. |
| The CFTC cannot legally authorize Kalshi's [*sic*] Sports Event Contracts.  NRA Mot. 13. | The CFTC cannot authorize CDNA's Sports Event Contracts.  PI Opp'n at 9–11. |

---

[8]    In light of the presumption of adequate representation in this case, the NRA relies on the wrong standard in arguing the burden for a prospective intervenor to show inadequacy is "minimal."  NRA Mot. 12 (quoting *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 823 (9th Cir. 2001)).

To the extent the NRA's interest is simply in being able to make its own arguments towards the same objectives as Defendants in its own style, that certainly does not justify intervention. *See Arakaki*, 324 F.3d at 1086; *Perry*, 587 F.3d at 949.

*Second*, the NRA cannot show Defendants are incapable or unwilling to argue against the preemption challenge at issue.[9]  When a state party is defending the enforceability of a state law or initiative, the Ninth Circuit has required a demonstrated disagreement with the would-be intervenor's position or a plausible conflict of interest to rebut the presumption of adequacy.  *See LULAC*, 131 F.3d at 1305–07.  But here, Defendants have not only strenuously opposed the positions CDNA asserts in this case in this Court, their counsel—the Nevada Attorney General— has reached out to file an amicus brief in a parallel case pending in the Third Circuit.  Br. of Amici Curiae of Nev., Ohio, 32 Other States, D.C., and N. Mar. I. Supporting Appellants, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), ECF No. 29.  This is certainly not a case in which the government can seriously be suspected of being "less than enthusiastic about enforcement" of a challenged state law.  *See Yniguez v. Ariz.*, 939 F.2d 727, 733 (9th Cir. 1991).  Indeed, in addition to experienced counsel from the Nevada Attorney General's office, Defendants just retained nationally-prominent attorneys from Mayer Brown LLP's New York and Washington offices to represent them in this case.  There can certainly be no suggestion that Defendants are anything other than well-equipped to effectively litigate this case.

*Third*, the NRA would not provide any necessary elements to the suit "that other parties would neglect."  *Broussard on behalf of Wynn Resorts, Ltd. v. Hagenbuch*, 2021 WL 107202, at *2 (D. Nev. Jan. 12, 2021) (citation omitted).  None of the NRA's attempts to articulate a necessary element are compelling.  The NRA proposes to discuss how a "multi-state regulatory approach works in practice," *see* NRA Mot. 13—a fact which is irrelevant to whether the CEA preempts state gaming law.  As for NRA members having "daily familiarity with issues of federal and state

---

[9]     While Defendants filed a joinder to the NRA's motion noting a belief that the NRA could provide a "perspective" on harm that Defendants could not "fully offer," Defendants did not point to any divergence in ultimate objectives with the NRA nor to an inability or unwillingness to enthusiastically and comprehensively litigate all arguments relevant to the merits of the case in a way that would protect any interests the NRA could identify through its "perspective."  *See* Defs.' Joinder to NRA's Emergency [*sic*] Mot. to Intervene, ECF No. 51.

law," *see id.*, there is no reason to believe their knowledge is somehow superior to that of Defendants—including Nevada's Attorney General. The NRA asserts it is "uniquely well-positioned" to address the full implications of CDNA's theory for Nevada gaming operators and to explain why Sports Event Contracts cannot be deemed federally regulated swaps.[10] *See id.* To the extent it wishes to share that policy perspective with the Court, it may seek leave to do so as amicus curiae. But it would not be appropriate to permit anyone who happens to have a perspective they wish to share to intervene as a party with rights in this case.

If anyone is inadequate to litigate the issues in this case, it is the NRA itself. The NRA does not hold a gaming license, and it does not have commercial interests of its own. To the extent that the NRA seeks to interject into this case questions related to "competitive disadvantage," *see, e.g.*, NRA Mot. 7–8, or other policy issues, the NRA itself is incapable of effectively litigating those issues. Because the NRA does not have, and therefore cannot readily be compelled to produce, evidence concerning the commercial aspects of its members' businesses, its participation in this case would be effectively one-sided. The NRA asks for Nevada's gaming industry to be permitted to fully participate in this case—including during the discovery process—without subjecting itself to the same. That the NRA's members themselves would not be required to face any scrutiny or be subject to any obligations during the proceedings raises serious questions as to whether NRA members would be bound by the outcome of the litigation. *See generally Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (recognizing that one requirement for an association to have standing to bring suit on behalf of its members is that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

---

[10] The NRA fails to make a compelling showing of why Defendants are incapable of effectively presenting those same arguments. In fact, Defendants have already done so. *See* PI Opp'n at 7–14. The NRA points to *Southwest Center for Biological Diversity v. Berg*, misrepresenting it as a case in which a private intervenor was welcomed to "express their own unique private perspectives." *See* NRA Mot. 13 (citing 268 F.3d 810, 823–24 (9th Cir. 2001)). That case is distinguishable, since the party defendant there stated it would "not represent proposed intervenors' interests in this action." *See Berg*, 268 F.3d at 823. There is no reason to suspect Defendants will be recalcitrant in defending the enforceability of state law here. Indeed, Defendants have indicated they intend to represent their constituents' interests in preventing CDNA from what they term obtaining "a competitive advantage over all licensed and regulated sports books in Nevada" and "avoid[ing] paying otherwise applicable state taxes." PI Opp'n at 2.

1    *4.  The NRA's Motion Is Untimely.*

2         Finally, timeliness is a threshold element for intervention of right such that "[i]f the court

3    finds that the motion to intervene was not timely, it need not reach any of the remaining elements

4    of Rule 24." *United States v. Washington*, 86 F.3d 1499, 1503 (9th Cir. 1996).  The Ninth Circuit

5    "consider[s] three factors: '(1) the stage of the proceeding at which an applicant seeks to intervene;

6    (2) the prejudice to other parties; and (3) the reason for and length of the delay.'"  *LULAC*, 131

7    F.3d at 1302 (quoting *Cnty. of Orange v. Air Cal.*, 799 F.2d 535, 537 (9th Cir. 1986)).  The "crucial

8    date" in determining whether the amount of time that has passed is acceptable is "when proposed

9    intervenors should have been aware that their interests would not be adequately protected by the

10   existing parties."  *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

11        Here, the NRA sat silent from when CDNA's Complaint was filed on June 3, 2025 until

12   August 15, 2025—over two months—before moving to intervene.  It delayed filing more than

13   three weeks even after it knew CDNA would oppose its motion.  And its motion was filed one

14   business day before Defendants' Opposition to CDNA's Motion for Judgment on the Pleadings

15   and Motion to Strike, which CDNA filed on August 4, 2025, was originally due.  *See* D. Nev. L.R.

16   7-2(b) (specifying fourteen day response period, making Defendants' deadline Monday, August

17   18, 2025).  While a few weeks or months may not be a lengthy delay in some cases, it *is* a

18   prejudicial delay here.  The pleadings are closed, and the parties are actively litigating a dispositive

19   motion on the basis of those pleadings.  A motion for a preliminary injunction has been fully

20   briefed.  While this delay should be fatal to the NRA's motion, at a minimum it should preclude

21   the NRA (or Defendants) from using the NRA's belated motion as a basis for disrupting the

22   ongoing progression of this litigation, or the Court's consideration of already-pending motions.[11]

23

24

25

26   _____

27   [11]     Indeed, the NRA itself states that it "does not seek to interfere with the briefing schedule for the preliminary injunction or the motion for judgment on the pleadings," NRA Mot. 12, it "does not seek to alter the case schedule or

28   assert any new claims," NRA Mot. 17, and it "does not seek to interfere with the current briefing or discovery schedule," *id*.

**B. The NRA Is Not Entitled to Permissive Intervention, and the Court Should Deny Such Intervention Even if It Were.**

Where a prospective intervenor is unable to make the requisite showing to intervene as of right—as is the case for the NRA—courts may consider permissive intervention. But permissive intervention by a private party is not wholly discretionary. Rather, it is permitted only where (a) a conditional intervention right is granted by a federal statute, or (b) the proposed intervenor has a "claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1); *see also Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998) (noting that an applicant for permissive intervention must prove "(1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims," though the court "has discretion to deny permissive intervention" even where the threshold elements are satisfied). Here, there is no federal statute that would authorize intervention, so that basis is unavailable. *See* Fed. R. Civ. P. 24(b)(1)(A). Permissive intervention is also unavailable to the NRA under Fed. R. Civ. P. 24(b)(1)(B). Timeliness is analyzed "more strictly" with regard to permissive intervention than intervention of right. *See LULAC*, 131 F.3d at 1308. Thus, the same reasons that support a finding of untimeliness for intervention of right also justify denial of permissive intervention. *See supra* p. 18. Further, the NRA is not seeking to assert any "claim or defense" at all. *See* Fed. R. Civ. P. 24(b)(1)(B). It has no such claims or defenses to assert, and it therefore has no ability to intervene.

*First*, the NRA certainly cannot assert any "claim" because neither it nor its members are DCMs that list event contracts, nor is it threatened with state enforcement action. Accordingly, it would not be entitled to declaratory judgment one way or the other as to whether the NGCB's authority is preempted. *See Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632, 637–38 (9th Cir. 2014) (finding not justiciable private plaintiff's action seeking declaratory judgment against environmental groups that federal agency's action did not violate the Administrative Procedure Act because plaintiff lacked "adverse legal interests arising from a legal claim" and "economic interest in the outcome of a lawsuit" was not enough).

As for "defenses," the NRA similarly has none to assert. The NRA cannot enforce state law in the first place and thus cannot be enjoined from enforcing state law. Accordingly, the NRA has no available defenses to being enjoined from doing so, particularly where, as here, no injunction is sought against the NRA. To the extent that what the NRA is trying to do is actually hijack *Defendants*' defense, asserting an interest in someone else's protectable rights is not a valid basis for intervention. *See, e.g.*, *United States v. Alisal Water Corp.*, 370 F.3d 915, 919, 920 n.3 (9th Cir. 2004) (noting that a mere property interest that "may be impacted by litigation is not a passport to participate in the litigation itself. To hold otherwise would create a slippery slope where anyone with an interest in the property of a party to a lawsuit could bootstrap that stake into an interest in the litigation itself."); *United Fin. Cas. Co. v. Alley*, 2015 WL 5163033, at *2 (D. Alaska Sept. 3, 2015) (denying intervention where proposed intervenor "ha[d] a financial interest in the outcome" of litigation but lacked "a claim or defense which could be pled.").

*Second*, the federal rules "*require*[] that the court 'consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Perry*, 587 F.3d at 955 (quoting Fed. R. Civ. P. 24(b)(3)). The Ninth Circuit has found permissive intervention to be properly denied when intervention would result in delays and largely duplicative discovery. *See Perry*, 587 F.3d at 955–56 (affirming district court reasoning finding that allowing intervention "might very well delay the proceedings, as each group would need to conduct discovery on substantially similar issues," and "the parties were capable of developing a complete factual record encompassing [the proposed intervenor's] interests.") (citations omitted); *see also Allen Calculators v. Nat'l Cash Reg. Co.*, 322 U.S. 137, 141–42 (1944) ("[W]here a suit is of large public interest, the members of the public often desire to present their views to the court in support of the claim or the defense. To permit a multitude of such interventions may result in accumulating proofs and arguments without assisting the court.").

That is the case here. The NRA does not seek to intervene for purposes of defending against the actual claims CDNA has asserted, which turn on essentially a sterile legal question. *See* Pl.'s 12(c)/12(f) Mot. Instead, by its own admission the NRA intends to try to interject into this litigation a non-justiciable policy debate about whether the Sports Event Contracts listed by

CDNA *should* be permitted to be listed on a DCM, and how state and federal regulation of gaming and derivatives markets *should* be divided and balanced. *See, e.g.*, NRA Mot. 6–7, 16. Indeed, that is effectively all the NRA has to add to this litigation. While CDNA does not oppose the NRA sharing its perspective with the Court via amicus briefing, it should not be permitted to hijack this litigation to serve its own policy, economic, or public relations objectives.

C. **The NRA Offers No Reason that Participation as an Amicus Would Be Insufficient.**

To the extent that what the NRA seeks is the ability to share its "perspective," there is a mechanism for that: filing an amicus curiae brief. The NRA offers no reason that doing so would be insufficient here, such that actual intervention is necessary. "Amicus briefs traditionally assist a court in cases of public interest as a supplement to the parties' arguments or to draw the court's attention to law that has escaped consideration." *Elias v. Wynn Las Vegas, LLC*, 2025 WL 489982, at *1 (D. Nev. Feb. 13, 2025). In parallel litigation in the Third Circuit, the NRA's counterpart industry associations have participated as amici, not as parties. *See* Br. of the Casino Ass'n of New Jersey, Inc. as Amicus Curiae in Supp. of Appellants and Reversal, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), ECF No. 33 (representing interests of the Atlantic City casino industry); Br. of the Am. Gaming Ass'n as Amicus Curiae in Supp. of Appellants and Reversal, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), ECF No. 34 (representing a variety of groups, including commercial and tribal casino operators). This type of participation better suits the relief that the NRA actually asserts—the right to share its views, not the right to participate in litigating the relief sought.

D. **The Court's Order Permitting Intervention in *Kalshi v. Hendrick* Counsels Against, Not for, Intervention.**

Finally, while the NRA relies heavily on this Court's order permitting its intervention in *Kalshi v. Hendrick*, 2025 WL 1901399 (D. Nev. June 2, 2025), that order actually undermines its position here. CDNA was not, of course, a participant in the *Kalshi v. Hendrick* case and accordingly did not have the opportunity to argue against intervention in that case. The arguments presented to the Court in response to the intervention motion in *Kalshi v. Hendrick* also differed from those addressed above. But regardless, to the extent that the NRA has already been afforded

1  the opportunity to participate in and share its views on the precise questions at issue in this case,

2  it does not require a second opportunity to do so. *See Yurok Tribe v. U.S. Bureau of Reclamation*,

3  2022 WL 1540029, at *1 (N.D. Cal. May 16, 2022) (denying intervention in part because "allowing

4  [the proposed intervenor] to intervene . . . in this case would be duplicative of other litigation,

5  including a related case before me in which I have already allowed [the proposed intervenor] to

6  intervene."). Moreover, while the NRA purports to have a vital contribution to make in the present

7  case, it clearly does not intend to do more than recycle, in many instances verbatim, what it has

8  already filed in *Kalshi v. Hendrick*—well-evidenced by its errant references to "Kalshi's" event

9  contracts, NRA Mot. 13, and the timeliness of its intervention motion in that lawsuit, NRA Mot.

10  17. While the NRA also asserts that it has an interest in avoiding inconsistent outcomes between

11  this case and *Kalshi v. Hendrick*, NRA Mot. 10, the parties in this case—particularly Defendants—

12  presumably have exactly the same interest.

13  **E.  If Not Denied, the NRA's Motion Should Be Held in Abeyance.**

14  Finally, if the Court is not inclined to deny the NRA's motion, CDNA respectfully submits

15  that it should be held in abeyance pending resolution of CDNA's pending Motion for Judgment

16  on the Pleadings and Motion to Strike. The crux of that motion is that there is no actual issue to

17  be litigated in this case, but rather that based on the undeniable allegations in the Complaint—and

18  the law—CDNA is entitled to the relief sought. *See* Pl.'s 12(c)/12(f) Mot. Because that motion is

19  limited to the four corners of the Complaint and Answer, and judicially-noticeable records, there

20  is nothing for the NRA to add to the Court's consideration of it.

21  **CONCLUSION**

22  For the foregoing reasons, the Court should deny the NRA's Motion to Intervene.

23  Dated this 29th day of August, 2025.

24

25  /s/ Bradley Austin
    Bradley Austin (Nevada Bar No. 13064)

26  SNELL & WILMER
    1700 South Pavilion Center Drive, Suite 700

27  Las Vegas, NV 89135
    702-784-5247

28  baustin@swlaw.com

Nowell D. Bamberger (*pro hac vice*)
Matthew C. Solomon (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037
202-974-1500
nbamberger@cgsh.com
msolomon@cgsh.com

*Attorneys for North American Derivatives Exchange, Inc.,
d/b/a Crypto.com | Derivatives North America*

1

### CERTIFICATE OF SERVICE

2

I hereby certify that on August 29, 2025, I electronically filed the foregoing document with

3

the Clerk of Court for the U.S. District Court, District of Nevada by using the Court's CM/ECF

4

system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF

5

system.

6

7

DATED August 29, 2025.

8

                                    */s/ Lyndsey Mosbey*
An Employee of Snell & Wilmer L.L.P.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28