AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General -
  Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada,
  Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov

Nicole A. Saharsky (*pro hac vice* pending)
Minh Nguyen-Dang (*pro hac vice* pending)
Mayer Brown LLP
1999 K Street, NW
Washington, D.C. 20006
(202) 263-3000 (phone)
nsaharsky@mayerbrown.com
mnguyen-dang@mayerbrown.com

Rory K. Schneider (*pro hac vice* pending)
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500 (phone)
rschneider@mayerbrown.com

*Attorneys for Kirk D. Hendrick, George Assad, Chandeni K. Sendall, The State of Nevada on Relation of the Nevada Gaming Control Board, and Aaron D. Ford*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| NORTH AMERICAN DERIVATIVES EXCHANGE, INC. d/b/a CRYPTO.COM \| DERIVATIVES NORTH AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KIRK D. HENDRICK, in his official capacity as Chairman of the Nevada Gaming Control Board; GEORGE ASSAD, in his official capacity as a Member of the Nevada Gaming Control Board; CHANDENI K. SENDALL, in her official capacity as a Member of the Nevada Gaming Control Board; THE STATE OF NEVADA ON RELATION OF THE NEVADA GAMING CONTROL BOARD; AARON D. FORD, in his official capacity as Attorney General of Nevada,<br><br>Defendants. | Case No.: 2:25-cv-00978-APG-BNW<br><br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS** |

1

**TABLE OF CONTENTS**

2                                                                                                  **Page**

3    INTRODUCTION ........................................................................................................... 1

4    STATEMENT .................................................................................................................. 2

5        A.    Legal Background ............................................................................................. 2

6              1.    Nevada Comprehensively Regulates Gaming........................................... 2

7              2.    The CEA Regulates Swaps and Futures Markets ..................................... 2

8        B.    Factual Background .......................................................................................... 5

9        C.    Procedural History ........................................................................................... 6

10   LEGAL STANDARD....................................................................................................... 6

11   ARGUMENT ................................................................................................................... 7

12   CRYPTO.COM IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS ......................... 7

13       A.    Material Fact Disputes Preclude Judgment on the Pleadings ......................... 7

14             1.    There Are Virtually No Undisputed Facts Here .................................... 7

15             2.    Key Material Fact Disputes Preclude Judgment on the Pleadings........ 9

16       B.    The CEA Does Not Preempt Application of Nevada's Gaming Laws Here .............. 12

17             1.    The Event Contracts on Crypto.com's Website Are Not Swaps ........ 13

18             2.    The CEA Does Not Expressly Preempt Nevada's Gaming Laws........ 19

19             3.    The CEA Does Not Field Preempt Nevada's Gaming Laws .............. 20

20             4.    The CEA Does Not Conflict Preempt Nevada's Gaming Laws ........ 28

21       C.    Crypto.com Is Not Entitled to the Permanent Injunction It Seeks.............. 30

22   CONCLUSION ............................................................................................................... 30

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**                                                                                                                 **Page(s)**

*Acceptance Cas. Ins. v. MRVK Hosp. Grp.*,
   2022 WL 17455972 (E.D. Cal. Dec. 6, 2022) ........................................................................ 7

*Ah Sin v. Wittman*,
   198 U.S. 500 (1905) ...................................................................................................... 13

*Altria Group, Inc. v. Good*,
   555 U.S. 70 (2008) ............................................................................................ 13, 20, 21

*Am. Apparel & Footwear Ass'n v. Baden*,
   107 F.4th 934 (9th Cir. 2024) ...................................................................................... 28, 29

*Artichoke Joe's Cal. Grand Casino v. Norton*,
   353 F.3d 712 (9th Cir. 2003) ......................................................................................... 12, 18

*Beecham v. United States*,
   511 U.S. 368 (1994) ..................................................................................................... 15

*Bond v. United States*,
   572 U.S. 844 (2014) ..................................................................................................... 16

*CFTC v. Noble Metals Int'l, Inc.*,
   67 F.3d 766 (9th Cir. 1995) ............................................................................................ 3

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
   583 U.S. 416 (2018) ................................................................................................ 17, 24

*EEOC v. Wedco, Inc.*,
   65 F. Supp. 3d 993 (D. Nev. 2014) ............................................................................... 30

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
   933 F.3d 882 (7th Cir. 2019) ......................................................................................... 19

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ..................................................................................................... 26

*Fleming v. Pickard*,
   581 F.3d 922 (9th Cir. 2009) .......................................................................................... 7

*Flynt v. Bonta*,
   131 F.4th 918 (9th Cir. 2025) ........................................................................................ 13

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995) ..................................................................................................... 22

*FTC v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001) ...................................................................................... 22

*Gallagher v. Philipps*,
   563 F. Supp. 3d 1048 (S.D. Cal. 2021) ......................................................................... 11

*Gen. Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*,
887 F.2d 228 (9th Cir. 1989) .................................................................................. 7, 12

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) ............................................................................................... 13

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ............................................................................................... 24

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) ............................................................................................... 21

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
896 F.2d 1542 (9th Cir. 1989) ............................................................................ 7, 12

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ............................................................................................... 23

*Inv. Co. Inst. v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012) ....................................................................... 16

*John Doe Co. v. CFPB*,
235 F. Supp. 3d 194 (D.D.C. 2017) ....................................................................... 30

*KalshiEX LLC v. Martin*,
2025 WL 2194908 (D. Md. Aug. 1, 2025) ..................................................... *passim*

*KalshiEX, LLC v. Hendrick*,
2025 WL 1073495 (D. Nev. Apr. 9, 2025) ...................................................... 1, 8, 20

*Kansas v. Garcia*,
589 U.S. 191 (2020) ......................................................................................... 19, 23

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ......................................................................................... 18, 19

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ......................................................................................... 12, 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ............................................................................... 3, 19, 20, 24

*Mont. Med. Ass'n v. Knudsen*,
119 F.4th 618 (9th Cir. 2024) ................................................................................ 28

*Montalvo v. Spirit Airlines*,
508 F.3d 464 (9th Cir. 2007) ................................................................................. 29

*Murphy v. NCAA*,
584 U.S. 453 (2018) ............................................................................... 13, 17, 24, 26

*Nat'l Fed. of the Blind v. United Airlines Inc.*,
813 F.3d 718 (9th Cir. 2016) ............................................................................ 20, 21

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ........................................................................................ 30

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
    461 U.S. 190 (1983) ........................................................................................ 19

*Rosebrock v. Beiter,*
    788 F. Supp. 2d 1127 (C.D. Cal. 2011) ....................................................... 30

*S. Cal. Edison Co. v. Orange Cnty. Transp. Auth.,*
    96 F.4th 1099 (9th Cir. 2024) ....................................................................... 16

*Sackett v. EPA,*
    598 U.S. 651 (2023) ........................................................................................ 20

*In re Saldana,*
    122 F.4th 333 (9th Cir. 2024) ................................................................. 16, 22

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n,*
    322 F.3d 1039, 1042 (9th Cir. 2003) .............................................................. 3

*TRW, Inc. v. Andrews,*
    534 U.S. 19 (2001) .......................................................................................... 16

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.,*
    959 F.3d 1201 (9th Cir. 2020) ....................................................................... 19

*W. Va. v. EPA,*
    597 U.S. 697 (2022) ........................................................................................ 24

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................ 30

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ................................................................................. 27, 29

*Yates v. United States,*
    574 U.S. 528 (2015) ........................................................................................ 15

**Statutes**

7 U.S.C. § 1a(47) ................................................................................................... 12

7 U.S.C. § 1a(47)(A) ............................................................................. 4, 14, 15, 16

7 U.S.C. § 1a(47)(A)(i) .......................................................................................... 15

7 U.S.C. § 1a(47)(A)(ii) ................................................................................. *passim*

7 U.S.C. § 1a(47)(A)(iii) ................................................................................. 15, 16

7 U.S.C. § 2(a) ..................................................................................... 4, 12, 23

7 U.S.C. § 2(a)(1) ........................................................................................... 17, 19

7 U.S.C. § 2(a)(1)(A) ..................................................................................................... *passim*

7 U.S.C. § 2(a)(1)(A)(I) .......................................................................................................... 23

7 U.S.C. § 2(e) .................................................................................................................... 4, 21

7 U.S.C. § 6a(a) ....................................................................................................................... 25

7 U.S.C. § 7a-2(c) ....................................................................................................... 17, 18, 23

7 U.S.C. § 7a-2(c)(1) ................................................................................................................ 4

7 U.S.C. § 7a-2(c)(2) ................................................................................................................ 4

7 U.S.C. § 7a-2(c)(5) ................................................................................................................ 4

7 U.S.C. § 7a-2(c)(5)(C)(i) ..................................................................................................... 23

7 U.S.C. § 7a-2(c)(5)(C)(i)(V) ............................................................................................... 29

7 U.S.C. § 9(a) ........................................................................................................................ 15

7 U.S.C. § 13 ........................................................................................................................... 25

7 U.S.C. § 13(a)(5) .................................................................................................................. 21

7 U.S.C. § 16(e)(2) ....................................................................................................... 5, 20, 22

7 U.S.C. § 16(e)(2)(B) ............................................................................................................ 22

7 U.S.C. § 16(h)(2) ....................................................................................................... 20, 22, 23

8 U.S.C. § 1324a(h)(2) ........................................................................................................... 19

12 U.S.C. § 1828(y) ................................................................................................................ 27

18 U.S.C. § 1804(a) ................................................................................................................ 26

25 U.S.C. § 2701(5) ................................................................................................................ 26

42 U.S.C. § 7543(a) ................................................................................................................ 19

Pub. L. No. 74-675, § 3, 40 Stat. 1491, 1491 ........................................................................ 3

Pub. L. No. 93-463, 88 Stat. 1389 .......................................................................................... 3

Pub. L. No. 93-463, § 101(a), 88 Stat. 1391 .......................................................................... 3

Pub. L. No. 93-463, § 201(b), 88 Stat. 1395 .......................................................................... 3

Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658–754 .......................................................... 3

12 C.F.R. § 163.172 ................................................................................................................ 27

17 C.F.R. § 38.150 .................................................................................................................. 28

1  17 C.F.R. § 38.151(b) ........................................................................................ 28

2  17 C.F.R. § 38.250 ............................................................................................ 29

3  17 C.F.R. § 38.255 ............................................................................................ 29

4  17 C.F.R. § 40.11(a)(1) .................................................................................. 4, 30

5  Fed. R. Civ. P. 12(c) ........................................................................................... 6

6  NRS § 458A.010 .................................................................................................. 2

7  NRS § 463.0129(1)(b) .......................................................................................... 2

8  NRS § 463.0193 .......................................................................................... 2, 6, 8

9  NRS § 463.151(2) ................................................................................................. 2

10  NRS § 463.160 ..................................................................................................... 2

11  NRS § 463.160(1)(a) ............................................................................................ 2

12  NRS § 463.160(4) ................................................................................................ 2

13  NRS § 463.350(1)(a) ............................................................................................ 2

14  NRS § 463.400 ..................................................................................................... 2

15  NRS § 463.490 ..................................................................................................... 2

16  NRS § 463.530 ..................................................................................................... 2

17  NRS § 463.625 ..................................................................................................... 2

18  NRS § 463.633 ..................................................................................................... 2

19  NRS § 463.637 ..................................................................................................... 2

20  NRS § 463.670 ..................................................................................................... 2

21  NRS § 463.1405(1) .............................................................................................. 2

22  **Other Authorities**

23  156 Cong. Rec. S5907 (July 15, 2010) ............................................................. 25

24  Activities and Operations of National Banks and Federal Savings Associations,
25      85 Fed. Reg. 40794 (July 7, 2020) ........................................................ 27

    Am. Gaming Ass'n, *State of the States 2025* (May 13, 2025) ......................... 24
26
    *Black's Law Dictionary* (12th ed. 2024) ........................................................... 4
27
    Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer
28      Protection Act* (2017) ........................................................................... 3, 4

Core Principles and Other Requirements for Designated Contract Markets,
75 Fed. Reg. 80572 (Dec. 22, 2010) ................................................................. 28

Crypto.com, *The Big Game 2026* ......................................................................... 6

Crypto.com, *Prediction Trading* .......................................................................... 10

Further Definition of ''Swap,'' 77 Fed. Reg. 48208 (Aug. 13, 2012) .................... 5, 18

Nev. Resorts Ass'n, *History of Gaming in Nevada* ........................................... 2

*Webster's New Collegiate Dictionary* (1995) ................................................... 14

Wes Burns, *Crypto.com Sports Betting Exchange Launches in All 50 States*,
BettingUSA (Dec. 27, 2024) ............................................................................... 11

**INTRODUCTION**

Plaintiff North American Derivatives Exchange, Inc. (Crypto.com) asks the Court to take the extraordinary step of entering judgment in its favor based solely on its own allegations, before Defendants can test those allegations through discovery. The motion should be denied.

To obtain judgment on the pleadings, Crypto.com must show that it prevails based only on the undisputed allegations in its complaint. But most allegations are disputed, and several basic factual disputes preclude judgment on the pleadings. For example, Crypto.com seeks to prevent Nevada from ever enforcing its gaming laws on any of Crypto.com's current or future event contracts, yet it has not identified the contracts it currently offers or intends to offer. The Court cannot determine whether Crypto.com's event contracts are "swaps" under the Commodity Exchange Act (CEA) or grant Crypto.com the relief it seeks without knowing those basic details. Because there are fact disputes even under Crypto.com's view of the law, this Court should deny the motion.

In any event, Crypto.com's legal position is incorrect. As far as Defendants can tell, Crypto.com's event contracts are not "swaps" under the CEA. And even if the event contracts are "swaps," the CEA does not preempt the application of Nevada's gaming laws. There is a strong presumption against preemption, particularly in an area of traditional state regulation such as gaming. Crypto.com's position would represent an extraordinary intrusion into the traditional exercise of the States' police powers. Nothing in the CEA shows that Congress intended that dramatic result.

Crypto.com relies on this Court's preliminary injunction decision in *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495 (D. Nev. Apr. 9, 2025). But the Court noted that the *Kalshi* decision was intended to preserve the status quo while the parties litigated the merits. What Crypto.com seeks is far more disruptive—a *permanent* injunction that would deprive Nevada of any ability to regulate sports betting—based on the bare allegations in its complaint, most of which are disputed. Further, since the *Kalshi* decision, a federal district court in Maryland reached the contrary conclusion, in *KalshiEX LLC v. Martin*, 2025 WL 2194908 (D. Md. Aug. 1, 2025). That decision shows that the issues are more nuanced than Crypto.com presents them, particularly with respect to the scope of the CEA's preemptive effect. Rather than rush to judgment, this Court should deny the motion and permit the factual development necessary to resolve these important legal issues.

1    **STATEMENT**

2    **A.    Legal Background**

3        **1.    Nevada Comprehensively Regulates Gaming**

4        Nevada has regulated gaming within the State for over 160 years. Starting in 1869, the State

5    progressively legalized gaming, first by allowing local governments to determine what gaming ac-

6    tivities to permit. Nev. Resorts Ass'n, *History of Gaming in Nevada*, perma.cc/ NY6G-PMGK (last

7    visited Sept. 5, 2025). Then, in 1949, the State enacted the Gaming Control Act to regulate gaming

8    state-wide. *Id.* The Act covers all forms of gaming in Nevada, including sports and other event

9    betting. *See* NRS § 463.160(1)(a), (4). Specifically, the Act regulates the operation of a "sports

10   pool" in the State, which is defined as "the business of accepting wagers on sporting events or other

11   events by any system or method of wagering." *Id.* § 463.0193.

12       Nevada gaming laws seek to ensure that gaming in the State is "conducted honestly and

13   competitively" and "is free from criminal and corruptive elements." NRS § 463.0129(1)(b). To that

14   end, the Act requires every gaming operator to obtain a license. *Id.* § 463.160(1). The State thor-

15   oughly investigates each applicant's background before issuing a license. *Id.* § 463.1405(1). For

16   corporate applicants, the State also individually investigates and licenses the directors and officers

17   and ensures that the corporation is fiscally sound. *Id.* §§ 463.490, 463.530. Publicly traded corpo-

18   rations that serve only as holding companies do not need to obtain licenses but must register with

19   the State, and the State may require their officers or directors to obtain licenses and satisfy suita-

20   bility requirements. *Id.* §§ 463.625, 463.633, 463.637. Licensees must pay licensing fees and keep

21   detailed records of their gaming operations for inspection by the State. *Id.* §§ 463.400, 463.670.

22       Nevada gaming laws also seek to protect the public welfare. No person under the age of 21

23   may engage in gaming, including sports betting. NRS § 463.350(1)(a). The State maintains a list

24   of persons who may not participate in gaming activities. *Id.* § 463.151(2). And the State funds and

25   operates services to help those suffering from problem gaming. *See id.* § 458A.010 *et seq.*

26       **2.    The CEA Regulates Swaps and Futures Markets**

27       In 1936, Congress enacted the CEA to regulate commerce in certain agricultural commod-

28   ities (such as wheat, cotton, rice, and corn), including futures contracts based on those commodities.

Pub. L. No. 74-675, § 3, 40 Stat. 1491, 1491 (1936). A futures contract is a contract to buy or sell a specific amount of a commodity at a predetermined price on a specified date in the future. *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). Businesses use futures contracts to hedge against price volatility. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 390 (1982). For example, a coffee roaster that expects prices to rise can purchase a contract to buy beans at a fixed price for delivery in 6 months, to lock in that price.

In 1974, following major price-manipulation scandals, Congress amended the CEA to strengthen federal regulation of the futures markets. *See* Pub. L. No. 93-463, 88 Stat. 1389 (1974). Congress expanded the CEA to cover nearly all commodities, including non-agricultural commodities. *Id.* § 201(b). Congress also created the Commodity Futures Trading Commission (CFTC) to centralize federal oversight of futures markets; before then, that responsibility was shared by the Department of Agriculture and other agencies. *Id.* § 101(a). Congress accordingly conferred "exclusive jurisdiction" over futures contracts to the CFTC, *id.* § 201(b), "to consolidate federal regulation of commodity futures trading in the Commission," *Merrill Lynch*, 456 U.S. at 386–87.

In 2010, Congress enacted the Dodd-Frank Act in response to the 2008–2009 financial crisis. The Act amended the CEA to cover swaps. *See* Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658–754 (2010). Generally speaking, a swap is an agreement between two parties to exchange (or swap) financial obligations. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003). For example, if one company has a fixed-rate loan, and another company has a variable-rate loan, the companies can agree to swap interest payments. *Id.* Other common swaps involve swapping financial obligations on foreign currencies or commodity prices. *Id*. Like futures, companies use swaps to hedge risk. *Id.* at 1043. Before the Dodd-Frank Act, swaps largely were unregulated. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* 19 (2017) (*The Dodd-Frank Act*).

Congress added "swaps" to the CEA because certain swaps had exacerbated the financial crisis. *The Dodd-Frank Act* 3. Many financial institutions had entered into a type of swap called a "credit default swap" to hedge against the risk that sub-prime mortgages would default. *Id*. In a credit default swap, one party makes periodic payments to the other party, and in return, receives a

1    payout if an underlying financial instrument (like a mortgage) defaults. *See Black's Law Dictionary*

2    (12th ed. 2024). Some institutions had sold so many credit default swaps that, when housing prices

3    fell, causing mortgages to default, the institutions risked collapse. *The Dodd-Frank Act* 3.

4         In the Dodd-Frank Act, Congress expanded the CFTC's remit to include "swaps." 7 U.S.C.

5    § 2(a). Congress provided a detailed, six-part definition of "swap" that reflects the many forms of

6    swaps in the market. *Id.* § 1a(47)(A). Each part describes a financial instrument involving a finan-

7    cial, economic, or commercial event or measure that is understood in the industry to be a swap. As

8    relevant here, one part covers an agreement "that provides for any payment . . . that is dependent

9    on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency asso-

10   ciated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

11        Congress specified that all trading in swaps must occur on CFTC-registered designated con-

12   tract markets (DCM) unless both parties to a swap are regulated financial institutions, major cor-

13   porations, or similar entities. 7 U.S.C. § 2(e); *see id.* § 1a(18). To offer a swap for trading, the

14   operator of a DCM can self-certify that the swap complies with the CEA. *Id.* § 7a-2(c)(1). The swap

15   then immediately may be traded without any further action by the CFTC. *Id.* § 7a-2(c)(2). The

16   CFTC can choose to initiate a formal review after self-certification. In particular, under the "special

17   rule," the CFTC "may" disallow a swap that involves "activity that is unlawful under any Federal

18   or State law," "terrorism," "assassination," "war," or "gaming." *Id.* § 7a-2(c)(5); *see* 17 C.F.R.

19   § 40.11(a) (prohibiting trading of a swap that "involves, relates to, or references terrorism, assassi-

20   nation, war, gaming, or an activity that is unlawful under any State or Federal law").

21        The CEA contains a number of provisions that address how the CFTC's authority relates to

22   state law. In addition to the special rule, the CEA includes a savings clause immediately after the

23   exclusive jurisdiction provision. That savings clause provides: "Except as hereinabove provided,

24   nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred

25   on . . . regulatory authorities under the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A).

26        Apart from the exclusive jurisdiction provision, the CEA also contains express preemption

27   clauses. Nothing in those clauses says that the CFTC displaces the application of state gaming law

28   generally. There is one express preemption provision that addresses gaming, but its scope is quite

narrow; it specifies that the CEA "preempt[s] the application of any State . . . law that prohibits or regulates gaming" as to transactions that are exempted from the CEA's requirements. 7 U.S.C. § 16(e)(2). Those exemptions are not at issue; Crypto.com does not claim that Section 16(e)(2) applies in this case. Another express preemption provision specifies that a swap "may not be regulated as an insurance contract under the law of any State." *Id.* § 16(h).

The CFTC has initiated several rulemakings addressing its authority to regulate swaps. In 2012, the CFTC promulgated a rule (jointly with the SEC) in which it stated that "swaps" do not include "consumer and commercial arrangements that historically have not been considered swaps," such as insurance contracts or mortgages. Further Definition of ''Swap," 77 Fed. Reg. 48208, 48246 (Aug. 13, 2012). Thus, the CFTC has recognized that "swaps" should be construed with a view to avoid disturbing historic areas of state regulation.

Then, in 2024, the CFTC proposed a rule that would categorically bar DCMs from offering events contracts based on the outcome of sports events. *See* Event Contracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024). The CFTC specifically noted that it was *not* proposing to displace state gaming law, and it never suggested that it has the authority to do so. *Id.* at 48982–83. It instead stated that it "does not believe that it has the statutory mandate nor specialized experience appropriate to oversee" gaming. *Id*. Notably, both dissenting Commissioners agreed with the majority that the CEA does not displace state gaming law. *Id.* at 48997 (statement of Commissioner Mersinger); *id.* at 48999 (statement of Commissioner Pham). Although the proposed rule was withdrawn, it reflects the CFTC's understanding that the CEA does not override state gaming law.

### B.    Factual Background

Crypto.com alleges that it operates a CFTC-registered DCM. ECF No. 1 (Compl.) ¶ 64. It alleges that starting on January 30, 2025, it self-certified a new category of swaps called "event contracts" that "allow users to trade on the outcome of lawful live events in the performing arts, spectator sports, and related industries." *Id.* ¶¶ 9, 66.

Crypto.com's complaint does not provide the details of—or even provide a list of—the event contracts that it currently offers or that it plans to offer in the future. Its website provides some possible examples, such as event contracts that allow users (including those in Nevada) to

1    wager on the outcome of certain sporting events, such as the winner of the 2026 Super Bowl. For

2    example, as of filing, Nevada residents could purchase event contracts for $0.15 each that pay $1

3    if the Buffalo Bills win. Crypto.com, *The Big Game 2026*, perma.cc/ 445Y-GJG3(accessed Sept.

4    8, 2025). Those event contracts are "sports pools" under Nevada gaming law, because they allow

5    users to wager a sum of money ($0.15) on the outcome of a sporting event (the 2026 Super Bowl)

6    and to receive a payout ($1) if the wager is correct—essentially, 7:1 odds. *See* NRS § 463.0193.

7        **C.**    **Procedural History**

8        On May 20, 2025, the Nevada Gaming Control Board sent Crypto.com a cease-and-desist

9    letter because Crypto.com offered its sports event contracts to Nevada residents without complying

10    with Nevada law relating to operating sports pools. Compl. ¶ 69. In response, Crypto.com filed this

11    lawsuit against the Board, its members, and the Nevada Attorney General. *Id.* ¶¶ 18–22.

12    Crypto.com asserts that the CEA prohibits Defendants from enforcing Nevada gaming law against

13    it with respect to any instrument it may ever list on its DCM. *Id.* ¶¶ 100–26.

14        On June 5, 2025, Crypto.com moved for a preliminary injunction. *See* ECF No. 15. That

15    motion became fully briefed on July 29, 2025. *See* ECF Nos. 36, 41. Defendants agreed not to

16    commence any enforcement action against Crypto.com until after the Court's ruling on that motion.

17    ECF No. 15-5, at 1–2. In the meantime, Defendants filed their answer. *See* ECF No. 38 (Answer).

18    The Answer denies 119 of the 126 paragraphs in the complaint in whole or in part and raises fifteen

19    affirmative defenses. *See id.*

20        Without waiting for a ruling on its preliminary injunction motion, Crypto.com filed this

21    motion for judgment on the pleadings. ECF No. 42 (Mot.). It asks the Court to permanently enjoin

22    Defendants from enforcing Nevada gaming law as to any event contract Crypto.com has listed on

23    its DCM or may list on its DCM in the future, based only on its own allegations and without any

24    opportunity for discovery. *Id.* at 8–21. Crypto.com also filed a motion asking Court to strike all key

25    substantive denials and all affirmative defenses from the answer. *See* ECF No. 43.

26                  **LEGAL STANDARD**

27        Under Rule 12(c), a court may grant a motion for judgment on the pleadings when there is

28    no disputed issue of material fact and the moving party is entitled to judgment as a matter of law.

1    *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). When the moving party is the plaintiff, the

2    burden is exceedingly difficult to meet. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d

3    1542, 1550 (9th Cir. 1989). The Court assumes all allegations in the complaint that are denied in

4    the answer are false; assumes all allegations in the answer are true; and draws all inferences in favor

5    of the defendant. *Id.* A plaintiff thus cannot rely on its view of disputed facts to obtain judgment.

6                                                    **ARGUMENT**

7    **CRYPTO.COM IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS**

8              **A.      Material Fact Disputes Preclude Judgment on the Pleadings**

9              Judgment on the pleadings is not appropriate here. Judgment on the pleadings may be

10   granted to the plaintiff only when the defendant's answer admits all facts needed to resolve the

11   parties' dispute. *See, e.g.*, *Acceptance Cas. Ins. v. MRVK Hosp. Grp.*, 2022 WL 17455972, at *9

12   (E.D. Cal. Dec. 6, 2022) (R&R) (defendant admitted that it sought coverage for damages from a

13   shooting; only question was whether policy's exclusion for assault and battery applied). A plaintiff

14   "is not entitled to judgment on the pleadings when the answer raises issues of fact that, if proved,

15   would defeat recovery." *Gen. Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist*

16   *Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989). Similarly, "if the defendant raises an

17   affirmative defense in [the] answer," that "will usually bar judgment on the pleadings." *Id.*

18                           **1.      There Are Virtually No Undisputed Facts Here**

19             Defendants' Answer denies virtually all of Crypto.com's factual allegations. *See* Answer.

20   Indeed, Defendants deny 119 of 126 allegations in the complaint in whole or in part. The admitted

21   allegations establish only that Nevada asserts jurisdiction over Crypto.com, *id.* ¶ 2; that this Court

22   and the district court for the District of New Jersey entered preliminary injunctions in favor of

23   KalshiEX, LLC in cases raising similar issues, *id.* ¶¶ 5–6, 69, 76, 78, 83; that Crypto.com offers

24   "sports event contracts" in Nevada and that the payouts on those contracts depend on the outcome

25   of sporting events, *id.* ¶¶ 9, 87; that the Board members and the Attorney General are sued in their

26   official capacities, *id.* ¶¶ 18–20, 22; that the CEA was enacted in 1936 and amended in 1974, *id.*

27   ¶¶ 28–29; and that Defendants did not appeal the preliminary injunction decision in *Kalshi*, *id.* ¶ 82.

28             The following chart sets out the entirety of the admitted allegations:

| ¶ | Admitted Allegation |
|---|---|
| 2 | "Nevada has . . . jurisdiction over CDNA, a federally regulated designated contract market." |
| 5 | "On April 9, 2025, Chief Judge Gordon enjoined the NGCB from regulating a federally registered DCM—KalshiEX, LLC ('Kalshi')." |
| 6 | "On April 28, 2025, Judge Edward S. Kiel of the U.S. District Court for the District of New Jersey . . . enjoined state gaming authorities in New Jersey from taking enforcement action against Kalshi." |
| 9 | "Among CDNA's offerings are 'event contracts' . . . whose returns depend on the outcome of a specified event. At issue here are 'Sports Event Contracts,' with return profiles dependent on the outcome of a live sporting event." |
| 18 | "Defendant Kirk D. Hendrick is sued in his official capacity as the Chairman of the Nevada Gaming Control Board." |
| 19 | "Defendant George Assad is sued in his official capacity as a Member of the Nevada Gaming Control Board." |
| 20 | "Defendant Chandeni K. Sendall is sued in her official capacity as a Member of the Nevada Gaming Control Board." |
| 22 | "Defendant Aaron D. Ford is sued in his official capacity as Attorney General of Nevada." |
| 28 | "The CEA [was] enacted in 1936." |
| 29 | "Congress . . . amend[ed] . . . the CEA in 1974." |
| 69 | After "Chief Judge Gordon . . . enjoined" the NGCB "from enforcing state law against [KalshiEX, LLC] . . . [on] April 9, 2025, the NGCB sent a cease-and-desist order to CDNA on May 20, 2025, signed by Defendant Kirk D. Hendrick in his capacity as Chairman of the NGCB. The NGCB's letter asserted that CDNA was offering 'event-based wagering contracts in Nevada on sporting events through its exchange.' The NGCB claimed that offering 'event-based wagering contracts is unlawful in Nevada, unless and until approved as licensed gaming by the Nevada Gaming Commission.' The letter described the NGCB's 'strict regulation' requiring 'that a person must be licensed to operate a sports pool in Nevada,' defining 'sports pool' as a person in the 'business of accepting wagers on sporting events or other events by any system or method of wagering' under NRS § 463.0193." (citations omitted). |
| 76 | "Chief Judge Andrew P. Gordon of this Court and Judge Edward S. Kiel of the U.S. District Court for the District of New Jersey have" entered preliminary injunctions in favor of KalshiEX, LLC. |
| 78 | "On April 9, 2025, Chief Judge Gordon entered a preliminary injunction enjoining state authorities 'from enforcing preempted state laws against KalshiEX LLC' and 'from pursuing civil or criminal prosecutions against KalshiEX LLC for offering event-based contracts on a CFTC-designated market.'" |
| 82 | "The defendants in *Kalshi v. Hendrick* did not appeal Chief Judge Gordon's ruling issuing a preliminary injunction against them." |
| 83 | "On April 28, 2025, Judge Edward S. Kiel of the U.S. District Court for the District of New Jersey . . . enjoined the New Jersey Division of Gaming Enforcement from regulating Kalshi's DCM and event contracts." |
| 87 | "CDNA . . . permits ['Sports Event Contracts'] to be purchased and sold by residents of Nevada." |

Defendants either denied or stated that they lacked sufficient knowledge about the remaining allegations, or indicated that the allegations contained legal conclusions to which no response is required. *See, e.g.*, Answer ¶ 10. Further, Defendants raised fifteen affirmative defenses. *See id.* at 16–17. There thus are many disputed fact issues that preclude judgment on the pleadings. As Judge Weksler explained in denying Kalshi's motion to stay discovery in that case, "a party should

1    not be able to advance arguments in support of its dispositive motion and, at the same time, expect

2    discovery to be denied as to the facts underpinning those arguments." Order 2, *Kalshi*, *supra* (Sept.

3    3, 2025), ECF No. 118 (*Kalshi* Stay Order).

### 2.    Key Material Fact Disputes Preclude Judgment on the Pleadings

5    Based only on the face of the pleadings, there are several disputed fact issues that need to

6    be resolved in order to decide the preemption issues in this case. Those include:

7    ***Crypto.com's event contracts.*** As a threshold matter, Crypto.com must establish that its

8    event contracts are "swaps" in order to argue that the CEA preempts state law. *See* Mot. 9 (relying

9    on 7 U.S.C. § 2(a)(1)(A), which says that the CFTC has "exclusive jurisdiction" over "transactions

10    involving swaps"). Crypto.com alleges that its event contracts are "swaps," and that Congress in-

11    tended to preempt all state regulation of swaps. Compl. ¶ 9. But the CEA provides a specific defi-

12    nition of swaps; as relevant here, a "swap" includes an agreement in which payment "is dependent

13    on the occurrence . . . of an event or contingency associated with a potential financial, economic,

14    or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

15    The parties dispute whether Crypto.com's event contracts come within this definition. Spe-

16    cifically, the parties dispute whether the outcome of a sport event is an event "associated with a

17    potential financial, economic, or commercial consequence." *See* pp. 13–18, *infra*. Resolving that

18    issue requires both construing that key statutory language and knowing additional facts about the

19    event contracts themselves. As a legal matter, Crypto.com does not provide any argument in its

20    briefing to explain how its event contracts meet the definition of "swap." *See* p. 14, *infra*. And as a

21    factual matter, whether a particular event contract is a swap depends on the underlying event. In-

22    deed, Crypto.com's competitor Kalshi has admitted that some sports event contracts lack financial,

23    economic, or commercial consequence and thus would not be "swaps." *Kalshi* Stay Order 3. Yet

24    Crypto.com does not even identify its particular event contracts, much less specify the underlying

25    events or explain how they meet the statutory definition of "swap." *See* Compl. ¶ 65.

26    Crypto.com cannot prevail as a matter of law when the undisputed allegations in the com-

27    plaint do not even show that its event contracts are swaps and thus within the CFTC's jurisdiction.

28    If the event contracts are not swaps, the preemption argument necessarily fails. As Judge Weksler

1  explained in addressing this issue in *Kalshi*, "Defendants should not be forced to accept Plaintiff's

2  conclusion that contracts offered on its DCM" meet the statutory definition of swaps with no dis-

3  covery. *Kalshi* Stay Order 3.

4      ***Crypto.com's future event contracts.*** Crypto.com's claims are not limited to the event con-

5  tracts it offered at the time of its complaint; it instead seeks to enjoin Defendants from regulating

6  any event contracts Crypto.com offers in the future. *See* Mot. 2 (seeking a declaration that Nevada

7  gaming laws are preempted "insofar as they would apply to instruments listed on a [DCM]"). Alt-

8  hough its website currently lists only sports event contracts, it promises that "financial" and "cul-

9  ture" event contracts are "coming soon." Crypto.com, *Prediction Trading*, perma.cc/sd6l-8r63 (ac-

10  cessed Aug. 27, 2025) (capitalization altered). Crypto.com's request for a permanent injunction for

11  all future event contracts is an extraordinarily broad request for relief. That request fails at the outset

12  if the event contracts are not swaps. So there is a fact issue as to whether all of the event contracts

13  Crypto.com intends to offer in the future qualify as "swaps" within the meaning of the CEA.

14      ***Crypto.com's consumer protection efforts.*** Crypto.com alleges that a DCM must engage in

15  consumer-protection efforts under the CEA, apparently in support of its field preemption argument.

16  Compl. ¶¶ 46–49. But it does not allege that it actually engages in such efforts, nor provides any

17  facts in support of those supposed efforts. There thus is a fact issue as to exactly what Crypto.com's

18  consumer-protection efforts are, and whether they are as protective as Nevada's gaming regula-

19  tions. If they are not, that strongly undermines Crypto.com's argument that the CEA preempts state

20  gaming regulation as to Crypto.com's event contracts.

21      ***Compliance with both federal and state law.*** Crypto.com alleges that it is impossible for it

22  to offer its event contracts while also complying with Nevada law, to support its conflict preemption

23  argument. Compl. ¶ 92. But again, it provides no factual allegations in support of that assertion.

24  There thus is a fact issue as to what Crypto.com's compliance efforts have been, and whether and

25  to what extent Crypto.com would in fact be unable to comply with both federal and state require-

26  ments. Crypto.com cannot show conflict preemption without establishing that there would, in fact,

27  be a conflict between federal and state law. The fact that Crypto.com makes this argument only as

28  an alternative to its field preemption argument does not mean that fact development is unnecessary;

1    "as long as [Crypto.com] advances arguments that turn on factual development, even when raised

2    as a fallback, Defendants are entitled to discovery." *Kalshi* Stay Order 3.

3        ***Crypto.com's statements.*** Crypto.com avoids calling its event contracts "sports betting" in

4    its legal filings, *see* Compl., but industry observers regularly describe these types of contracts as

5    such. *E.g.*, Wes Burns, *Crypto.com Sports Betting Exchange Launches in All 50 States*, BettingUSA

6    (Dec. 27, 2024), perma.cc/cc7a-2u8w. There thus is a fact issue as to whether Crypto.com has said

7    as much itself, which would show that Crypto.com was aware that its event contracts were sports

8    wagers and nonetheless chose to offer them. That would support Defendants' affirmative defense

9    that injunctive relief is barred by the doctrine of unclean hands. *See Kalshi* Stay Order 3–4.

10        ***Scope of the relief.*** Details about Crypto.com's current and future event contracts are nec-

11   essary to determine not only whether they are swaps under the CEA, but also the scope of any

12   relief. The Court cannot decide what relief to grant if it cannot tell what contracts would be covered.

13       All of these factual issues come directly from the pleadings. Yet Crypto.com argues

14   (Mot. 3) that only three facts are needed to resolve this case, and it contends that all are undisputed:

15   (1) whether Crypto.com is "a CFTC-regulated DCM"; (2) whether "the Sports Event Contracts at

16   issue [are] listed on [Crypto.com's] DCM"; and (3) whether Defendants "purported to require

17   [Crypto.com] to cease offering Sports Event Contracts for trading in Nevada." As explained below,

18   Crypto.com is not correct on the law when it says this is all it has to prove. But even if it were

19   correct, these items are not undisputed and do not show an entitlement to relief.

20       As to the first factual issue—whether its DCM is registered with the CFTC—Defendants

21   denied this allegation because they lack sufficient information, and they should not be required to

22   take Crypto.com's word on this key point. *See* Answer ¶¶ 63–64. Crypto.com argues (Mot. 18) that

23   its registration as a DCM can be established by judicial notice, because it is listed on the CFTC's

24   website as a DCM. Nevada does not dispute that Crypto.com is on that list, but it disputes whether

25   inclusion on the list establishes that Crypto.com has, in fact, met the applicable requirements. *See*

26   *Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1071 (S.D. Cal. 2021) (distinguishing between taking

27   judicial notice of existence of information on government websites and taking notice of the truth

28   of that information). When a plaintiff files a motion for judgment on the pleadings, an allegation

1   that the defendant denies cannot be taken as true, *Hal Roach Studios*, 896 F.2d at 1550, and De-

2   fendants deny Crypto.com's allegation on this point.

3        Further, on the second factual issue—whether Crypto.com's sports event contracts are listed

4   on its DCM—Crypto.com skips a critical step. The CEA applies to its event contracts only if they

5   are "swaps" under the CEA. *See* 7 U.S.C. §§ 1a(47), 2(a). It is not enough that the event contracts

6   are listed on a DCM; they also must be "swaps" under the CEA. Defendants dispute that point, *see*

7   Answer ¶ 9—in part because they do not even know what Crypto.com's event contracts are now or

8   will be in the future, *see* pp. 9–10, *supra*. If the event contracts are not swaps, Crypto.com's preemp-

9   tion arguments all fail as a matter of law.

10        Also, Crypto.com's simplistic analysis ignores Defendants' affirmative defenses.

11   Crypto.com has moved to strike those defenses, but, as Defendants explain in their response to that

12   motion, it has not met the demanding bar for that extreme step. And, as explained above, there are

13   disputed fact issues pertaining to the affirmative defenses. *See Gen. Conf. Corp.*, 887 F.2d at 230.

14        In sum, Crypto.com acknowledges that resolution of its legal argument depends on facts,

15   and then it asks this Court to simply accept its version of the facts, without giving Defendants the

16   chance to develop facts to contest its bottom-line position. Even under Crypto.com's incredibly

17   simplified view of the case, key factual disputes preclude judgment on the pleadings.

18       **B.**     **The CEA Does Not Preempt Application of Nevada's Gaming Laws Here**

19        Because Crypto.com has not established an entitlement to judgment based solely on its un-

20   disputed allegations, the Court can and should deny the motion for judgment on the pleadings and

21   go no further. But if the Court reaches the merits of Crypto.com's preemption argument, it should

22   reject that argument. Crypto.com's event contracts are not swaps under the CEA, and even if they

23   were, the CEA does not preempt the application of Nevada's gaming laws here.

24        "In all pre-emption cases," courts start by presuming that Congress did not preempt state

25   law, "particularly" in cases involving "a field which the States have traditionally occupied." *Med-*

26   *tronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). Gaming is such

27   a field; "the regulation of gambling lies at the heart of the state's police power." *Artichoke Joe's*

28   *Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (internal quotation marks omitted);

1   *accord Flynt v. Bonta*, 131 F.4th 918, 930 (9th Cir. 2025). The Supreme Court has agreed that

2   regulating gaming "is concededly within the police powers of a state," *Ah Sin v. Wittman*, 198 U.S.

3   500, 505–06 (1905), and that federal law "defer[s] to, and even promote[s], differing gambling

4   policies in different States," *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527

5   U.S. 173, 187 (1999); *see Murphy v. NCAA*, 584 U.S. 453, 458–61 (2018) (describing the history

6   of State gaming regulation, including of sports betting). Thus, if the CEA "is susceptible of more

7   than one plausible reading," this Court should "accept the reading that disfavors pre-emption." *Al-*

8   *tria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008).

9       As the district court in Maryland explained, answering the question whether the CEA has

10  some preemptive effect does not resolve the issue here, because the Court also must determine the

11  scope of that preemption. *Martin*, 2025 WL 2194908, at *7. According to Crypto.com, Congress

12  intended to preclude all state regulation of sports betting on CFTC-registered markets. But given

13  the long history of state regulation of gaming and of federal deference to that regulation, Congress

14  would need to make its intent to preempt state regulation exceptionally clear. Nothing in the CEA

15  expressly states that preemptive intent; the CEA does not say that it precludes all regulation of state

16  gaming. *Id.* Congress did not impliedly preempt all of state gaming law, either. *Id.* at *7–11.

17      Crypto.com's reading of the CEA is breathtakingly broad. Under its view of the CEA, every

18  sports wager is a "swap" that can be traded only on a CFTC-registered market, subject solely to the

19  oversight of the CFTC. That means that every casino and racetrack across the nation must register

20  as a DCM, *and no State may regulate them*. That position, if accepted, would represent an extraor-

21  dinary intrusion on the States' police powers and work a complete overhaul of decades of federal

22  law on sports betting. The CEA's text, history, and purposes do not require that result.

23              **1.    The Event Contracts on Crypto.com's Website Are Not Swaps**

24      For the CEA to apply, Crypto.com's sports event contracts must be "swaps" within the

25  meaning of the statute. Crypto.com's complaint does not identify any particular event contracts. To

26  the extent Crypto.com refers to the contracts on its website, those do not qualify as swaps.

27      As an initial matter, although Crypto.com's complaint alleges that its sports event contracts

28  are swaps, its briefing does not actually make any argument on this point. Its briefing asserts that

1   every financial instrument on a DCM is preempted from state regulation and cites the relevant

2   definition of swap just once, in passing. *See* Mot. 5. The Court should not grant judgment as a

3   matter of law to Crypto.com when it made no attempt to brief this foundational element of its claim.

4          In any event, Crypto.com's sports event contracts are not swaps. A swap is an agreement

5   used by institutions to exchange financial obligations such as interest payments, often as a means

6   of hedging volatility and managing risk. *See* pp. 3–4, *supra*. Because there are many different types

7   of swaps traded in the financial-services industry, the CEA provides a detailed, six-part definition

8   of "swap." *See* 7 U.S.C. § 1a(47)(A). Crypto.com relies on the second part, which covers any con-

9   tract "that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or

10  the extent of the occurrence of an event or contingency associated with a potential financial, eco-

11  nomic, or commercial consequence." *Id.* § 1a(47)(A)(ii); *see* Compl. ¶ 37.

12         Crypto.com's motion does not explain how its sports event contracts come within this def-

13  inition. Based on its complaint and arguments it has made in other filings, it appears that

14  Crypto.com takes an extraordinarily broad view of this provision. *See* Compl. ¶¶ 38–42. It says that

15  its sports event contracts—such as the contract that pays $1 if the Bills win the Super Bowl—are

16  swaps because the outcomes of sports events are events "associated with a potential financial, eco-

17  nomic, or commercial consequence," in the sense that there can be downstream economic conse-

18  quences from the outcome (*e.g.*, if the Bills win, bars in Buffalo might make some more money).

19  *See id*. Under that view, essentially every wager is a swap.

20         Crypto.com's reading of Section 1a(47)(A)(ii) cannot be squared with the text, purposes, or

21  history of the statute. Instead, the better reading is that Section 1a(47)(A)(ii) covers only financial

22  instruments based on inherently financial, economic, or commercial events. Those are financial

23  instruments recognizable to the industry as swaps.

24         ***Statutory text.*** Under Section 1a(47)(A)(ii), only events that are "associated with" a poten-

25  tial financial, economic, or commercial consequence can be the subject of a swap. 7 U.S.C.

26  § 1a(47)(A)(ii). "Associate" means to "connect or join together" or to "connect in the mind," *Web-*

27  *ster's New Collegiate Dictionary* 68 (1995)—such as in the phrase "smoking is associated with

28  lung cancer." Thus, the events that are "associated with" potential financial, economic, or

commercial consequences are those that inherently are financial, economic, or commercial in nature. Events that merely have some potential downstream consequence are not sufficient. In particular, the *outcome* of a sports event (*e.g.*, who the winner of the event is, as opposed to whether the event takes place at all) generally is not inherently financial, economic, or commercial in nature—except, perhaps, for the participants themselves, who cannot trade on that event contract. *See Martin*, 2025 WL 2194908, at *7 n.4; 7 U.S.C. § 9(a).

The rest of Section 1a(47)(A) confirms that swaps under Section 1a(47)(A)(ii) must involve events that inherently are financial, economic, or commercial in nature. Section 1a(47)(A)(ii) is one part of a six-part definition of "swap." *See* 7 U.S.C. § 1a(47)(A). When a definition contains multiple parts, a court should look to the other parts to inform the meaning of the part at issue. *Yates v. United States*, 574 U.S. 528, 543–44 (2015) (explaining the *noscitur a sociis* canon of construction). If all of the other parts share a common thread, then the court should interpret the part at issue to also contain that thread. *See, e.g.*, *Beecham v. United States*, 511 U.S. 368, 371 (1994).

Here, all parts of Section 1a(47)(A) describe financial instruments based on inherently financial, economic, or commercial events or measures that commonly are traded as swaps. The first and third parts cover specific financial instruments. *Id.* § 1a(47)(A)(i) (any contract "that is a put, call, cap, floor, collar or similar option" in any "financial or economic interests or property of any kind"); *id.* § 1a(47)(A)(iii) (any contract "that provides . . . for the exchange . . . of 1 or more payments based on the value or level of" any "financial or economic interests or property of any kind," including 22 named types of swaps). The fourth part covers any contract "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). The fifth part covers certain "security-based swap agreement[s]" in which "a material term is based on the price, yield, value, or volatility of any security." *Id.* § 1a(47)(A)(v). And the sixth part covers any contract "that is any combination or permutation" of contracts in the five previous parts. *Id.* § 1a(47)(A)(vi).

The *noscitur a sociis* canon of construction thus confirms that an event-based swap must involve an event that is inherently financial, economic, or commercial, such that it would be recognizable to the industry as a swap. Further, the term itself being defined ("swap") also confirms that the definition should be limited to financial instruments known in the industry as swaps, and

1    should not "reach" far beyond the "ordinary meaning" of the term. *Bond v. United States*, 572 U.S.

2    844, 861–62 (2014).

3        Crypto.com's reading of "associated with a potential financial, economic, or commercial

4    consequence" also "effectively erases" this key limiting language. *S. Cal. Edison Co. v. Orange

5    Cnty. Transp. Auth.*, 96 F.4th 1099, 1110 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1310 (2025).

6    Under its reading, this language would not provide any limit at all: If an event qualifies because

7    there might be some downstream consequence from the outcome of the event, *see* Compl. ¶ 42,

8    then that would appear to cover any conceivable event. For example, who wins a middle school

9    softball game could have a financial consequence for the winning team's preferred fast-food res-

10   taurant. Crypto.com's reading thus violates the rule against superfluity, which is another reason to

11   reject that reading. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

12       Crypto.com's expansive reading of Section 1a(47)(A)(ii) also would swallow up the rest of

13   Section 1a(47)(A). *See In re Saldana*, 122 F.4th 333, 343 (9th Cir. 2024) (canon against superfluity

14   applies "with special force" when a proposed statutory construction "render[s] an entire subpara-

15   graph meaningless" (internal quotation marks omitted)), *cert. denied*, 2025 WL 1727392 (U.S. June

16   23, 2025). If any event can be the subject of a swap under Section 1a(47)(A)(ii), then every financial

17   instrument covered in all of the other subparagraphs of Section 1a(47)(A) would come within Sec-

18   tion 1a(47)(A)(ii). Take, for example, a credit default swap (listed in Section 1a(47)(A)(iii)), which

19   is a contract under which the buyer will receive payment if an event with financial, economic, or

20   commercial consequence occurs (a mortgage default). So that swap, along with everything else in

21   the other parts, would be covered by Section 1a(47)(A)(ii), making those other parts superfluous.

22       **Purpose.** Congress added "swaps" to the CEA in the Dodd-Frank Act in order to bring

23   swaps in from the "dark," given the role that unregulated swaps played in the financial crisis. *Inv.

24   Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2012) (internal quotation marks omitted),

25   *aff'd*, 720 F.3d 370 (D.C. Cir. 2013). It thus makes sense for Congress to have chosen a definition

26   that covers the financial instruments that are or may be traded as swaps by the financial industry.

27       It would not have made sense for Congress to have chosen Crypto.com's capacious view of

28   "swaps." Under that view, every sports wager would be a swap. There is no reason Congress would

1   have been concerned about sports wagers in the Dodd-Frank Act; sports wagers did not contribute

2   to the financial crisis, and in fact, federal law largely prohibited sports betting at the time. *Murphy*,

3   584 U.S. at 486. Indeed, Crypto.com's competitor Kalshi has admitted that sports event contracts

4   "are unlikely to serve any commercial or hedging interest." Appellee Br. at 45, *KalshiEX LLC v.*

5   *CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) (internal quotation marks omitted).

6          But Crypto.com's view goes much further than just sports wagers. Under its view, *every*

7   wager or form of gaming of every kind would be a swap, because they all are contracts for payment

8   on the occurrence of some event that could have some conceivable downstream financial, eco-

9   nomic, or commercial consequence. Under the CEA, the CFTC has authority over swaps traded on

10  "any" market. 7 U.S.C. § 2(a)(1). So under Crypto.com's view, by adding "swaps" to the CEA,

11  Congress gave the CFTC the *exclusive* authority to regulate every wager that occurs anywhere in

12  the United States—including in the casino halls of Las Vegas, on the racetrack at Belmont, and at

13  poker night in a summer camp dorm. "Congress does not hide elephants in mouseholes." *Cyan, Inc.*

14  *v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 431 (2018) (internal quotation marks omitted). If

15  that had been Congress's intent, Congress would have made its intent very clear.

16         Crypto.com has called this argument a "strawman." ECF No. 41, at 6. But it has not ex-

17  plained why this is not the logical consequence of its position. If its sports event contracts are swaps,

18  so too are (at a minimum) any other sports wagers. Crypto.com has pointed to the differences in

19  how its sports event contracts operate from traditional sportsbooks, *see id.*, but those allegations

20  are disputed, *see* Answer ¶ 41. In any event, none of the asserted differences are relevant to the

21  definition of "swap" set out in Section 1a(47)(C)(ii). Even if Crypto.com's event contracts operate

22  differently from traditional sports wagers, that does not mean the wagers are not swaps under

23  Crypto.com's expansive reading of Section 1a(47)(C)(ii).

24         Crypto.com also has argued that the special rule shows that Congress intended for wagers

25  to be swaps because it allows the CFTC to disallow event contracts that involve "gaming." ECF

26  No. 41, at 5 (citing 7 U.S.C. § 7a-2(c)). It reads too much into that provision. The special rule

27  reflects only that there may be overlap between some wagers and *bona fide* swaps, and it permits

28  (but does not require) the CFTC to disallow those swaps if they are contrary to the public interest.

1    7 U.S.C. § 7a-2(c). The rule does not show that Congress expected *all* gaming wagers to be swaps,

2    or that the rule would be the only tool for regulating wagers in all of federal and state law.

3          ***Rulemaking history.*** Shortly after the enactment of the Dodd-Frank Act, the CFTC issued

4    a rule to further define "swap." *See* 77 Fed. Reg. at 48208. In that rulemaking, the CFTC made

5    clear that Section 1a(47)(A)(ii) should be limited to financial instruments that commonly are traded

6    as swaps. It adopted, jointly with the SEC, a definition of "swap" that excludes "consumer and

7    commercial arrangements that historically have not been considered swaps." *Id.* at 48246.

8          The CFTC applied that definition to explain that insurance contracts and other common

9    contracts do not fall within the definition of "swap." The CFTC recognized that if Section

10   1a(47)(A)(ii) were to be read expansively, insurance contracts would come within that provision—

11   they are contracts that provide for payment when an event associated with a potential economic,

12   financial, or commercial consequence occurs (*e.g.*, a fire). 77 Fed. Reg. at 48212. But the CFTC

13   rejected that view. It explained that insurance products traditionally are regulated by States, not

14   "under the CEA," and there was no "suggest[ion] that Congress intended for traditional insurance

15   products to be regulated as swaps." *Id.* at 48212 & n.29. Along similar lines, the CFTC also ex-

16   cluded "mortgages," "automobile loans," and "employment contracts"—along with myriad other

17   common contracts that historically have been regulated by the States—even though they could

18   come within an expansive definition of "swap" under Section 1a(47)(A)(ii). *Id.* at 48246–48.

19         The CFTC's reasoning applies equally to sports wagers. As with insurance contracts, sports

20   wagers traditionally have been regulated by the States, *Artichoke Joe's*, 353 F.3d at 737, and there

21   is no indication that Congress intended to change that in the Dodd-Frank Act. Notably, in its 159-

22   page rulemaking in which it canvassed all manner of consumer and commercial contracts that might

23   come within the definition of "swap," the CFTC never once mentioned sports wagers. *See* 77 Fed.

24   Reg. 48208. The considered, contemporaneous view of the CFTC that Section 1a(47)(A)(ii) should

25   cover only financial instruments understood by the industry to be swaps is powerful evidence of

26   the provision's meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

27         Crypto.com's principal response to all of these arguments is that only the CFTC gets to

28   decide whether something is a swap. ECF No. 41, at 6. But nothing in the CEA gives the CFTC

that power—the CEA gives the CFTC "exclusive jurisdiction" over swaps, 7 U.S.C. § 2(a)(1), but that does not mean that the CFTC alone gets to decide whether a particular event contract is a swap. Determining what a statute means and whether a set of facts comes within its terms is a quintessentially judicial function. *See Loper Bright*, 603 U.S. at 385. The CEA expressly states that it does not "supersede or limit the jurisdiction conferred on courts of the United States." 7 U.S.C. § 2(a)(1)(A). It is this Court's role to decide (after appropriate factual development) whether Crypto.com's sport event contracts qualify as swaps. Based on everything known so far, those event contracts are not swaps and so the preemption argument fails.

### 2.    The CEA Does Not Expressly Preempt Nevada's Gaming Laws

Crypto.com briefly argues (Mot. 9–10) that the CEA expressly exempts Nevada gaming laws. It relies on the CFTC's exclusive jurisdiction provision, which provides that the CFTC "shall have exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a [DCM] . . . or any other . . . market." 7 U.S.C. § 2(a)(1)(A).

But "exclusive jurisdiction" is not language of express preemption. An express preemption provision is one that contains "explicit preemptive language" that states an intent to supersede other law and specifies which law is superseded. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983). It must state, in so many words, that state law is preempted or that a State may not regulate on the subject. *E.g.*, *Kansas v. Garcia*, 589 U.S. 191, 203 (2020) (construing 8 U.S.C. § 1324a(h)(2), which provides that "[t]he provisions of this section preempt any State or local law"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1215 (9th Cir. 2020) (construing 42 U.S.C. § 7543(a), which provides that "[n]o State . . . shall adopt or attempt to enforce any standard" other than the federal standard).

The exclusive jurisdiction provision does not say anything about preemption or state law. *See Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (the CEA "does not expressly preempt state law"). The point of the provision is to specify which federal agency oversees futures markets. *Merrill Lynch*, 456 U.S. at 387. Before 1974, that responsibility was allocated between "the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General." *Id.*

at 363. Congress enacted "the exclusive jurisdiction provision . . . only to consolidate federal regulation of commodity futures trading in the Commission," *id.* at 386–87—not to preempt state law.

Notably, the CEA contains express preemption provisions that use the necessary language of preemption. Those provisions say nothing about preempting all of state gaming law. One provision states that the CEA "shall supersede and preempt the application of any State or local law the prohibits or regulates gaming" in limited circumstances not applicable here. 7 U.S.C. § 16(e)(2). Crypto.com does not rely on that provision. Another provision states that a swap "may not be regulated as an insurance contract under the law of any State." *Id.* § 16(h)(2). This shows that Congress knows how to preempt state law when it wants to do so.

Crypto.com suggests (Mot. 10) that this Court already concluded that Section 2(a)(1)(A) is expressly preemptive. But the Court rested principally on field preemption, not express preemption. *Kalshi*, 2025 WL 1073495, at *6. Further, the Court did not explain how the exclusive jurisdiction provision can be expressly preemptive when it does not expressly mention state law. Defendants respectfully suggest that the Court's preliminary view on this issue was not complete and that a more fulsome analysis shows that there is no express preemption here.

### 3. The CEA Does Not Field Preempt Nevada's Gaming Laws

Crypto.com principally argues (Mot. 10–14) that the CEA field preempts Nevada's gaming laws. It relies almost entirely on Section 2(a)'s exclusive jurisdiction provision, reading that provision in isolation and taking the most expansive view of that provision possible. *See* Mot. 10–11. But courts do not read statutory provisions in isolation, *Sackett v. EPA*, 598 U.S. 651, 674 (2023), and they do not read preemptive provisions expansively, *Altria*, 555 U.S. at 77, especially in an area of traditional state regulation like gaming, *Medtronic*, 518 U.S. at 485. When read in context, it is clear that the exclusive jurisdiction provision has a more modest scope.

Field preemption occurs when "federal law so thoroughly occupies a legislative field" that there is "no room for the States to supplement it." *Nat'l Fed. of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733 (9th Cir. 2016) (internal quotation marks omitted). As this Court recognized in *Kalshi*, it is clear that Congress intended for the CEA to have *some* field preemptive effect. 2025 WL 1073495, at *6. But, as the district court in Maryland explained, the analysis does not end there,

1   *see Martin*, 2025 WL 2194908, at *7: The question then is what the "pertinent field" is, *Nat'l Fed.*

2   *of the Blind*, 813 F.3d at 737, and specifically whether it includes gaming regulation.

3         Crypto.com's position is breathtakingly broad. It says (Mot. 10) that the preempted field is

4   not just the core regulation of swap markets, but also *any* state regulation of *any* kind that affects

5   swaps in *any* way. In other words, if a sports wager is a swap, the CFTC is the only entity that may

6   regulate the swap, the market, or the sponsor. The implications of Crypto.com's position are stag-

7   gering: The CFTC would be the Nation's sole gaming regulator, and the many millions of Ameri-

8   cans that engage in lawful gaming under state law are felons under federal law. That is because

9   every wager would qualify as swap, and the CEA provides that all trading in swaps must take place

10  on a CFTC-registered market (unless both parties are financial institutions, major corporations, or

11  the like). 7 U.S.C. § 2(e). A willful violation of that provision is a felony punishable by a fine of

12  up to $1,000,000 or 10 years' imprisonment. *Id.* § 13(a)(5). Crypto.com's interpretation is "absurd,"

13  and thus should be "avoided" when an "alternative interpretation[] consistent with the legislative

14  purpose [is] available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

15        There is a much more reasonable way to read the CEA. As the district court in Maryland

16  explained, the better reading of the CEA is that "Congress did not clearly and manifestly intend to

17  preempt state laws with respect to sports wagering." *Martin*, 2025 WL 2194908, at *8. Instead, the

18  preempted field is the core regulation of swap markets, and not gaming regulation. That is, a State

19  cannot create a "parallel regulatory regime" for swap markets, *id.* at *7, but when a swap also is a

20  sports wager, the State can regulate it and its sponsor. At a minimum, this reading is entirely plau-

21  sible, and in preemption cases, courts should adopt the plausible reading that "disfavors pre-emp-

22  tion." *Altria*, 555 U.S. at 77 (internal quotation marks omitted).

23        ***Statutory text.*** Four aspects of the statutory text establish that the preempted field does not

24  include state gaming law. First, the exclusive jurisdiction provision does not refer to gaming; it

25  refers only to the futures markets and swap markets ("transactions involving swaps or contracts of

26  sale of a commodity for future delivery . . . traded or executed on . . . any . . . market"). 7 U.S.C.

27  § 2(a)(1)(A). So there is no indication of an intent to occupy any field other than futures and swap

28  market regulation. For this reason, the D.C. Circuit concluded that this provision does not prevent

1  the FTC from applying its advertising standards to a futures contract. *FTC v. Ken Roberts Co.*, 276

2  F.3d 583, 589 (D.C. Cir. 2001). The same logic applies here; the CEA does not displace state gam-

3  ing regulation that happens to apply to a swap. *Martin*, 2025 WL 2194908, at *9–10.

4        Second, the CEA contains two express preemption provisions that would be superfluous

5  under Crypto.com's position. *See Saldana*, 122 F.4th at 343 (canon against superfluity). The first

6  provision expressly preempts "State . . . law that prohibits or regulates gaming" as to a narrow

7  category of transactions. 7 U.S.C. § 16(e)(2)(B). Specifically, this provision applies to transactions

8  that are either statutorily excluded from regulation under the CEA or that the CFTC has exempted

9  from the CEA's requirements, *see id.*—neither of which is alleged here. The provision ensures that

10  if a transaction is not subject to the CEA's requirements, it also is not subject to state gaming law.

11  This shows that Congress was aware that the CEA could overlap with state gaming law, and that

12  Congress carefully chose the extent to which it wanted to preempt state gaming law. *See Freight-*

13  *liner Corp. v. Myrick*, 514 U.S. 280, 289 (1995) (express preemption provision supports an "infer-

14  ence" that Congress did not impliedly preempt state laws outside of that provision). This narrow

15  provision is "strong evidence that Congress did not intend to regulate so comprehensively as to

16  exclude all state law." *Martin*, 2025 WL 2194908, at *9.

17        Crypto.com has argued that Section 16(e)(2) is not superfluous under its reading of the

18  CEA. It reasons that the exclusive jurisdiction provision preempts state law only for swaps that are

19  covered by the CEA's requirements, so Section 16(e)(2) is needed to ensure that swaps that are

20  exempt from the CEA's requirements also are shielded from state regulation. ECF No. 41, at 8.

21  That is incorrect. Section 2(a)(1)(A) says that the CFTC has "exclusive jurisdiction" over all swaps

22  and futures, whether traded on a CFTC-designated market or on "any other . . . market." 7 U.S.C.

23  § 2(a)(1)(A). So even if a transaction is exempted from the requirements of the CEA, it remains

24  subject to the CFTC's exclusive jurisdiction—which, under Crypto.com's view, means that state

25  gaming law is preempted. Thus, Section 16(e)(2) does no work under Crypto.com's view.

26        The second express preemption provision, Section 16(h)(2), also would be superfluous un-

27  der Crypto.com's view. That provision states that a swap "may not be regulated as an insurance

28  contract under the law of any State," thus preempting state insurance law that might apply to swap.

7 U.S.C. § 16(h)(2). This provision shows that Congress was aware that some contracts regulated under state law could qualify as swaps, and that Congress chose exactly how far the CEA would preempt that state law. *Martin*, 2025 WL 2194908, at *9. Again, under Crypto.com's view of the CEA, this express preemption provision would be unnecessary; under that view, state insurance law already would be preempted by virtue of the exclusive jurisdiction provision.

Third, the CEA contains savings clauses that expressly preserve state authority. Section 2(a) states that the exclusive jurisdiction provision does not "supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A)(I). This provision confirms that the preemptive effect of the exclusive jurisdiction provision is narrow, because Congress expressly manifested its intent *not* to preempt state law outside of that scope. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (a savings clause generally "negates the inference that Congress 'left no room' for state causes of action"). Under Crypto.com's expansive view of the CEA's exclusive authority, there would be little left of this savings clause, because if a transaction is a swap then no other entity may act at all.

Fourth, in the special rule, Section 7a-2(c), Congress authorized the CFTC to disallow event contracts that "involve . . . activity that is unlawful under . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). This provision allows the CFTC to preclude swaps that are not in the public interest because of their subject matter. It "clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful," and not an intent to override state law. *Martin*, 2025 WL 2194908, at *8. Crypto.com notes (Mot. 13) that the CEA gives the CFTC, not the States, the authority to disallow event contracts. But that cuts against field preemption, not in favor of it— it would be odd for Congress to expressly preserve state law, yet give the State that enacted that law no say in determining the scope of that law (because in Crypto's view, only the CFTC can make that determination). The better view is that Congress leaves "room for supplementary state legislation" where it expressly relies on and incorporates state law. *Garcia*, 589 U.S. at 208 (internal quotation marks omitted). In any event, even if the Court believes this provision could cut either way, "ambiguity means that on balance it cuts against a finding of field preemption." *Martin*, 2025 WL 2194908, at *9. So this provision also shows that the CEA does not preempt state gaming law.

1    ***Purpose.*** Congress's purpose in enacting the CEA was to consolidate federal regulation of

2    futures and swap markets into the CFTC. *Merrill Lynch*, 456 U.S. at 387. That is why Congress

3    used the term "exclusive jurisdiction"—to signify that the CFTC is the federal agency with regula-

4    tory authority, to the exclusion of other federal agencies. *Id*. But there is no indication that Congress

5    had a broader purpose of preempting state gaming law in its entirety whenever a swap also is a

6    sports wager, and designating the CFTC as the sole regulator of sports gaming. On the contrary, it

7    is clear that Congress did not have that purpose.

8        To start, federalizing sports betting would have massively upset the federal-state balance.

9    Gaming in general (and sports betting in particular) is a longstanding area of state regulation, and

10   federal law historically has respected state authority in this field. *Murphy*, 584 U.S. at 458–61.

11   Under Crypto.com's view of "swaps," *any* sports wager is a swap, *see* p. 17, *supra*, and under

12   Crypto.com's view of the exclusive jurisdiction provision, only the CFTC can regulate swaps to

13   any degree, *see* p. 21, *supra*. So, under Crypto.com's view, Congress federalized all of sports bet-

14   ting and gave the CFTC the sole authority to regulate it. Congress does not make major changes to

15   the federal-state balance without clearly saying so. *See Cyan*, 583 U.S. at 431; *Gregory v. Ashcroft*,

16   501 U.S. 452, 460–61 (1991). Nothing in the "text and legislative history" of the CEA shows Con-

17   gress's intent to take that extraordinary step. *Martin*, 2025 WL 2194908, at *9. If Congress had

18   intended an unprecedented intrusion into state authority, it would have made that intent clear.

19       Similarly, courts "expect Congress to speak clearly if it wishes to assign to an agency deci-

20   sions of vast economic and political significance." *W. Va. v. EPA*, 597 U.S. 697, 716 (2022) (inter-

21   nal quotation marks omitted). Under Crypto.com's view, by adding "swaps" to the CEA, Congress

22   gave the CFTC the sole authority to decide whether and to what extent to allow sports betting

23   nationwide. That is a matter of "vast economic and political significance": sports betting is a $14-

24   billion-a-year industry that is both "controversial" and "immensely popular." *Murphy*, 584 U.S. at

25   460, 484; *see* Am. Gaming Ass'n, *State of the States 2025*, at 10, (May 13, 2025), perma.cc/j27s-

26   wlsb. There thus would need to be "clear congressional authorization" for the CFTC to regulate in

27   that manner, *W. Va.*, 597 U.S. at 732 (internal quotation marks omitted), which is lacking here.

28

1    The CEA does not contain a comprehensive regulatory scheme for gaming. Crypto.com
2    observes that the CEA contains a comprehensive scheme for regulating swap markets. *See* Mot.
3    12–13 (citing the CEA's "recordkeeping," "reporting," and "liquidity" requirements). But the ques-
4    tion here is not whether the CEA preempts state swap-market regulation; it is whether the CEA
5    preempts state *gaming regulation*. The CEA lacks the most basic features of a gaming regulatory
6    scheme. Unlike Nevada's gaming laws, the CEA does not contain any provisions relating to age
7    restrictions, or any provisions addressing problem gaming or organized crime. *See* 7 U.S.C.
8    §§ 6a(a), 13. It simply is not plausible to think that Congress intended for the CFTC to act as a
9    gaming regulator—much less as the Nation's *exclusive* gaming regulator—without giving the
10   CFTC the basic tools of gaming regulation.

11   The CFTC itself has said that the CEA does not preempt state gaming law. In the proposed
12   rulemaking that would have prohibited DCMs from offering sports-based event contracts, the
13   CFTC expressly stated that it "does not believe that it has the statutory mandate nor specialized
14   experience appropriate to oversee" gaming. 89 Fed. Reg. at 48982–83. It specifically observed that
15   the CEA "do[es] not include provisions aimed at protecting against gambling-specific risks and
16   concerns, including customer protection concerns inherent to gambling." *Id*. Although the rule did
17   not go into effect, there was no dispute among the Commissioners on this point—the dissenting
18   Commissioners agreed with the majority that the CFTC lacked the authority to regulate gaming.
19   *See id.* at 49997 (statement of Commissioner Mersinger); *id.* at 49999 (statement of Commissioner
20   Pham). The Court should not ascribe a power to the CFTC that the agency itself has rejected.

21   ***Legislative history.*** If Congress had understood the CEA to be fundamentally disrupting
22   sports betting, that understanding would have been apparent in the legislative record. Yet there is
23   only one clear mention of sports betting in the legislative history, and it supports Defendants' view
24   that sports event contracts are not swaps. *See Martin*, 2025 WL 2194908, at *11. Specifically, Sen-
25   ator Lincoln stated "an 'event contract' around sporting events" would "not serve any real com-
26   mercial purpose" and instead "would be used solely for gambling," 156 Cong. Rec. S5907 (July
27   15, 2010)—which suggests they are not swaps. While the views of a single legislator mean little to
28   begin with, here, those views do not support Crypto.com's view.

Crypto.com cites (Mot. 11–12) snippets of legislative and drafting history from 1974, before Congress added swaps to the CEA, which suggest that Congress intended to preempt the field of "futures regulation." S. Rep. No. 93-1194, at 35 (1974). But futures are not swaps, and anyway everyone agrees that the CEA preempts the core regulation of futures markets. "[E]vidence of *that* legislative intent does not help determine whether Congress intended the scope of that preemptive [effect] to encompass state gambling laws." *Martin*, 2025 WL 2194908, at *11 n.5.

**Other statutes.** Crypto.com's view of the CEA would create conflicts with other federal statutes on both gaming and financial regulation.

To start, at the time Congress enacted the Dodd-Frank Act, sports betting largely was illegal at the federal level. Under the Professional and Amateur Sports Protection Act, sports betting was illegal except in one State—Nevada. *See Murphy*, 584 U.S. at 461. It is implausible to think that Congress *sub silentio* decided that it would allow sports betting nationwide and then gave the CFTC the exclusive authority to determine the scope of that gaming. The Dodd-Frank Act was intended to strengthen financial regulation in the wake of the financial crisis, not to regulate gaming.

Further, Crypto.com's view of the CEA would mean that Congress impliedly repealed several other federal laws when it added "swaps" to the CEA. There is a strong presumption against repeal by implication; instead, courts read statutes in harmony to the extent possible. *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). Crypto.com's view would impliedly repeal at least the Indian Gaming Regulatory Act (IGRA) and the Wire Act. *Martin*, 2025 WL 2194908, at *10. Under the IGRA, Indian tribes have the "exclusive right" to determine whether and to what extent to allow gaming that is permitted under federal and state law on tribal lands. 25 U.S.C. § 2701(5). Crypto.com's view "would necessarily entail at least a partial implied repeal of the IGRA," because under that view, Congress gave the CFTC the exclusive authority to determine how much sports betting to allow nationwide (including on tribal land). *Martin*, 2025 WL 2194908, at *10. Similarly, under Crypto.com's view, the Dodd-Frank Act impliedly repealed the Wire Act's prohibition on using wire communication facilities for placing bets or wagers on "any sporting event." 18 U.S.C. § 1804(a). Under that view, the CFTC would have the authority to allow exactly those communications nationwide. *Martin*, 2025 WL 2194908, at *10. This Court should not assume that Congress

1   intended to drastically curtail the IGRA and Wire Act without providing some clear and unambig-

2   uous indication of that intent.

3         Crypto.com's absolutist view of the CFTC's authority over swaps also cannot be squared

4   with federal banking laws. Crypto.com argues that CEA preempts other regulation of the sponsors

5   of swaps, which is why it does not need to comply with Nevada's licensing requirements. But

6   federal law expressly recognizes that States can regulate the sponsors of swaps: It provides that

7   state banks "may engage in a derivative transaction," including a "swap," only if the law "of the

8   State in which the . . . bank is chartered" accounts for exposure to derivative transactions in setting

9   lending limits. 12 U.S.C. § 1828(y); *see id.* § 84(b)(3). Federal law similarly authorizes federal

10  banking regulators to oversee the swap activities of national banks. *See* Activities and Operations

11  of National Banks and Federal Savings Associations, 85 Fed. Reg. 40794, 40806, n.76 (July 7,

12  2020) (noting that the Office of the Comptroller of the Currency (OCC) has regulated the futures

13  and swaps activity of national banks since 1986); 12 C.F.R. § 163.172 (OCC regulation imposing

14  risk management, oversight, and recordkeeping duties on the futures and swaps activity of federal

15  savings associations); *id.* § 223.33 (Federal Reserve regulation imposing requirements on the fu-

16  tures and derivatives activities of banks). It just is not the case that if something is a swap, only the

17  CFTC may regulate, and everyone else must back off.

18                                          * * * * *

19        The standard for field preemption is very high to begin with. It is even higher in cases

20  involving traditional areas of state regulation—particularly where "Congress has indicated its

21  awareness of the operation of state law in a field of federal interest, and has nonetheless decided to

22  stand by both concepts." *Wyeth v. Levine*, 555 U.S. 555, 575 (2009) (internal quotation marks omit-

23  ted). And Crypto.com has made it higher still, by propounding a theory of field preemption so

24  expansive it would overturn the federal-state balance on sports betting as well as existing federal

25  law on both sports betting and banking regulation. The exclusive jurisdiction provision of the CEA

26  is too thin of a reed on which to hang that expansive view of preemption.

27

28

**4.    The CEA Does Not Conflict Preempt Nevada's Gaming Laws**

Crypto.com also argues (Mot. 14–17) that Nevada's gaming laws are conflict preempted. Neither form of conflict preemption—impossibility or obstacle preemption—is present here.

***Impossibility preemption.*** Impossibility preemption applies when it would be "impossible to comply with both federal and state law," *Am. Apparel & Footwear Ass'n v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024)—for example, if a state law required a warning label to be blue and the federal law required the label to be red. Dual compliance must actually be impossible; speculation that compliance may be difficult or impossible is "insufficient." *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 629 (9th Cir. 2024).

Crypto.com does not identify a single provision of Nevada gaming law that would require it to violate federal law. It says only that it "may" be impossible for it to comply with both Nevada law and two of the CFTC's "core principles," which are principles that DCMs must follow. Mot. 16–17. That is not enough to meet the standard, and anyway, Crypto.com is wrong. Crypto.com presumes that, if Nevada gaming law were to apply, it could not offer its event contracts in Nevada and so must "cut[] off Nevada residents." *Id.* But Nevada *permits* sports betting, if done in accordance with its gaming regulations. *See* p. 2, *supra*. The question is not whether Crypto.com would violate the core principles by withdrawing from the Nevada market; it is whether Crypto.com would violate the core principles by serving the Nevada market in compliance with Nevada law. *Martin*, 2025 WL 2194908, at *13. Crypto.com does not identify a single Nevada law that would require it to violate a core principle.

Even if Crypto.com were to withdraw from the Nevada market, Crypto.com would not be violating the core principles. Crypto.com cites (Mot. 16) Core Principle 2, which requires a DCM to provide "impartial access" to its market. 17 C.F.R. §§ 38.150, 38.151(b). This principle prohibits DCMs from erecting "discriminatory access requirements," such as "exclusive membership standards that focus on high net worth." Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 & n.51 (Dec. 22, 2010). It does not require a DCM to offer an event contract in a State where the DCM cannot operate. Crypto.com also cites (Mot. 16–17) Core Principle 4, which requires DCMs to "establish and maintain risk control mechanisms to

1    prevent and reduce the potential risk of . . . market disruptions." 17 C.F.R. §§ 38.250, 38.255.

2    Crypto.com argues (Mot. 16–17) that it would be disruptive if it were required to terminate its

3    existing contracts with Nevada residents. But a regulated entity cannot manufacture impossibility

4    preemption by starting to act in violation of state law and then claiming that it would be disruptive

5    for it to stop. Anyway, Crypto.com has provided no evidence that terminating Nevada residents'

6    positions would cause any market disruption.

7        ***Obstacle preemption***. Obstacle preemption applies when the application of state law would

8    "stand[] as an obstacle" to Congress's purposes in enacting a federal law. *Am. Apparel*, 107 F.4th

9    at 943. At the outset, Crypto.com's argument is premised on the idea that Congress wanted to pro-

10   mote sports betting. But Congress did not have that purpose, *see* pp. 20–27, *supra*; to the contrary,

11   it authorized the CFTC to disallow swaps that involve "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i)(V).

12   Anyway, even if Congress sought to promote sports betting, Nevada allows sports betting. So Ne-

13   vada gaming laws do not pose an obstacle to the CEA's objectives.

14        Crypto.com makes (Mot. 14–16) two obstacle preemption arguments, neither of which has

15   merit. First, it argues (Mot. 14–15) that Nevada's regulation of its sports event contracts would

16   frustrate the CEA's supposed goal of "uniform" swap-market regulation. But uniformity is a field

17   preemption argument, not a conflict preemption argument. *Martin*, 2025 WL 2194908, at *12; *see,*

18   *e.g.*, *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007). Conflict preemption presumes

19   that States can regulate in the field, and that they may do so differently, *see Wyeth*, 555 U.S. at 575;

20   the question is whether a particular state regulation conflicts with federal law. Here, Congress did

21   not intend to occupy the field of gaming regulation, *see* pp. 20–27, *supra*, so individual States may

22   regulate, and they may do so non-uniformly.

23        Second, Crypto.com argues (Mot. 15–16) that applying Nevada law to its DCM would frus-

24   trate Congress's supposed goal of having only *one* regulator (the CFTC) for the DCMs. Again, this

25   is a field preemption argument, not a conflict preemption argument; it presupposes that Congress

26   intended for Crypto.com to be regulated only by the CFTC. *Martin*, 2025 WL 2194908, at *12.

27   There is no indication of that intent. To the contrary, the CEA expressly preserves state law, and it

28

1   would be very odd indeed for Congress to have made the CFTC the sole arbiter of the extent to

2   which state law should apply. There thus is no conflict preemption here.

3       **C.      Crypto.com Is Not Entitled to the Permanent Injunction It Seeks**

4           Even if this Court concluded that Crypto.com succeeded on the merits, Crypto.com would

5   not be entitled to the permanent injunction it seeks. A permanent injunction "does not follow from

6   success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32

7   (2008). Courts may deny injunctive relief where the equities do not warrant it. *See, e.g.*, *Rosebrock*

8   *v. Beiter*, 788 F. Supp. 2d 1127, 1149 (C.D. Cal. 2011), *aff'd sub nom. Rosebrock v. Mathis*, 745

9   F.3d 963 (9th Cir. 2014). There are two reasons for denying the injunction sought here.

10          First, Crypto.com has not shown irreparable harm. Its sole claim of injury (Mot. 19–21) is

11  the prospect of facing enforcement under state law. But "having to submit oneself to an enforcement

12  proceeding typically does not constitute irreparable harm," *John Doe Co. v. CFPB*, 235 F. Supp.

13  3d 194, 203 (D.D.C. 2017), because the regulated entity could make the same arguments in those

14  proceedings, *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). Further, any harm here is self-inflicted:

15  Crypto.com chose to self-certify sports event contracts, even though the CFTC's regulations pro-

16  hibit any contract that "involves, relates to, or references . . . gaming." 17 C.F.R. § 40.11(a)(1). A

17  party that "has dirtied [its] hands in acquiring the right presently asserted" cannot obtain injunctive

18  relief. *EEOC v. Wedco, Inc.*, 65 F. Supp. 3d 993, 1010 (D. Nev. 2014).

19          Second, the injunction Crypto.com seeks is overbroad. It seeks an injunction categorically

20  prohibiting Nevada from regulating any aspect of its DCM. Mot. 2. That injunction would cover

21  any "instrument[] listed" on Crypto.com's DCM, including in the future, even though the

22  Crypto.com has never explained what those instruments may be and hey may be different in kind

23  from the sports events contracts Crypto.com currently offers. *Id.* The Court should not prejudge

24  whether the analysis is the same for those unknown future contracts as for Crypto.com's current

25  contracts. So at a minimum, any injunction should be limited to Crypto.com's current contracts.

26                                          **CONCLUSION**

27          The Court should deny Crypto.com's motion for judgment on the pleadings.

28

DATED this 8th day of September, 2025.

AARON D. FORD
Attorney General

By: */s/ Jessica E. Whelan*

Jessica E. Whelan (Bar No. 14781)
   Chief Deputy Solicitor General - Litigation
Sabrena K. Clinton (Bar No. 6499)
   Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov

Nicole A. Saharsky (*pro hac vice* pending)
Minh Nguyen-Dang (*pro hac vice* pending)
Mayer Brown LLP
1999 K Street, NW
Washington, D.C. 20006
(202) 263-3000 (phone)
nsaharsky@mayerbrown.com
mnguyen-dang@mayerbrown.com

Rory K. Schneider (*pro hac vice* pending)
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500 (phone)
rschneider@mayerbrown.com

*Attorneys for Kirk D. Hendrick, George Assad,*
*Chandeni K. Sendall, The State of Nevada on*
*Relation of the Nevada Gaming Control Board,*
*and Aaron D. Ford*