1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF NEVADA

3

4  NORTH AMERICAN DERIVATIVES        )
   EXCHANGE, INC., d/b/a             )   Case No. 2:25-cv-00978-APG-BNW
5  Crypto.com Derivatives North      )
   America,                          )   Las Vegas, Nevada
6                                    )   OCTOBER 2, 2025
            Plaintiff,               )   9:30 A.M.
7                                    )   Courtroom 6C
        vs.                          )
8                                    )   MOTION HEARING
   THE STATE OF NEVADA, et al.,      )
9                                    )
            Defendants.              )   **C E R T I F I E D   C O P Y**
10                                   )

11

12  _____

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE ANDREW P. GORDON
15            UNITED STATES CHIEF DISTRICT JUDGE

16

17

18

19

20  COURT REPORTER:    Judy K. Moore, CRR, RMR
                       United States District Court
21                     333 Las Vegas Boulevard South, Room 1334
                       Las Vegas, Nevada  89101
22                     Judy_Moore@nvd.uscourts.gov

23

24  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.
25

1                        <u>**APPEARANCES**</u>

2    For the Plaintiff:

3        **MR. NOWELL D. BAMBERGER, ESQ.**
         **MR. MATTHEW C. SOLOMON, ESQ.**
4        **MR. CALEB ROBERTSON, ESQ.**
         CLEARY GOTTLIEB STEEN & HAMILTON, L.L.P.
5        2112 Pennsylvania Avenue N.W., Suite 1000
         Washington, D.C. 20037

6
         and
7
         **MR. BRADLEY T. AUSTIN, ESQ.**
8        SNELL & WILMER, L.L.P.
         3883 Howard Hughes Parkway, Suite 1100
9        Las Vegas, Nevada 89169

10

11   For the State Defendants:

12       **MS. NICOLE A. SAHARSKY, ESQ.**
         **MR. MINH NGUYEN-DANG, ESQ.**
13       MAYBER BROWN, L.L.P.
         1999 K Street N.W.
14       Washington, D.C. 20006-1101

15       and

16       **MS. JESSICA WHELAN, ESQ.**
         NEVADA ATTORNEY GENERAL'S OFFICE
17       1 State of Nevada Way, Suite 100
         Las Vegas, Nevada 89119

18

19   For the Intervenor Defendant:

20       **MR. ADAM HOSMER-HENNER, ESQ.**
         MCDONALD CARANO, L.L.P.
21       100 West Liberty Street, 10th Floor
         Reno, Nevada 89501

22

23                              * * *

24

25

1          LAS VEGAS, NEVADA; OCTOBER 2, 2025

2                      --oOo--

3          (Proceedings commenced at 9:38 a.m.)

4               P R O C E E D I N G S

5          COURTROOM ADMINISTRATOR:  North American Derivatives

6   Exchange, Inc., versus The State of Nevada, et al.,

7   2:25-cv-978-APG-BNW.

8               Counsel, please make your appearances.

9          MR. BAMBERGER:  Good morning, Your Honor.  Nowell

10  Bamberger from Cleary Gottlieb on behalf of North American

11  Derivatives Exchange, Inc., which we refer to in our papers as

12  CDNA.

13          THE COURT:  Good morning.  And let me catch my notes

14  up.  Mr. Bamberger sitting in seat 1.  Okay.

15          MR. SOLOMON:  Good morning, Your Honor.  Matthew

16  Solomon also from Cleary Gottlieb Steen & Hamilton also

17  representing CDNA.

18          THE COURT:  Good morning to you.

19          MR. ROBERTSON:  Good morning, your Honor.  Caleb

20  Robertson also from Cleary Gottlieb for CDNA.

21          THE COURT:  Good morning.

22          MR. AUSTIN:  Good morning, your Honor.  Bradley

23  Austin from Snell & Wilmer, Bar Number 13064, on behalf of

24  plaintiffs.

25          THE COURT:  Good morning to you as well.

1              MS. SAHARSKY:  Hello.  I'm Nicole Saharsky from

2    Mayer Brown representing the State defendants.

3              THE COURT:  Good morning.

4              MR. NGUYEN-DANG:  Minh Nguyen-Dang also from Mayer

5    Brown also representing the State defendants.

6              THE COURT:  Good morning.

7              MS. WHELAN:  Good morning, Your Honor.  Jessica

8    Whelan, Chief Deputy Solicitor General for the State,

9    representing the State defendants.

10             THE COURT:  Good morning to you.

11             MR. HOSMER-HENNER:  Good morning.  Adam Hosmer

12   Henner, McDonald Carano, representing intervenor defendant

13   Nevada Resort Association.

14             THE COURT:  Good morning as well.  Anyone else?

15   Okay.

16             There are three motions on calendar, one motion for

17   preliminary injunction by the plaintiff, a motion to strike by

18   the plaintiff, and a motion for judgment on the pleadings by

19   the plaintiff.  I don't have any questions about the motion to

20   strike.  My questions, of which I have many today, focus on the

21   preliminary injunction and the motion for judgment.  And,

22   really, to preview this, it all goes to whether the plaintiff

23   has a likelihood of success on the merits.

24             Before we begin, let me tell folks that are on the

25   audio line that you are not allowed to record these proceedings

1  verbally, audioly, videoly, however you can record.  You're not

2  allowed to do it.  If you do, you're in big, big trouble.  And

3  I won't tell you what that would be.  Just don't do it, please.

4          So, with that, Mr. Bamberger, it looks like you're

5  ready to get up and argue.

6          MR. BAMBERGER:  I am, Your Honor.

7          THE COURT:  Please come to the podium.  It's better

8  for Judy's audio.  And I'll just warn you, fasten your seatbelt

9  because this ride is going to get rough.  I have a lot of

10  questions and I'm going to launch right in because I've got

11  questions to help me resolve this.

12          MR. BAMBERGER:  Well, I hope I have answers for you.

13          THE COURT:  I do, too.

14          So to fall within the CFTC's exclusive jurisdiction

15  provisions of the statute, you have to show that these event

16  contracts are swaps, correct?

17          MR. BAMBERGER:  I think to fall within the CFTC's --

18  within Section 2 of the Commodities Exchange Act it refers to

19  swaps or contracts on commodities traded on an exchange.  I

20  think that's correct.  To fall with the CFTC's exclusive

21  jurisdiction for deciding whether they can be listed on a DCM,

22  I don't think there's a preliminary question of whether they're

23  swaps or not.  I think that's a question that's left to the

24  CFTC to determine.  And I can walk through why I think

25  that's --

1          THE COURT:  No.  Here's where I agree with you:  I

2    don't think the CFTC has the sole authority to decide if it's a

3    swap or not.  Preview, I don't think it's a swap.  So let's

4    take the first part.  I think CFTC does not have that exclusive

5    jurisdiction to decide if it's a swap, and here's my analysis:

6          MR. BAMBERGER:  Okay.

7          THE COURT:  Correct me if I'm wrong.  Yes, the CFTC

8    has exclusive jurisdiction over agreements involving swaps, but

9    the statute doesn't say it has exclusive jurisdiction to

10   determine what is a swap.  Congress has defined what a swap is

11   by statute.  Clearly, since *Marbury vs. Madison* and up through

12   *Loper Bright*, the Courts have always said that it is

13   emphatically the province of the Courts to interpret the law,

14   say what the law is.  So -- and further on that point, 7 U.S.C.

15   Section 13a-2(i) says that the Attorney General for any State

16   can file a lawsuit to enforce a CFTC regulation or statutory

17   violation, so a Court has to be able to interpret that statute

18   and what it means.  So that's why I disagree with you that the

19   CFTC has sole authority to determine whether it is a swap or

20   not.  So tell me where I'm wrong.

21         MR. BAMBERGER:  So I actually don't think you're

22   wrong on any of those points, but I don't think it resolves the

23   question here.

24         THE COURT:  Okay.

25         MR. BAMBERGER:  So if you look at Section 13-a-2 as

1  you described, that section is very clear that it does give the

2  State the authority to enforce provisions of the CEA, but it

3  says, "against any person other than a contract market."  It's

4  very clear that the jurisdiction that the States have -- and

5  Congress was quite clear about this -- the States do not have

6  jurisdiction under that provision to bring an enforcement

7  action against a designated contract market like CDNA.

8          THE COURT:  So you're saying the only authority of

9  that is the CFTC?

10          MR. BAMBERGER:  Very explicitly, the only authority

11  is the CFTC.

12          But there's more, Your Honor, and that is, you know,

13  the question of whether something is a swap or not can come up

14  in a variety of different contexts.  And, fundamentally, I

15  agree with you that there is a question and the question of

16  interpretation of a statute, I think, under *Loper Bright* is

17  very clear, that's a question for a Court ultimately to

18  resolve.  But the question is how -- the question that we have

19  to resolve today is, how does that question get presented?

20  So --

21          THE COURT:  Well, let me stop you there, and let's

22  address it head-on.

23          MR. BAMBERGER:  Okay.

24          THE COURT:  I don't think what your client is doing

25  is a swap.  Here's why:

1              MR. BAMBERGER:  Okay.

2              THE COURT:  7 U.S.C. Section 1a(47)(A)(ii) defines

3    what a swap is.

4              MR. BAMBERGER:  Uh-huh.

5              THE COURT:  And it says the contract has to depend

6    on the "occurrence, non-occurrence, or the extent of an

7    occurrence of an event."  Your client's contracts explicitly

8    state that they depend on the outcome of an event, not the

9    occurrence of an event but the outcome.  That, to me, is

10   different and so, therefore, it's not a swap.  Tell me where

11   I'm wrong.

12             MR. BAMBERGER:  So, I mean, I can see where Your

13   Honor reaches that conclusion.  I would submit that an event

14   happens when a sporting event occurs, right?  So a football

15   game is played.  That is an event.  One team wins the game.

16   That is also an event within the --

17             THE COURT:  Why isn't that the outcome?

18             MR. BAMBERGER:  Well, the out -- I would

19   respectfully submit the outcome is an event, in the same way

20   that, you know, the extent of rainfall is an event, the extent

21   of -- sort of any other thing that the CFTC may regulate is an

22   event.  The amount of wheat that's harvested is an event.

23             And I think here, what my client did -- and I would

24   direct Your Honor, it's not that my client sort of woke up and

25   decided one day that this was an event.  They submitted a

1  detailed 20-page analysis to the CFTC explaining exactly why in

2  their view the outcome of a sporting event is an event with an

3  economic consequence and laying out all their rationale as to

4  why that's the case.

5        THE COURT:  What meaning does the word "event" have,

6  then, if every outcome is an event?  Everything's an event.

7        MR. BAMBERGER:  Well, I think that's actually the

8  statute Congress wrote, Your Honor, which is Congress

9  deliberately defined swaps to be extraordinarily broad.

10  Congress wrote a statute that allowed parties to write swap

11  contracts on essentially anything you can imagine.  And then it

12  carved --

13        THE COURT:  Well, then why do we have all these

14  subparts to say what they can and can't do, an event, an

15  occurrence, a non-occurrence?  It doesn't say outcome.  It

16  says, "occurrence, non-occurrence, or the extent of an

17  occurrence."  If everything was on par, everything was open,

18  why didn't they just be explicit and say that, instead of

19  sub-parceling out, here's the restrictions on that?

20        MR. BAMBERGER:  Yeah.  Well, I mean, I think

21  Congress did write a number of restrictions, as you know in the

22  special rule, and it specifically indicated that certain types

23  of contracts on certain types of events are subject to review

24  by the CFTC and disallowance if, in the CFTC's judgment,

25  they're contrary to public policy, right?  It's expressly a

1   public policy question as to whether certain types of contracts

2   get listed.

3          But I want to go back for a second, Your Honor,

4   because I think when you look at what the statute gives the

5   CFTC the authority to do, right, under Section -- 7 U.S.C.

6   7(a)(2), what the statute speaks about are listing of contracts

7   and other instruments, right?  So it creates a structure in

8   which a regulated designated contract market, a board of trade

9   like my client, which is heavily regulated by the CFTC, can

10  accept for listing a contract or other instrument and then the

11  CFTC allows that to be listed if it's compliant with the CEA or

12  disallows it from being listed if it's either non-compliant

13  with the CEA, with the rule book of the designated exchange, or

14  in the exercise of its discretion under the special rule.

15         THE COURT:  Or it just ignores your filing and you

16  get to do it without any comment from the CFTC, right?

17         MR. BAMBERGER:  Well, yes, but that's a structure

18  that Congress created.

19         THE COURT:  Understood.  I'm not disputing that.

20         MR. BAMBERGER:  Yeah.  And so, Your Honor, now

21  there's a separate question.  Now what if the CFTC came out and

22  decided that table games at the casino down the street are

23  actually swaps trading?  In that case, it would bring an

24  enforcement action.  It would have to come to court and it

25  would have to establish that it did have exclusive jurisdiction

1  that the thing that it was regulating was within the scope of

2  its regulatory authority.

3        That question would come to court in a proceeding,

4  presumably in Federal Court, and Your Honor would decide in

5  that context whether the thing that was listed -- the thing

6  that was traded was a swap or not a swap and whether the CFTC

7  had jurisdiction at all.  And I think a casino would have very

8  good defenses to the CFTC exercising that type of jurisdiction,

9  based on the history of the CEA and the historical regulatory

10  jurisdiction that the agency has asserted.

11        THE COURT:  Okay.  Let me stop you there.  So if the

12  CFTC decided that what you were proposing one of its market

13  participants was doing was improper, it would have to come to

14  court, as opposed to it has exclusive jurisdiction over the

15  swaps your clients are proposing.  Why would it need to come to

16  court to tell the Court, "Stop them from doing it" if it has

17  exclusive jurisdiction over anything that their markets do?

18        MR. BAMBERGER:  Well, it would ultimately end up in

19  court, potentially, right, but it wouldn't have to come to

20  court in the first instance.

21        THE COURT:  How would I have jurisdiction at all if

22  the CFTC has exclusive jurisdiction over the markets it

23  regulates?

24        MR. BAMBERGER:  Because if the CFTC were to disallow

25  my client from listing a contract on its exchange, we would be

1  able to seek judicial review of that decision the same way you

2  could seek judicial review of any unlawful agency action.

3  Through the Administrative Procedures Act, we'd come to court

4  and we would challenge that decision.

5          Now, there would be a question in that proceeding as

6  to whether this was an agency exercising discretion given to it

7  under law, but if the question was, is it a swap or not, I

8  think that's a legal question that in that context the Court

9  would decide, same way the Court would decide it in the context

10  of an enforcement proceeding.

11          THE COURT:  Okay.  Not sure I disagree with you much

12  on that point, but I want to go back to your definition of sort

13  of event and outcomes are events.  How do you draw a principle

14  line between gaming that the States can regulate legally and a

15  sporting event that your client takes a contract on that the

16  States can't?  So if your client says, we're going to create a

17  market and take contracts on the winner of the Superbowl, your

18  position, I presume, is States can't touch them for that

19  because that's exclusively with the CFTC.  So what is left for

20  the States to regulate?

21          MR. BAMBERGER:  So in that context, there are a

22  number of things that I think are clearly left to the States to

23  regulate.  For example, if my client committed fraud in

24  offering or making those contracts available to residents, I

25  think the case law is relatively clear that common law fraud

 1  claims are not preempted.  Same way as under the securities

 2  laws listing --

 3          THE COURT:  But focusing on the salient issue here,

 4  in terms of a contract that they call a sports bet, what's the

 5  principle line of distinction between what is and is not

 6  available for them to regulate?

 7          MR. BAMBERGER:  Well, the first principle line of

 8  distinction is, who is listing it and where is it listed,

 9  right?

10          THE COURT:  So if you do it, your client does it,

11  and it's regulated by the CFTC, the States can do nothing?

12          MR. BAMBERGER:  Well, the States can do nothing

13  under State law, right?  The States don't have a State law

14  remedy in that scenario.  What they can do is what they are

15  doing, which is I understand the Senators from the State of

16  Nevada are lobbying the CFTC currently to exercise its

17  jurisdiction.  The CFTC is quite active in this area.  It

18  issued guidance recently, has reaffirmed my client's

19  registration very recently, holding -- scheduling roundtables

20  at which this issue is being discussed.  So there are political

21  solutions that the State may take.

22          And the State may have remedies under the

23  Administrative Procedures Act because there is a body of law

24  that deals with when a Federal agency is acting ultra vires or

25  contrary to law or is failing to exercise a mandate that it's

 1  required to exercise under law.  But that's a Federal law

 2  remedy and, what I would submit, doesn't work and we can't have

 3  and it's totally inconsistent with the national market that

 4  Congress created under the CEA --

 5          THE COURT:  So we're clear, if a market participant,

 6  creation, whatever you want to call it, DCM I think is the term

 7  we've used, puts out a sports wager on who's going to win the

 8  Superbowl, as long as your client puts it out and it's

 9  regulated by the CFTC, the States can do nothing with regard to

10  stopping that wager from happening, even though it violates

11  Nevada law?

12          MR. BAMBERGER:  They may have a remedy under the

13  Administrative Procedures Act, I don't know, but that would be

14  the appropriate remedy is to ask the agency that is charged

15  with discretion to act.  It is not -- they would not have a

16  State law remedy to take the action themselves.

17          THE COURT:  And to be clear, your definition of

18  event, or something with a potential financial, economic, or

19  commercial consequence, would pretty much cover anything your

20  client issues?

21          MR. BAMBERGER:  Well, I don't -- I don't know that

22  it would, Your Honor.

23          THE COURT:  What wouldn't qualify?

24          MR. BAMBERGER:  That's a good question, and we've

25  thought a lot about that question.

1    THE COURT:  So did Kalshi, and they changed their

2    mind after we talked about the coin flip.

3    MR. BAMBERGER:  I had a feeling.  And I think Your

4    Honor made a very good point about the coin flip, right,

5    because a coin flip in my hotel room may not be of consequence

6    to anyone, but the coin flip at the Superbowl certainly is.

7    THE COURT:  But it only has consequence to the

8    betters on it.

9    MR. BAMBERGER:  I don't necessarily know that that's

10   true.  The prediction markets -- I will answer your question,

11   but let me make one point in the meantime.

12   THE COURT:  Yeah.

13   MR. BAMBERGER:  The prediction markets are markets

14   that involve trading of contracts.  They are structurally not

15   bets, they are structurally not the same as gambling contracts

16   or gambling on a sportsbook.

17   THE COURT:  You're going to have to explain why

18   because I still don't grasp it.

19   MR. BAMBERGER:  Well, one, there's no house.  We're

20   not taking a bet against our clients.  Two, they are contracts

21   that are -- they are traded in a market where the price of

22   those contracts are set bilaterally by parties to the contract.

23   THE COURT:  Just like the house changes its bet when

24   other betters, sharps, come in and bet on one side, they adjust

25   their rates as well.

1                MR. BAMBERGER:  But they control that, Your Honor,

2    and that's not the case here, right?  My client doesn't control

3    what the price is.

4                It's also -- it's a heavily regulated market.  The

5    market -- CDNA, for example, my client, has a 400-page rule

6    book that has been approved by the CFTC, very detailed,

7    involves market surveillance, prohibitions on insider

8    trading --

9                THE COURT:  So does the Gaming Control Board and the

10   Nevada Gaming Commission and all the --

11               MR. BAMBERGER:  Well, there are different

12   regulations, Your Honor.  I'm not sure that there are

13   restrictions on insider trading.

14               THE REPORTER:  Could you slow down?

15               MR. BAMBERGER:  I'm sorry.

16               THE COURT:  And I'm interrupting.  I apologize.

17               MR. BAMBERGER:  I'm not sure there are the same

18   types of regulations.  You could place limit orders on CDNA.

19   That's something that you can't do, as far as I know, on a

20   sportsbook.  It's a fundamentally different market and it's a

21   fundamentally different structure, and it's surveilled and

22   regulated in a fundamentally different way.

23               Now, if Your Honor's point is, at the end of the

24   day, someone is staking some money on the outcome of an event

25   and they're doing that in sports betting and they're doing that

1  in -- when they're regulating -- I'm sorry, when they're buying

2  a contract on our exchange, that's been true from the very

3  beginning of the derivatives markets.  I mean, there's cases

4  going back to the '70s where States tried to regulate cash

5  settled futures products and said, well, that's just a wager,

6  and the Courts have consistently said for decades that, no, the

7  CFTC has exclusive jurisdiction over regulating those markets.

8         So the argument that it is essentially a bet is an

9  argument that I think overlooks the structure of the markets.

10 But I come back to, I guess, the structure that Congress

11 created is a national market.  It said that in Section 5 of the

12 CEA.  It said that the purpose of this Commodities Exchange Act

13 was to create and promote a national marketplace that featured

14 self-regulation of the market, and that marketplace doesn't

15 work if every State and, frankly, every municipality in the

16 country, many of which have their own municipal gaming

17 regulations, has the ability to step in and exercise its own

18 judgment relying on State law as to whether something is or is

19 not an event or a swap or a swap with sufficient economic

20 consequence.

21        THE COURT:  So let's go back to the question we

22 diverted on, and what's an example of a contract based on

23 something associated with a sporting event that would not have

24 potential financial, economic, or commercial consequences, as

25 you define it?

1          MR. BAMBERGER:  So I don't want to go into

2    hypotheticals, but I'll answer your question this way, which is

3    to say, in order to list a contract --

4          THE COURT:  Say it again slowly.

5          MR. BAMBERGER:  In order to list a contract, my

6    client had to explain in detail to the CFTC what the specific

7    economic, financial, and commercial consequences of the event,

8    that is, the outcome of the event, would be.

9          So, for example, I think someone would probably have

10   a hard time writing a contract -- or writing a certification

11   that explained what the economic, commercial, or financial

12   consequences were of what color the Gatorade is that's poured

13   on the coach.  I think you'd have a hard time certifying that.

14   Now, I'm not going to pre-judge it before somebody writes that

15   out, but I personally have a hard time seeing that happen.

16         But that's why the structure exists, right?  We're

17   not asked to answer this question in the abstract.  There's a

18   regulatory structure that Congress created specifically

19   referring to self-regulation in this market, and that structure

20   is, you certify, you explain in detail what the consequence is,

21   why the contract meets the listing criteria under the CEA, and

22   then we have a decider, and the decider is the CFTC.

23         THE COURT:  So if CFTC -- I'm sorry -- if a DCM

24   self-certified to the CFTC a contract to be a swap when it's

25   actually an auction and the CFTC didn't stop you, then that's

1  blessed and you're insulated from any State regulation simply

2  because you offered it to the CFTC and they didn't stop you?

3         MR. BAMBERGER:  I think we're insulated from State

4  regulation because we're operating under the umbrella and under

5  the auspices of Federal regulation.

6         THE COURT:  Okay.  So --

7         MR. BAMBERGER:  I think if we did that, Your Honor,

8  I think we would have a lot of problems.  If we falsely

9  certified a contract to the CFTC, I think we probably would

10  have committed a Federal crime.

11         THE COURT:  That gets to my next question.  Not that

12  you've committed a Federal crime, but let's talk about the

13  self-certification.  You have to self-certify that you have

14  complied with the CEA and all of the CFTC regulations, correct?

15         MR. BAMBERGER:  Correct.

16         THE COURT:  17 CFR 40.11(a) prohibits a registered

17  entity like Crypto from listing a swap based on such things as

18  terrorism, assassination, war, gaming, or an activity that's

19  unlawful under State and Federal law.  How did you comply with

20  that and say, this is not gaming?

21         MR. BAMBERGER:  Yeah.  And I think the answer is

22  straightforward.  If you look at the decision from the District

23  Court in the District of Columbia in the *Kalshi* case, which I

24  know Your Honor is familiar with, that Court addressed the

25  question of, what does that Section 40.11, what does it

1   address?  Does it address the contract itself or does it

2   address the underlier of the contract?  And the Court concluded

3   in that case -- the CFTC was arguing that, look, these

4   political event contracts, they look an awful lot like gaming.

5              THE COURT:  Slow down.

6              MR. BAMBERGER:  I'm sorry.  I've thought about this

7   before, as you might imagine.

8              THE COURT:  Yeah.  That's good.  I'm glad.

9              MR. BAMBERGER:  The Court in that case said, right,

10  if you look at these event contracts, these political outcome

11  contracts, they look a lot like gaming and, therefore, they

12  fall within the special rule prohibition.  By the way, also

13  went through a process in that case of looking at whether it

14  would be against public policy for those contracts to be

15  listed.  It concluded in that case that it would be and it

16  brought an enforcement action.

17             The Court said you look at the underlier.  The

18  underlier of the contracts that my client listed is not

19  gambling, it's not gaming; it's sporting events, and sporting

20  events are lawful in Nevada and they're not gambling.  Now, if

21  we wrote a contract on, you know, the outcome of the draw at

22  the roulette wheel, I might have a different answer for Your

23  Honor, but that's not the type of contract that we wrote in

24  this case.

25             THE COURT:  Who's defining the word "gaming" in the

 1  reg according to that?

 2          MR. BAMBERGER:  Well, the CFTC does, subject to

 3  judicial review.  There was a process -- my friends on the

 4  other side point out that the CFTC went through, started a

 5  regulatory process to provide additional guidance on the

 6  definition of the term "gaming."  That process, there were

 7  strong objections from -- including from the Commissioner,

 8  who's now the Chair of the CFTC, who was concerned that the

 9  process the CFTC was pursuing would actually install the CFTC

10  as effectively a gaming regulator, which she didn't want to do,

11  and so that regulatory process was discontinued.

12          The CFTC is actively considering how it's going to

13  regulate prediction markets, including the prediction market

14  that my client operates.  It's an active topic of discussion

15  right now, but, ultimately, that's a CFTC question, subject to

16  judicial review.

17          THE COURT:  So you self-certify to the CFTC that

18  we're in compliance with the regulations, that this is not

19  gaming.  The CFTC doesn't stop you and so you're allowed to do

20  it?

21          MR. BAMBERGER:  Yes, Your Honor.  And I think --

22  there has been a -- if I could, Your Honor?

23          THE COURT:  Yeah.

24          MR. BAMBERGER:  There has been a suggestion, I

25  think, on the other side that there's something nefarious or

1  untoward about the self-certification or about the CFTC not

2  acting, and I think if you look at -- this is a system Congress

3  designed, and it's not easy to become a DCM, right?  There are

4  only a handful of them in the country.  They're subject to

5  extensive oversight.  They have extraordinary compliance

6  departments.  They spend an awful lot of money complying with

7  the CFTC's various regulations and they're subject to stringent

8  oversight.  And so the mechanism that Congress created was,

9  these regulated entities, yes, they may have more leeway to

10 list contracts than your ordinary citizen does, but it's

11 because they're subject to the stringent oversight and

12 regulatory regime as, essentially, self-regulatory

13 organizations.

14         THE COURT:  So if, hypothetically, your client

15 proposes a market on the assassination of a Federal judge,

16 proposes that to the CFTC and the CFTC is asleep at the switch

17 or just doesn't care or it's unstaffed because of budget

18 cut-backs or whatever reason and it's not objected to, it's not

19 stopped by the CFTC, your client can make that market and take

20 contracts on the assassination of a Federal judge, despite the

21 fact that it specifically violates the reg, and nobody can stop

22 that?

23         MR. BAMBERGER:  So I don't think so, Your Honor.

24 First of all, I want to say, I don't think my client has any

25 interest in --

1              THE COURT:  I hope not.

2              MR. BAMBERGER:  -- the assassination of Federal

3    judges.

4              THE COURT:  And I don't mean to cast aspersions on

5    your client.

6              MR. BAMBERGER:  I understand, Your Honor.

7              But, also, I think in the -- in the special rule and

8    the regulation implementing the special rule, right, the

9    regulation refers to the underlier of the contract and it

10   refers specifically to assassination.  I think if my contract

11   wrote -- sorry -- that my client wrote a contract on

12   assassination of a Federal judge, I think you'd have a pretty

13   good argument they were in violation of that rule.

14             THE COURT:  I would hope, but the defense are saying

15   you wrote a contract on gaming and everybody in Nevada

16   considers what you're taking is gaming.

17             MR. BAMBERGER:  Right.  Well, but there would be --

18   there would be a separate question -- so let's say we did that.

19   Let's say we wrote a contract on an assassination of a Federal

20   judge.  There would be a question, I suppose, as to who has the

21   authority to stop us from listing that on a Federally-regulated

22   exchange, and I would submit even in that very extreme scenario

23   where I have a difficult time imaging that the CFTC wouldn't

24   step in and stop it, it would not be the Nevada gaming

25   regulators and it wouldn't be the Nevada Attorney General.

1              I think Section 13a-2 is very clear that the

2    regulatory authority of the CF -- sorry -- of the States

3    extends to any person other than a contract market.  So it is

4    not unusual that you would have a framework under our

5    Federalist structure where the principal regulator of a market

6    and the principal regulator of decisions on that market is at

7    the Federal level.  And that's to the exclusion of State

8    regulation.

9              And candidly, Your Honor, I think that's what you

10   recognized in the PI decision for Kalshi.  And if I could just

11   make a couple of points as to why it just doesn't work any

12   other way, Your Honor.

13             You know, there's a point made in my friend's brief

14   on the other side that, well, can't you just -- can't you just

15   register under Nevada gaming laws?  So register under Nevada

16   gaming law.  What's the harm?  Well, the reason we can't, Your

17   Honor, is that Nevada gaming law explicitly does not allow

18   interstate trading of the type that my client does.

19             So if you look at Nevada Revised Statute 465.094, it

20   allows online sportsbooks to only accept wagers in the State of

21   Nevada.  And even more, Your Honor, if you look at Nevada

22   gaming regulation 22.140, it requires online sportsbooks to

23   register those who want to place bets in person at the

24   sportsbook.  So if we wanted to operate in compliance with

25   Nevada State gaming law, we would have to essentially open a

1  casino in the State of Nevada.  And if we can be required to do

2  it in the State of Nevada, we can be required to do it in any

3  state.

4          And the point that I would make is, you may agree or

5  disagree that the contracts at issue are appropriately traded

6  in a Federal market, but I think when you look at the special

7  rule, when you look at the legislative history, which is, I

8  think, quite clear going back to the '70s, saying -- where I

9  think the legislative history makes express that Congress wants

10  to preempt the field of regulation of derivatives markets and

11  going forward to the discussion that Senator Feinstein and

12  Senator Lincoln had in connection with the adoption of the

13  amendments to the CEA as part of Dodd-Frank in 2010 where the

14  question of gaming expressly came up -- and my friends on the

15  other side say, well, it was recognized in 2010 that Congress

16  didn't want gaming on the derivatives markets, and the Senators

17  who were -- who wrote the bill and drafted the legislation

18  said, yeah, and we have put a mechanism in place to prevent

19  that, and that is the CFTC can disallow it.

20          And we've cited in our brief, an amicus brief, that

21  those -- Senator Lincoln and others wrote to the 3rd Circuit

22  where they make this point expressly, which is to say, you

23  know, at the end of the day, essentially all derivatives are a

24  bet.  It's a wager on some future event.  That's what a

25  derivatives contract is.

1      But Congress was very clear in wanting to give one

2  national Federal regulator discretion to decide what is and is

3  not listed.  And they didn't just give the CFTC discretion

4  subject to guideposts that they created under Federal law.

5  Congress made very clear that it was a public policy question,

6  right?  So under the statute, it's not just, is it gaming;

7  it's, is it gaming and is it contrary to public policy?  So

8  allowing States to reach their own conclusions under State law

9  to bring their own enforcement actions essentially

10  second-guessing that determination by the CFTC, that's totally

11  incompatible with the Federal framework that exists.

12      THE COURT:  Okay.  But two points.  First, the CFTC

13  did pass regs based upon the statute, and 17 CFR 40.11(a) says

14  that you're prohibited from putting contracts on gaming.  So

15  the CFTC said, gaming's out, just like assassinations and war;

16  it's that bad.  We're not going to let you do it.  And so, in a

17  sense, we're dancing on the head of a pin as to whether your

18  contracts are gaming or not.

19      MR. BAMBERGER:  Well, but we're not dancing on -- so

20  I agree to a point, Your Honor, right?  The CFTC did exercise

21  its discretion, it did adopt a rule.  I think if you look at

22  the way the D.C., District Court, interpreted that rule and we

23  agree with it -- you look at the underlier, you don't look at

24  the contract itself.  Otherwise, essentially all derivatives

25  you could reach a conclusion are gaming.

1           THE COURT:  And the underlier here is it's a

2    contract based on the outcome of the Superbowl, who wins the

3    Superbowl.

4           MR. BAMBERGER:  I actually disagree, Your Honor.  So

5    the contract is a contract on the outcome of the Superbowl.

6    The underlier is the outcome of the Superbowl, and that is not

7    gaming.  The outcome of the Superbowl is not gaming.  Now, I

8    could be right or wrong about that and you could think I'm

9    parsing the statute or the rule much too closely, but my point

10   is actually a different one, which is, if the CFTC's given

11   discretion and it's adopted a rule implementing its discretion,

12   if we're in violation of that rule, we have problems with our

13   principal regulator, and we may have significant problems with

14   our principal regulator, up to and including removal of our

15   registration, right?

16          But the State doesn't -- because we violate Federal

17   law, if we violate Federal law, that doesn't open the door for

18   the State to come in and fill the gap with State regulation.

19          THE COURT:  And based on your interpretation of

20   these words, what is left for the States to regulate?  Anybody

21   that's not in your market, a market approved by the CFTC?

22          MR. BAMBERGER:  Which is almost everything, Your

23   Honor.  I mean, it's everything I saw coming in from the

24   airport yesterday.

25          THE COURT:  And so -- I understand your argument.

 1  Let me think about it for a second.  I see what you're saying.

 2  Hang on a second.  Let me catch my notes up here.

 3          MR. BAMBERGER:  Your Honor, I guess the point I

 4  would add is, I think, you know, the reason we're here on a

 5  12(c) motion very early in the case, and I appreciate it's very

 6  early in the case, is that the relief we're asking for, Your

 7  Honor, is actually very, very narrow.  We're not asking you to

 8  rule on whether the contracts at issue here are swaps or not or

 9  properly listed or not; we're asking for a very narrow ruling

10  that the regulatory jurisdiction under the CEA, the ability to

11  enforce the CEA's listing standards, is the exclusive

12  jurisdiction of the CFTC.

13          And I think when you look at the statutory scheme,

14  the exclusive jurisdiction clause, the provision in Section 16

15  of the -- 7 U.S.C. 16 which says that the CFTC does not have

16  exclusive jurisdiction, does not preempt trading that is not on

17  Federally-regulated markets, that provision only makes sense if

18  Congress thought it had taken control of regulation with

19  respect to trading that is on Federally-regulated markets.

20  It's a very narrow declaration of law, and it's one that I

21  think is compelled by the statutory structure.

22          And I would say to Your Honor, you know, we look

23  at -- we look at what -- under the *field preemption* analysis --

24          THE COURT:  Under what?

25          MR. BAMBERGER:  Under the *field preemption* analysis,

1   we look at what Congress says.  We also look at what Congress

2   was trying to do and how it would work.  And the examples that

3   I've given Your Honor of how Federal regulation is just totally

4   inconsistent with State regulation, I think, illustrates the

5   problem.  There's specific -- and understandably very specific

6   regulation in the State of Nevada on gaming.  Nevada has

7   probably the oldest regime regulating gaming, some of the most

8   sophisticated gaming regulators in the world, I would imagine,

9   and there's a very comprehensive scheme for regulating gaming

10   here.  It is expressly protectionist.  It does not allow risk

11   pooling across state lines.  And that is what Congress was

12   trying to create under the Commodities Exchange Act was just

13   that, the ability of a farmer in Nebraska to hedge his crop

14   exposure with the banker in New York.

15            THE REPORTER:  Could you please slow down?

16            MR. BAMBERGER:  I'm sorry.

17            That's -- it was a national market that Congress was

18   trying to create.  It was worried about overstepping by State

19   regulators, and that's why it created this framework subject to

20   CFTC oversight.

21            THE COURT:  And the turnabout argument, though, is

22   that for decades Congress has recognized the States' abilities

23   to regulate gaming.

24            MR. BAMBERGER:  I agree.

25            THE COURT:  Nevada, eventually New Jersey.  And for

1  decades, Congress, CFTC, nobody thought these statutes and regs

2  allowed them to, in a sense, step on the toes of the State

3  gaming regulators, until now.

4          MR. BAMBERGER:  Well, I would --

5          THE COURT:  And I have a hard time seeing the

6  argument that this is what Congress intended, to allow an

7  entity to get licensed by the CFTC and thereby avoid complying

8  with every other State and Indian country's gaming regulations.

9          MR. BAMBERGER:  Well, I have two, maybe three

10  responses, two and a half responses, Your Honor.

11          The first one is, well, we can look at what the

12  members of Congress who drafted the provision in 2010 said.  We

13  can look at what Blanche Lincoln said in her amicus brief to

14  the 3rd Circuit, which is that expressly -- and that was in the

15  context of *Kalshi* and Kalshi sports betting markets.  Expressly

16  what Congress intended was to give the CFTC that exclusive

17  jurisdiction.

18          The other point I would make is that while

19  regulation of the derivative markets goes back decades,

20  regulation of swaps only existed since -- Federal regulation of

21  swaps only existed since the great recession and Dodd-Frank.

22  So that's a more recent innovation, but when Congress decided

23  to take control over that market, it brought swaps and put them

24  in the framework that had existed since the 1970's.

25          The third point I'd make is, I think you do have

1   congressional recognition over time that States have the

2   authority to regulate gaming, and nothing that we're saying is

3   inconsistent with that.  And I would say, you know, Your

4   Honor's colleague in Maryland, as you're probably aware, went

5   the other way from us on this issue, and I think he did so by

6   framing the questioning correctly.  He's framing the question

7   in the way that the State has proposed it be framed, which is,

8   does the CEA preempt gaming regulation?  And I think Your Honor

9   correctly recognized in your decision in the *Kalshi* decision,

10  that's not the question.  The question is, does the CEA preempt

11  State regulation of Federal derivatives markets?

12          And I make one other point, Your Honor, which is,

13  that's expressly what the State was trying to do here.  The

14  cease and desist order that they sent to my client expressly

15  says that CDNA has offered -- has been offering and continues

16  to offer event-based wagering contracts in Nevada on sporting

17  events through its exchange.  They expressly targeted the

18  Federally-regulated exchange and said, we're going to regulate

19  that, we have regulatory authority under State gaming law.

20          And that is what States, you know, with due respect,

21  have been trying to do since the 1920's, right?  There have

22  been -- there has been a long history of States trying to

23  regulate the commodity futures market, as I mentioned, the cash

24  settled commodity futures market under gaming regulation.  A

25  line has to be drawn somewhere.  I appreciate that there's

1  probably a continuum of contracts, from the bet that's put on

2  the table at the casino down the street to your traditional,

3  you know, wheat futures contract that my friends, I don't

4  think, would argue is subject to their regulation.  A line has

5  to be drawn somewhere, and Congress both drew that line,

6  recognized then that there may be some overlap, right, there

7  may be some overlap between what might be characterized as

8  gaming and what might be characterized as swaps trading --

9           THE COURT:  Let me pause you there because that's

10  the line I'm trying to figure out, but the line you're drawing

11  is, anybody regulated by the CFTC is on the proper side of the

12  line, so the States can't touch them; anybody that's not is on

13  the other side of the line.  So you're drawing the line based

14  upon who's registered with the CFTC, as opposed to what is

15  gaming or what is a swap.  Those are two different questions.

16           MR. BAMBERGER:  I agree they're two different

17  questions, and I'm, I guess, answering them for two different

18  purposes.

19           THE COURT:  Okay.  Let me be clear, then, because I

20  don't want to try to reframe the issue.  And I'm not -- I'm not

21  going back on what I said on *Kalshi* yet, but my point for today

22  is much more narrow.  It's where I began.  I don't see what

23  your client is doing is a swap.  It's a bet on the outcome.

24  And I know you want to say an outcome is an event, but that

25  means everything's an event, and that, to me, is a bridge too

 1  far.  I can't get to the point that says everything is an event

 2  and, therefore, we get to do it.  That's where I'm troubled.

 3          MR. BAMBERGER:  I appreciate that.  And I think if

 4  we were in front of Your Honor in a different posture I would

 5  be less confident in my argument before you, which is to say,

 6  if we were in front of Your Honor on an administrative review

 7  of a CFTC decision or on an action to challenge the CFTC's

 8  decision or, candidly, let's say some private party brings a

 9  private suit under the Commodities Exchange Act, which is

10  permitted, against a casino and says, you know, look, that

11  contract is in connection -- is a swap, or, frankly, let's say

12  somebody brings a private suit in connection with one of the

13  contracts that my clients list.  There's a legal question there

14  that Your Honor has to answer, and I guess what I would say for

15  purposes of today is, I don't think Your Honor has to answer

16  that question because it doesn't -- it doesn't -- it isn't

17  necessary to the relief that we're asking for.

18          THE COURT:  Well, you're asking for an injunction to

19  stop the Gaming Control Board, the State of Nevada, from

20  regulating your client or from doing the cease and desist.

21          MR. BAMBERGER:  Correct.

22          THE COURT:  Because CFTC has exclusive jurisdiction

23  over you.

24          MR. BAMBERGER:  Correct.

25          THE COURT:  If this isn't a swap, then they don't

 1  have exclusive jurisdiction over you, under the statute, the

 2  way I read it, and so I shouldn't stop them from regulating

 3  you.  That's why I think it's relevant today.

 4          MR. BAMBERGER:  Yeah.  And I understand the

 5  argument, and I think it's the argument that the other side has

 6  made.  And I think they presented it well in their briefing.

 7  But I think when you look at the -- again, through the rubric

 8  of what Congress said and the *field preemption* analysis, it

 9  can't be the case that States get to decide that they disagree

10  with a registration under the Commodities Exchange Act and,

11  therefore, have jurisdiction.  We're before Your Honor because

12  my client brought an -- as you know, my client brought an

13  action for declaratory relief ahead of enforcement, but the

14  default way this would happen, right, is that the State would

15  bring enforcement action and we would be in State Court or we

16  would be subject to a C&D order that we would have to comply

17  with.

18          The default way this happens is the States act under

19  color of State law to second-guess a decision that's been made

20  at the Federal level.  And I think kind of riding through their

21  briefing and their arguments is a suggestion that the CFTC is

22  some sort of asleep-at-the-switch regulator or is a nefarious

23  actor that isn't properly regulating the markets that it's in

24  charge of, and I would submit that, first of all, I don't think

25  that's relevant to the analysis.  I don't think that, you know,

1  if a Federal agency doesn't follow its mandate under Federal

2  law, I don't think that opens the door for State regulation.

3          But, second of all, to the contrary here, the CFTC

4  has been incredibly active in thinking about these markets, but

5  it's proceeding carefully because the CFTC recognizes that

6  prediction markets have an important value in terms of the

7  transmission of information to people in the market.

8          Now, you may agree or disagree with any particular

9  contract, but the CFTC is trying, I think -- and this is

10  reflected in the public statements that it's made -- it's

11  trying to proceed carefully in exercising its regulatory

12  authority.  Any day of the week they could tell us to stop

13  listing these, any day of the week.  They haven't done so.

14  They know that they're listed.

15          THE COURT:  Understood.  You've answered all of my

16  questions for now.

17          MR. BAMBERGER:  Okay.

18          THE COURT:  Thank you.  Let me turn it over to the

19  defendants.

20          MR. BAMBERGER:  Thank you, Your Honor.

21          THE COURT:  Thank you.  Well-argued.

22          Ms. Saharsky?

23          MS. SAHARSKY:  Good morning.

24          THE COURT:  Good morning.  And I'm going to jump in

25  with you sort of on a similar issue to what I asked Mr.

1  Bamberger.  How do you draw a principle line between event

2  contracts that are within the exclusive jurisdiction of the

3  CFTC and gambling, gaming, that you contend your clients can

4  regulate?

5          MS. SAHARSKY:  Right.  So we think, as Your Honor

6  was suggesting in the discussion, that it comes from the

7  definition of swaps because it is absolutely the case that the

8  CFTC only has some kind of jurisdiction here if it is a swap on

9  a DCM.  It's not just anything on a DCM.  That's just not my

10  argument.  That's like the statutory language, it says in

11  Section 2(a), right, swap on a DCM, so we have the discussion

12  you've had so far about what does --

13          THE COURT:  Slow down.  Slow down.

14          MS. SAHARSKY:  Sorry.  -- what does it mean to be a

15  swap?  And so we have a definition of the swap that Congress

16  provided and we've talked about the language in Section 2 -- or

17  I'm sorry -- it's 1a(47)(ii), the language there, but we also

18  have to look at it in the context of the six-part definition,

19  the rulemaking that the CFTC did, and the consequences of

20  calling something a swap.

21          And so if we start with the language, as Your Honor

22  said, it's not just any agreement, contract, or transaction

23  with potential financial, economic, or commercial consequences;

24  it's where payment is dependent on the occurrence or

25  non-occurrence of an event or contingency.  And I think Your

1  Honor drew a reasonable line there about looking at the event

2  and what Congress was getting at there, as opposed to the

3  outcome, the outcome of a sporting event.

4          I think when we look at the context of the six-part

5  definition, what Congress was talking about were financial

6  instruments that companies use to hedge against economic

7  uncertainty, and that's not what a sports bet is about.

8          I think one way to look at the definition of

9  swaps -- there's kind of two ways to look at it.  I think

10  there's why our definition is right, and then I think there's

11  why Crypto's definition can't be right.  So in terms of why our

12  definition is right, we think, starting with the language in

13  (ii), that it needs a limiting principle, particularly if you

14  have the whole six-part definition there, because if (ii) is as

15  broad as Crypto says, then all those other parts would be

16  superfluous.  A swap would include almost anything.

17          And then we haven't -- this hasn't come up so far,

18  but I'll just mention it, and this is discussed in the briefs,

19  that actually the CFTC had a significant rulemaking to address,

20  to further define what is a swap, a 159-page rulemaking, and it

21  specifically was focused on insurance and it said, not

22  insurance contracts and, more generally, not consumer and

23  commercial arrangements that historically have not been

24  considered swaps.  And that's exactly what gaming is, and if

25  the CFTC thought that gaming was -- gaming contracts or sports

1  betting was a swap, you know, we thought we would have seen

2  something about that in the 159 pages.

3          THE COURT:  But history changes over time,

4  obviously, and to play devil's advocate, if it's changed now

5  that gaming is considered a swap, why doesn't it fall in under

6  that definition?

7          MS. SAHARSKY:  Well, I don't think that it has

8  changed in that way.  We have no actual expressed intent from

9  Congress to field preempt all of sports betting, right?  We

10  just don't.  There's nothing in the language that says, no more

11  State regulation of betting, and that is the consequence of

12  their position.  I guess I'd -- and this is, I think, relevant

13  to how you think about the definition of swap.  I think the

14  definition of swap has to be narrower than they say because of

15  what the consequences of it are.  And in particular, if

16  something is a swap, it can only -- if it's a consumer swap, it

17  can only be traded on a DCM, only be traded on a DCM.  And

18  that's in the statute in Section 2(e).  "It shall be unlawful

19  for any person other than an eligible contract participant to

20  enter into a swap unless the swap is entered into on or subject

21  to the rules of a board of trade designated as a contract

22  market under Section 7."

23          Now, there are some exemptions.  It says, "other

24  than eligible contract participants," and those are defined as

25  financial institutions, large companies, government entities,

1    and individuals with over $5 million, but as a general matter,

2    this Section 2(e) says, if it's a swap, it has to be on a DCM.

3              And so I just want to talk through what the

4    consequences of that are because I think they are really

5    extreme.  This is not a narrow ruling that our friends are

6    asking for at this early stage of the case --

7              THE COURT:  Well, I get all that.  I certainly took

8    that, and that's motivated a number of my questions already,

9    but I guess the question when we started this was, what's the

10   principle line to distinguish, and you sort of said it sort of

11   depends on the definition of a swap, and if it's a swap, it

12   comes in under the CFTC, and if it's not, you can regulate it,

13   but I guess the question is, who makes that decision?  They're

14   arguing CFTC decided this was a swap, they haven't stopped us

15   and that's the end game, we're done.  What's wrong with that

16   argument?

17             MS. SAHARSKY:  Well, Your Honor decides.  It's the

18   interpretation of a statute.  So under *Marbury vs. Madison*,

19   most recently *Loper Bright,* the Supreme Court has made clear to

20   us that a legal question about the reach of a Federal statute

21   is one to be decided by a Court.  And that's actually

22   reiterated at the end of Section 2(a), which says, "Nothing in

23   this section shall supersede or limit the jurisdiction

24   conferred on Courts of the United States or any State."

25             So this idea when they're saying --

1              THE COURT:  Slow down.

2              MS. SAHARSKY:  -- if the CEA applies, it has this

3    enormous effect and there is a threshold question for whether

4    the CEA applies, which is is it a swap, they're saying that a

5    Court can't decide that?  Well, that's like, in their view, the

6    whole ball game.  Whether it's the CEA applies or whether this

7    provision applies depends on whether it's a swap, so we think a

8    Court has to decide that question.

9              And then in drawing that line, you take the language

10   of this provision that we've talked about in the context of the

11   six-part definition and say that it's talking about events.

12   Those events are events that are inherently financial, such

13   that companies would want to hedge against those events

14   occurring, and it's not the outcome of a sporting event.

15             I guess just the other way to look at this -- and I

16   do think this is a really significant point and I just want to

17   make sure it's clear -- is, you know, what the consequence of

18   it -- what the consequence is of it being a swap.  We think

19   under their view, all wagers, all sports betting, counts as

20   swaps.  I don't know that I heard a limiting principle as to

21   what wouldn't be a swap.  They basically say as long as there's

22   some downstream economic consequence -- like, whether my

23   colleague grows a beard could be a swap under their view

24   because maybe he'd buy beard oil; or whether a little league

25   team won a game could be a swap because they may all go out to

1   their favorite pizza parlor afterward.  So I don't think

2   they've given us any limiting principal to --

3           THE COURT:  Let me interrupt.  I get the argument.

4   You focus on the definition of, under 1a(47)(A)(ii), that it's

5   gotta be an underlying event with a financial, economic, or

6   commercial nature.  Would that preclude, for instance, a

7   contract on something like, is a tornado going to ruin my wheat

8   crop in Kansas this year?  That seems to be something a farmer

9   would want to hedge his bet against.  He would want, if my

10  wheat farm gets destroyed, it's a commodity, I want to hedge

11  against that, so I'm going to take out a contract.  Now,

12  that -- does the event of a tornado satisfy that?  It seems to

13  have economic and financial consequences.  Would that be a

14  swap?

15          MS. SAHARSKY:  Yes.  And, actually, you don't need

16  to use (ii) for that because weather-based swaps are

17  specifically listed in (iii).  So if we just take kind of the

18  whole structure, putting aside (ii) which we've addressed, (i)

19  and (iii) address a whole bunch of specific types of financial

20  instruments and (iii) gives a very long list of examples of

21  things that have traditionally been understood to be swaps,

22  which include weather-based swaps --

23          THE COURT:  All right.  Let me change my

24  hypothetical.

25          MS. SAHARSKY:  Okay.

1          THE COURT:  Somebody puts a market on plaintiff's

2     whatever we call it.  There's a contract for, will Green Bay

3     host the -- will Green Bay host a Superbowl parade this year?

4     One would argue that's a bet on the outcome of the Superbowl.

5     The contrary argument is, there's a lot of factors that would

6     go into that besides them winning.  It's February.  There might

7     be a blizzard.  They might cancel the parade.  They might not

8     have hotel rooms.  There might be a power outage.  There might

9     be a lot of reasons that parade doesn't happen, but would a

10    contract that says, will Green Bay hold a Superbowl parade,

11    does that qualify as a swap or not, in your mind?

12         MS. SAHARSKY:  Well, three responses on that.  First

13    of all, I'm from Green Bay, so I hope they win the Superbowl.

14    That would be amazing.

15         Second, I think that that would depend on whether we

16    would consider this to be an event that's kind of inherently

17    financial, such that companies would normally hedge against

18    those events.  I don't think it --

19         THE COURT:  I would suggest, yes, every motel in the

20    city, the Chamber of Commerce, every restaurant, they want this

21    to happen.

22         MS. SAHARSKY:  Well, I think that you're talking

23    about downstream effects, as opposed to financial, economic

24    consequences associated with the event itself.  It's the

25    "associated with" language that we think provides a limiting

1  principle there.

2          But the third thing that I would say is that we are

3  at a very early stage in this case where we don't even know

4  what their event contracts are.  They haven't been identified.

5  And the relief that they ask for is, all event contracts that

6  they list now or in the future.  And the reason that I'm saying

7  that is twofold.  One, we think that it is a good reason to

8  deny the 12(c) request that they are asking for, but, two, this

9  question about where to draw the line with swaps would be a lot

10  more appropriately answered if we knew what they were doing,

11  which we don't right now.

12          And the other thing that I would like to say about

13  that, because I think it's really important, that, you know,

14  they said to the Court, we're just seeking a narrow ruling

15  here, we just have a few of these sports event contracts, yes

16  or no on the outcome of a game, but as soon as Your Honor

17  entered the preliminary injunction in the *Kalshi* case, that

18  market has exploded and is offering much more than just

19  win/loss on games, offering all types of prop bets, parlay,

20  huge, huge amounts of what I think have to be considered sports

21  betting.  And so I don't think this Court needs to answer the

22  question today finally about what might be on either side of

23  the swaps line, but I do think that there should be some

24  hesitation in kind of accepting anything like their definition

25  of swaps because we've seen what that means.

1        You know, I think they may suggest, well, just enter

2   a preliminary injunction and that would have the status quo

3   remain in place, and that's not what's happened with *Kalshi*.

4   It has meant big changes, more folks claiming this claimed

5   protection of the CFTC and doing sports betting.

6        And I guess that's -- I, of course, want to answer

7   Your Honor's questions, but I just want to make sure to make

8   this point:  Like, what they're proposing is, you know, no

9   role, no role for State and tribal regulation.  This would be

10  an unprecedented and serious intrusion on State sovereignty,

11  and they're saying that that happened when Congress added the

12  word swaps to the CEA in 2010, that that was really designed to

13  give -- to legalize sports betting nationwide, which wasn't

14  legal at the time.  This was before the Supreme Court's

15  decision in the *Murphy* case.  -- legalize it nationwide and

16  make the CFTC the nation's sole gaming regulator.  And if we --

17  if we think that these are swaps and so we're trying to answer,

18  is there some kind of preemption here, I would just submit,

19  like, we've gotta start with the idea that if Congress wanted

20  to take that step, it would have to be, you know, super-clear.

21        THE COURT:  Mr. Bamberger says that there is a role,

22  that you can regulate every other entity that's not registered

23  on the CFTC because that's what CFTC has exclusive jurisdiction

24  over and so you can't touch them, but you can deal with MGM and

25  Caesars and everyone else, DraftKings, whoever else out there

1  is not on their CFTC-approved list.

2          Now, that may create competitive problems for the

3  gaming companies and all that, but I gotta follow the law.  And

4  to be clear to everybody, I understand the decisions that I

5  make and the New Jersey Court and the Maryland Court have

6  profound impacts on this industry.  I get it.  But I have to

7  follow the law just like the judges do.  And my focus in the

8  *Kalshi* argument and the *Kalshi* decision I entered previously

9  didn't really hone in on whether it's a swap or not.  We got

10  bogged down a lot in the exclusive jurisdiction area, which is

11  why I've got so many questions today on swaps, so we're clear.

12          But let me turn this into a question instead of a

13  speech, if I can.  You argue in your opposition at Page 29 that

14  a State cannot create a parallel regulatory regime for swap

15  markets, but when a swap is also a sports wager, the State can

16  regulate it.  I think I know your answer, but who decides when

17  a swap is also a sports wager, and how do they make that

18  determination to give you the opportunity to regulate it?

19          MS. SAHARSKY:  Right.  So I'll say our going-in

20  position is that these aren't swaps at all, so we're not in

21  this world of answering this preemption question, but if Your

22  Honor thinks that they do or may qualify as swaps, then, you

23  know, whether something constitutes gaming within the Nevada

24  laws or, more specifically, wagering and whether someone is

25  operating as a sports pool is decided, you know, by the Nevada

1  authorities and then, if tested, of course, by a Court.

2          And so, you know, Your Honor suggested, oh, there's

3  some division between them and what everyone else is doing in

4  sports gaming and that there maintains a role for Nevada --

5          THE COURT:  Slow down.  Slow down.

6          MS. SAHARSKY:  -- maintains a role for Nevada, under

7  their view, for folks who are not on a DCM but, under their

8  view, all those folks should be on DCM's because they're doing

9  swaps.  Sports betting is a swap, under their expansive

10 definition of swaps, and as I said, Section 2(e) of the statute

11 requires that all swaps be traded on a DCM.  So those other

12 folks, in their view, are violating Federal law because they

13 should be on DCM's.  And certainly if Your Honor were to

14 finally decide that their definition of swaps, you know, were

15 correct, I think that there would be no rule, no role left for

16 the State to regulate.

17         I do want to talk, though, because you mentioned

18 kind of the other folks who are doing similar activities in

19 terms of, for example, internet sports betting.  Those folks

20 are complying with Nevada law and also with the Federal Wire

21 Act.  They're doing essentially the same thing that Crypto is

22 doing.  DraftKings, FanDuel, MGM, Caesars, they comply with

23 State laws.  And I think that that -- what that has told us is

24 that there can be concurrent -- if there is CFTC jurisdiction,

25 some jurisdiction here.  If you conclude that it's a swap, that

 1  is concurrent jurisdiction, and for them to come in and explain

 2  that there can't be State jurisdiction, you know, they would

 3  have to show a real conflict, and we don't think that they've

 4  done that to this point.  I mean, their primary conflict

 5  argument to this point has been, we just don't want to comply

 6  with Nevada law and so once we're not complying, then we won't

 7  be able to offer contracts in Nevada, but, you know, the

 8  presumption in our, like, constitutional system of dual

 9  sovereignty is that the States get to regulate unless it's

10  super-clear that Congress says, we don't --

11          THE COURT:  And the "exclusive jurisdiction"

12  language of the statute isn't clear enough?

13          MS. SAHARSKY:  It's not, actually.  Let me explain

14  why.  So the express preemption -- or I'm sorry -- the

15  "exclusive jurisdiction" language is not the language of

16  express preemption.  "Express preemption" language is like, no

17  State may regulate this thing, like, for example, we see in

18  Section 16(e)(2) and 16(h).  And I think those are pretty

19  important, so I'll come back to those in a second, but this

20  exclusive jurisdiction, it just isn't express preemption and so

21  we need to answer a question about whether it is field

22  preemption or conflict preemption, and I think the *field*

23  *preemption* analysis starts with a presumption against

24  preemption in an area of traditional State regulation.

25          So the question is, like, is Congress speaking very

1    clearly here?  And to answer that, we need to look at all of

2    the statutes that help us -- all the parts of the statute that

3    potentially answer this question.  We have Section 2(a), which

4    says exclusive jurisdiction, but it doesn't say it supersedes

5    State gaming law.  And it actually has a savings clause.

6           THE COURT:  I recall reading these arguments in the

7    papers and I'm familiar with them.  I just was kind of

8    parceling out where you were going.  But let me slightly tweak

9    where I was at, I guess, and spin another hypothetical off of

10   where we left off a minute ago in terms of sort of parallel

11   regulatory regimes.

12          Could Nevada pass a gambling gaming law or

13   regulation that defines contracts on the future price of corn

14   as gambling and outlaw it and then pursue civil or criminal

15   remedies against Kalshi or Crypto or anybody that's -- or Acme

16   Corporation that's taking wagers on corn futures?

17          MS. SAHARSKY:  If I understand that correctly, I

18   don't think so because that would be within the core of the

19   CFTC's regulation of swaps on the designated contract market.

20          THE COURT:  But if you define it as gaming, who's to

21   say, then?  Does that then come to the Court to look at whether

22   it's gaming or not?

23          MS. SAHARSKY:  Well, our laws don't currently define

24   it as gaming, and it would be hard to believe that that would

25   happen, but yes, I think that there would be a question in

1  court.  I think that as the Maryland Court explained, there is

2  this traditional area of State regulation of gaming and

3  everybody knows what it includes, the Supreme Court knows what

4  it includes, Congress knows what it includes when it built

5  other Federal laws, like the Indian Gaming Regulatory Act and

6  Wire Act based on it, and if a State were calling something

7  gaming that was not, in fact, gaming, then I think there would

8  be a real question as to whether there is a conflict with the

9  particular role of the CFTC.

10       But I don't think we're anything close to that here.

11 Everything that we are trying to do in terms of regulating

12 gaming is well-within traditional State regulation of gaming,

13 and I don't think anyone has argued to the contrary.

14       THE COURT:  Last question, then.  To the extent that

15 there's a problem your client alleges with what Crypto and

16 Kalshi and other exchanges are doing, is that a problem for

17 Congress to fix or the CFTC to fix, as opposed to the Courts?

18       MS. SAHARSKY:  No.  I think that question perhaps

19 assumes that the CFTC is the only regulator here, and we don't

20 think that that's correct.  If the CFTC were the only

21 regulator, if Congress had completely kicked out the States,

22 then you might think that it is only something the CFTC can

23 address, but our whole point is that the CFTC can regulate as

24 it wishes as one of the sovereigns in our Federal system, but

25 so can we.  The presumption is that we can regulate and that

1  there's just nothing in the statute that made clear that

2  that -- that authority was intended to be taken away from us,

3  especially the kind of, like, clarity it would need to have to

4  satisfy, say, like, the major questions doctrine.

5           If I could just add one note --

6           THE COURT:  Briefly.  We're running out of time.  Go

7  ahead.

8           MS. SAHARSKY:  I will be very brief.

9           THE COURT:  Sure.  Slowly, though.

10           MS. SAHARSKY:  The regulation that Your Honor

11  addressed, Section 40.11, I just think that's -- it's really

12  a -- I think Crypto's argument is kind of a heads I win, tails

13  you lose.  You know, they are trying to seek the protection of

14  the CFTC.  They do -- they say, we are only within the

15  exclusive jurisdiction of the CFTC.  The State can't regulate

16  at all here.  But then they also say, if it's gaming, the CFTC

17  says we can't do it under Section 4011.  So it seems either --

18  you know, it seems that 4011 shows that they're not entitled to

19  any of this protection that they claim, and I'm just not sure

20  that there was an answer to that.

21           THE COURT:  You have answered all of my questions.

22  Thank you, Ms. Saharsky.

23           MS. SAHARSKY:  Thank you.

24           THE COURT:  Mr. Bamberger, you get the last word.

25  And let me start with an issue Ms. Saharsky reminded me about,

1    and that is, the way you're defining swaps, everybody who's not

2    registered with the CFTC is violating the law and everybody

3    needs to get registered with the CFTC?

4            MR. BAMBERGER:  So I don't think that's the case,

5    Your Honor, and I think it goes to the question of how the

6    question of whether something is a swap is decided and when.

7    The CFTC has never taken the position and we have never taken

8    the position that all gaming are swaps regulated by the CFTC.

9    And I think if the CFTC were to take that position tomorrow and

10   come in and try to inspect or conduct an enforcement action at

11   the MGM, there would be very serious questions, including under

12   the *major questions* doctrine, about whether that's really what

13   Congress intended in 2010 when it adopted the CEA.

14           THE COURT:  Well, that's kind of what we're here on

15   right now.  I mean, your definition of 1a(47)(A)(ii), the

16   definition of swaps, where it says, "A swap is a contract for

17   the payment," that it's "dependent upon the occurrence,

18   non-occurrence, or extent," you mean outcome, "of an event

19   associated with a financial, economic, or commercial

20   consequence."  The winner of the Superbowl, in your opinion,

21   satisfies every one of those, so every bet MGM takes or Caesars

22   takes on the winner of the Superbowl is a swap and so they have

23   to be regulated by the -- by the CFTC.  Tell me what the flaw

24   in that argument is.

25           MR. BAMBERGER:  Well, two points I'll make.  So,

Case 2:25-cv-00978-APG-BNW   Document 104   Filed 10/05/25   Page 52 of 67
2:25-cv-00978-APG-BNW   *MOTION HEARING*   *10/02/2025*

**52**

 1  one -- and I always think of better answers after I sit down,

 2  but when we were talking about event earlier, right, that

 3  section also refers, as my friend noted, to event or

 4  contingency.

 5          THE COURT:  It says what?

 6          MR. BAMBERGER:  Event or contingency, right?

 7          THE COURT:  The occurrence of an event or

 8  contingency?

 9          MR. BAMBERGER:  Or contingency.  So to the extent

10  Your Honor is held up on whether the outcome of the Superbowl

11  is an event, I would respectfully submit it is certainly a

12  contingency.

13          THE COURT:  I'm not sure I buy that.  Go ahead,

14  though.

15          MR. BAMBERGER:  Okay.  Well, a contingency is

16  whether something does or does not come to pass.

17          THE COURT:  Yes.

18          MR. BAMBERGER:  Right?  So the winner of the

19  Superbowl is a contingency.  It's contingent on which team wins

20  or doesn't win.

21          THE COURT:  Whether a tornado hits my wheat field, I

22  think, could be a contingency.

23          MR. BAMBERGER:  I think that's also a contingency,

24  Your Honor.

25          THE COURT:  Go ahead.

1          MR. BAMBERGER:  And I make the point that -- you

2    know, you asked the question, well, what if the State were to

3    write a statute that prohibits or tries to regulate as gaming

4    wheat futures trading, right?  The State's already written that

5    statute.  If you look at the definition of sports wagering or

6    sports pools under Nevada law, it extends to sporting events or

7    other events.  And the only thing that has stopped the State

8    for decades from enforcing State gaming law with respect to

9    commodity futures trading or swaps trading, it's two things.

10   It's Federal preemption of those markets and the States'

11   traditional understanding that that's not what they intended to

12   regulate under their sports betting statute.

13          But you have here two statutes, when you look at

14   them, the sports -- the definition of a sports pool under

15   Nevada law and the definition of a swap under Federal law.

16   They're actually very similar, right?  It's staking a sum of

17   money on the outcome of an event and -- under Federal law,

18   under event or contingency.  So the question becomes, how do we

19   decide whether the thing that's happening is an event or a

20   contingency that is subject to Federal regulation?  And I think

21   the statute is quite clear when you look at, it's not just

22   Section 2 of the CEA.  When you look at 7 U.S.C. 7(a)(2) which

23   governs the listing process for contracts, right, that

24   provision of the statute does not refer to swaps; it refers to

25   contracts or other instruments.

1          Now, Congress could have said, when a party lists a

2    swap, the CFTC gets to make a decision, but instead, Congress

3    wrote in that statute that the determination is made with

4    respect to a contract or other instrument.  And, clearly, the

5    framework that was being created there is a framework that an

6    instrument or contract gets listed on a Federal market and then

7    the CFTC decides whether or not that contract or other

8    instrument meets the listing criteria for a DCM.  Is a swap or

9    a commodity future, is it within the scope of the special rule?

10          Respectfully, Your Honor, I think my friends want to

11   raise a question and then essentially have an enforcement

12   proceeding in the context of this case where we go through the

13   details of every single contract that trades on my client's

14   exchange and asks Your Honor -- or if we had not brought this

15   case, asks a State Court judge to make a determination as to

16   whether he or she thinks that it's an event or contingency or

17   an event or contingency with a sufficient commercial

18   consequence.

19          THE COURT:  But circle back to what you said

20   earlier, and that is the sort of historical traditional, the

21   States have never said, we're going into wheat and corn because

22   that's theirs.  Historically, Congress has said, we're not

23   going into gaming.  Gambling has always historically been the

24   States.  And 7(a)(2), the special rule for review and approval

25   of event contracts, 7(a)(2)...  I'm losing track of which sub

1 it is, (d), (c), I can't remember, but --

2          MR. BAMBERGER:  I think it's (c), Your Honor.

3          THE COURT:  Thank you.  It says, "In connection with

4 contracts for certain things, the Commission may determine

5 whether these are contrary to the public interest," and it

6 specifically lists gaming.  So Congress recognizes gaming's

7 different and it may violate public interest and we're going to

8 give it to the CFTC to decide and the CFTC passes a regulation

9 that says, you're right, gaming's out, like terrorism and war,

10 and yet you want to circle it back in because we've posited

11 this to the CFTC and they didn't say no.

12          MR. BAMBERGER:  Right.  And so the way I would

13 answer that question, Your Honor, is twofold.  First, it has

14 actually not always been the case that the States have

15 recognized they didn't have authority over wheat futures, et

16 cetera.  For decades the States --

17          THE COURT:  And that's why it was passed, to stop

18 them.

19          MR. BAMBERGER:  It's a settled question of law now,

20 right?  And it's a settled question of law with respect to

21 those markets, right?  The whole -- the question was settled as

22 to Federally-regulated markets.  So then in 2010 what Congress

23 does is it brings swaps, which are defined extremely broadly,

24 into those markets, the scope of markets that are

25 Federally-regulated.  And then it's very clear, it says, you

Case 2:25-cv-00978-APG-BNW   Document 104   Filed 10/05/25   Page 56 of 67
*2:25-cv-00978-APG-BNW*   *MOTION HEARING*   *10/02/2025*

**56**

1   know what there isn't preemption over in Section 16(e)?  There

2   isn't preemption over trading that's not on a

3   Federally-regulated market.

4           And Congress -- my friend referred to the rulemaking

5   that was enacted that referred specifically to insurance

6   contracts and other commercial contracts.  You know what that

7   rulemaking also makes clear?  A condition of not being subject

8   to regulation as a swap is that the instrument is not traded on

9   a designated market.  That rulemaking itself makes very clear

10  that the CFTC recognizes a distinction, a regulatory

11  distinction, between instruments that are traded on a

12  Federally-regulated market and instruments that are not.

13          And why does it recognize that distinction?  Because

14  it has control over those markets, Your Honor.  If the CFTC

15  doesn't like what we're listing, we are in violation of Federal

16  law.  There is a remedy.  The remedy is just not a remedy under

17  State law that belongs to the Nevada State gaming regulators.

18          And, you know, we've gone back and forth, I think,

19  about the parade of horribles that could follow from Your Honor

20  ruling one way or the other, and I think I would just ask Your

21  Honor to think about this case from the practical context of,

22  how are Federally-regulated markets going to work if every time

23  we list a contract, it's subject to challenge and review in

24  State Court proceedings?

25          Now, it may be in this case Your Honor thinks the

1  State regulators have a point, right?  You may think that we

2  are listing something that we shouldn't list.  I would disagree

3  with you, but it wouldn't be the first time I disagreed with a

4  judge.  And I would recognize that, in your courtroom, I am

5  therefore incorrect.

6          THE COURT:  No, no.  The 9th Circuit disagrees with

7  me all the time.

8          MR. BAMBERGER:  But, Your Honor, the question isn't

9  are we right or wrong, right?  The question is it's a

10  regulatory question, and that's the question that I would ask

11  Your Honor to answer and that we're seeking declaratory

12  judgment on.

13          I hope we've answered, by the way, the question of

14  who gets to decide in our briefing.  I think it's an important

15  question because, going forward with this case -- and through

16  discovery and through discovery, not just with the State, but

17  also with a party that has self-styled itself as a competitor

18  of my client, essentially the gaming industry of the State of

19  Nevada, that in and of itself is an intrusion into the

20  Federally-regulated market that my client is operating in.  If

21  it happens here, it can happen in any State and it can happen

22  with respect to any contract, right?

23          So you may think this one is too far out, but what

24  about the political event contracts that were listed that the

25  CFTC for a time thought shouldn't be listed, the State may -- I

 1   don't know, but the State may still think shouldn't be listed

 2   on a Federally-regulated market?  Are we going to be -- you

 3   know, if we list contracts like that, are we going to be

 4   subject to enforcement jurisdiction in certain States?

 5           What if we structure a contract in a way that a

 6   State objects to and they say, well, that's not really -- I

 7   disagree that that crop future contract is really an event or a

 8   contingency?  Are we going to be subject to State regulation in

 9   that scenario?  I think it will be the destruction of the

10   Federal system for regulation of a national marketplace.

11           So if we haven't answered Your Honor's questions

12   sufficiently in the briefing and today, we'd be happy to

13   provide supplemental briefing.

14           THE COURT:  No, I get it.  It seems my decision is,

15   do I destroy the Federal system of regulation or do I destroy

16   the State systems of regulation?  Each side says calamity and

17   plagues and locusts and cats and dogs living together,

18   everything is going to happen.

19           MR. BAMBERGER:  I hope cats and dogs not living

20   together, Your Honor.

21           THE COURT:  That's an old line.  Some of us remember

22   that one.

23           MR. BAMBERGER:  One thing I would say on that,

24   though, Your Honor, is, if you rule against us and you allow

25   the case to go forward or you ultimately conclude that there is

1  State regulation here, there is no political remedy for that,

2  really, other than going back to Congress and asking them to

3  write a more explicit statute than they've written.

4         THE COURT:  Why isn't that a political remedy?  It

5  is.

6         MR. BAMBERGER:  I mean, good luck getting things

7  through Congress these days, but fair enough.

8         THE COURT:  That's what they're saying, too.

9         MR. BAMBERGER:  But it's different on the other

10 side, Your Honor, right?  If the State thinks that we are

11 listing things we shouldn't be listing, they can, as they are

12 doing, go to the CFTC and say, prevent them from listing these

13 contracts, right?  And if they don't think the CFTC is acting

14 appropriately under the law, there's -- you know, there are

15 elections, there are -- there's, you know, legislation, there's

16 petitions for rulemaking.  The Federal system has a way to deal

17 with an absent Federal regulator.

18        THE COURT:  And like you said earlier, we may have

19 different arguments if this were in a different posture, and

20 one of the issues is the CFTC hasn't said anything on these

21 particular contracts, other than to say, we're not going to say

22 no.  Now, does that mean they're implicitly blessed?  Clearly,

23 that's what you're saying because the statute allows us to

24 self-certify.  If the CFTC certainly said, we've looked at

25 this, it's not gaming or it's allowed gaming or whatever, it

 1  might be a different posture.  Or if they say you can't do it,

 2  then you'd have your answer, so...

 3          MR. BAMBERGER:  Well, actually, think about that

 4  example, Your Honor, though.  If they simply can't do it, then

 5  we have our answer.

 6          THE COURT:  Well, hang on, because that's what

 7  happened in New Jersey or wherever it was where the political

 8  issue and the CFTC said, no, you can't and then the Court

 9  overturned it.  So I guess if they spoke, we'd be back here and

10  one side or the other would be asking me to overturn it again.

11          MR. BAMBERGER:  Yes, although it wouldn't

12  necessarily be the State Gaming Commission on the other side of

13  the table.

14          But think about it this way, Your Honor:  If the

15  CFTC said, no, you can't, then we have our answer, subject to

16  judicial review.  What if the CFTC came in and said, yeah, we

17  think it's fine, in the exercise of our judgment under the

18  statute, right?  The statute says CFTC gets to exercise

19  discretion, not just as to whether it's gaming, but whether

20  it's gaming contrary to public policy.  You know,

21  administrations change.  CFTC, you know, composition of the

22  board changes.  What if the CFTC exercises that discretion and

23  says, you know what?  We're going to allow the listing of

24  contracts that everybody thinks are gaming.  The statute

25  permits them to do that expressly, it expressly gives them that

1   discretion.  Then we would have the Nevada gaming regulators

2   coming in and second-guessing that decision and perhaps the

3   regulators in multiple States and doing it, not under the

4   Federal regime, not saying you mis -- you abused your

5   discretion under Federal law, but saying, well, wait a second.

6   We have our own Nevada statutes that are broad and reach this

7   conduct as well.

8            And there's a direct conflict.  And I come back to,

9   you know, we've laid it out in the papers, I don't think my

10  colleague is correct in her suggestion that our argument is

11  just we don't want to comply with State law.  I've given you

12  some very specific examples of how we can't run a national

13  market and comply with State law because we can't risk pool

14  over state lines and we would have to set up a casino in Nevada

15  to comply with Nevada State gaming regulation.  And so I think

16  there's a direct conflict.

17           I think if you look back at the history of the

18  CFTC's regulation, there's a clear intent to avoid these types

19  of conflicts by taking control of the Federally-regulated

20  market to avoid putting judges like Your Honor in the position

21  of having to make what is essentially a policy decision as to

22  what should and should not be listed.  That's the -- Congress

23  wanted to avoid exactly this.  And so here we are, and the

24  relief that we're asking for is very narrowly tailored to

25  giving effect to that congressional purpose.

 1          That's, I think, what I have for you today, Your

 2   Honor.

 3          THE COURT:  Thank you, Mr. Bamberger.  Let's do

 4   this:  We've been going at it for an hour and a half.  Let's

 5   take a five-minute break, give Judy's fingers a chance to cool

 6   off.  And I want to think a little further on some of these

 7   points.  I'm going to issue a written decision.  The question

 8   is whether I can give you a verbal answer today because I know

 9   things gotta go forward quickly.  So let me think a little

10   further, and we'll recess for about five minutes and come back,

11   and I'll tell you where I'm at.

12          (Recess from 10:59 to 11:10 a.m.)

13          THE COURT:  Thank you for your patience, and let me

14   compliment both sides.  The papers were very good and the

15   arguments today were very good.  These are difficult issues,

16   obviously, and I appreciate the dialogue because it's helped me

17   shape my thinking.  Obviously, I had some preconceived ideas

18   coming in.  Both sides have dissuaded me from some of those

19   thoughts, so that's the whole purpose of argument, in my mind.

20          Here's where I'm at:  Crypto's contracts explicitly

21   refer to outcome.  I see outcome as different than occurrence,

22   non-occurrence, or extent of contingency of occurrence.

23   They're just different things.  If they were all the same,

24   everything would be a swap, and that's not what I think

25   Congress intended or the CFTC intended.  So I don't think -- at

 1    least the papers in front of me that I think were attached to
 2    the Complaint at -- I don't have the -- yep, I do.  Hold on.
 3    ECF Number 1-4 at 3, I think that's one of Crypto's contracts,
 4    explicitly says "outcome," and that, to me, means it's not a
 5    swap and so, therefore, the exclusive jurisdiction of the CFTC
 6    doesn't apply in this situation on Crypto's contracts.

 7           So, therefore, Crypto is not entitled to judgment as
 8    a matter of law, based on what I have in front of me, so I'm
 9    going to deny the motion for judgment on the pleadings.  It
10    also means that I don't see at this stage a likelihood of
11    success on the merits of its case and so, therefore, I'm not
12    going to grant a preliminary injunction.  It's not a final
13    ruling on the case, obviously, it's just preliminary, but
14    that's where I'm at today.  So those two motions will be
15    denied.

16           I will issue a written order.  I will try to get it
17    out quickly because I know you need something to appeal to the
18    9th Circuit.  I'm not offended.  Give me some guidance.  So
19    I'll get an order out as quick as I can, and take up the
20    appeal, I'm sure, just like in the 3rd and 4th Circuits they're
21    looking at there.  But that's at least you have the benefit of
22    my decision right now, and we'll go from there.

23           Anything else I can address right now while you have
24    my attention?

25           MR. BAMBERGER:  Your Honor, just very briefly, given

1  the outcome and the denial of the -- the impending, I guess,

2  denial of the motion for preliminary injunction, I think it's

3  very likely that we do take an appeal, no offense, and I think

4  they are important questions --

5            THE REPORTER:  Slow down.

6            THE COURT:  Slow down.  Judy's gotta keep up.

7            MR. BAMBERGER:  -- important questions, I think,

8  Your Honor, this whole case will become very complicated if,

9  off the back of the Court's decision, the State now proceeds

10  into State Court to take enforcement action while we are

11  seeking that appeal, and so I would ask Your Honor to, I

12  suppose, stay the effect of its order so that we can seek

13  relief from the Circuit.

14            THE COURT:  Let me think about that for a second and

15  tell you this:  As of right now, there's no stay prohibiting

16  the State from doing that.  They have voluntarily agreed, if my

17  recollection is correct, not to prosecute while this issue is

18  pending in front of me.

19            If the State's willing to not prosecute while this

20  is pending on appeal at the 9th Circuit, then I don't need to

21  do that.  So I'm not going to pin anybody down for an answer

22  immediately, but my suggestion is you all ought to talk,

23  because, obviously, if the State goes forward with the

24  prosecution, there's going to be motion practice in the State

25  Court to seek a stay and all that kind of stuff, or wherever

1  it's filed, so it gets even more complicated and more

2  expensive.

3          The parties should talk, see if you can reach an

4  agreement on some kind of stay.  If not, file an emergency

5  motion and I'll consider it.  And we'll brief it on an

6  emergency basis.  So let me do this, too:  If you can't agree

7  on a standstill, a continued standstill, then see if you can at

8  least agree on a briefing schedule for that motion, and that

9  way everybody's calendars are accounted for in terms of how

10  much time you have and need.  It works out better for

11  everybody.  And I'll endeavor to address it as quick as I can,

12  with the assurance that I'm in trial next week, so you're not

13  going to get an answer before Wednesday or Thursday, probably

14  not next week, but do what you can to help each other out.

15          Good question.  Anything further, Mr. Bamberger?

16  Fair question.

17          MR. BAMBERGER:  Thank you, Your Honor.  And just one

18  other, Your Honor.  Just for purposes of figuring out when our

19  time runs from, is the Court's order what you've said today, or

20  is the Court's order the final written order that you'll enter?

21          THE COURT:  Safety would dictate you should start

22  the appeal once I file my written order.  I mean... Yeah, this

23  is my tentative decision right now.  It's going to be a lengthy

24  order.  I've already started outlining kind of where I am, but

25  I need to change a lot of what I was thinking about based upon

1  the arguments today.  So I'll try to get it out right away, but

2  I think, in my mind, your time would start running once I enter

3  the order.

4          Do the defendants have any disagreement with that?

5          MS. SAHARSKY:  That sounds right.

6          THE COURT:  So once the written order is entered,

7  that's when the clock will start ticking, in my mind.

8          MR. BAMBERGER:  Thank you, Your Honor.

9          MS. SAHARSKY:  I just have one question.

10          THE COURT:  Of course.

11          MS. SAHARSKY:  For the sake of completeness, did you

12  want to say anything about the motion to strike?

13          THE COURT:  I'm going to put that in the order, too.

14          MS. SAHARSKY:  Okay.

15          THE COURT:  Yeah, that will all be wrapped up in the

16  order.  I didn't have any questions about that today.

17          Going once, going twice.  Again, well-argued,

18  well-briefed.  Thank you, all.  It's good working with good

19  lawyers.  I really appreciate it.  We're in recess on this

20  matter.

21          (Proceedings concluded at 11:16 a.m.)

22

23

24

25

0

* * *

COURT REPORTER'S CERTIFICATE

I, Judy K. Moore, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, do certify that pursuant to 28 U.S.C. § 753, the foregoing is a true, complete, and correct transcript of the proceedings had in connection with the above-entitled matter.

DATED:  ^ Date

/s/ Judy K. Moore_____
Judy K. Moore, CRR, RMR
Official Court Reporter
United States District Court
District of Nevada