| | |
|---|---|
| Shay Dvoretzky (*pro hac vice*) | Bradley Austin |
| Parker Rider-Longmaid (*pro hac vice*) | Nevada Bar No. 13064 |
| Sylvia O. Tsakos (*pro hac vice*) | baustin@swlaw.com |
| SKADDEN, ARPS, SLATE, | SNELL & WILMER |
|   MEAGHER & FLOM LLP | 1700 South Pavilion Center Drive, Suite 700 |
| 1440 New York Avenue NW | Las Vegas, NV 89135 |
| Washington, DC 20005 | Telephone: (702) 784-5247 |
| Telephone: (202) 371-7000 | |
| shay.dvoretzky@skadden.com | David Meister (*pro hac vice*) |
| parker.rider-longmaid@skadden.com | Robert A. Fumerton (*pro hac vice*) |
| sylvia.tsakos@skadden.com | Judith A. Flumenbaum (*pro hac vice*) |
| | SKADDEN, ARPS, SLATE, |
| Nowell D. Bamberger (*pro hac vice*) |   MEAGHER & FLOM LLP |
| Matthew C. Solomon (*pro hac vice*) | One Manhattan West |
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | New York, NY 10001 |
| 2112 Pennsylvania Avenue NW | Telephone: (212) 735-3000 |
| Washington, DC 20037 | david.meister@skadden.com |
| Telephone: (202) 974-1500 | robert.fumerton@skadden.com |
| nbamberger@cgsh.com | judy.flumenbaum@skadden.com |
| msolomon@cgsh.com | |

*Attorneys for North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| North American Derivatives Exchange, Inc. d/b/a Crypto.com \| Derivatives North America, | |
| Plaintiff, | |
| v. | Case No.: 2:25-cv-00978-APG-BNW |
| Mike Dreitzer, in his official capacity as Chairman of the Nevada Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada Gaming Control Board; Chandeni K. Sendall, in her official capacity as a Member of the Nevada Gaming Control Board; the State of Nevada on relation of the Nevada Gaming Control Board; Aaron D. Ford, in his official capacity as Attorney General of Nevada, | **PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER**<br><br>**ORAL ARGUMENT REQUESTED** |
| Defendants. | |

Plaintiff North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America ("CDNA") respectfully moves for a protective order prohibiting the State Defendants and the Intervenor from seeking discovery in this case.[1] The claims asserted and relief sought raise only questions of law, not fact—as does the pending appeal to the Ninth Circuit from the District Court's Order dated October 14, 2025, ECF No. 105 (the "Order"). Any discovery sought by Defendants would be irrelevant to any claim or defense and not proportional to the needs of the case. Good cause exists pursuant to Federal Rule of Civil Procedure 26(c)(1) to issue a protective order to shield CDNA from the prejudice and harm of unnecessary discovery.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

The Court should issue a protective order prohibiting discovery in this case. Under controlling Ninth Circuit authority, where a case involves pure legal questions, a protective order preventing a party from conducting discovery is appropriate. *See Travers v. Shalala*, 20 F.3d 993, 995 (9th Cir. 1994). Here, the District Court's Order turned on its holding that CDNA's "event contracts are not 'swaps' falling within the CFTC's exclusive jurisdiction." Order at 2. That is a legal conclusion (one that CDNA is appealing to the Ninth Circuit)—not a fact dispute—and thus discovery is irrelevant and not proportional to the needs of the case. This is true regardless of how the Ninth Circuit decides CDNA's appeal of the District Court's Order. ECF No. 114. If the District Court's holding that Sports Event Contracts fall outside of the scope of CEA preemption is affirmed, there is little if anything to litigate given that preemption serves as the basis for the declaratory and injunctive relief sought by CDNA. Likewise, there would be nothing left to litigate if the District Court's Order is reversed on the grounds CDNA argues because Nevada state gaming

---

[1] "State Defendants" are Mike Dreitzer, in his official capacity as Chairman of the Nevada Gaming Control Board; George Assad, in his official capacity as a Member of the Nevada Gaming Control Board; Chandeni K. Sendall, in her official capacity as a Member of the Nevada Gaming Control Board; the State of Nevada on relation of the Nevada Gaming Control Board; Aaron D. Ford, in his official capacity as Attorney General of Nevada. "Intervenor" is Nevada Resort Association. Together, the State Defendants and the Intervenor are referred to as "Defendants."

2

law would be deemed preempted. The District Court has addressed the legal dispute at the heart of this case, and, with that issue now on appeal, it would be a waste of party and judicial resources to proceed with discovery.

Defendants have refused to consent to a cessation of discovery, claiming they want to advance this litigation expeditiously and complaining about ongoing harm in the state. This is in spite of the fact that (1) CDNA has, in agreement with the State Defendants, ceased all its challenged operations in the state, thereby eliminating all conceivable prejudice or urgency; and (2) Chief Judge Gordon encouraged the parties in *KalshiEX, LLC v. Hendrick* to negotiate a stay. While Defendants may argue that Chief Judge Gordon was referring to a stay of enforcement, not a stay of discovery, the reasoning behind any stay of enforcement applies with equal force to preventing discovery at this stage. And in any event, Kalshi is in a dramatically different position than CDNA as it has not agreed to cease operations in Nevada. There is no justification for Defendants to force all parties into a lengthy and expensive discovery process that is entirely pointless.

In accordance with the Federal Rules of Civil Procedure, "good cause" exists to issue a protective order to "forbid[] the . . . discovery" to "protect [CDNA] . . . from annoyance, embarrassment, oppression, or undue burden or expense" at the hands of Defendants. Fed. R. Civ. P. 26(c)(1).

## BACKGROUND

A. **Procedural History**

    **1. The District Court's Order**

The District Court's Order resolved three related motions brought by CDNA: (1) a motion for a preliminary injunction, (2) a motion for judgment on the pleadings, and (3) a motion to strike. All three proceeded from a central premise that the Commodity Exchange Act ("CEA") affords the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" to approve or disapprove the listing of "a new contract or other instrument" on boards of trade designated as federally regulated contract markets ("DCM"). 7 U.S.C. §§ 2(a)(1)(A), 7a-2(c)(5)(B). CDNA's motions did not ask the District Court to consider or construe *whether* the Sports Event Contracts

3

at issue here were eligible for DCM listing, but rather *who* gets to make that decision—the CFTC, which Congress entrusted with regulatory oversight of the swaps and derivatives markets, or state regulators seeking to apply state gaming law to invalidate the CFTC's listing decisions.

Chief Judge Gordon's Order held that the "plain and unambiguous language [of Section 2 of the CEA] grants the CFTC exclusive jurisdiction over accounts, agreements, and transactions involving swaps or contracts of sale of a commodity for future delivery" traded on a CFTC-designated exchange. Order at 10. Chief Judge Gordon further noted that even "[a]bsent an express preemption clause, federal law may preempt state law where Congress has occupied the field or where state laws conflict with federal law." *Id.* at 9. But the Order stated that the field of DCM regulation Congress intended to occupy does *not* include listings and transactions on DCMs that do not meet the Court's interpretation of the statutory definition of "swaps." *See id.* Under the District Court's interpretation, the word "event" as used in the CEA's definition of "swap" did not include "outcomes." *Id.* at 15. The District Court concluded that CDNA's Sports Event Contracts were not swaps as a matter of law because they "turn[ed] on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event." *Id.* As a result, the District Court held that the preemptive effects of the CEA did not and could not apply to these products. *Id*. at 16. Based on that holding, the Court denied a preliminary injunction due to a failure to demonstrate a likelihood of success on the merits and likewise denied the motion for judgment on the pleadings. *Id.*

**2. CDNA Ceases the Challenged Activity in Nevada and Appeals to the Ninth Circuit**

Following the issuance of the Order, on October 24, 2025, the parties filed a notice to the District Court indicating they had reached an agreement that obviated the need for interim relief pending CDNA's appeal. ECF No. 110. The basis of that agreement was CDNA's decision to cease offering or accepting Sports Event Contracts to Nevada residents during the pendency of its appeal to the Ninth Circuit.

On November 13, 2025, CDNA appealed the Order to the Ninth Circuit. *See* ECF No. 114.

4

### 3. *KalshiEX, LLC v. Hendrick*

In *KalshiEX, LLC v. Hendrick*, Chief Judge Gordon originally granted a preliminary injunction, concluding that the CFTC had exclusive jurisdiction over contracts listed on a DCM, so Nevada state gaming law was preempted. 2:25-cv-00575-APG-BNW, ECF No. 45. On November 25, 2025, Chief Judge Gordon dissolved Kalshi's preliminary injunction due to "new arguments, facts, and law develop[ing]" but admitted that since this is a "a novel and evolving area of the law," the "circumstances may change yet again." 2:25-cv-00575-APG-BNW, ECF No. 237 at 4. Chief Judge Gordon also noted that Kalshi "raised serious questions about how to properly interpret the statutory language, to divine congressional intent, and to resolve the tension between what constitutes state-regulated gambling versus federally regulated derivatives" and that "[t]he issues in this and similar cases are complex, novel, and evolving." *Id.* at 24.

Kalshi has moved for an emergency stay of the dissolution order pending appeal. 2:25-cv-00575-APG-BNW, ECF No. 238. State Defendants responded, stating they would "not commence enforcement proceedings against Kalshi while the Court considers Kalshi's request for a stay pending appeal." 2:25-cv-00575-APG-BNW, ECF No. 242 at 1. Chief Judge Gordon ordered the Defendants and Intervenor to respond to Kalshi's emergency stay motion on December 8, 2025, and Kalshi to file a reply in support of its motion on December 12, 2025. 2:25-cv-00575-APG-BNW, ECF No. 243.

### B. Discovery Sought by Defendants

On August 28, 2025, the parties submitted a Discovery Plan and Scheduling Order, ECF No. 56 ("Discovery Plan"), in which they set forth separate positions on discovery. This Court adopted Defendants' proposed discovery deadlines in the Discovery Plan, but invited CDNA to make a motion to stay discovery. Discovery Plan at 8.

On September 24, 2025, State Defendants initially submitted their First Set of Requests for Production ("RFPs") to CDNA, attached here as Exhibit 1 to the Declaration of Robert A.

5

Fumerton ("Fumerton Decl."), that included 27 standalone requests.[2] While all of the State Defendants' requests are irrelevant to the legal issues in this case, many of them are entirely unrelated to those issues. By way of example only, RFPs 1 through 3 request communications with federal regulators that have nothing to do with the question of whether event contracts are swaps. Ex. 1 at 7. RFP 6 requests documents regarding "institutional market makers" related to "Crypto.com's Market Maker Programme or VIP Programme," even though CDNA is not responsible for and does not operate these programs associated with Crypto.com's cryptocurrency exchange. *Id.* RFP 8's request for CDNA's "business model, revenue generation, and profitability" and RPF 9's request for information about age restrictions also have no conceivable relevance to the question of whether event contracts are swaps. *Id.* at 8.

CDNA submitted its Responses and Objections to the State Defendants' RFPs, attached here as Exhibit 2, noting that "Discovery in this Action is inappropriate and unnecessary because the claims asserted and relief sought raise only questions of law not of fact and accordingly, Defendants' Requests seek information not relevant to any claim or defense and not proportional to the needs of the case." Ex. 2 at 1. Even so, in response to State Defendants' RFPs, CDNA has produced 1023 pages of material to date, while expressly reserving on its responses and objections to the RFPs. *See* Fumerton Decl. at ¶ 6.

On November 17, 2025, the Intervenor submitted its First Set of Requests for Production to CDNA, attached here as Exhibit 3, that included 39 standalone requests and its First Set of Interrogatories to CDNA, attached here as Exhibit 4, that included 21 interrogatories. Like the State Defendants' requests, all of the Intervenor's discovery requests are irrelevant to the legal issues in the case and most are entirely unrelated to the case. Simply by way of example, the Intervenor's RFPs request documents regarding "Crypto.com's business model, revenue generation, and profitability," which has nothing to do with the issues in this case regarding CDNA. Ex. 3 at 12. In addition, by way of further example, the Intervenor's interrogatories

---

[2] Pursuant to LR 26-6, the text of the discovery originally sought and responses thereto are attached to the Fumerton Declaration as Exhibits 1-4.

6

request details of every single event contract that "Crypto.com has made available to Nevadans." Ex. 4 at 6. CDNA has not yet responded to the Intervenor's RFPs or interrogatories as a response is not due for several weeks under the Federal Rules.[3]

### C. The Meet-and-Confer Process

Before filing this motion, CDNA sought to avoid unnecessary motion practice by explaining to Defendants that the dispute involved a purely legal issue and discovery could be entirely avoided. CDNA first set forth its position that discovery is unnecessary in the Discovery Plan and in its Responses and Objections to State Defendants' First Set of Requests for Production. *See, e.g.*, Discovery Plan at 3; Ex. 2 at 1. And pursuant to Local Rule 26-6(c), CDNA also "made a good faith effort to meet and confer as defined in LR IA 1-3(f) before filing the motion."

The parties' meet and confer occurred on November 24, 2025. In accordance with LR 26-6(c), CDNA has included with this motion "a declaration setting forth the details and results of the meet-and-confer conference" about the disputed discovery. *See* Fumerton Decl. at ¶¶ 9-18. Although all participants made a "good-faith effort to meet and confer" by "communicat[ing] directly and discuss[ing] in good faith the issues" and engaging in "direct dialogue and discussion" via this video conference, the parties reached an impasse. *See* LR 26-6 and LR IA 1-3(f); Fumerton Decl. at ¶ 17.

As a result of the parties' impasse, CDNA filed this motion.

### ARGUMENT

Federal Rule of Civil Procedure 26(c)(1) provides that "[a] party . . . may move for a protective order in the court where the action is pending" and "[t]he court may, for good cause, issue an order to protect a party . . . from annoyance, embarrassment, oppression, or undue burden or expense, including . . . forbidding the disclosure or discovery." Trial courts "have substantial latitude to fashion protective orders." *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d

---

[3] On November 20, 2025, CDNA also submitted its own requests for production to State Defendants and the Intervenor. *See* Fumerton Decl. at ¶ 8. CDNA expressly served those discovery requests only in case CDNA's motion here is not granted and without prejudice to its position that discovery should not proceed. *Id.*

1206, 1211 (9th Cir. 2002) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)); *see also Brower v. McDonald's Corp.*, No. 2:19-CV-02099-GMN-BNW, 2021 WL 3573633, at *1 (D. Nev. May 28, 2021) (Weksler, M.J.) ("The Court has wide discretion to determine what constitutes good cause."). For a protective order to issue there must be (1) a "specific prejudice or harm [that] will result if no protective order is granted" and (2) a balance of "public and private interests" that weighs in favor of the order. *Phillips*, 307 F.3d at 1210-11.

### A. Good Cause Exists to Issue a Protective Order to Protect CDNA from the Prejudice and Harm of Irrelevant Discovery

CDNA would face substantial prejudice and harm if required to move forward with discovery. A showing of prejudice and harm "can be met by showing that the sought after discovery is irrelevant" because "[t]he compulsion of production of irrelevant information is an inherently undue burden for which a protective order may issue." *Carrera v. First Am. Home Buyers Prot. Co.*, No. 13-CV-1585-BAS JLB, 2014 WL 3695403, at *1 (S.D. Cal. July 23, 2014) (citation omitted). The Federal Rules mandate that "the court must limit the frequency or extent of discovery otherwise allowed . . . if it determines that . . . the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii). Rule 26(b)(1) in turn defines the scope of discovery as nonprivileged relevant material that is "proportional to the needs of the case, considering . . . whether the burden or expense of the proposed discovery outweighs its likely benefit."

In cases that involve purely legal questions, as here, discovery is irrelevant, and a court may grant a motion for a protective order preventing a party from conducting such unnecessary discovery. *See, e.g.*, *Travers*, 20 F.3d at 995 (affirming district court's grant of protective order preventing party "from conducting discovery on the ground that the issues raised in the [opposing party's] motion involved pure legal questions"); *see also Doherty v. Wireless Broad. Sys. of Sacramento, Inc.*, 151 F.3d 1129, 1131 (9th Cir. 1998) (recognizing that "[t]he district court concluded that Pacific did not need to undertake discovery because the issue in this case involved a purely legal question"); *Saavedra v. Eli Lily & Co.*, No. 2:12-CV-9366-SVW-MAN, 2013 WL 12133834, at *2 (C.D. Cal. May 1, 2013) (denying request for additional discovery prior to

summary judgment because inquiry was "a purely legal question for which no discovery is required"). Where "the relevance of the discovery sought is *not* apparent, then the party seeking discovery bears the burden of establishing the relevance of the request." *SFR Inv. Pool 1, LLC v. NewRez LLC*, No. 2:22-CV-00195-JCM-BNW, 2022 WL 17261855, at *1 (D. Nev. Nov. 29, 2022) (Weksler, M.J.) (emphasis in original).

      CDNA's case and the Order are predicated entirely on purely legal issues. The District Court's Order involves two related and controlling questions of law: (1) whether the preemptive effects of the CEA extend to all event contracts listed on federally-regulated DCMs given the CEA's comprehensive regulatory scheme governing those markets and its vesting of authority over them with the CFTC, and (2) whether CDNA's Sports Event Contracts are "swaps" as defined by the CEA in any case. On the first question, the District Court found it has "authority to interpret the CEA, including its definition of 'swap.'" Order at 10. The District Court did not otherwise address CDNA's argument that even allowing state regulators like the State Defendants to apply state law to event contracts listed on a DCM undermines the CFTC's exclusive jurisdiction over the contract listing process and Congress's clear intent to preempt the field of regulating listing decisions and transactions on DCMs. The District Court then proceeded to the second question and found that CDNA's Sports Event Contracts are not "swaps" as defined by the CEA. *Id.* at 15-16. The District Court's answers to these questions were dispositive for both motions. *Id.* at 20-21.

      These preemption and statutory interpretation questions are "questions of law" that the Ninth Circuit will resolve in a manner that dictates the ultimate outcome of the case. The District Court's conclusion that "event" as used in the CEA's definition of "swap" does not include the outcome of sports events is one of pure statutory interpretation. *In re Mitchell*, 977 F.2d 1318, 1320 (9th Cir. 1992) ("[S]tatutory construction . . . is a pure question of law."); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 389 (2024) (describing court's interpretation of a statutory term as implicating a "pure legal question"). Similarly, the existence and scope of federal preemption is also "a purely legal question." *See In re Bard IVC Filters Prod. Liab. Litig.*, 969 F.3d 1067, 1073 (9th Cir. 2020); *see also Bennett v. United States*, No. C20-5382 BHS, 2021 WL

9

4902485, at *2 (W.D. Wash. Aug. 31, 2021) (finding question of federal preemption was a controlling question of law for purposes of interlocutory review).

A decision by the Ninth Circuit on (a) whether Sports Event Contracts are "swaps" under the CEA, or (b) whether the answer to that question need even be reached to determine whether state law is preempted here, will turn entirely on these legal issues. If the Ninth Circuit agrees with the District Court that CDNA's Sports Event Contracts are not "swaps" under the CEA and thus fall outside both the CFTC's exclusive jurisdiction and the scope of CEA preemption, there is little else to argue given that preemption serves as the basis for the declaratory and injunctive relief sought by CDNA. On the other hand, if the Ninth Circuit determines the District Court erred in its interpretation of the CEA's definition of "swap" and that CDNA's Sports Event Contracts meet that definition, then, under the District Court's Order, they fall into the CFTC's exclusive jurisdiction, and Nevada state gaming law is preempted from applying to them. *See* Order at 10. The Ninth Circuit similarly could reach the ultimate preemption question—including by holding that preemption applies regardless of the answer to the question of whether CDNA's Sports Event Contracts are swaps. In any case, the ultimate holding on preemption from the Ninth Circuit would be dispositive of the outcome in this case. Any of these outcomes would be controlling.[4]

As it stands, the Order leaves no basis for discovery—the District Court's interpretation of the CEA forecloses any factual arguments that would change its conclusion that preemption under the CEA does not apply to CDNA's Sports Event Contracts. Attempts to pursue burdensome discovery are thus likely to be met with motions practice, resulting in needless litigation over issues that will soon be clarified by the Ninth Circuit in any event. At time of filing, State Defendants

---

[4] Moreover, due to State Defendants' sovereign immunity, CDNA would also suffer prejudice and harm because it would have no recourse for any unnecessary costs spent in litigation, including the substantial costs entailed in discovery—even though the Ninth Circuit's opinion will resolve the entire case as a matter of law. *See California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012) (finding irreparable harm when plaintiffs "can obtain no remedy in damages against the state because of the Eleventh Amendment").

have propounded 27 broad requests for production, ranging from intrusive requests about CDNA's business model and profitability, age restrictions for the use of CDNA's event contracts, and CDNA's partnership with a fantasy sports company. *See* Ex. 1 at 8-9. And the Intervenor has propounded an additional 38 broad requests for production and 21 interrogatories. *See* Exs. 3 & 4. Responding to these irrelevant requests "is an inherently undue burden" which CDNA should not be forced to shoulder. *Carrera*, 2014 WL 3695403, at *1 (citation omitted).

Importantly, CDNA's request here is distinct from Kalshi's motion to stay discovery in *KalshiEX, LLC v. Hendrick*. *See* Plaintiff's Emergency Motion to Stay Discovery, *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575 (D. Nev. Aug. 1, 2025), Dkt. No. 87. CDNA, unlike Kalshi, has ceased offering or accepting Sports Event Contracts to Nevada residents during the pendency of the appeal, and thus there is no possible prejudice to Defendants in halting discovery at this stage. And even in *KalshiEX, LLC v. Hendrick*, Chief Judge Gordon has encouraged the parties to negotiate a stay:

> I will tell you, in all candor, as I sit here now, I'm leaning towards dissolving the [preliminary] injunction, and that's why what I want you to do is talk about a potential stay. In a sense, at worst, I'm giving you the stay right now by not issuing a decision if I dissolve. If I don't dissolve, there's no need for the stay. . . . But I want you all to talk about ramifications -- whether or not you can reach an agreement on a stay if I dissolve with my order.

Hearing Transcript at 109:20-110:3, No. 2:25-cv-00575-APG-BNW (Nov. 14, 2025). The reasoning behind a stay—i.e., seeking resolution on these purely legal issues without prejudicing either party—applies equally to preventing discovery here as well.

In light of the purely legal question that is live in the case, issuing a protective order would protect CDNA from the substantial prejudice and harm in responding to irrelevant discovery that is not proportional to the needs of the case.

**B. Public and Private Interests Weigh in Favor of a Protective Order**

A balance of "public and private interests" also weighs in favor of the protective order. *Phillips*, 307 F.3d at 1210-11. First, Defendants would suffer no damage from cessation of discovery since neither outcome of the Ninth Circuit's opinion will require discovery. In other words, "no amount of discovery" would affect Defendants' defense either way. *Ningbo Yituo*

*Enter. Mgmt. Co. v. GoPlus Corp.*, No. 5:24-CV-02548-SHK, 2025 WL 1421394, at *5 (C.D. Cal. Apr. 10, 2025) (ruling on motion without discovery because issue was "purely legal question" and "no amount of discovery would save [party's] claim"); *see also Youngevity Int'l, Corp. v. Smith*, No. 16-CV-704 BTM (JLB), 2017 WL 4777318, at *6 (S.D. Cal. Oct. 23, 2017) (where requested discovery was "not proportional to the needs of this case as it will not resolve the issues in this case and would be unduly burdensome," the "potential harm" to party from whom discovery was sought "outweighs any other private or public interests"). Moreover, avoiding unnecessary, irrelevant discovery would serve the public interest by preserving judicial resources that could be taken up by motion practice associated with that discovery.

The parties in the case have also reached an agreement that obviates the need for interim relief regarding enforcement pending appeal, the basis of which was CDNA's decision to cease offering or accepting Sports Event Contracts to Nevada residents during the pendency of its appeal to the Ninth Circuit. *See* ECF No. 110. Thus, the current state of affairs is that no CDNA Event Contracts are being offered in the State, and thus there is no public or private interest or urgency involved related to the ongoing activity.

## CONCLUSION

For the foregoing reasons, the Court should issue a protective order prohibiting discovery in this case. In the event that the Court denies this motion, CDNA reserves the right to seek relief on Defendants' specific requests, many of which have no conceivable relevance to the issues in the case.

Dated this 1st day of December, 2025.

/s/ *Bradley Austin*
Bradley Austin
Nevada Bar No. 13064
SNELL & WILMER
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135
Telephone: (702) 784-5247

David Meister *(pro hac vice)*
Robert A. Fumerton *(pro hac vice)*
Judith A. Flumenbaum *(pro hac vice)*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

Shay Dvoretzky *(pro hac vice)*
Parker Rider-Longmaid *(pro hac vice)*
Sylvia O. Tsakos *(pro hac vice)*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
Telephone: (202) 371-7000

Nowell D. Bamberger (*pro hac vice*)
Matthew C. Solomon (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 974-1500

*Attorneys for North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America*

# CERTIFICATE OF SERVICE

I certify that on December 1, 2025, I electronically filed the foregoing document with the Clerk of Court for the United States District Court, District of Nevada by using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated December 1, 2025

                                                  */s/ Lyndsey Mosbey*
                                                  Snell & Wilmer L.L.P.